# In the United States Court of Appeals for the First Circuit

BEAN MAINE LOBSTER, INC; MAINE LOBSTERMEN'S ASSOCIATION; MAINE COAST FISHERMEN'S ASSOCIATION, INC.; MAINE LOBSTER AND PROCESSING, LLC, d/b/a Atwood Lobster, LLC; BUG CATCHER, INC.,
*Plaintiffs-Appellees*

*v.*

MONTEREY BAY AQUARIUM FOUNDATION,
*Defendant-Appellant.*

*On Appeal from the United States District Court for the District of Maine
No. 2:23-cv-00129 (Hon. John A. Woodcock, Jr.)*

## BRIEF OF DEFENDANT-APPELLANT

<table>
<tr>
<td>

RUSSELL B. PIERCE, JR.
NORMAN, HANSON & DETROY, LLC
  *220 Middle Street, P.O. Box 4600*
  *Portland, ME 04112*
  *(207) 774-7000*
  *rpierce@nhdlaw.com*

</td>
<td>

LISA S. BLATT
  *Counsel of Record*
JOSEPH M. TERRY
AMY MASON SAHARIA
NICHOLAS G. GAMSE
CLAIRE R. CAHILL
EDWARD L. PICKUP
HAROLD W. HILD
WILLIAMS & CONNOLLY LLP
  *680 Maine Avenue SW*
  *Washington, DC 20024*
  *(202) 434-5000*
  *lblatt@wc.com*

</td>
</tr>
</table>

# CORPORATE DISCLOSURE STATEMENT

In accordance with FRAP 26.1(a), Monterey Bay Aquarium Foundation states that it is a nonprofit corporation, incorporated under the laws of the State of California with its principal place of business in Monterey, California. There are neither parent corporations nor publicly held corporations owning 10% or more of stock or an ownership interest in Monterey Bay Aquarium Foundation.

Respectfully submitted,

*/s/ Lisa Blatt*
LISA S. BLATT

JANUARY 28, 2026

i

**TABLE OF CONTENTS**

Page

INTRODUCTION .................................................................................................1

STATEMENT OF JURISDICTION ....................................................................4

STATEMENT OF THE ISSUES ..........................................................................5

STATEMENT OF THE CASE .............................................................................6

    A.    Factual Background ...............................................................................6

        1.    *The endangered right whale* .........................................................6

        2.    *The Aquarium's Seafood Watch Report* ...............................11

    B.    Procedural History .............................................................................15

        1.    *The complaint* ...........................................................................15

        2.    *The district court's orders* .......................................................18

STANDARD OF REVIEW ..................................................................................22

SUMMARY OF ARGUMENT.............................................................................23

ARGUMENT .......................................................................................................27

I.    The Group-Defamation Rule Bars Plaintiffs' Claims ...........................27

    A.    Statements About Large Groups Are Not Actionable .................28

    B.    The Group-Defamation Rule Squarely Applies Here...................33

II.    The Statements Are Nonactionable Opinions Within an Ongoing Scientific Debate.................................................................................41

    A.    Scientific Conclusions Are Protected Opinions ...........................41

    B.    The Aquarium's Statements Are Protected Scientific Opinions..........................................................................................47

III.    Maine's Anti-SLAAP Statute Bars Plaintiffs' Claim............................56

    A.    The Aquarium's Statements Are Petitioning Activity.................58

    B.    The Aquarium's Statements Had Ample Factual Basis...............62

CONCLUSION....................................................................................................68

**TABLE OF AUTHORITIES**

Page

**CASES**

*Abramson v. Pataki*, 278 F.3d 93 (2d Cir. 2002) ...................................................31

*AIDS Counseling & Testing Ctrs. v. Grp. W Television, Inc.*,
   903 F.2d 1000 (4th Cir. 1990) ...................................................32, 41

*Ajay Nutrition Foods, Inc. v. FDA*,
   378 F. Supp. 210 (D.N.J. 1974), *aff'd*, 513 F.2d 625 (3d Cir. 1975) ........28, 39

*Alexis v. District of Columbia*, 77 F. Supp. 2d 35 (D.D.C. 1999) ....................32

*Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996 (3d Cir. 1994) ..........32

*Am. Sch. of Magnetic Health v. McAnnulty*, 187 U.S. 94 (1902) ....................44

*Arcand v. Evening Call Publ'g Co.*, 567 F.2d 1163 (1st Cir. 1977) .........*passim*

*Arthur v. Offit*, 2010 WL 883745 (E.D. Va. Mar. 10, 2010) ........................47, 52

*Barger v. Playboy Enters., Inc.*,
   564 F. Supp. 1151 (N.D. Cal. 1983),
   *aff'd*, 732 F.2d 163 (9th Cir. 1984) ...................................................33

*Blatty v. N.Y. Times Co.*,
   42 Cal. 3d 1033, 728 P.2d 1177 (Cal. 1986) ...................................................30

*Caron v. Bangor Publ'g Co.*, 470 A.2d 782 (Me. 1984) ...............................41, 43

*Cassava Scis., Inc. v. Bredt*,
   2024 WL 1347362 (S.D.N.Y. Mar. 28, 2024) .............................................47, 56

*Cheng v. Neumann*, 51 F.4th 438 (1st Cir. 2022) ........................................40, 51

*Cole v. Chandler*, 752 A.2d 1189 (Me. 2000) ...................................................28

*Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517 (1st Cir. 2023) ....................*passim*

*CrossFit, Inc. v. Nat'l Strength & Conditioning Ass'n*,
   2016 WL 5118530 (S.D. Cal. Sept. 21, 2016) ...........................................55

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ........................43

*Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers
   Local Lodge 207 v. Raimondo*, 18 F.4th 38 (1st Cir. 2021) ..........................6

*Eastwood v. Holmes*, 175 Eng. Rep. 758 (1858) ...................................................28

*Emerito Estrada Rivera-Isuzu de P.R., Inc. v. Consumers Union of
   U.S., Inc.*, 233 F.3d 24 (1st Cir. 2000) ...................................................29

*Farrell v. Triangle Publ'ns, Inc.*, 399 Pa. 102, 159 A.2d 734 (Pa. 1960) ..........29

*First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765 (1978) ...............................52

*Florio v. Gallaudet Univ.*, 119 F.4th 67 (D.C. Cir. 2024) ...............................31

Cases—continued:

*Franchini v. Investor's Bus. Daily, Inc.*, 981 F.3d 1 (1st Cir. 2020)...........5, 21

*Freyd v. Whitfield*, 972 F. Supp. 940 (D. Md. 1997) ..........................................45

*Gaudette v. Davis*, 160 A.3d 1190, 1200 (Me. 2017)......................................59, 61

*Gaudette v. Mainely Media, LLC*, 160 A.3d 539 (Me. 2017) ...........................61

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) .............................................40

*Godin v. Schencks*, 629 F.3d 79 (1st Cir. 2010).................................................57

*Golden N. Airways v. Tanana Publ'g Co.*, 218 F.2d 612 (9th Cir. 1954) ........32

*HipSaver, Inc. v. Kiel*, 464 Mass. 517, 984 N.E.2d 755 (2013) .........................43

*Hudson v. Guy Gannett Broad. Co.*, 521 A.2d 714 (Me. 1987) ....................27, 28

*Ioppolo v. Rumana*, 581 F. App'x 321 (5th Cir. 2014) ......................................50

*Joseph v. Springer Nature*,
2021 WL 1372952 (S.D.N.Y. Apr. 12, 2021),
*aff'd* 2021 WL 6105369 (2d Cir. Dec. 21, 2021) .............................................47

*Judkins v. Buckland*, 149 Me. 59, 98 A.2d 538 (1953) ......................................27

*Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106 (D.C. Cir. 2017) ..............22

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
385 U.S. 589 (1967)..........................................................................................45

*Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298 (2023).......................3

*Ky. Fried Chicken of Bowling Green, Inc. v. Sanders*,
563 S.W.2d 8 (Ky. 1978) ..................................................................................33

*Lester v. Powers*, 596 A.2d 65 (Me. 1991)..........................................................28

*Levinsky's, Inc. v. Wal-Mart Stores, Inc.*,
127 F.3d 122 (1st Cir. 1997) .................................................................22, 42, 44

*Linmark Assocs., Inc. v. Willingboro Twp.*, 431 U.S. 85 (1977) ......................46

*Loe v. Town of Thomaston*, 600 A.2d 1090 (Me. 1991) ......................................44

*Loftus v. Nazari*, 21 F. Supp. 3d 849 (E.D. Ky. 2014) ......................................29

*Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180 (2021).....................................56

*Maietta Const., Inc. v. Wainwright*, 847 A.2d 1169 (Me. 2004) .......................58

*Malone v. WP Co., LLC*, 2023 WL 6447311 (W.D. Va. Sept. 29, 2023) .....51, 56

*Mass. Lobstermen's Ass'n, Inc. v. Menashes*,
127 F.4th 398 (1st Cir. 2025).....................................................................6, 7, 8

*McKee v. Cosby*, 874 F.3d 54 (1st Cir. 2017)......................................................22

Cases—continued:

*Mich. United Conservation Clubs v. CBS News, A Div. of CBS, Inc.*,
665 F.2d 110 (6th Cir. 1981)....................................................................32
*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ....................................54
*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964) ...................................30
*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) .....................61
*Nader v. Me. Democratic Party*, 41 A.3d 551 (Me. 2012) ......................63
*Nat'l Nutritional Foods Ass'n v. Whelan*,
492 F. Supp. 374 (S.D.N.Y. 1980)........................................................29
*Neiman-Marcus v. Lait*, 13 F.R.D. 311 (S.D.N.Y. 1952)........................38
*Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. # 204*,
523 F.3d 668 (7th Cir. 2008)................................................................32
*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
720 F.3d 490 (2d Cir. 2013) ........................................................*passim*
*Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*,
63 F.4th 240 (3d Cir. 2023)..........................................................*passim*
*Pan Am. Sys. v. Atl. Ne. Rails & Ports, Inc.*,
804 F.3d 59 (1st Cir. 2015) ............................................................42, 44
*Phantom Touring, Inc. v. Affiliated Publ'ns*,
953 F.2d 724 (1st Cir. 1992) ................................................................44
*Piccone v. Bartels*, 785 F.3d 766 (1st Cir. 2015)....................................43
*R v. Alme & Nott*, 91 Eng. Rep. 790 (1699) ...........................................28
*Riley v. Harr*, 292 F.3d 282 (1st Cir. 2002).............................................43
*Saad v. Am. Diabetes Ass'n*, 123 F. Supp. 3d 175 (D. Mass 2015)...................47
*Schelling v. Lindell*, 942 A.2d 1226 (Me. 2008)................................57, 58, 59, 61
*Schuster v. U. S. News & World Rep., Inc.*, 602 F.2d 850 (8th Cir. 1979).......32
*Schutzman & Schutzman v. News Syndicate Co.*,
304 N.Y.S. 2d 167 (N.Y. Sup. Ct. 1969) .........................................29, 39
*Serv. Parking Corp. v. Wash. Times Co.*, 92 F.2d 502 (D.C. Cir. 1937) ..........30
*Shire City Herbals, Inc. v. Blue*,
2016 WL 2757366 (D. Mass. May 12, 2016)........................................61
*Steinmetz v. Coyle & Caron, Inc.*, 862 F.3d 128 (1st Cir. 2017) .......................22

Page

Cases—continued:

*Texas Beef Grp. v. Winfrey*,
    11 F. Supp. 2d 858 (N.D. Tex. 1998),
    *aff'd*, 201 F.3d 680 (5th Cir. 2000) ................................................29, 39
*Thomas v. Jacksonville Television, Inc.*,
    699 So. 2d 800 (Fla. Dist. Ct. App. 1997).................................................33, 40
*Thurlow v. Nelson*, 263 A.3d 494 (2021).................................22, 59, 61, 62
*Torrey v. Infectious Diseases Soc'y of Am.*,
    86 F.4th 701 (5th Cir. 2023) ...............................................................*passim*
*Underwager v. Salter*, 22 F.3d 730 (7th Cir. 1994) .........................41, 43, 46, 56
*United States v. Alvarez*, 567 U.S. 709 (2012) ...........................................30
*Waugh v. Genesis Healthcare LLC*, 222 A.3d 1063 (Me. 2019).......................40
*Weatherhead v. Globe Int'l, Inc.*, 832 F.2d 1226 (10th Cir. 1987).....................33
*Weinstein v. Old Orchard Beach Fam. Dentistry*,
    271 A.3d 758 (Me. 2022).................................................................57, 61

**CONSTITUTION, STATUTES, AND REGULATIONS**

U.S. Const. amend. I.................................................................*passim*
16 U.S.C.
    ch. 31.............................................................................................6
    ch. 35.............................................................................................6
    § 1387.........................................................................................6, 7
28 U.S.C.
    § 1291.............................................................................................5
    § 1292.........................................................................................5, 21
    § 1332.............................................................................................4
*Uniform Public Expression Protection Act*, 2023 Me. Laws 1404;
    S.P. 367 – L.D. 870 (April. 13, 2024) ...............................................19
14 M.R.S. § 556 (2023) ...............................................................*passim*
35 Fed. Reg. 18319 (Dec. 2, 1970) .......................................................6
62 Fed. Reg. 39157 (July 22, 1997).......................................................9

Regulations—continued:

72 Fed. Reg. 57104 (Oct. 5, 2007) ........................................................9
86 Fed. Reg. 51970 (Sept. 17, 2021) ...............................................8, 67
89 Fed. Reg. 8333 (Feb. 7, 2024) ........................................................10

## OTHER AUTHORITIES

Nicolas Bagley, Aaron E. Carroll, & Pieter A. Cohen, *Scientific Trials: In the Laboratories, Not the Courts*, 178 JAMA Internal Med. 7 (2018) ..............................................45
Final Environmental Impact Statement, Regulatory Impact Review, and Final Regulatory Flexibility Analysis for Amending the Atlantic Large Whale Take Reduction Plan: Risk Reduction Rule, NMFS, Appx. Vol. III (2021)..............................................................10
Maine Delegation and Governor Mills Oppose New Rule that Will Harm Maine's Lobster Industry, Susan Collins (Aug. 31, 2021), https://perma.cc/9K7Y-YZT5 ......................................................9
*Monitoring and Evaluation System*, Seafood Watch (2017), https://perma.cc/J327-D42M ......................................................60
*North Atlantic Right Whale*, NOAA Fisheries (Jan 6, 2026), https://perma.cc/T33B-JU3G .......................................................6
H.M. Pettis, et al., North Atlantic Right Whale Consortium 2024 Annual Report Card (2025) ..........................................................64
*Our Strategy*, Seafood Watch (2026), https://perma.cc/4THM-ZLK2..............................................11
Record of Decision for the Final Environmental Impact Statement on Amendment to the Atlantic Large Whale Take Reduction Plan, NMFS (2021) (2021 EIS) ...............................................9, 10, 65, 66
Red Listing Monterey Bay Aquarium Act, S. 5067, 117th Cong. (2022)..............................................15, 60
Report on American Lobster in Canada: Northwest Atlantic Pots, MBAF Seafood Watch (Sept. 6, 2022), https://perma.cc/TV6W-YMLF ...........................................12
Restatement (Second) of Torts § 564A (1977)...................31, 35, 37
2 Robert D. Sack, *Sack on Defamation* (5th ed. 2017)...................23

*Seafood Watch Group Lists New England Lobster as Seafood to Avoid Due To Environmental Concerns*, CBS News (Sept. 6, 2022), https://perma.cc/RAH8-986H..................................................................14

## INTRODUCTION

This defamation case concerns the question whether Appellant Monterey Bay Aquarium Foundation, a nonprofit conservation and education organization, can recommend that consumers avoid American lobster.

In a Report drafted by scientists, the Aquarium relied on peer-reviewed research to conclude that lobster fishing in the Northwest Atlantic region—an area off the New England coast—poses a risk to the endangered North Atlantic Right Whale and encouraged consumers to stop buying this lobster. Maine's lobster industry opposed the Report. Although the industry acknowledges that *some* commercial fishing poses a risk to right whales, it denies that lobster fishing off Maine's coast specifically poses any threat. A collection of industry members sued the Aquarium for defamation. Even though the Report does not mention any individual or entity in the lobster fishing industry, the district court held that the Aquarium could be liable for defaming the entire industry.

Foundational defamation principles foreclose Plaintiffs' suit. For more than three centuries, courts have held that speech about an entire industry is

1

not actionable. The rule barring group defamation safeguards speech on myriad issues of public concern, permitting Americans to freely criticize the gun industry for endangering lives, abortion clinics for killing unborn children, the oil and gas industry for polluting the environment, or Big Tech for censoring speech.

The settled group-defamation bar compels dismissal. The Aquarium's statements concern the entire American lobster fishing industry in the Northwest Atlantic, an enormous group that includes all 5,600 lobstermen employed in Maine. The Aquarium did not identify any particular company, much less any individual Plaintiff. Indeed, the Report highlighted that the available information did not identify *which* fisheries put right whales at risk. Although the district court identified no case approving defamation liability for speech about an entire industry (and none exists to the best of our knowledge), the court nevertheless permitted Plaintiffs' suit to proceed on the theory that the Aquarium's industry-wide statements "implicated" each Maine industry member. That novel rule flouts precedent and would dispense with the group-defamation rule altogether, exposing important speech to liability in the process.

The district court independently should have dismissed this suit because the Aquarium's statements are nonactionable scientific opinions. Aquarium scientists drafted the Report in consultation with outside experts and reviewed dozens of scientific papers and regulatory analyses before concluding that lobster fishing in the Northwest Atlantic is presently unsustainable for the right whale. In doing so, the Aquarium contributed to a decades-long scientific debate about the best way to protect the dwindling right whale population. Courts have recognized that similar contributions to scientific debates—from COVID treatment to the existence of extraterrestrial life—are nonactionable because the truth or falsity of contested scientific conclusions are for scientists to resolve, not courts. Those decisions deliver on the First Amendment's guarantee of an "open marketplace in which differing ideas … can compete freely for public acceptance." *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 309 (2023) (citation omitted).

The district court instead invoked the "scientific" and "objective" nature of the statements as a reason to *permit* Plaintiffs' claims to proceed. That approach would put this Court out of step with other circuits and require federal district courts to resolve all sorts of intractable scientific disputes.

3

Finally, and alternatively, the district court should have dismissed this suit as barred by Maine's Anti-SLAPP statute, 14 M.R.S. § 556 (2023). Section 556 requires courts to dismiss claims seeking to hold speakers liable for "petitioning activity" provided speakers have any "reasonable factual support" for their assertions. That text covers the Aquarium's challenged speech. The statements are "petitioning" because they were intended to—and in fact did—draw government attention to the right whale's plight. And the Aquarium had a factual basis given that the Report contained dozens of citations to scientific and regulatory sources substantiating the Aquarium's claims. Evidence that a right whale died in a Maine lobster rope during this litigation further confirms the reasonableness of the Aquarium's scientific assessment. This Court should reverse with instructions to dismiss the complaint.

## STATEMENT OF JURISDICTION

The district court had diversity jurisdiction under 28 U.S.C. § 1332(a). JA19. The district court issued an order denying the Aquarium's motion to dismiss on February 6, 2025. Add.1. The court certified that order for interlocutory appeal on April 15, 2025. JA1928. The Aquarium timely filed its petition for interlocutory appeal on April 25, 2025, and this Court granted that

4

petition on August 12, 2025. This Court has jurisdiction over the interlocutory appeal under 28 U.S.C. § 1292(b). This Court has also jurisdiction under section 1291 over the Aquarium's timely appeal, filed on February 27, 2025, of the district court's February 6, 2025, order denying the Aquarium's motion to dismiss under Maine's Anti-SLAPP law. *See Franchini v. Investor's Bus. Daily, Inc.*, 981 F.3d 1, 6-8 (1st Cir. 2020); JA1916.

## STATEMENT OF THE ISSUES

1.     Whether, as a matter of law, there can be an exception to the group-defamation rule that permits defamation claims based on statements encompassing an entire industry comprising thousands of businesses and individuals.

2.     Whether, as a matter of law, statements based on scientific sources in the context of a public, scientific debate can give rise to a defamation claim.

3.     Whether, under the applicable version of Maine's Anti-SLAPP statute, statements based on numerous sources and intended to raise the profile of an issue to state and federal regulators are "petitioning activity" with "reasonable factual support."

## STATEMENT OF THE CASE

### A. Factual Background

#### 1. *The endangered right whale*

The North Atlantic Right Whale is "highly endangered." *Mass. Lobstermen's Ass'n, Inc. v. Menashes*, 127 F.4th 398, 404 (1st Cir. 2025). Today, only about 380 right whales remain in the world. *North Atlantic Right Whale*, NOAA Fisheries (Jan 6, 2026), https://perma.cc/T33B-JU3G. The right whale's position is so precarious that "even one additional death a year increases the odds that [it] will go extinct." *Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Local Lodge 207 v. Raimondo*, 18 F.4th 38, 41 (1st Cir. 2021). The National Marine Fisheries Service (NMFS), a federal agency, has concluded that the "steep decline" in the right whale population is the result of "human-caused mortality from entanglements in fishing gear and vessel strikes." *Menashes*, 127 F.4th at 404.

To protect the right whale and other marine mammals, Congress in 1972 enacted the Marine Mammal Protection Act. 16 U.S.C. ch. 31. The Act directs NMFS to "develop and implement" so-called "take reduction plan[s]" to safeguard certain protected species—including those, like the right whale, listed under the Endangered Species Act. *Id.* § 1387(f); *see* 16 U.S.C. ch. 35; 35 Fed.

6

Reg. 18319, 18320 (Dec. 2, 1970); *Menashes*, 127 F.4th at 403. Take reduction plans aim to "assist in the recovery or prevent the depletion" of endangered marine mammals by reducing "incidental mortality" from "commercial fishing operations." § 1387(f).

Exercising that authority, NMFS promulgated the first Atlantic Large Whale Take Reduction Plan in 1997 and has amended the Plan over time. JA23. The Plan and its amendments impose measures to reduce the risk of right whale entanglements in commercial lobster-fishing lines. Lobster fishing uses traps on the seabed, "laid out as singles or pairs, or in strings (trawls) with a number of traps attached to a rope." JA21. Traps in turn connect to buoys on the surface with "vertical or buoy lines." JA21. Amendments to the Take Reduction Plan have focused on reducing entanglement danger from these lines, requiring "the use of sinking lines between traps," "the incorporation of 'weak-links'" in buoy lines, and the attachment of more traps to each buoy line to help decrease the amount of "rope in the water." JA23. Maine

separately imposes its own restrictions on lobster fishing in waters exempt from the Take Reduction Plan.  JA25.

Although those measures and others like them initially helped the right whale population recover, the population began to decline again in 2011.  JA23. In 2017, NMFS declared an "Unusual Mortality Event" after observing 17 right whale fatalities—including "many … caused by vessel strikes and entanglements."  86 Fed. Reg. 51970, 51971 (Sept. 17, 2021); JA23.

Fearing that more deaths could push the right whale to extinction, NMFS in 2021 again amended the Take Reduction Plan, imposing "new rules on the lobster … fisheries to reduce entanglement risks to right whales." *Menashes*, 127 F.4th at 404.  The 2021 amendments close off more waters to fishing and mandate additional weak-link rope, gear-marking, and minimum-trap-per-trawl requirements.  86 Fed. Reg. at 51,971.  Supply chain problems, however, delayed implementation of some of these new measures.  Add.34 (citing NOAA Compliance Letter, JA1750); JA1616.

Maine's lobster industry has steadfastly opposed the Take Reduction Plan and its amendments.  The industry and Maine politicians have criticized Plan requirements as unnecessary on the theory that lobster fishing in Maine

poses no threat to the right whale. For example, when NMFS promulgated the first Take Reduction Plan in 1997, one commentor argued that regulatory efforts were "not necessary and … a waste of taxpayers' money" because "there are no whales in Maine waters." 62 Fed. Reg. 39157, 39179 (July 22, 1997). In 2007, another commentor objected that "Maine fishermen are [being] required to compromise to fix a problem they are not causing." 72 Fed. Reg. 57104, 57116 (Oct. 5, 2007). And in 2021, a Plaintiff in this case, the Maine Lobstermen's Association, told NMFS that "imposing new restrictions on the Maine lobster fishery [is] unsupported by the observed evidence of entanglements in Maine gear." Record of Decision for the Final Environmental Impact Statement on Amendment to the Atlantic Large Whale Take Reduction Plan, NMFS 17-18 (2021) (2021 EIS); *see also* Maine Delegation and Governor Mills Oppose New Rule that Will Harm Maine's Lobster Industry, Susan Collins (Aug. 31, 2021), https://perma.cc/9K7Y-YZT5.

Environmental organizations and scientific experts, however, take the opposite view. For instance, in a comment letter regarding the 2021 amendments, a collection of environmental organizations expressed support for additional gear-marking measures to prevent "industry members," including

the "Maine Lobstermen's Association," from continuing "to deny potential risk from their fishery." Environmental Impact Statement, Regulatory Impact Review, and Final Regulatory Flexibility Analysis for Amending the Atlantic Large Whale Take Reduction Plan: Risk Reduction Rule, NMFS Appx. Vol. III 301 (2021). NMFS, too, has recognized that despite the difficulty tying specific entanglements to particular fisheries, safety measures in U.S. waters, including in the Gulf of Maine, are necessary. 2021 EIS at 18. That is because "U.S. fisheries fish many more buoy lines than Canadian fisheries." *Id.*; *see also* 89 Fed. Reg. 8333, 8345 (Feb. 7, 2024) (imposing additional fishing closures off Massachusetts to "reduce mortalities" in an area with "high co-occurrence of right whales and vertical lines").

Recent developments reinforce NMFS's concerns about the risk of whale entanglement in lobster fishing gear in the Northwest Atlantic. In August 2022, days before the Aquarium published the at-issue Report, a right whale was observed to have been "serious[ly] injur[ed]" by entanglement in a fishing rope. JA1681-82. Then, in January 2024, the whale's carcass was discovered in Massachusetts. JA1616. NMFS later determined that the whale, labelled #5120, died due to "chronic entanglement" with a lobster rope that

was "consistent with the rope used in Maine state water trap/pot buoy lines." JA1617-18.

### 2. *The Aquarium's Seafood Watch Report*

The Aquarium's Seafood Watch program encourages consumers to buy "environmentally sustainable" seafood so that their choices can lead to a "healthier ocean." *Our Strategy*, Seafood Watch (2026), https://perma.cc/4THM-ZLK2. Seafood Watch "work[s] directly with farmers, industry leaders, and governments around the world" to help them "improve their practices." *Id.* Seafood Watch also aims to "raise awareness of important ocean conservation issues and empower seafood consumers" by issuing reports and recommendations stating its views on the environmental impact of fisheries. JA54.

Each report is "conducted by Seafood Watch scientists, in collaboration with scientific, government, industry, and conservation experts." JA54. To determine whether seafood from a specific fishery—like American lobster, pink shrimp from the Gulf of Mexico, or white cod from Iceland—should be considered sustainable, Seafood Watch considers a detailed list of factors. Those factors include the "abundance" of the seafood, the impact of fishing on

other species, "management effectiveness," and how fishing affects the "ecosystem." JA4, 13, 19, 44, 58. For each factor, Seafood Watch gives an overall score from zero ("very poor performance") to five ("the fishing operations have no significant impact"). JA58. The resulting total then places the seafood on a rating scale from "Best Choice" (green) to "Avoid" (red). JA58.

In 2022, the Aquarium published 14 Seafood Watch reports evaluating fisheries in the United States and Canada based on available scientific data and existing regulations. The reports found that these fisheries—including American lobster and snow crab fisheries in Canada—pose a risk to the right whale and have insufficient risk-mitigation measures in place. As a result, the Aquarium recommended that consumers avoid seafood caught in the fisheries. *See, e.g.*, Report on American Lobster in Canada: Northwest Atlantic Pots, MBAF Seafood Watch (Sept. 6, 2022), https://perma.cc/TV6W-YMLF.

As part of this series of assessments, the Aquarium published a 73-page Report recommending that consumers avoid American lobster from the United States North Atlantic region. JA57. The Report lists ten pages of references—including both academic literature and government documents—supporting its conclusions. JA115-24. The Aquarium consulted with lobster

12

industry representatives, Maine's governor, and all four members of Maine's congressional delegation before issuing the report. JA1485.

The Aquarium concluded that existing regulations have not "been successful at reducing serious injury and mortality to the North Atlantic right whale." JA56. The Report thus recommended that consumers "Avoid" "American lobster caught by trap from [the] Georges Bank and the Gulf of Maine stocks" fished in the Northwest Atlantic off the New England coast due to "risks to the critically endangered North Atlantic right whale, and insufficient measures for reducing these risks." JA57. For the same reasons, the Report also rated American lobster "from the Southern New England stock" as "Avoid." JA57.

The Report's analysis reflected a cautious approach to a difficult problem. The right whale is endangered, entanglements are a leading cause of death, but it is hard to pinpoint the responsible fisheries. JA92. "Until there is more specific information available regarding which fisheries are responsible," the Report reasoned, "all relevant fisheries that may overlap with [the right whale population] pose risks." JA92. And because existing management measures would (according to government data) take "9 years" to bring right

13

whale mortality to a more sustainable level, Seafood Watch deemed those measures insufficiently protective. JA100. Accordingly, Seafood Watch argued that immediate action was necessary to stave off right whale extinction and recommended that consumers "avoid" American lobster fished in the Northwest Atlantic. JA56-57. The Report does not name a single Maine lobster company or any individual in the industry.

Because the Aquarium sought to "influence consumer decisions" and "spark change throughout the supply chain," JA26, the Aquarium promoted its findings with press releases and media appearances, *see, e.g.*, JA28-29. For instance, the Aquarium issued a press release stating that since "only 12% of entanglements can be linked to a specific location," Seafood Watch considers "all of the fisheries using [certain fishing] gear … a risk." JA36. And in a TV interview, the Aquarium's Vice President of Global Ocean Conservation stated that the Report aimed to get people to "pay attention" to an "important issue" because "[n]o one wants to know their appetite for seafood is driving a species to extinction." *Seafood Watch Group Lists New England Lobster as Seafood to Avoid Due To Environmental Concerns*, CBS News (Sept. 6, 2022), https://perma.cc/RAH8-986H; JA42.

The Report prompted immediate backlash from Maine officials. Two days after the Report's publication, Maine's governor and congressional delegation thanked the Aquarium for its "attention to this incredibly important matter," but criticized the Report as "a reckless piece of activism" and demanded that the red rating be reversed. JA297, 299. Less than a month later, Maine's congressional delegation introduced a bill that would have blocked all federal funding to the Aquarium. Red Listing Monterey Bay Aquarium Act, S. 5067, 117th Cong. § 3 (2022).

## B.   Procedural History

### 1.   *The complaint*

In March 2023, a collection of companies and organizations involved in catching, processing, and selling Gulf of Maine/Georges Bank lobster sued the Aquarium for defamation. Plaintiffs are Bean Maine Lobster, a company selling lobster in Maine; the Maine Lobstermen's Association, a trade organization representing 1,200 of Maine's 5,600 lobster fishermen; the Maine Coast Fishermen's Association, a nonprofit advocating for "the needs of community-based fishermen"; Maine Lobster and Processing, a lobster processing company in Maine; and Bug Catcher, a lobster fishing company operating a

boat in Maine. JA18-19. Again, because the Report does not identify any company or person in the lobster industry, the Report does not mention a single one of these Plaintiffs.

The complaint alleges that the Aquarium "falsely depicted the Maine lobster fishery as being directly responsible for right whale injuries and mortalities." JA15. The complaint further alleges that the "evidence" shows that no "North Atlantic right whale has been harmed—let alone killed—by entanglement in Maine lobster fishing gear in more than 18 years." JA15. According to Plaintiffs, "the real threats to right whales come … from entanglements in Canadian snow crab gear, vessel strikes, climate change, and ocean noise." JA30. In short, Plaintiffs renew in their complaint the same argument that lobster-industry groups have pressed for decades: right whales may be at risk, but Maine's lobster fishermen are not to blame. *See supra* pp. 8-9.

The complaint alleges nine defamatory statements made in either the Report or associated media statements.

   a. "At this time, each fishery using this gear is putting this protected species [*i.e.*, the right whale] at risk of extinction."

b. "No one wants to know their appetite for seafood is driving a species to extinction."

c. "The seafood [rated Avoid] is caught or farmed in ways that harm other marine life or the environment. There's a critical conservation concern or many issues need substantial improvement."

d. "[M]anagement measures and the Atlantic Large Whale Take Reduction Plan have not been successful at reducing serious injury and mortality to the North Atlantic right whale[.]"

e. "Based on the available information and the significant risks to NARW, the American lobster fishery cannot be considered sustainable."

f. "The [Report] highlight[s] significant risks of entanglement in pot, trap, and gillnet fisheries to the endangered North Atlantic right whale and the lack of timely, effective management necessary to mitigate entanglement risks and promote recovery of the species."

g. Seafood Watch reviewed "all available scientific data" and followed a "rigorous, transparent, science-based process to evaluate" the Maine lobster fishery.

h. "According to Seafood Watch standards, when fisheries pose a high risk of harm to marine life or the environment and appropriate management measures are not in place, they are assigned a red rating."

i. Consumers [seeking to purchase sustainable seafood] should "avoid" and "take a pass" on purchasing lobster and lobster products caught in the Gulf of Maine/Georges Bank region.

JA42-43 (emphasis in original). Statements (c), (d), (e), and (i) appear in the Report itself; statements (a), (b), (f), (g), and (h) appear in the media.

The complaint further alleges that the Aquarium's statements harmed Plaintiffs' business by causing a "sharp decline in demand" for their lobsters. JA40-42. Plaintiffs seek damages and an injunction forcing the Aquarium to retract the challenged statements. JA47.

### 2. *The district court's orders*

The Aquarium moved to dismiss, pressing three arguments relevant to this appeal. *See* D. Ct. Dkt. 19. First, the Aquarium argued that the allegedly defamatory statements were not "of and concerning" Plaintiffs because the statements referred to "'Gulf of Maine/Georges Bank' lobster fisheries in general"—a group including all 5,600+ lobstermen employed in Maine. D. Ct.

Dkt. 19 at 30.  Second, the Aquarium contended that the statements were non-actionable opinion, not defamatory assertions of fact, because they expressed "scientific conclusions in the context of a heated scientific and public debate" and were "expressly disclosed as such."  D. Ct. Dkt. 19 at 32.  Third, the Aquarium argued that the then-operative version of Maine's Anti-SLAPP statute barred the claims.  *See* 14 M.R.S. § 556 (2023).[1]  That statute, the Aquarium explained, protects the First Amendment right to petition by providing a mechanism for speedy dismissal of defamation suits like this one that are "based on" petitioning activity.  D. Ct. Dkt. 19 at 34 (citing § 556).

The district court denied the motion.  Add.1.  The court concluded that the Aquarium's statements were "of and concerning" Plaintiffs, even though the statements mention "[n]o individual lobstermen or lobster-industry entities."  Add.104 & n.21.  The court acknowledged that "[d]efamation of a large

---

[1] On April 13, 2024, Maine repealed section 556 and replaced it with a new Anti-SLAPP statute.  *See Uniform Public Expression Protection Act*, 2023 Me. Laws 1404; S.P. 367 – L.D. 870 (Apr. 13, 2024).  Because Plaintiffs filed suit before January 1, 2025, section 556 continues to apply.  *Id.* §§ 3, 7.

group" generally "gives rise to no civil action on the part of an individual member of the group" and that courts routinely apply the group-defamation rule to bar claims challenging speech about groups of "more than 20 or 30 members." Add.104, 106. But the court nonetheless held that "the letter and spirit of the group defamation rule are inapposite here, where the industry-wide nature of the Statements necessarily implicated each and every member of the Plaintiff group." Add.109.

The district court separately held that the Aquarium's statements were actionable statements of fact, not protected opinion. Add. 115. Minimizing the Aquarium's citations to cases holding that scientific conclusions are nonactionable, *see* D. Ct. Dkt. 19 at 31, the court deemed the Aquarium's "objective and scientific" "methodology" a reason to *permit* Plaintiffs' defamation claims to proceed, Add.115. The court reasoned that an ordinary reader might understand the Report's "rigorous, transparent, scienced-based process" to convey "verifiable facts." Add.120 (citation omitted).

The district court also concluded that Maine's Anti-SLAPP statute does not block Plaintiffs' defamation claims. Add.100. The court assumed without deciding that the Aquarium's speech was protected "petitioning activity."

Add.95-96. But the court held that Plaintiffs' claims could proceed because they had shown "at least one of [the Aquarium's] petitioning activities was 'devoid of any reasonable factual support' and 'caused actual injury.'" Add.100.

The Aquarium appealed the court's Anti-SLAPP decision under the collateral order doctrine, *Franchini v. Investor's Bus. Daily, Inc.*, 981 F.3d 1, 6-8 (1st Cir. 2020), and moved for an interlocutory appeal of the group-defamation and scientific-opinion holdings under 28 U.S.C. § 1292(b). D. Ct. Dkt. 64, 65. The district court granted the Aquarium's motion for interlocutory appeal. JA1928. As to group defamation, the court recognized that neither this Court nor any Maine court has permitted defamation claims based on speech concerning an entire "industry." JA1922. As to scientific opinion, the court acknowledged that its order had "extended" existing First Circuit precedent, which does not "settl[e]" whether the Aquarium's statements are actionable. JA1923. The court also granted the Aquarium's motion for a stay pending appeal. JA1928.

This Court granted the Aquarium's section 1292(b) petition and consolidated the two appeals. Order, No. 25-8012 (1st Cir. Aug. 12, 2025). Despite having themselves selected a federal forum, Plaintiffs then moved to certify

questions of law to the Maine Supreme Judicial Court. After the Aquarium opposed that motion, the Court denied certification without prejudice to reconsideration by the merits panel.

## STANDARD OF REVIEW

This Court "review[s] de novo the district court's grant of a motion to dismiss a defamation suit," taking as true the complaint's well-pleaded factual allegations and drawing reasonable inferences in favor of the non-moving party. *McKee v. Cosby*, 874 F.3d 54, 59 (1st Cir. 2017). A district court's decision on a motion to dismiss under Maine's Anti-SLAPP statute is likewise subject to de novo review. *See Steinmetz v. Coyle & Caron, Inc.*, 862 F.3d 128, 136 (1st Cir. 2017); *accord Thurlow v. Nelson*, 263 A.3d 494, 503 (2021).

Where, as here, defamation claims "implicate free speech concerns … appellate judges must" take special care to "examine for themselves" whether the First Amendment protects the at-issue statements. *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 127 (1st Cir. 1997); *accord Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017) (Kavanaugh, J.) ("To preserve First Amendment freedoms … the Supreme Court has directed

courts to expeditiously weed out unmeritorious defamation suits."). Defamation actions are particularly susceptible to early dismissal on the merits because, "unlike in most litigation, in a libel suit the central event—the communication about which suit has been brought—is ordinarily before the judge at the pleading stage." 2 Robert D. Sack, *Sack on Defamation* § 16:2.1 at 16-3 (5th ed. 2017).

## SUMMARY OF ARGUMENT

I. Statements about a group do not support a defamation claim by individual members of that group. The group-defamation rule provides a critical safeguard for free speech about large groups and industries—topics central to American political discourse. Countless federal and state courts have invoked the group-defamation rule to reject claims premised on speech about entire industries.

That rule applies here. The Aquarium's challenged statements concerned the American lobster-fishing industry in the Northwest Atlantic, a group that includes the 5,600+-member Maine lobster industry. That undisputed fact should have ended this case.

The group-defamation rule is subject to just two narrow exceptions: (1) statements about small groups of 25 or fewer; (2) statements about large groups that make specific reference to a particular plaintiff. Neither exception applies here. The Aquarium's statements concerned an industry with thousands of members, not a small group. And none of the Aquarium's statements mention any specific lobster-fishing company, let alone Plaintiffs. To the contrary, the Aquarium stated that there was *no specific information* available about which specific fishermen were responsible for right-whale entanglements.

The district court reached a contrary conclusion only by misreading this Court's precedents to permit liability where "industry-wide" speech "implicates" each industry member. But *all* industry-wide speech necessarily relates to each member. Tellingly, the district court cited no case imposing liability for similar speech about an industry as a whole. The court's outlier holding disregards centuries of case law and threatens to swallow the group-defamation rule altogether.

II. The district court separately erred in holding that the Aquarium's scientific opinions are actionable in defamation. Although this Court has not

yet settled the question, at least three other circuits have held that scientific assertions expressed during an ongoing scientific debate are protected opinions. This Court should adopt that consensus position.

Scientific conclusions on contested topics bear all the hallmarks of protected opinions. For one, because the scientific method demands continuous testing of new theories, readers understand scientific statements to express opinions reflecting current knowledge, not final assertions of definitive fact. For another, scientific claims on subjects about which there is no consensus are not readily verifiable as "true" or "false" by courts. Recognizing that researchers and laboratories are the proper arbiters of scientific disagreements, courts have refused to adjudicate the veracity of statements about contested topics ranging from medical treatment guidelines to the existence of extraterrestrial life. Those decisions protect vital speech, preventing lawsuits from chilling research and undermining academic freedom.

These principles apply with full force here. Regulators, scientists, environmental groups, and lobstermen have for decades debated the impact of lobster fishing on the right whale. The Aquarium contributed to that discourse

by carefully reviewing the scientific literature in consultation with outside experts, acknowledging gaps in the existing data, and concluding that existing conservation measures do not go far enough.  That is a protected opinion.

The district court nonetheless held that the Aquarium's statements were actionable assertions of fact because the court deemed the statements "objective and scientific" and "unqualified."  But the objective and scientific nature of the Aquarium's opinions only underscores why they are protected.  And the Aquarium *did* qualify its statements, expressly disclosing uncertainty about tracing right whale entanglements to specific fisheries.

III.  The applicable version of Maine's Anti-SLAPP law independently compels dismissal.  A claim based on "a party's exercise of its right of petition" may proceed only if the at-issue speech is totally "devoid of any reasonable factual support or any arguable basis in the law."  14 M.R.S. § 556 (2023).

This suit falls within the heartland of section 556.  The Aquarium's statements are "petitioning activity" under the statute's capacious definition because they were "reasonably likely" to encourage government "consideration" of the environmental impact of lobster fishing.  The Aquarium published the Report after years of engagement with officials and aimed to enlist public

participation in drawing further regulatory attention to lobster fishing. And the Aquarium's statements have ample factual basis given the Report's extensive citations to dozens of scientific and regulatory documents establishing that lobster fishing poses serious risks to the right whale. Evidence that a right whale died in 2024 from entanglement with a Maine lobster-fishing rope only confirms the factual support for the Aquarium's statements.

## ARGUMENT

## I.    The Group-Defamation Rule Bars Plaintiffs' Claims

Defamatory speech "must be 'of or concerning the plaintiff.'" *Hudson v. Guy Gannett Broad. Co.*, 521 A.2d 714, 716 (Me. 1987); *accord Judkins v. Buckland*, 149 Me. 59, 65, 98 A.2d 538, 541 (1953). Under the well-established "group defamation" rule, speech about a large group is not "of or concerning" any one member of that group. *See Arcand v. Evening Call Publ'g Co.*, 567 F.2d 1163, 1164 (1st Cir. 1977). That rule forecloses Plaintiffs' claim that the Aquarium defamed everyone involved in fishing for American lobster in the Northwest Atlantic—including all "5,600 lobstermen" employed in Maine's lobster industry. *See* Add.6. The district court's contrary holding dispenses with decades of precedent and raises serious First Amendment concerns. If large groups of plaintiffs from abortion providers to firearms manufacturers

can use defamation suits to attack their critics, the effect will be to chill speech on matters of public concern.

### A. Statements About Large Groups Are Not Actionable

This Court has long recognized as a "guiding principle" that "[d]efamation of a large group gives rise to no civil action on the part of an individual member." *Arcand*, 567 F.2d at 1164. The foundational group-defamation rule is both reflected in the Restatement (Second) of Torts, which Maine follows, and applied by courts nationwide. *See, e.g.*, *Lester v. Powers*, 596 A.2d 65, 69 (Me. 1991) (citing Restatement); *Cole v. Chandler*, 752 A.2d 1189 (Me. 2000) (same); *Hudson*, 521 A.2d at 717 (citing Restatement for "of and concerning" element). Courts have hewed to that approach for more than three centuries. As one early court noted, "[w]here a writing … inveighs … against a particular order of men, as for instance, men of the gown, this is no libel," for it does not "descend to particulars and individuals." *R v. Alme & Nott*, 91 Eng. Rep. 790 (1699); *accord Eastwood v. Holmes*, 175 Eng. Rep. 758, 759 (1858) (all lawyers).

The group-defamation rule stops "an entire industry" from suing "on grounds of defamation." *Ajay Nutrition Foods, Inc. v. FDA*, 378 F. Supp. 210, 218 (D.N.J. 1974), *aff'd*, 513 F.2d 625 (3d Cir. 1975); *accord Nat'l Nutritional*

28

*Foods Ass'n v. Whelan*, 492 F. Supp. 374, 381 (S.D.N.Y. 1980). As a result, "[i]f someone should speak or write defamatorily of all the members of one of the professions, such as the law, medicine, or ministry, no particular lawyer, doctor or minister could maintain a personal action." *Farrell v. Triangle Publ'ns, Inc.*, 399 Pa. 102, 104-05, 159 A.2d 734, 736 (Pa. 1960); *accord Texas Beef Grp. v. Winfrey*, 11 F. Supp. 2d 858, 864 (N.D. Tex. 1998) (cattle industry), *aff'd*, 201 F.3d 680 (5th Cir. 2000); *Loftus v. Nazari*, 21 F. Supp. 3d 849, 854 (E.D. Ky. 2014) ("medical profession" generally); *Schutzman & Schutzman v. News Syndicate Co.*, 304 N.Y.S. 2d 167, 169-70 (N.Y. Sup. Ct. 1969) ("entire legal profession").

Courts have uniformly adopted the group-defamation rule because the First Amendment requires it. As this Court has recognized, "constitutional concerns" animate the "of and concerning" element. *Emerito Estrada Rivera-Isuzu de P.R., Inc. v. Consumers Union of U.S., Inc.*, 233 F.3d 24, 28 (1st Cir. 2000). The group-defamation rule provides a critical safeguard for free speech. The rule guarantees space for "public discussion" about large groups and industries—topics which are more likely to touch on "matters of general concern"—unless a group-wide statement singles out a specific individual.

*Serv. Parking Corp. v. Wash. Times Co.*, 92 F.2d 502, 505-06 (D.C. Cir. 1937); *accord Blatty v. N.Y. Times Co.*, 42 Cal. 3d 1033, 1044, 728 P.2d 1177, 1184 (Cal. 1986).

Public discussion about industry has long been central to American political discourse, from yesterday's robber barons to today's tech giants. Without the group-defamation rule, industry-wide commentary would be a target for speech-chilling defamation suits. Gun manufacturers accused of supplying criminals, coal companies alleged to pollute the environment, abortion providers accused of killing unborn children, vaccine manufacturers accused of causing autism, or jewelers derided as purveyors of blood diamonds could all bring claims. The First Amendment prohibits that result, prioritizing "[t]he interest of the public" in hearing such speech over "the interest of … [any] individual" in any harm to his reputation, *see N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 272 (1964), and instead relying on "speech that is true" to correct "speech that is false," *United States v. Alvarez*, 567 U.S. 709, 727 (2012) (plurality op.).

This bedrock rule is subject to only two limited exceptions, neither of which applies here. The small-group exception permits claims where a defamatory statement applies to all members of a "*small* group" of about 25 or fewer individuals on the theory that it "can be seen as a blanket slur, reaching all." *Arcand*, 567 F.2d at 1164-65. Meanwhile the particular-reference exception allows members of large groups to sue where a defamatory statement makes "particular reference" to a specific individual within the group. *Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517, 530 (1st Cir. 2023).

The Restatement explains that statements about a "group or class" are actionable only if the group is so "small that the matter can reasonably be understood to refer to [each] member" or there is a "particular reference to [a] member." Restatement (Second) of Torts § 564A (1977). Indeed, every federal court of appeals to consider the issue has agreed that a statement concerning a large group cannot give rise to an action by one of its members unless that member is specifically identified.[2] Cases from "state jurisdictions,"

---

[2] *See Florio v. Gallaudet Univ.*, 119 F.4th 67, 76 (D.C. Cir. 2024) (alumni members of the Gallaudet University Kappa Gamma fraternity); *Abramson v.*

too, "evince a consistent rule of thumb … that unnamed group members … will almost invariably not be permitted to sue if the group has more than 100 members." *Alexis v. District of Columbia*, 77 F. Supp. 2d 35, 41 (D.D.C. 1999). Departing from that view would constitute an "eccentric minority position." *Arcand*, 567 F.2d at 1164.

Accordingly, state and federal courts across the country have routinely granted motions to dismiss where the groups involved were far smaller than the thousands of lobster fishermen allegedly targeted by the Aquarium's speech. For example:

---

*Pataki*, 278 F.3d 93, 102 (2d Cir. 2002) ("more than one thousand" Javits Center workers); *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1016 (3d Cir. 1994) ("between 20 and 25" 800-number dealers); *AIDS Counseling & Testing Centers v. Grp. W Television, Inc.*, 903 F.2d 1000, 1005 (4th Cir. 1990) (all investors in an AIDS-testing company); *Mich. United Conservation Clubs v. CBS News, A Div. of CBS, Inc.*, 665 F.2d 110, 112 (6th Cir. 1981) ("more than one million" "Michigan sports hunters,"); *Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. # 204*, 523 F.3d 668, 672 (7th Cir. 2008) (all "homosexuals"); *Schuster v. U. S. News & World Rep., Inc.*, 602 F.2d 850, 854 (8th Cir. 1979) ("hundreds of persons … involved in the sale, distribution, and advocacy of Laetrile"); *Golden N. Airways v. Tanana Publ'g Co.*, 218 F.2d 612, 615, 620 (9th Cir. 1954) ("all non-scheduled air carriers operating in Alaska"); cases cited in bullet list, *infra* p. 33.

- A "group of 955" dog breeders, *Weatherhead v. Globe Int'l, Inc.*, 832 F.2d 1226, 1228-29 (10th Cir. 1987);

- "464 commercial net fishermen," *Thomas v. Jacksonville Television, Inc.*, 699 So. 2d 800, 802, 805 (Fla. Dist. Ct. App. 1997);

- "5,000" KFC franchise restaurants, *Ky. Fried Chicken of Bowling Green, Inc. v. Sanders*, 563 S.W.2d 8, 9 (Ky. 1978);

- "100 to 125" women married to members of the Hell's Angels, *Barger v. Playboy Enters., Inc.*, 564 F. Supp. 1151, 1153-54 (N.D. Cal. 1983), *aff'd*, 732 F.2d 163 (9th Cir. 1984).

**B.    The Group-Defamation Rule Squarely Applies Here**

1. The group-defamation rule bars Plaintiffs' claims, which assert that the Aquarium defamed the entire 5,600+-individual Maine lobster industry. JA42.  Notably, Plaintiffs suggest that the group may be larger still, encompassing "[m]ore than a thousand" young people fishing on student licenses, the holders of "12,000 jobs on the water" and "an additional 6,600 shoreside jobs." JA13.  And Plaintiffs' estimate does not account for all the other lobstermen in Massachusetts, Rhode Island, and New Hampshire who also fish in the Northwest Atlantic.  Plaintiffs have never disputed, then, that the Aquarium's

speech concerned a group or class and is covered by the rule absent an exception.

Neither of the group-defamation rule's two exceptions applies. *First*, statements about the American lobster-fishing industry in the Northwest Atlantic—a group numbering in the thousands—plainly do not fit the small-group exception. This Court has identified two types of actionable statements under this exception: statements about "all members of a small group" and statements about a subset of a small group that give rise to a "high degree of suspicion" about an individual member (*e.g.*, "all but one of a group of 25 are thieves"). *Arcand*, 567 F.2d at 1164 (citation omitted). The Aquarium's statements fit neither category because the group at issue is simply too big. As the district court recognized, the "small-group exception" generally applies to groups of "no more than 20 or 30 members." Add.106 (citation omitted). Courts have thus applied the exception to "small group[s]," like "9 models" or "25 salesmen," while refusing to apply the exception to "large group[s]," like "382 saleswomen." *See Arcand*, 567 F.2d at 1164 (citing cases). The group here is too large by thousands.

*Second*, the particular-reference exception likewise does not apply because none of the Aquarium's statements mentioned any specific lobsterman, lobster-fishing company, or lobstering organization. Certainly, none called out any Plaintiff. *See supra* pp. 16-18. Again, the Aquarium went out of its way to emphasize that there was no specific information available about "which fisheries are responsible" for right-whale entanglements. JA92. Such statements about "all of a great many persons engaged in a particular trade or business … cannot ordinarily be taken to have personal reference to any of the class." Restatement (Second) of Torts § 564A cmt. a. The particular-reference exception governs only where an individual member of the group can show "special application of the defamatory matter to himself." *Arcand*, 567 F.2d at 1164 (citation omitted).

This Court's decision in *Conformis* illustrates why the exception does not apply here. 58 F.4th 517. Conformis, a customized total-knee-replacement device manufacturer, brought a defamation suit against an insurer for adopting a new policy denying coverage of all customized total-knee-replacement devices. Although the insurer's policy did not mention Conformis's device, the insurer dedicated an entire subsection of the policy's "background section" to

the "ConforMIS Knee Implant"—and "singled out" no other total knee replacement. *Id.* at 530. The Court held that the particular-reference exception applied because a "reasonable reader could conclude … that the Policy statement made particular reference to Conformis." *Id.* Those facts are worlds away from this case.

2. The district court recognized that "[d]efamation of a large group" generally "gives rise to no civil action on the part of an individual member of the group." Add.104. The court also acknowledged that "the American lobster fishery" is "too large a group to qualify for the small-group exception." Add.107. Even so, the court invoked this Court's decisions in *Arcand* and *Conformis* to suggest that this case fits within the particular-reference exception. Add.108-10.

Those cases do not support the court's holding. In *Arcand*, this Court applied the group-defamation rule to affirm dismissal of claims against a newspaper for asserting that one unidentified member of a 21-member police department had locked "himself and a female companion in the back of a cruiser." 567 F.2d at 1163-64. Although the speech concerned a small group, this Court held that the small-group exception did not apply because the

speech was "aimed at only one unidentified member," not a "considerable proportion of the group." *Id.* at 1165.

The district court erroneously inferred from that discussion that "there can be recovery" for defamation if a statement applies to most or all members of a group, giving rise to "a high degree of suspicion" that the defamatory speech applies to each individual member. Add.109. But *Arcand* says no such thing. *Arcand* merely acknowledged that the small-group exception still applies where a statement concerns "part of" a small group but casts a "high degree of suspicion" on each individual member. 567 F.2d at 1164-65; *accord id.* ("Our case would be different if we were confronted with a statement defaming a number of members of a small group"). There is nothing remarkable about that proposition, which also appears in the Restatement's treatment of the small-group exception. *See* § 564A, cmt. c.

*Arcand* did not purport to effect a sea change in group-defamation jurisprudence by creating a new "high degree of suspicion" exception applicable to speech about large groups. 567 F.2d at 1164 (citation omitted). To the contrary, even though *Arcand* involved a small group, the Court went out of its way to restate the normal rule that "[d]efamation of a large group gives rise

to no civil action on the part of an individual member of the group unless he can show special application of the defamatory matter to himself." *Id.* at 1165 (citation omitted). In support of that rule, *Arcand* favorably cited *Neiman-Marcus v. Lait*, 13 F.R.D. 311, 315 (S.D.N.Y. 1952), which is crystal clear that no member of a large group may sue even if "the language used is *inclusive*" of the whole group. *See* 567 F.2d at 1164-65 (emphasis added). That reasoning squarely applies to bar Plaintiffs' claims over statements which, again, concern a large group, do not single out any specific member, and express uncertainty about which fishing lines are to blame for right whale entanglements.

Nor does *Conformis* support the district court's decision. The district court read *Conformis* to permit liability where "the industry-wide nature of the Statements necessarily implicat[e] each and every member of the Plaintiff group." Add.109. But that novel principle appears nowhere in *Conformis*. As discussed, that decision merely applied the normal rule that a member of a large group may sue for defamatory speech about the group if the speaker makes "*particular* reference" to him. 58 F.4th at 530 (emphasis added). The Aquarium's statements do not make specific reference to any individual lobster fisherman.

38

The district court's reading of *Conformis* would essentially dispense with the group-defamation rule altogether. Many, if not all, "industry-wide" statements could be said to "implicate" in some way each of that industry's members. Add.109. Statements that all lawyers are "not trustworthy," that American cattlemen produce a "dangerous" and "disease[d]" product, or that all health-food companies are "faddists" and "quacks" would be actionable under the district court's test. Yet in each of those instances, courts have applied the group-defamation rule to reject defamation suits. *See Schutzman & Schutzman*, 304 N.Y.S. 2d at 170; *Texas Beef*, 11 F. Supp. 2d at 862, 864; *Ajay Nutrition*, 378 F. Supp. at 218. Conversely, the district cited no case permitting industry members to sue based on allegedly defamatory statements about a whole industry.

The district court's remaining arguments fail to justify that astonishing intrusion on freedom of speech. The court thought it germane to the group-defamation analysis that the Aquarium's statements were "based upon scientific data," distinguishing them from "the type of hyperbolic statements that undergird the group defamation rule." Add.109-10. But there would be no need for the group-defamation rule if it applied only to hyperbolic statements,

for such speech is not actionable in the first place. *See, e.g.*, *Cheng v. Neumann*, 51 F.4th 438, 444 (1st Cir. 2022). We know of no case supporting the notion that only hyperbole gets protection under the rule, and countless cases foreclose it. *E.g.*, *Conformis*, 58 F.4th at 530 (applying group-defamation analysis to non-hyperbolic claims about knee-replacement device efficacy); *Thomas*, 699 So.2d at 802, 805 (affirming dismissal of suit based on claims that "commercial net fishing" produces "negative consequences" for the environment).

The district court also deemed it important that "the Statements were not merely informational but included a call to action" to avoid American lobster, allegedly harming Plaintiffs. Add.110. That reasoning muddles the elements of a defamation claim. The group-defamation rule is part of the "of and concerning" element; injury to the plaintiff is a separate element, requiring separate analysis. *See, e.g.*, *Waugh v. Genesis Healthcare LLC*, 222 A.3d 1063, 1066 (Me. 2019) (listing elements); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974) ("actual injury" required). If plaintiffs could bootstrap their way around the group-defamation rule by showing harm to their businesses,

the group-defamation rule would be eviscerated. *See AIDS Counseling*, 903 F.2d at 1005 ("mere fact" of "injury" insufficient to show specific reference).

In the end, no principled reason exists to depart from the centuries-old group defamation rule. This Court should apply the rule, hold that statements concerning a 5,600+-member industry are not actionable, and dismiss Plaintiffs' claims.

## II. The Statements Are Nonactionable Opinions Within an Ongoing Scientific Debate

Even if Plaintiffs' defamation claims could survive the group-defamation rule, the claims fail for a second independent reason: the Aquarium's statements are protected scientific opinions. At root, the disagreement between the parties is a scientific one—whether certain fishing practices pose a risk to right whales. Both Maine defamation law and the First Amendment require scientific debates like this one to be resolved by "[m]ore papers, more discussion, better data, and more satisfactory models," not more litigation. *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994).

### A. Scientific Conclusions Are Protected Opinions

Under both Maine law and the First Amendment, assertions of "fact" are actionable in defamation; "opinion[s]" are not. *Caron v. Bangor Publ'g Co.*,

41

470 A.2d 782, 784 (Me. 1984); *Pan Am. Sys. v. Atl. Ne. Rails & Ports, Inc.*, 804 F.3d 59, 65 (1st Cir. 2015). Plaintiffs may not base defamation claims on statements "expressing a subjective view, an interpretation, a theory, conjecture, or surmise" rather than "objectively verifiable facts." *Levinsky's Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 127 (1st Cir. 1997) (citation omitted).

As the district court noted, this Court has not yet had occasion to "settl[e]" the question whether statements made during scientific debate are protected opinions. JA1923. But this Court has recognized that there is "some force" to the notion that "a statement 'made as part of an ongoing scientific discourse about which there is considerable disagreement'" should "be treated as a non-actionable opinion." *Conformis*, 58 F.4th at 534 (quoting *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 497 (2d Cir. 2013)). Now that the question is squarely presented, this Court should join a growing consensus of circuits holding that scientific opinions are nonactionable.

At least three circuits have held that scientific conclusions drawn from "non-fraudulent" data and studies "on subjects about which there is legitimate ongoing scientific disagreement" are protected opinions. *ONY*, 720 F.3d at 497; *accord Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*,

63 F.4th 240, 246 (3d Cir. 2023); *Torrey v. Infectious Diseases Soc'y of Am.*, 86 F.4th 701, 704 (5th Cir. 2023); *see also Underwager*, 22 F.3d at 736 (similar analysis as part of actual malice inquiry).  No circuit has yet disagreed.

Two features of scientific debate support this uncontroversial application of the fact/opinion distinction.  *First*, reasonable readers considering all the "circumstances" understand contributions to an ongoing scientific debate to express "personal observation[s]" and not "objective fact[s]."  *Caron*, 470 A.2d at 784.  Scientific conclusions are always "subject to revision, because they represent inferences about the nature of reality based on the results of experimentation and observation."  *ONY*, 720 F.3d at 496.  Readers expect other researchers to respond with "continuous inquiry, testing, debate, disagreement, and revision."  *HipSaver, Inc. v. Kiel*, 464 Mass. 517, 533, 984 N.E.2d 755, 769 (2013); *accord Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993) ("Scientific conclusions are subject to perpetual revision.").  Context thus confirms that scientific conclusions "expres[s] a point of view only."  *Riley v. Harr*, 292 F.3d 282, 989 (1st Cir. 2002) (citation omitted).

*Second*, scientific claims are not "objectively verifi[able]" by courts, so they "belon[g] squarely in the category of protected opinion."  *See Piccone v.*

43

*Bartels*, 785 F.3d 766, 772 (1st Cir. 2015) (citation omitted). Because "the falsity of a published statement" is an "essential element" of defamation, actionable assertions must be verifiable in the judicial process. *Loe v. Town of Thomaston*, 600 A.2d 1090, 1092-93 (Me. 1991); *Pan Am. Sys.*, 804 F.3d at 65; *Levinsky's*, 127 F.3d at 127 n.3 ("the First Amendment bars recovery [where] statement[s] cannot be objectively verified"). And courts are not cut out to determine the truth or falsity of tentative scientific assertions, especially where there is no scientific "consensus." *See Conformis*, 58 F.4th at 533.

Even if contested scientific conclusions are, in some theoretical sense, "capable of verification or refutation by means of objective proof" in universities and laboratories, *Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 728 n.7 (1st Cir. 1992), there is "no precise standard" by which courts can measure them, *Am. School of Magnetic Health v. McAnnulty*, 187 U.S. 94, 106 (1902). Argument about any topic subject to genuine scientific disagreement will involve accusations that one side or the other "employed a flawed method," or "disregarded" pertinent data and "studies." *Pacira*, 63 F.4th at 247 (citation omitted). But those are disputes for "future scholarly debate" to resolve, not judges and juries. *Id.* at 248.

Treating contested scientific conclusions as protected opinions fits with First Amendment principles. "The First Amendment," courts have recognized, "places scientific debates unfolding within the scientific community beyond the reach" of litigation. *Torrey*, 86 F.4th at 705 (citation omitted). Lawsuits based on critiques of scientific "data and methodology … "risk 'chilling' the natural development of scientific research and discourse," *Pacira*, 63 F.4th at 248 (citation omitted)," and thus threaten to undermine "academic freedom"—a "special concern of the First Amendment." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967); *accord Freyd v. Whitfield*, 972 F. Supp. 940, 945 (D. Md. 1997).

That risk is far from hypothetical. As several researchers wrote after one of them defeated a defamation suit: even the "most frivolous lawsuit can generate substantial legal costs, distract scientists from research, force the indiscriminate disclosure of laboratory notebooks and emails, and create unnecessary stress for colleagues and families." Nicolas Bagley, Aaron E. Carroll, & Pieter A. Cohen, *Scientific Trials: In the Laboratories, Not the Courts*, 178 JAMA Internal Med. 7, 7 (2018). The First Amendment forbids that result, instead leaving "falsehood[s] and fallacies" to be resolved by "more

45

speech." *See Linmark Assocs., Inc. v. Willingboro Twp.*, 431 U.S. 85, 97 (1977) (citation omitted).

Recognizing these points, courts of appeals affirm dismissal of claims on the basis that scientific conclusions are nonactionable opinions. For instance, the Third Circuit recently held that "the reliability of the data in scientific articles is not fit for resolution" in a "defamation lawsuit" and, on that basis, refused to permit trade-libel claims over statements asserting that one analgesic was "inferior" to another. *Pacira*, 63 F.4th at 243, 247-48 (cleaned up). Similarly, the Second Circuit rejected Lanham Act claims where the defendants maintained in a research paper that the plaintiffs' drug was riskier than a competitor's, reasoning that such "statements about contested and contestable scientific hypotheses … [are] matters of opinion." *ONY*, 720 F.3d at 494. And the Fifth Circuit rejected misrepresentation claims challenging Lyme disease treatment guidelines where the court lacked any "precise standard" to evaluate dueling scientific studies expressing different "medical opinions." *Torrey*, 86 F.4th at 705-06 (citation omitted); *see Underwager*, 22 F.3d at 736 ("Scientific controversies must be settled by the methods of science rather than by the methods of litigation.").

District courts across the country also have refused to "ventur[e] into the thicket of the scientific debate, especially in the defamation context." *Arthur v. Offit*, 2010 WL 883745, at *6 (E.D. Va. Mar. 10, 2010); *accord Saad v. Am. Diabetes Ass'n*, 123 F. Supp. 3d 175, 178-79 (D. Mass 2015). Courts have rejected attempts to litigate the veracity of everything from statements on the efficacy of vaccines, *Offitt*, 2010 WL 883745, at *6, to assertions about "extraterrestrial life on Venus and Mars," *Joseph v. Springer Nature*, 2021 WL 1372952, at *1, *7 (S.D.N.Y. Apr. 12, 2021), *aff'd* 2021 WL 6105369 (2d Cir. Dec. 21, 2021), to disputes over the quality of research supporting Alzheimer's drugs, *Cassava Scis., Inc. v. Bredt*, 2024 WL 1347362, at *8-10 (S.D.N.Y. Mar. 28, 2024).

## B.     The Aquarium's Statements Are Protected Scientific Opinions

The Aquarium's statements are nonactionable scientific opinions drawn from "non-fraudulent" data and studies on a "subjec[t] about which there is legitimate ongoing scientific disagreement." *ONY*, 720 F.3d at 497. "The content of the publication, the verifiability [or lack thereof] of the assertions, and the context in which they were written" all support that conclusion. *Torrey*,

86 F.4th at 706-07. The district court erred in treating the at-issue statements as assertions of fact.

1. For starters, four statements appeared in the Report, and express the Aquarium's opinion on this continuing scientific debate. JA42-43 (statements (c), (d), (e), and (i)). Regulators, scientists, environmental groups, and lobstermen have for decades debated the impact of lobster fishing on the right whale. *See supra* pp. 6-10. The Report contributed to that discourse, expressing agreement with federal regulators that lobster fishing poses risks, but concluding that existing measures do not go far enough. JA92. And the Report reached that conclusion through careful analysis by scientists of the academic literature in consultation with "scientific, government, industry, and conservation experts." JA54. The Report thus represented a step on "the path toward superior understanding" of the ecological impact of lobster fishing. *See Conformis*, 58 F.4th at 534 (citation omitted).

The Report also expressly disclosed the Aquarium's conclusions as "subject to revision." *Pacira*, 63 F.4th at 247. The Report noted that the Aquarium's "assessments and ratings are updated regularly" to reflect "chang[ing]" data and conditions. JA54. And the Report disclosed gaps in the

existing data, acknowledging, for instance, that "[d]ue to a lack of information, it is often not possible to assign entanglements to a specific fishery." JA90. Those caveats would leave any reasonable reader with the firm impression that the Report conveys conclusions that are subject to refinement once "there is more specific information available." JA101.

The Report's conclusions are not readily verifiable. Were this case to proceed, a judge or a jury would have to decide whether the Aquarium or the lobstermen are correct about the risks posed by lobster fishing. But, even after thirty years of scientific debate, environmentalists, regulators, and industry groups remain at an impasse on that question. Adjudicating the merits of Plaintiffs' defamation claims would require the court to resolve the disagreement and give its imprimatur to one side or another—possibly distorting future discussion in the process. This Court should decline Plaintiffs' invitation to turn judges into junior-varsity peer reviewers and instead leave this debate for scientists and regulators to resolve. *Pacira*, 63 F.4th at 248.

Of course, like all other scientific research, the Report "engages with empirically verifiable facts about the universe" in reaching its conclusions. *ONY*, 720 F.3d at 496. And based on the literature and studies the Aquarium

reviewed, the Aquarium strongly believes that the facts support its view about the risk lobster fishing poses to the endangered right whale. But in debates like this one, even "propositions of empirical 'fact' … [are] subject to rigorous debate by qualified experts," making them ill-suited to adjudication by courts. *Id.* As a result, courts routinely hold that fact-based scientific assertions are nonactionable opinions. *E.g.*, *id.* at 494 ("[one drug] was associated with a 49.6% greater likelihood of death than [another drug]"); *Torrey*, 86 F.4th at 706 ("[t]here is no convincing biological evidence for the existence of sympto-matic chronic B. burgdorferi infection among patients after receipt of recommended treatment regimens for Lyme disease").

For the same reasons, the Aquarium's media statements and press re-leases are also protected scientific opinions. *See* JA42-43 (statements (a), (b), (f), (g), (h)). Statements (a) and (f) merely "repeat[ed] or paraphras[ed] lan-guage in the Report" by saying that American lobster fisheries were putting the right whale at risk. *Ioppolo v. Rumana*, 581 F. App'x 321, 330-31 (5th Cir. 2014); JA42-43 (statements (a), (f)). Statements (g) and (h) describe the Re-port's "science-based process" and Seafood Watch's own "standards." JA43 (statements (g), (h)). And statement (b) is nonactionable hyperbole, *Cheng*, 51

50

F.4th at 444, expressing the Aquarium's view that "no one wants to know their appetite for seafood is driving a species to extinction." JA42 (statement (b)). In all events, courts have routinely held that scientific opinions expressed to the media are protected. *See, e.g.*, *Malone v. WP Co., LLC*, 2023 WL 6447311, at *4 (W.D. Va. Sept. 29, 2023).

2. The district court ultimately recognized that "no controlling First Circuit authority" dictates whether the "scientific statements in this case" are protected opinions. JA1923. But in denying the Aquarium's motion to dismiss, the court nevertheless deemed the Aquarium's statements actionable assertions of fact on the theory that they were grounded in an "objective and scientific" methodology, "unqualified and declarative," and failed to disclose contrary evidence. Add.115, 118. That analysis misunderstands the law and risks chilling scientific debate on vital and controversial public issues.

Although courts routinely give scientific opinions special protection, *supra* pp. 46-47, the district court cited the Aquarium's "emphasis of its methodology as objective and scientific" as a reason why the challenged statements *should* be actionable. Add.115. That is backwards, particularly in the context of a robust scientific debate that the district court acknowledged was

51

ongoing. Add.12-13. Reasonable readers know that scientific assertions in ongoing public debates are often limited by the available evidence and subject to revision—as the Report expressly acknowledged. *See supra* pp. 48-49; *ONY*, 720 F.3d at 496.

And it makes no difference that consumers purportedly "relied upon [the Report] as the basis to stop purchasing" Plaintiffs' lobster. Add.122. "[T]he fact that advocacy may persuade … is hardly a reason to suppress it: The Constitution protects expression which is eloquent no less than that which is unconvincing." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 790 (1978) (quotation marks omitted). Accordingly, scientific opinion does not become actionable just because it advocates for a particular behavior or because the audience "found the opinions persuasive." *Torrey*, 86 F.4th at 706. Otherwise courts would be forced to decide the truth or falsity of science-based advocacy on all sorts of pressing issues, like whether doctors should follow certain treatment guidelines for Lyme disease, *id.* at 704, or whether children should receive vaccines, *Offit*, 2010 WL 883745, at *6.

The district court's decision to fault the Aquarium for its "unqualified and declarative" statements likewise misses the mark. Add.115. The Report

*did* qualify the Aquarium's conclusions as based on existing data, as the district court elsewhere acknowledged. Add.115-16; *see ONY*, 720 F.3d at 498 ("Even if [scientific opinions] … could be actionable, such claims would be weakest when, as here, the authors readily disclosed the potential shortcomings."); *accord Pacira*, 63 F.4th at 247. The court nevertheless discounted the Aquarium's caveats because it did not "express[ly]" repeat them in its press releases. Add.119-20. But making speakers list every qualification in their research when speaking to the press would offend the First Amendment by rendering popular discourse about science all but impossible.

The district court's requirement that scientific reports disclose all contrary evidence or risk liability similarly lacks any basis in law. Courts routinely find that scientific opinions are protected where the authors are alleged to have "disregarded" unfavorable "studies." *See, e.g.*, *Pacira*, 63 F.4th at 247. Scientific opinions "do not become actionable factual representations merely because they disapprove of studies Plaintiffs prefer." *Torrey*, 86 F.4th at 705. The district court's cite-every-study mandate conflicts with those decisions and creates constitutional problems of its own by forcing speakers to

choose between editorial control of their work and the protection of the First Amendment. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024).

Nor does *Conformis* salvage the district court's flawed analysis. The district court "extend[ed]" *Conformis*, JA1923, to permit defamation liability whenever a statement "suggests an appraisal … against objective professional or scientific standards," Add.120-21 (citing 58 F.4th at 532). But *Conformis* embraced no such blanket rule. Instead, this Court straightforwardly held that an insurer's description of knee replacement devices as "not yet accepted by doctors" and "not proven as effective" conveyed "verifiable facts" that could be measured against objective standards—*i.e.*, whether doctors in fact accepted the devices and whether "a consensus exists" that the devices are "clinically effective." 58 F.4th at 532-33. By contrast, statements about the ecological risks of lobster fishing have been contested for decades and are not readily verifiable by the judicial process. *See supra* pp. 6-10.

3. For their part, Plaintiffs contend that the Aquarium's statements are not protected scientific opinions because the Aquarium purportedly "distorted its citations to the underlying data" and failed to publish its research in a "scientific journal." No. 25-8012, Opposition to Petition for Permission to Appeal

54

at 22-23 (May 5, 2025). But those arguments do not strip the Aquarium's scientific opinions of protection.

Even if Plaintiffs were correct (they are not) that the Aquarium "misrepresented statistics and conflated data," JA45, a defamation lawsuit is not the right forum to air academic critiques. The whole point of the scientific-debate doctrine is to *prevent* courts from nitpicking scholarly methodology and data analysis. *Pacira*, 63 F.4th at 247-48. For that reason, a scientific opinion will lose protection only if its conclusions are "drawn from falsified or fraudulent data." *Id.* at n.14; *accord ONY*, 720 F.3d at 497; *CrossFit, Inc. v. Nat'l Strength & Conditioning Ass'n*, 2016 WL 5118530, at *7 (S.D. Cal. Sept. 21, 2016) (finding statement published in academic journal actionable where the defendant may have "fabricated the ... data"). Plaintiffs do not allege anything approaching fraud in this case.

Nor does it help Plaintiffs that the Aquarium self-published its scientific opinions. To be sure, the "medium in which the statement was published" and its "audience" are relevant to whether a statement is protected scientific opinion. *Conformis*, 58 F.4th at 534. But the First Amendment does not shield only ideas sufficiently well-received to be selected for publication. *See, e.g.*,

*Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 190 (2021). And any such distinction would expose to liability scientific discussion of urgent and controversial issues, like a quick-spreading virus or a climate-related disaster, unless speakers waited for a journal's approval. For good reason, then, courts have extended protection to scientific opinions appearing in media coverage, *Malone*, 2023 WL 6447311 at *4, whistleblowing letters to the FDA and slide decks published on websites, *Cassava*, 2024 WL 1347362 at *9-10, *15-16, as well as a self-published book, *Underwager*, 22 F.3d at 733.

In sum, this Court should decline Plaintiffs' invitation to police speech in a decades-long scientific debate over the threat lobster fishing poses to the right whale—a result that would chill research, publication, and public comment on myriad other issues.

## III. Maine's Anti-SLAPP Statute Bars Plaintiffs' Claim

The applicable version of Maine's Anti-SLAPP law, 14 M.R.S. § 556 (2023), directs courts to quickly dispose of "meritless lawsuits," like this one, that "chil[l] or dete[r]" a defendant's "First Amendment right to petition the government." *Schelling v. Lindell*, 942 A.2d 1226, 1229 (Me. 2008); *see also*

*Godin v. Schencks*, 629 F.3d 79, 91 (1st Cir. 2010) (section 556 applies in federal court).

Section 556 permits defendants to file a special motion to dismiss at a suit's outset. By the statute's terms, a claim based on "a party's exercise of its right of petition" may proceed only if the at-issue speech is totally "devoid of any reasonable factual support or any arguable basis in the law" and "caused actual injury" to the plaintiff. § 556. To evaluate a special motion to dismiss, Maine courts employ a two-step analysis. At step one, the defendant must show "the claims against him are based on his exercise of the right to petition." *Weinstein v. Old Orchard Beach Fam. Dentistry*, 271 A.3d 758, 764 (Me. 2022). If the defendant makes that showing, the burden flips to the plaintiff at the second step to provide "prima facie evidence" that the petitioning activity lacked factual or legal basis and injured him. *Id.*

Plaintiffs cannot carry their burden here. Because the Aquarium's speech sought regulatory change, it counts as "petitioning activity." And the Aquarium's citations to dozens of scientific articles substantiating its claims undercut any allegation that it lacked "factual support."

**A.    The Aquarium's Statements Are Petitioning Activity**

1. Section 556 defines the "right to petition" "very broadly." *Schelling*, 942 A.2d at 1230. A "party's exercise of its right of petition," the statute provides, includes "*any* statement reasonably likely" either to "encourage consideration or review of an issue by" the government or to "enlist public participation in an effort to effect such consideration." § 556 (emphasis added).

In line with that capacious definition, the Maine Law Court has "construed the meaning of petitioning activity liberally." *Schelling*, 942 A.2d at 1230. If a statement "may have the effect of bringing an issue not currently under consideration into consideration or review by any governmental body," section 556 protects it. *Id.* at 1231. Thus, for instance, writing a letter to a newspaper hoping to influence the government's approach to a property development project is "petitioning activity." *Maietta Const., Inc.* v. *Wainwright*, 847 A.2d 1169, 1172 (Me. 2004). So too "letters to the editor" hoping to "enlist public support" for "reconsideration" of a recently passed law count as "petitioning." *Schelling*, 942 A.2d at 1230-31. And statements intended to "inform an ongoing public discussion," the Maine Law Court has held, "clearly fit within the broad definition of petitioning activity." *Gaudette*

*v. Davis*, 160 A.3d 1190, 1200 (Me. 2017) (*Gaudette I*), *overruled on other grounds*, *Thurlow*, 263 A.3d at 502.

The statute's definition of "petitioning activity" encompasses the Aquarium's Report and media statements for multiple reasons. *First*, because the Aquarium published its Report after engaging with, and trying to influence, state and federal officials, the Report was part of an effort to "encourage consideration or review of an issue" by the government. § 556. In the years leading up to publication, the Aquarium repeatedly conferred with Maine's governor and congressional delegation. JA1480-81; JA1482; JA1485-87. The Aquarium promised to "incorporate[]" the officials' feedback "into the draft assessment," JA1486, and the officials "encourage[d]" the Aquarium to "continue to engage in a meaningful and collaborative discussion with … *government regulators*." JA1612 (emphasis added); JA1609.

*Second*, the Report aimed to "enlist public participation" in drawing state and federal regulators' attention to the environmental impact of lobster fishing. § 556. The Aquarium has long used its Seafood Watch "ratings' to encourage "governments to improve regulations," as the Aquarium notes on a website repeatedly cited by the Complaint. *See Monitoring and Evaluation*

*System*, Seafood Watch (2017), https://perma.cc/J327-D42M; JA25 n.19, 20, 21 (citing "seafoodwatch.org").  The Aquarium's "red" rating for American lobster is no different.  The Aquarium issued that rating based on its view that existing government regulations, including the 2021 amendments to the Take Reduction Plan, are "insufficient to reduce the risk" to the right whale.  JA101.  The Report thus aimed to "influence … public opinion" to change that status quo.  JA17.

*Third*, the Aquarium's Report quickly prompted further governmental "consideration" and "review" of the issue.  § 556.  Two days after the Aquarium released the Report, Maine's governor and congressional delegation criticized the Report as "activism" and demanded reversal of the red rating.  JA297.  Maine's congressional delegation later introduced a bill that would have blocked federal funding to the Aquarium.  Red Listing Monterey Bay Aquarium Act, S. 5067, 117th Cong. § 1 (2022).  To be sure, the Maine legislators' response was not the one the Aquarium hoped for.  But that is beside the point.  What matters is that the Report "expand[ed] the public consideration of a controversial issue," *Schelling*, 942 A.2d at 1231, and "inform[ed] an ongoing public discussion." *Gaudette I*, 160 A.3d at 1200.

*Fourth*, the Aquarium's speech urging consumers to refrain from purchasing American lobster constitutes clear First Amendment petitioning activity. Section 556 protects petitioning under the federal Constitution. *See Weinstein*, 271 A.3d at 763-64. And the Supreme Court has held that a "boycott of … merchants" designed to "bring about political, social, and economic change" constitutes "constitutionally protected" petitioning activity. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 907, 911 (1982). Tellingly, Massachusetts has interpreted its substantively identical Anti-SLAPP statute to encompass the "quintessential petitioning activities" of "[p]ublishing statements and organizing a boycott." *Shire City Herbals, Inc. v. Blue*, 2016 WL 2757366, *4, *6 (D. Mass. May 12, 2016) (citing Massachusetts cases). Following Massachusetts's "useful guidance," *Gaudette v. Mainely Media, LLC*, 160 A.3d 539, 543 & n.2 (Me. 2017), this Court should apply section 556 the same way.

2. The district court took "no position on whether [the Aquarium] was engaged in petitioning activity." Add.96. The counterargument that Plaintiffs advanced below falters under even cursory inspection.

Plaintiffs contended that the Aquarium's statements are not "petitioning activity" because they were made to "convince consumers and businesses" and were not "directed to a governmental body to effect change." D. Ct. Dkt. 24 at 19. That is both wrong and irrelevant. Speech often has more than one audience. Here, the Aquarium's Report aimed both to leverage consumer pressure against harmful fishing *and* to persuade the government to adopt more stringent protections for the right whale. *See supra* pp. 59-61. In any event, the Anti-SLAPP statute does not require petitioning speech to be *directed* at the government itself. The statute expressly provides that speech may be directed at the "public" so long as it is "reasonably likely" to encourage government consideration of the issue. § 556.

## B. The Aquarium's Statements Had Ample Factual Basis

Courts must dismiss claims based on "petitioning activity" unless the plaintiff presents "some evidence," through pleadings and affidavits, that one of the contested statements was devoid of any factual basis. *See Thurlow*, 263 A.3d at 500, 502 (quoting *Nader v. Me. Democratic Party*, 41 A.3d 551, 562 (Me. 2012)). Plaintiffs did not come close to carrying their burden here.

The Aquarium's Report contained *ten pages* of citations to academic literature and regulatory documents substantiating the Aquarium's view that lobster fishing in the Northwest Atlantic poses a risk to the right whale. For instance, the Report cited a 2003-2018 study of right whale fatalities concluding that "entanglement" with fishing gear was a leading cause of death, including in waters between "Massachusetts and Maine." S.M. Sharp et al., *Gross and histopathologic diagnoses from North Atlantic right whale Eubalaena glacialis mortalities between 2003 and 2018*, 135 Diseases of Aquatic Organisms 1, 6, 21 (2019) (cited JA124).[3] Citations like that one readily provide "reasonable factual basis" for the Aquarium's statements. § 556.

---

[3] *Accord* J.M. Van der Hoop et al., *Drag from Fishing Gear Entangling North Atlantic Right Whales*, 32 Marine Mammal Science 619, 636-37 (2015) (highlighting "hidden, sublethal costs" from entanglements that compromise a right whale's overall fitness and reproductive capacity) (cited at JA91); S.D. Kraus et al, Letter to Senator Susan Collins (Sept. 17, 2019) ("better gear marking won't change the fact that right whales go everywhere, and any rope in the water creates a risk of entanglement") (cited at JA119, in the record at JA307); H.M. Pettis, et al., North Atlantic Right Whale Consortium 2021 Annual Report Card (2022) ("immediate, broad-based mitigation strategies that result in significant risk reduction throughout the right whale's range must be a priority if this species is to survive") (emphasis removed) (cited at JA123, in the record at JA320). Recent data show new entanglements, including in Southern

1.  In the district court's view, Plaintiffs carried their burden by "present[ing] specific allegations, backed by factual support, suggesting that the Maine lobster fishery has not presented a significant risk to right whales." Add.100.  Confusingly, however, the court reached that result after acknowledging that a specific right whale—called #5120—died in 2024 due to "chronic entanglement in rope identified as belonging to the Maine lobster industry," Add.97-98; *see* JA1616-24.  If that record evidence does not count as "factual support," § 556, for the Aquarium's claim that lobster fisheries are "putting [the right whale] at risk," JA42, it is hard to know what would.

The district court minimized the import of right whale #5120's death, reasoning that it may have been killed by an old-style rope, not "one of the 'weak link' variety implemented under the 2021 revisions to the Take Reduction Plan." Add.98.  True, but irrelevant.  Even if #5120 died from entanglement with an outdated rope, it is undisputed that lobster fishermen

---

New England. *See* H.M. Pettis, et al., North Atlantic Right Whale Consortium 2024 Annual Report Card (2025).

were still using those old ropes—and still putting right whales at greater risk—when the Aquarium published its Report. *See* Add.34.

In finding a lack of factual basis for the Aquarium's claims, the district court also relied on Plaintiffs' assertion that "right whales are rarely found in the Maine lobster fishery" and an affidavit suggesting that the Aquarium "was aware of [contrary] evidence" yet failed to address it. Add.98-99. But those observations again miss the mark. Even if right whales *were* rare in the Maine lobster fishery, as Plaintiffs claim, Plaintiffs do not allege that whales never swim there. Nor could they. *Cf.* 2021 EIS at 18 ("[a]coustic detections indicate that right whales are present in U.S. waters year round"). And even if the Aquarium was aware of contrary evidence, that does not prove the absence of evidence on the Aquarium's side of the ledger. After all, it is not unusual for evidence to cut both ways on hard environmental issues.

2. Moving beyond the district court's reasoning, Plaintiffs offered no reason to conclude the Aquarium lacked factual basis for its claims.

Plaintiffs suggested below that the challenged statements are false because "the Aquarium significantly misrepresented actual data, which provide no evidence that any right whale has been entangled in Maine lobster gear in

nearly 20 years." JA45. That contention cannot hold water after the documented death of a right whale due to entanglement with Maine lobster gear in 2024. Beyond that incident, the Report's ten pages of citations substantiate the Aquarium's claims about entanglement risk and the government's struggle to mitigate it.

Plaintiffs also contended that the Aquarium's statements are false because the "Take Reduction Plan and other measures" purportedly "achieved their intended purpose" of protecting the right whale from lobster fishing. JA34. But again, the Aquarium's citations provide fulsome foundation for the view that "mitigation" measures, including the "Take Reduction Plan," "have not been effective in reducing the number of entanglement events for large whales." Sharp, *supra*, at 2 (cited at JA100). Indeed, the federal government shared the Aquarium's concern in 2021 when it wrote that "entanglement-related serious injuries and mortalities … in U.S. waters" had "persisted" under existing measures. 2021 EIS at 1 (2021). Nor did the 2021 regulatory amendments reduce entanglement risk to zero, especially since supply-chain problems delayed compliance—a point underscored by the undisputed fact

that a right whale died due to entanglement with a Maine rope in 2024. *See* Add.34 (citing JA1751-52); JA1616.

Finally, Plaintiffs claimed that Maine lobster fishing is not to blame for right whale deaths and that "Canadian snow crab gear, vessel strikes, climate change, and ocean noise" are the true threat. JA30. But the Aquarium is not alone in rejecting that argument. During notice and comment for the 2021 amendments to the Take Reduction Plan, NMFS had deemed additional regulation of "U.S. fisheries" necessary to "reduce human-caused mortality" because "U.S. fisheries fish many more buoy lines than Canadian fisheries." 86 Fed. Reg. 51976. The Aquarium's Report reached precisely the same conclusion for precisely the same reasons. *See, e.g.*, JA107 (noting the need for management efforts in both "United States and Canadian waters").

# CONCLUSION

The Court should reverse with instructions to dismiss the complaint.

Respectfully submitted,

RUSSELL B. PIERCE, JR.
NORMAN, HANSON & DETROY, LLC
  *220 Middle Street, P.O. Box 4600*
  *Portland, ME 04112*
  *(207) 774-7000*
  *rpierce@nhdlaw.com*

*/s/ Lisa Blatt*
LISA S. BLATT
  *Counsel of Record*
JOSEPH M. TERRY
AMY MASON SAHARIA
NICHOLAS G. GAMSE
CLAIRE R. CAHILL
EDWARD L. PICKUP
HAROLD W. HILD
WILLIAMS & CONNOLLY LLP
  *680 Maine Avenue SW*
  *Washington, DC 20024*
  *(202) 434-5000*
  *lblatt@wc.com*

*Counsel for Defendant-Appellant Monterey Bay Aquarium Foundation*

JANUARY 28, 2026

# COMBINED CERTIFICATIONS

1. **Bar Membership**:  I certify that I am a member of this Court's Bar.

2. **Word Count, Typeface, and Type Style:**  I certify that this brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 32(a)(7)(B) and 32(f) because the brief was produced using Microsoft Word and it contains 12,794 words, excluding those portions excluded by Rule 32(a)(7)(B)(iii).  I further certify that this brief complies with the typeface requirements of Rule 32(a)(5) and type style requirements of Rule 32(a)(6) because it has been prepared in the proportionally spaced typeface, Century Expanded BT, size 14.

3. **Service.**  I certify that on this date I am causing this brief to be filed electronically via the Court's CM/ECF system.  All participants in both consolidated cases are registered CM/ECF users and service will be accomplished using the CM/ECF system.

4. **Paper copies.**  I certify that the text of the electronic brief filed via ECF is identical to the text of the paper copies that will be delivered to the Court.

5. **Virus check.**  I certify that I have caused a virus check to be performed using the latest version of Symantec Endpoint Protection, Version 14.

> /s/ Lisa Blatt
> *Counsel for Defendant-Appellant*

JANUARY 28, 2026

# ADDENDUM

# TABLE OF CONTENTS

Order on Motion to Dismiss,
    D. Me. No. 2:23-cv-00129-JAW (Feb. 6, 2025)....................................... Add.1

14 M.R.S. § 556 (2023) ............................................................ Add.138

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

BEAN MAINE LOBSTER, INC.,       )
et al.,                          )
                                 )
        Plaintiffs,              )
                                 )
        v.                       )      No. 2:23-cv-00129-JAW
                                 )
MONTEREY BAY AQUARIUM            )
FOUNDATION,                      )
                                 )
        Defendant.               )

**ORDER ON MOTION TO DISMISS**

A nonprofit corporation that publishes sustainability ratings for types of seafood moves to dismiss a defamation lawsuit brought by members of the Maine lobster industry in response to the negative rating the nonprofit assigned to American lobster. The nonprofit asks the court for numerous alternative resolutions, including dismissal for lack of personal jurisdiction, transfer of venue, dismissal pursuant to Maine's anti-SLAPP statute, and dismissal for failure to state a claim. The court concludes that the plaintiffs' chosen jurisdiction of Maine is proper and that the nonprofit failed to meet its burden to justify a transfer of venue. Furthermore, the court concludes that plaintiffs pleaded sufficient facts, taken as true, to survive the motions to dismiss pursuant to Maine's anti-SLAPP lawsuit and, alternatively, for failure to state a claim of defamation. Finally, the court determines that it is premature to dismiss the plaintiffs' request for injunctive relief at this stage of the proceeding until final judgment can be reached on the merits of the plaintiffs' defamation claim and a determination made on the adequacy of legal remedies.

Add.1

## I.    PROCEDURAL HISTORY

On March 14, 2023, Bean Maine Lobster, Inc., Maine Lobstermen's Association, Inc., Maine Coast Fishermen's Association, Inc., Maine Lobster and Processing, LLC d/b/a Atwood Lobster, LLC, and Bug Catcher, Inc. filed a civil action against the Monterey Bay Aquarium Foundation ("MBAF").  *Compl.* (ECF No. 1). That same day, Plaintiffs filed additional attachments to their complaint.  *Additional Attachs.* (ECF No. 4) (*Pls.' Additional Attachs.*).  The complaint, which has not been amended, contains one count for defamation for which the Plaintiffs seek money damages and injunctive relief.  *Compl.* at 31-36.

On May 22, 2023, MBAF filed a motion seeking, in the alternative: 1) dismissal for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2); 2) transfer of venue to the Northern District of California pursuant to 28 U.S.C. § 1404(a); 3) dismissal pursuant to Maine's anti-SLAPP statute, 14 M.R.S. § 556; or 4) dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6).  *Def. Monterey Bay Aquarium Found.'s Mot. to Dismiss for Lack of Pers. Jurisdiction (Fed. R. Civ. P. 12(b)(2)) or, in the Alt., Transfer Venue Due to Forum Non Conveniens (28 U.S.C. 1404(a)), or Dismiss Under Maine's Anti-SLAPP Statute (14 M.R.S. § 556), or Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted (Fed. R. Civ. P. 12(b)(6))* (ECF No. 19) (*Def.'s Mot.*).  That same day, MBAF filed several additional attachments in support of its motion.  *Additional Attachs.* (ECF No. 20) (*Def.'s Additional Attachs.*).

On July 24, 2023, the Plaintiffs responded to MBAF's motion. *Pls.' Mem. in Opp'n to Def.'s Mot. to Dismiss, or in the Alt. to Change Venue* (ECF No. 24) (*Pls.' Opp'n*). That same day, the Plaintiffs filed a motion for leave to conduct jurisdictional discovery, *Pls.' Mot. for Ltd. Jurisdictional Disc.* (ECF No. 30) (*Pls.' Disc. Mot.*), and several declarations in support of their opposition to MBAF's motion. *Decl. of Patrice McCarron* (ECF No. 25) (*McCarron Decl.*); *Decl. of John Petersdorf* (ECF No. 26) (*Petersdorf Decl.*); *Decl. of Ben Martens* (ECF No. 27) (*Martens Decl.*); *Decl. of Gerald R. Cushman* (ECF No. 28) (*Cushman Decl.*); *Decl. of Corey Thompson* (ECF No. 29) (*Thompson Decl.*).

On August 24, 2023, MBAF filed a reply in support of its motion to dismiss or change venue. *Def. Monterey Bay Aquarium Found.'s Reply to Pls.' Opp'n to Mot. to Dismiss for Lack of Pers. Jurisdiction (Fed. R. Civ. P. 12(b)(2)) or, in the Alt., Transfer Venue Due to Forum Non Conveniens (28 U.S.C. 1404(a)), or Dismiss Under Maine's Anti-SLAPP Statute (14 M.R.S. § 556), or Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted (Fed. R. Civ. P. (12(b)(6))* (ECF No. 38) (*Def.'s Reply*). Also on August 24, 2023, MBAF responded in opposition to the Plaintiffs' jurisdictional discovery motion. *Def. Monterey Bay Aquarium Found.'s Opp'n to Pls.' Mot. for Ltd. Jurisdictional Disc.* (ECF No. 39) (*Def.'s Opp'n to Disc.*).

On September 6, 2023, the Plaintiffs filed a reply in support of their jurisdictional discovery motion. *Pls.' Reply in Further Supp. of Mot. for Ltd. Jurisdictional Disc.* (ECF No. 40) (*Pls.' Disc. Reply*).

On September 30, 2023, MBAF filed a motion seeking to supplement the record with a judicial decision recently issued by the United States District Court for the Eastern District of Louisiana. *Def. Monterey Bay Aquarium Found.'s Mot. to Suppl. the Rec. on Its Mot. to Dismiss with La. Order Transferring Parallel Action Against Def. to the U.S. Dist. Ct. for the N. Dist. of Cal.* (ECF No. 41) (*Def.'s First Mot. to Suppl.*). On October 23, 2023, the Plaintiffs responded in opposition. *Pls.' Opp'n to Def.'s Mot. to Suppl. the Rec. on Its Mot. to Dismiss* (ECF No. 42) (*Pls.' Opp'n to First Mot. to Suppl.*). On January 16, 2024, the Plaintiffs notified the Court that a lawsuit filed against MBAF in the Northern District of California by a different set of plaintiffs had been voluntarily dismissed with prejudice. *Notice/Correspondence* (ECF No. 43) (*Pls.' Notice*).

Then, on October 11, 2024, MBAF moved to again supplement the record on its motion to dismiss based on new information and requested that the Court take judicial notice of several government webpages documenting right whale entanglements. *Def. Monterey Bay Aquarium Found.'s Mot. to Suppl. Rec. and Req. for Jud. Notice in Connection with Mot. to Dismiss* (ECF No. 46) (*Def.'s Second Mot. to Suppl.*). MBAF filed a supplemental brief in support of its motion to dismiss on October 28, 2024, explaining its position on how the Court should consider the new information in the context of its motion to dismiss. *Def. Monterey Bay Aquarium Found.'s Supp. Brief in Support of Mot. to Dismiss* (ECF No. 49) (*Def.'s Supp. Brief*).

Also on October 28, 2024, the Plaintiffs filed their own motion to supplement the record and request for judicial notice, reiterating their opposition to the motion

4

Add.4

to dismiss in light of the new information and asking the Court to take judicial notice of an additional government publication "to add context" to MBAF's submissions. *Pls.' Mot to Suppl. the Rec. and Req. for Jud. Notice* at 1 (ECF No. 50) (*Pls.' Mot. to Suppl.*). The Plaintiffs also submitted their own brief articulating their position on the relevance of the new information to the Court's disposition of MBAF's motion to dismiss. *Pls.' Opening Br. Addressing Materials Attached to Def.'s Mot. to Suppl. Rec., and in Further Opp'n to Mot. to Dismiss* (ECF No. 52) (*Pls.' Suppl. Br.*).

On November 12, 2024, the Plaintiffs responded to MBAF's supplemental brief, arguing the Court should reject the motion to dismiss notwithstanding the new information concerning the January 2024 right whale death. *Pls.' Resp. to Def.'s Suppl. Br., and in Further Opp'n to Mot. to Dismiss* (ECF No. 53) (*Pls.' Suppl. Resp.*). That same day, MBAF filed its own response to the Plaintiffs' brief, reiterating its request that the Court dismiss the complaint based on both the original record and the new information. *Def. Monterey Bay Aquarium Found.'s Reply Br. Re: Suppl. Briefing in Support of Mot. to Dismiss* (ECF No. 54) (*Def.'s Suppl. Resp.*). The Court granted both parties motions to supplement the record and requests to take judicial notice on December 5, 2024, explaining that it would consider the newly submitted information in its review of the motion to dismiss but taking no position at that time on how the new information would affect its disposition. *Order on Mots. to Suppl. the Rec. and Reqs. for Jud. Notice* (ECF No. 55) (*Order on Mots. to Suppl.*).

5

Add.5

## II.    FACTS

### A.    The Parties

#### 1.    The Plaintiffs

Bean Maine Lobster, Inc. ("BML") markets and sells high-quality mid-coast Maine-caught lobster and lobster foods.  *Compl.* ¶ 14; *Petersdorf Decl.* ¶ 1. Incorporated in Maine, BML retains its principal place of business in Rockland, Maine. *Compl.* ¶ 14. BML's offices are located in Maine, employees familiar with the facts and circumstances of this case reside in Maine, and all BML documents related to this case are in Maine.  *Petersdorf Decl.* ¶ 2.

Maine Lobstermen's Association, Inc. ("MLA") is a nonprofit corporation representing roughly 1,200 of Maine's 5,600 lobstermen[1] that advocates to protect its members, the lobster industry, and the value of the lobster resource, including goodwill associated with Maine lobster.  *Compl.* ¶ 15.  MLA is incorporated in Maine, and its principal place of business is in Kennebunk, Maine.  *Id.*  MLA's employees and contractors familiar with this case reside in Maine, and all MLA documents relevant to this case are in Maine.  *McCarron Decl.* ¶ 2.  MLA does not maintain any offices outside of Maine.  *Id.*

Maine Coast Fishermen's Association, Inc. ("MCFA") is a nonprofit corporation that works directly with roughly 200 Maine fishermen, nearly all of whom trap and sell lobster, to enhance the sustainability of Maine's fisheries by advocating for the

---

[1]    According to the complaint, the term, "lobstermen," is used to describe both men and women who hold commercial licenses to harvest lobster.  *Compl.* ¶ 5.  Since both parties use "lobstermen" as a gender-neutral term, the Court does so as well.

6

Add.6

needs of community-based fishermen, the environmental restoration of the Gulf of Maine, and the brand value and goodwill associated with Maine lobster. *Martens Decl.* ¶ 1. MCFA is incorporated in Maine, and its principal place of business is in Brunswick, Maine. *Compl.* ¶ 16. MCFA's employees familiar with this case reside in Maine, and all MCFA documents related to this case are in Maine. *Martens Decl.* ¶ 2.

Maine Lobster and Processing, LLC, doing business as Atwood Lobster, LLC ("Atwood"), is a third-generation Maine lobster company and one of the leading lobster producers in the United States. *Thompson Decl.* ¶ 1. Atwood was formed under Delaware law, and its principal place of business is in South Thomaston, Maine. *Compl.* ¶ 17. Atwood's employees familiar with this case reside in Maine, and all Atwood documents related to this case are in Maine. *Thompson Decl.* ¶ 2.

Bug Catcher, Inc. ("Bug Catcher") is a lobster fishing company owned by Gerald R. Cushman, a sixth-generation lobsterman and member of MLA and MCFA. *Compl.* ¶ 18. Bug Catcher is incorporated in Maine, and its principal place of business is in Port Clyde, Maine. *Id.* Mr. Cushman resides in Maine, as do Bug Catcher's contractors who are familiar with this case. *Cushman Decl.* ¶ 2. All Bug Catcher documents related to this case are located in Maine. *Id.*

### 2.    Monterey Bay Aquarium Foundation

MBAF is a nonprofit corporation that operates Seafood Watch, a program that issues consumer- and business-facing ratings and recommendations for seafood sources, which are purportedly based on assessments of environmental sustainability

7

Add.7

and supported by scientific data. *Compl.* ¶ 19. Seafood Watch seeks and secures commitments from major seafood industry buyers to follow its recommendations and purchase only products that Seafood Watch has deemed environmentally sustainable. *Id.* MBAF is organized under California law, and its principal place of business is in Monterey, California. *Id.* It is licensed to solicit charitable donations in Maine. *Pls.' Opp'n*, Attach. 1, *MBAF Charitable Org. Licensure Status.*

The documents at issue in this case were authored, edited, published, and uploaded to Seafood Watch's website in California. *Def.'s Mot.*, Attach. 1, *Decl. of Rob Mann* ¶ 2 (*Mann Decl.*); *id.*, Attach. 2, *Decl. of Jennifer Dianto Kemmerly* ¶ 2 (*Kemmerly Decl.*). Seafood Watch's website, which is accessible worldwide, is passive and does not allow users to post comments or engage in dialogue. *Mann Decl.* ¶¶ 3-4. MBAF represents that it has not circulated magazines, sent correspondence, or otherwise engaged in conduct aimed at deliberately exploiting a market in Maine. *Kemmerly Decl.* ¶ 5. MBAF further states that it did not direct the documents at issue in this case, or any other communications, to any resident of Maine, nor has it reached out to Maine in any way other than having a website. *Id.*

## B.    The Maine Lobster Fishery

The Northwest Atlantic Ocean, encompassing waters from Maine to North Carolina, is divided into two discrete lobster stocks: the Gulf of Maine/Georges Bank and Southern New England. *Compl.* ¶ 27. The Maine lobster fishery, which targets the Gulf of Maine/Georges Bank stock, is the center of the lobster industry in the United States. *Id.* ¶¶ 25, 27. In 2021, the Maine lobster fishery hauled more than

8

Add.8

80% of the country's lobster landings. *Id.* ¶ 25. That year, the fishery was responsible for landing more than 100 million pounds of lobster, worth nearly $725 million. *Id.* Lobsters caught off the coast of Maine are sold domestically and internationally, in both live and processed forms. *Id.*

The lobster industry contributes about $1 billion annually to Maine's economy. *Compl.* ¶ 3. It directly supports roughly 12,000 jobs on the water and an additional 6,600 shoreside jobs through its supply chain. *Id.* By law, each of Maine's 5,600 commercial lobstermen is a self-employed small business owner who operates his or her own boat. *Id.* ¶ 5.

Many ancillary businesses—including those in the hospitality, retail, dining, trucking, banking, and manufacturing sectors—base their operations around the lobster fishery and depend on robust national and international markets for lobster. *Id.* ¶ 3. Additionally, the lobster industry is intertwined with Maine's tourism sector: of the roughly 10.1 million people who visited Maine between May and August 2021, 64% said they visited Maine for the state's food and culinary experiences and 42% said they specifically came to Maine for lobster. *Id.* ¶ 4.

### C.    Sustainability Measures Adopted By the Lobster Industry

To catch lobster, lobstermen use traps deployed on the seabed, which feature an entrance tunnel through which a lobster is lured with bait. *Id.* ¶ 26. These traps are laid out alone, in pairs, or in strings with a number of traps attached to a rope. *Id.* Deployed traps are connected to surface buoys by means of ropes, which are also

Add.9

called vertical lines. *Id.* Traps are generally harvested and re-baited several times per week. *Id.*

Lobster fishing in Maine is subject to strict regulations aimed at ensuring resource preservation and environmental sustainability. *Id.* ¶ 28. Examples of such regulations include size limitations, aimed at ensuring the reproductive success of the lobster stock, and restrictions on the number and configuration of traps. *Id.*

Maine lobstermen have also taken steps to protect the North Atlantic right whale, a species primarily inhabiting the North Atlantic Ocean, that is listed as endangered under the Endangered Species Act and protected under the Marine Mammal Protection Act. *Id.* ¶ 29; *see also* 16 U.S.C. § 1531 *et seq.*; 16 U.S.C. § 1361 *et seq.* Commercial whaling caused the right whale population to "substantially diminish" by the end of the nineteenth century. *Id.* In 1935, the National Marine Fisheries Service (NMFS) designated the right whale as endangered when the whale population reached an estimate of only 100 surviving members as a result of commercial whaling. *Id.* While the right whale population grew to 481 in 2011, the NMFS reported in 2017 that the population had again declined to roughly 350 due to an unusual rate of mortalities.[2] *Id.* As of the date of the complaint's filing, none of the whale deaths during this unusual mortality event had been attributed to Maine

---

[2]    The exact number of right whales remaining in the wild is a subject of debate. *See Compl.*, Attach. 2, MONTEREY BAY AQUARIUM SEAFOOD WATCH, REPORT ID 524, AMERICAN LOBSTER 39 (2022) (stating that the "best estimate" of the right whale population at the end of 2020 was 336).

lobster gear.[3]  *Id.*  Since 2014, the number of right whales in the Maine lobster fishery has decreased due to changing ocean conditions.  *Id.* ¶ 46.

Since 1997, the Maine lobster industry has adhered to the Atlantic Large Whale Take Reduction Plan (Take Reduction Plan).  *Id.* ¶ 30 (citing 72 Fed. Reg. 57,104, 57,106 (Oct. 5, 2007); 73 Fed. Reg. 51,241 (Sept. 2, 2008); 79 Fed. Reg. 36,586, 36,587 (June 27, 2014); and 80 Fed. Reg. 30,367, 30,378 (May 28, 2015)).  The Take Reduction Plan—which was developed by fisheries, government agencies, scientists, lobstermen, and environmental groups—required the implementation of innovative fishing practices and gear deployment strategies designed to protect right whales.  *Id.* These measures now include: 1) the use of sinking lines between traps, which effectively removed 27,000 miles of rope from New England waters; 2) requirements that more lobster traps be attached to each buoy line, removing an additional 3,000 miles of rope; and 3) the incorporation of "weak-links" in the buoy line to allow entangled right whales to break free.  *Id.*

In 2021, the Take Reduction Plan was further modified to provide for: 1) a higher minimum number of lobster traps per buoy line in certain areas; 2) the closure of nearly 1,000 square miles of prime winter fishing grounds for one-third of the year to eliminate even more rope from the water; 3) new requirements mandating the use

---

[3]    The parties' October 2024 motions to supplement the record with new information implicate the Plaintiffs' assertions regarding right whale fatalities imputed to Maine lobster gear.  *See Def.'s Second Mot. to Suppl.*; *Pls.' Mot. to Suppl.*  The Court granted both parties' motions, *Order on Mots. to Suppl.*, and discusses the revised facts and parties' positions on their substantive effect on the presently pending motion later in this order.  *See, supra*, Section II.L*;* Section III.D-F.

of weak ropes designed to break at a force of 1,700 pounds; and 4) expanded gear marking requirements.  *Id.* ¶ 32.

Many individual Maine lobstermen use even less rope than permitted under the Take Reduction Plan.  *Id.* ¶ 33.  Additionally, the state of Maine has voluntarily maintained right whale protections in waters exempt from the Take Reduction Plan and implemented enhanced gear marking nearly two years sooner than required by federal rules.  *Id.*

Plaintiffs aver in their complaint that, as of the date of filing, "[t]here has not been a single documented entanglement of a right whale in Maine lobster gear since 2004."[4]  *Id.* ¶ 31.  The 2004 entanglement was not severe, and as of the date of filing, the NMFS database chronicling right whale injuries and mortalities contained no records of right whale entanglements with Maine fishing gear that resulted in serious injury or death.  *Id.* ¶¶ 9, 31.  By contrast, the NMFS database and other experts have documented many right whale entanglements with gear from other fisheries, including Canadian snow crab fisheries, that resulted in serious injury or death.  *Id.* ¶ 31.

### D. The Scientific and Political Debate Surrounding Lobster Fishing's Effect on North Atlantic Right Whales

Notwithstanding the initiatives described above, the impact of lobster fishing on the North Atlantic right whale has been the subject of considerable scientific,

---

[4]    As explained in footnote 3, on December 5, 2024, the Court granted the parties' October 2024 motions to supplement the record with new information about documented entanglements.  *See Def.'s Second Mot. to Suppl.*; *Pls.' Mot. to Suppl.*; *Order on Mots. to Suppl.*  The Court discusses the revised facts and parties' positions on their substantive effect on the presently pending motion later in this order.  *See, supra*, Section II.L*;* Section III.D-F.

political, and legal activity in recent years.   On September 17, 2019, eighteen

scientists and conservationists sent a letter to U.S. Senator Susan Collins (R-Maine),

which argued that "the number of North Atlantic right whales in Maine waters, the

number of entanglements that are occurring in Maine waters, and the severity of all

entanglements and their effects upon the right whale population are all significantly

underestimated." *Def.'s Additional Attachs.*, Attach. 2, *Letter from Scott D. Kraus,*

*Vice President, Anderson-Cabot Ctr. for Ocean Life et al., to Senator Susan Collins* at

4 (Sept. 17, 2019) (*Letter to Senator Collins*).   This letter also criticized Maine's efforts

to "undermine proposed conservation measures critical to the North Atlantic right

whale's survival." *Id.* at 1.

In January 2018, several groups dedicated to environmental conservation filed

a lawsuit in the U.S. District Court for the District of Columbia, challenging the

federal government's failure to issue a Biological Opinion sufficient to ensure that

lobster fishing does not jeopardize the continued existence of the right whale.[5]  *See*

---

[5]   As recounted in a recent order, the District of Columbia litigation has a lengthy procedural history, the specifics of which are unimportant for present purposes.  *See Ctr. for Biological Diversity*, 2024 U.S. Dist. LEXIS 14889, at *3-10.  The Court notes the existence of this litigation to underscore the point that MBAF is not the only organization to raise concerns about the impact of lobster fishing on the North Atlantic right whale.

As a related note, the Court also recognizes the publication of a recent decision by the First Circuit Court of Appeals relating to lobster fishing in Massachusetts and its effects on the right whale. *See, generally*, *Mass. Lobstermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, Nos. 24-1480, 24-1481, slip op. (1st Cir. Jan. 30, 2025).  This case centered on an emergency rule issued by the National Marine Fisheries Service seasonally banning the use of vertical buoy lines in certain federal waters off Massachusetts based on the risk of injury or death posed to North Atlantic right whales.  *Id.* at 3, 11. In that case, a Massachusetts lobster industry trade group challenged the NMFS rulemaking as violative of the temporary statutory authorization of lobster and Jonah crab fishing contained in a rider to the Consolidated Appropriations Act of 2023.  *Id.* at 3 (citing Pub. L. No. 117-328, Div. JJ, 126 Stat. 4459, 6089–93, § 101(a) (Dec. 29, 2022)).  Though there are similarities between that case and the case at bar—to wit, the endangered species and industry bringing suit—the First Circuit's analysis of NMFS' statutory authority to issue the emergency rule has no bearing on the defamation claim here.

13

Add.13

*Ctr. for Biological Diversity v. Raimondo*, No. 18-112 (JEB), 2024 U.S. Dist. LEXIS 14889, at *3-10 (D.D.C. Jan. 29, 2024).  While this litigation was pending, Congress passed, as part of the Consolidated Appropriations Act of 2023, 117 P.L. 328, a provision enshrining until December 31, 2028, the current lobster industry regulations regarding interactions with right whales.  *Def.'s Mot.*, Attach. 7, *Press Release, Off. of Governor Janet T. Mills, Me. Delegation, Governor Mills Announce Lifeline for Me.'s Lobster Ind. Secured in Gov't Funding Package* (Dec. 20, 2022).

## E.     The Seafood Watch Rating System

MBAF's Seafood Watch program aims to "push suppliers to source more environmentally responsible products."  *Compl.* ¶ 34 (quoting MONTEREY BAY AQUARIUM SEAFOOD WATCH, https://www.seafoodwatch.org/ (last visited May 1, 2024)). Seafood Watch recommends certain seafood products to consumers and businesses and rates seafood sources based on its own "purportedly scientific assessments" of environmental sustainability.  *Id.* ¶ 35.  Seafood Watch seeks to influence consumer decisions and "spark change throughout the supply chain." *Id.* ¶ 36 (quoting MONTEREY BAY AQUARIUM SEAFOOD WATCH, https://www.seafoodwatch.org/ (last visited May 1, 2024)).  It also seeks and secures commitments from major seafood buyers—including restaurants, grocery stores, and retailers—to "serve environmentally responsible seafood following the Seafood Watch recommendations." *Id.* ¶ 36 (quoting *Businesses*, MONTEREY BAY AQUARIUM SEAFOOD WATCH, https://www.seafoodwatch.org/collaborations/businesses (last visited May 1, 2024)).

Add.14

In arriving at its recommendations, Seafood Watch claims to review "all available scientific data" and follow a "rigorous, transparent, science-based process to evaluate the current environmental performance of a fishery." *Id.* ¶ 38 (quoting *Id.*, Attach. 1, *Press Release, Monterey Bay Aquarium Seafood Watch, Seafood Watch Assigns Red Ratings to Canadian and U.S. Fisheries that Pose Dire Risk to the Endangered N. Atl. Right Whale* (Sept. 5, 2022) (*Red Listing Press Release*)). Seafood Watch defines "sustainable seafood" as "originating from sources, whether wild-caught or farmed, which can maintain or increase production in the long-term without jeopardizing the structure or function of affected ecosystems." *Id.* ¶ 39 (quoting *Id.*, Attach. 2, MONTEREY BAY AQUARIUM SEAFOOD WATCH, Rep. ID 524, Am. Lobster at 3 (2022) (*Lobster Rep.*)). According to Seafood Watch, each of its ratings is supported by "a Seafood Watch assessment," in which "the fishery or aquaculture operation is evaluated using the Seafood Watch standard." *Id.* ¶ 40 (quoting *Lobster Rep.* at 3). The Seafood Watch standard is "built on [Seafood Watch's] guiding principles." *Id.* (quoting *Lobster Rep.* at 3).

Seafood Watch's guiding principles are "operationalized" in four "criteria." *Id.* ¶ 41 (quoting *Lobster Rep.* at 4). Once a rating has been assigned to each criterion, Seafood Watch assigns the seafood being reviewed a color-coded "overall recommendation." *Id.* (quoting *Lobster Rep.* at 4). Seafood given a "red" or "avoid" rating "comes from sources that don't align with [Seafood Watch's] guiding principles." *Id.* ¶ 42 (quoting *Lobster Rep.* at 3-4). A red rating signals "a critical conservation concern or many issues need[ing] substantial improvement." *Id.*

15

Add.15

(quoting *Lobster Rep.* at 3). Seafood Watch tells consumers to "[t]ake a pass" on red-rated seafood because it is "caught or farmed in ways that harm other marine life or the environment." *Id.* (quoting *Lobster Rep.* at 4). Seafood Watch has also stated that fisheries given a red rating "pose a high risk of harm to marine life or the environment and appropriate management measures are not in place." *Id.* ¶ 43 (quoting *Answers to Frequently Asked Questions About Seafood Watch's Latest Assessments for Fisheries Using Gear that Pose Significant Risk to the Endangered N. Atl. Right Whale*, MONTEREY BAY AQUARIUM (updated July 7, 2023), https://www.montereybayaquarium.org/newsroom/press-releases/seafood-watch-assessments-faqs-north-atlantic-right-whale (*MBAF FAQ Answers*)).

In contrast, a "green" or "best choice" rating tells consumers to "[b]uy first" because the seafood is "well managed and caught or farmed responsibly." *Id.* ¶ 44 (quoting *Lobster Rep.* at 4). Sources of green-rated seafood "operate in a manner that's consistent with [Seafood Watch's] guiding principles," and the seafood itself "is caught or farmed in ways that cause little or no harm to other wildlife or the environment." *Id.* (quoting *Lobster Rep.* at 3). An intermediate "yellow" or "good alternative" label tells consumers to "[b]uy, but be aware there are concerns with how [the seafood is] caught, farmed or managed." *Id.* (quoting *Lobster Rep.* at 4).

**F.     Dialogue Between Seafood Watch and Lobster Industry Stakeholders Regarding Seafood Watch's Rating for Lobster**

In 2014, Seafood Watch assigned Maine lobster a "yellow" rating. *Id.* ¶ 45. In or around February 2020, MBAF emailed MLA about a planned update to the Seafood Watch sustainability rating for U.S. lobster fisheries. *McCarron Decl.* ¶ 3. MBAF

claimed to be interested in "a range of stakeholder viewpoints" and requested to meet with Patrice McCarron, then MLA's executive director, to discuss the Maine lobster industry generally and interactions with North Atlantic right whales in particular. *Id.* ¶ 4.

In March 2020, MBAF again emailed MLA, seeking MLA's comments on a draft assessment of the U.S. lobster fishery. *Id.* ¶ 5. On May 15, 2020, Ms. McCarron told MBAF that MLA was "concerned about how the Maine lobster fishery is characterized, particularly with regard to right whales." *Id.* ¶ 6. Ms. McCarron also informed MBAF that there is no evidence any right whale has ever suffered serious injury or death as a result of entanglements in gear used by the Maine lobster fishery, and she directed MBAF to data from the NMFS supporting this conclusion. *Id.* In its response to Ms. McCarron, MBAF acknowledged that "[t]he possible results of this assessment and the impact that it may have is not lost on us." *Id.*

On June 12, 2020, Ms. McCarron again emailed MBAF to raise issues with the draft assessment and directed MBAF to sources showing: 1) a 90% reduction in entanglements in New England lobster gear since 2010, likely due to successful protective measures and a geographic shift of right whales to Canada; 2) a steep decline in the amount of rope exceeding 0.5 inches in diameter being removed from entangled right whales; 3) the removal of 30,000 miles of rope from the water; and 4) NMFS's determination that certain gear removed from right whales could not have originated in Maine and was likely from a non-trap/pot fishery. *Id.* ¶ 7. That same month, Ms. McCarron again emailed MBAF to share new data showing that in 2019,

17

Add.17

a total of nine right whales were reported dead in Canadian waters, and a tenth whale found in U.S. waters was determined to have died as a result of Canadian activities. *Id.* ¶ 8.

On August 12, 2020, MBAF shared an updated draft assessment with MLA and several other industry stakeholders to solicit feedback. *Id.* ¶ 10. On August 17, 2020, marine biologist Curt Brown shared his comments on the draft assessment with Ms. McCarron, which he had also sent to MBAF directly. *Id.* ¶ 11. Mr. Brown pointed MBAF to relevant scientific data and explained that "the evidence is simply not there" to blame the U.S. lobster fishery for right whale entanglements. *Id.* He further described the Maine lobster fishery's "long history of sustainable practices" and "proactive track record of modifying gear to reduce risk to right whales," including using ropes with weak links. *Id.* In addition, Mr. Brown explained that, as of August 2020, no right whales have become entangled in Maine lobster gear since 2004, and NMFS's statistical database that tracks human interactions with right whales showed that 21 of the 30 right whale deaths since 2017 were attributed to Canada. *Id.* According to Mr. Brown, MBAF failed to account for major lobster industry efforts to further reduce risks to right whales, making Seafood Watch's planned red rating "premature and irresponsible." *Id.*

In response to Mr. Brown, MBAF argued a red rating was warranted because the New England lobster fishery had not proven the negative—that it was not among the unidentified fisheries that could be responsible for right whale deaths. *Id.* ¶ 12. MBAF acknowledged that the lobster industry had taken "many steps to reduce the

18

Add.18

impact on [right whales]," but it countered that "other groups have argued that action should have been taken sooner." *Id.*

On August 21, 2020, MBAF responded to Ms. McCarron's comments on the updated draft report. *Id.* ¶ 13. MBAF insisted that "any fishery that is known to overlap with [right whales] has the potential to contribute" to the dangers faced by the whales. *Id.* ¶ 14. Responding to Ms. McCarron's presentation of data tracking the diameters of ropes found in entanglements, which indicated the ropes were not from the Maine lobster fishery, MBAF expressed its opinion that there was "significant uncertainty around this data," although the data was drawn from the NMFS's documented record of ropes removed from right whales. *Id.* However, MBAF agreed to update the draft assessment "to reflect the most up to date information regarding the fisheries involved in [right whale] entanglements." *Id.* ¶ 15.

On September 4, 2020, several lobster industry stakeholders emailed MBAF to share additional data-backed responses to each criterion considered in the draft assessment. *Id.* ¶ 16. The stakeholders explained that MBAF's contention that "any fishery with a vertical line has the exact same likelihood of bycatch to endangered species" was "not supported by the data." *Id.* They also warned that a red rating would "mislead consumers," identified outdated and irrelevant data cited in the draft assessment, and notified MBAF that publishing a red rating would cause "permanent, irreparable harm to one of the world's most sustainable, conscientious, and proactive fisheries." *Id.* On September 24, 2020, MBAF responded, dismissing the data provided by the stakeholders. *Id.* ¶ 17.

On September 8, 2020, Ms. McCarron was copied on a letter to MBAF from Maine elected officials, which stated that the planned red listing was based on "scant, outdated and contradictory evidence." *Id.* ¶ 18. The elected officials also expressed disappointment at having recently learned that MBAF circulated its initial findings to "just a few select entities" earlier in 2020, thereby "eliminating the opportunity to incorporate broader scientific feedback and engage in a meaningful dialogue with stakeholders." *Id.*

**G. Seafood Watch's Assignment of a Red Rating to American Lobster**

On September 5, 2022, Seafood Watch downgraded the rating of American lobster from yellow to red. *Compl.* ¶ 47. That same day, Seafood Watch published a press release on its website announcing its assignment of a red rating to all lobsters caught in certain Canadian and U.S. fisheries, including the Gulf of Maine/Georges Bank region that encompasses the Maine lobster fishery. *Id.* According to the press release, the red rating was based on "significant risks of entanglement in pot, trap, and gillnet fisheries to the endangered North Atlantic right whale and the lack of timely, effective management necessary to mitigate entanglement risks and promote recovery of the species." *Id.* (quoting *Red Listing Press Release*). The press release further stated that Seafood Watch determined the affected fisheries "do not go far enough to mitigate entanglement risks" after reviewing "all available scientific data" and following a "rigorous, transparent, science-based process." *Id.* (quoting *Red Listing Press Release*). In particular, Seafood Watch stated that some of the red-rated

20

Add.20

fisheries "use gear with vertical lines that are known to entangle the endangered North Atlantic right whale." *Id.* (quoting *Red Listing Press Release*).

In addition to announcing Seafood Watch's conclusions, the press release cites specific data and sources relied upon by Seafood Watch. The press release notes that "[f]or the North Atlantic right whale population to recover, the average number of whales injured or killed by human-related activity must be less than one whale per year," *Red Listing Press Release* (citing NE. FISHERIES SCI. CTR., U.S. DEP'T OF COM., NOAA TECHNICAL MEM. NMFS-NE-288, U.S. ATL. AND GULF OF MEXICO MARINE MAMMAL STOCK ASSESSMENTS 2021 (2022) (*2021 Mammal Stock Assessments*)), but "[t]his number has been exceeded almost every year since 1995." *Id.* (citing *Marine Mammal Stock Assessment Reports by Species/Stock*, NOAA FISHERIES, https://www.fisheries.noaa.gov/national/marine-mammal-protection/marine-mammal-stock-assessment-reports-species-stock (last visited Aug. 8, 2024)).

Further, the press release states that "U.S. and Canadian fisheries, combined, deploy up to one million vertical lines throughout North Atlantic right whale migratory routes, calving, and foraging areas." *Id.* (citing NE. FISHERIES SCI. CTR., U.S. DEP'T OF COM., NOAA TECHNICAL MEM. NMFS-NE-247, N. ATL. RIGHT WHALES— EVALUATING THEIR RECOVERY CHALLENGES IN 2018 (2018)). Finally, the press release declares that "[o]ver 80 percent of North Atlantic right whales have been entangled in fishing gear at least once," *id.* (citing Amy R. Knowlton et al., *Monitoring N. Atl. Right Whale Eubalaena glacialis Entanglement Rates: A 30 Yr Retrospective*, 466 MARINE ECOLOGY PROGRESS SER. 293 (2012) (*Knowlton et al.*)), and "[m]ore than 90%

21

Add.21

of entanglements cannot be linked to a specific gear type, and only 12% of entanglements can be linked to a specific location." *Id.* (citing *Knowlton et al.*; and *Letter to Senator Collins*).

On September 6, 2022, Seafood Watch published the Lobster Report, which contained its recommendations regarding American lobster caught in the Northwest Atlantic region and detailed its assignment of a red rating to lobster caught in the Gulf of Maine/Georges Bank and Southern New England regions. *Compl.* ¶ 48. The Lobster Report urges readers to "***[a]void*** American lobster caught by trap from Georges Bank and the Gulf of Maine stocks due to risks to the critically endangered North Atlantic right whale and insufficient measures for reducing these risks." *Id.* ¶ 49 (emphasis in original) (quoting *Lobster Rep.* at 6). According to the Lobster Report, "management measures and the Atlantic Large Whale Take Reduction Plan have not been successful at reducing serious injury and mortality to the North Atlantic right whale." *Id.* ¶ 50 (quoting *Lobster Rep.* at 5). The Lobster Report further states that "[u]ntil there is more specific information available regarding which fisheries are responsible for the unattributed entanglements, Seafood Watch considers that all relevant fisheries that may overlap with [right whales] pose risks. *Lobster Rep.* at 41. "Based on the available information and the significant risks to [the right whale], the American lobster fishery cannot be considered sustainable." *Id.* ¶ 51 (quoting *Lobster Rep.* at 41).

After the publication of the Lobster Report, Ms. Kemmerly, MBAF's Vice President of Global Ocean Initiatives, stated in an interview that consumers'

22

Add.22

"appetite for seafood is driving a species to extinction." *Compl.* ¶ 52 (quoting *Seafood Watch Group Lists New England Lobster as Seafood to Avoid Due to Env't Concerns*, CBS NEWS (Sept. 6, 2022, 10:19 AM EDT), https://www.cbsnews.com/news/seafood-watch-group-new-england-lobster-north-atlantic-right-whale/).

Like the press release, the Lobster Report cites governmental and scientific studies for the data relied upon by Seafood Watch. Sources cited by the Lobster Report include research conducted by scientists at the National Oceanic and Atmospheric Administration (NOAA), *see Marine Mammal Stock Assessment Reps.*, NOAA   FISHERIES,   https://www.fisheries.noaa.gov/national/marine-mammal-protection/marine-mammal-stock-assessment-reports (last visited Aug. 8, 2024), and studies published in *Ecology and Evolution* and *ICES Journal of Marine Science. See* Richard M. Pace III et al., *State—Space Mark—Recapture Estimates Reveal a Recent Decline in Abundance of North Atlantic Right Whales*, 7 ECOLOGY & EVOLUTION 8730 (2017) (*Pace et al.*); Michael J. Moore, *How We Can All Stop Killing Whales: A Proposal to Avoid Whale Entanglement in Fishing Gear*, 76 ICES J. OF MARINE SCI. 781 (2019) (*Moore*).

In publishing the red rating, MBAF took care to collect and analyze the most sophisticated and relevant available data. *Kemmerly Decl.* ¶ 3. In addition, MBAF invited various ocean conservation and lobster industry stakeholders to review and comment on the Lobster Report before it was released. *Id.* ¶ 4. Peer reviewers included nine scientists from federal management agencies, the Maine Department of Marine Resources, MLA, environmental organizations, and a wholesale lobster

23

Add.23

supplier. *Id.* The reviewers exchanged data but ultimately disagreed over the risks posed to right whales by the lobster industry. *Id.*

Three days after the red rating was announced, on September 8, 2022, Maine Governor Janet Mills, Senator Collins, U.S. Senator Angus King, and U.S. Representatives Chellie Pingree and Jared Golden wrote a letter to MBAF demanding that the red rating be reversed and citing data contrary to the conclusions in the Lobster Report. *Def.'s Additional Attachs.* at 1-5, *Letter from Governor Janet T. Mills, Sen. Susan M. Collins, Sen. Angus S. King, Jr., Rep. Chellie Pingree & Rep. Jared Golden, to Jennifer Dianto Kemmerly, Vice Pres. of Glob. Ocean Initiatives, Monterey Bay Aquarium* (Sept. 8, 2022). On October 5, 2022, MBAF responded in a press release, declining to retract the red rating and stating that "Seafood Watch reviewed all publicly available data, including the latest government stock assessments, peer-reviewed science, and all state and federal management measures." *Id.*, Attach. 1, *Press Release, Monterey Bay Aquarium, Response from Monterey Bay Aquarium on Calls to Reverse Recent Seafood Watch Red Ratings* (Oct. 5, 2022).

### H.    Statements by Seafood Watch and Individuals Associated with the Monterey Bay Aquarium After the Announcement of the Red Rating

On September 16, 2022, MBAF issued another press release, reiterating that "each fishery using [vertical lines] is putting [the North Atlantic right whale] at risk of extinction." *Compl.* ¶ 66 (citing *Press Release, Monterey Bay Aquarium, Seafood Watch Responds to Misinformation Regarding Red Ratings of Canadian and U.S.*

*Fisheries that Pose Dire Risk to the Endangered North Atlantic Right Whale* (Sept. 16, 2022).

On September 6, 2022, Ms. Kemmerly spoke to New England Cable News, a regional news outlet, repeating her claim that "no one wants their appetite for seafood to drive a species to extinction." *Pls.' Opp'n* at 6 & n.1 (citing David Guildford, *Maine Leaders React to 'Absurd' Seafood Watch Red List on Lobster* (Sept. 10, 2022, 11:38 AM EDT), NBC NEWS CTR. ME., https://www.newscentermaine.com/article/money/business/maine-leaders-stew-over-seafoodwatch-red-list-lobster-industry-right-whale-regulations-protections-lobstermen-environment/97-d718ea08-3e2d-4b07-97a1-08ecebe897ca). Ms. Kemmerly also gave a lengthy interview to *Down East*, a Maine-based magazine, which was published in December 2022. *Id.* at 6-7, 7 n.3 (citing Kathryn Miles, *How Did Gulf of Maine Lobster Get Canceled?*, DOWNEAST MAG., Dec. 2022, https://downeast.com/issues-politics/how-did-gulf-of-maine-lobster-get-canceled/ (*Down East Article*)). In this interview, Ms. Kemmerly explained how Seafood Watch develops its ratings and what triggered the reassessment of American lobster. *Down East Article.* She noted, for example, that "Seafood Watch has based its rating system on international best practices, including those established by the United Nations' Food and Agriculture Organization." *Id.* According to Ms. Kemmerly, Seafood Watch was "doing a lot of updating, watching, and incorporating new data for two years before [it] began circulating [the] draft assessment for peer review and public comment." *Id.*

25

Add.25

I.   **Seafood Watch's Allegedly False Statements Concerning Lobster**

   1.   **The Relationship Between Lobster Fishing Practices and Right Whale Mortality**

According to Plaintiffs, available scientific data shows that the most acute threats to the right whale come from entanglements in Canadian snow crab gear, vessel strikes, climate change, and ocean noise. *Compl.* ¶ 53. Plaintiffs allege this data belies MBAF's claim that Seafood Watch conducted a rigorous, transparent assessment of all available scientific data. *Id.* ¶ 59.

Right whales are rarely found in Maine lobster fishing grounds. *Id.* ¶ 54. Beginning in 2010, the Gulf of Maine and Scotian Shelf regions of the Northwest Atlantic experienced a significant change in oceanic conditions, causing a substantial decline in the abundance of copepods, a primary component of the right whale's diet. *Id.* Copepod populations in the Gulf of Maine have remained low since that time. *Id.* As a result, right whales have abandoned the Gulf of Maine in favor of Canada's Gulf of St. Lawrence, where copepods are more plentiful. *Id.*

The locational shift of right whales into Canadian waters has increased their risk of vessel strikes and entanglement with heavy, deep-water snow crab gear. *Id.* ¶ 55. The ropes used in the Canadian snow crab fishery are heavier and thicker than those used in the Maine lobster industry. *Id.* As a result, snow crab ropes pose a greater risk to right whales. *Id.* Canada has not implemented protective gear deployment measures similar to those used in the Maine lobster fishery, and such measures are not expected until 2024. *Id.*

26

Add.26

Right whales have experienced an unusually high mortality rate since 2017, and an unprecedented number of adult whales have been lost to vessel strikes and fishing gear entanglement. *Id.* ¶ 56. As of the date of filing, "none of the injuries or deaths caused by entanglement during this time have been attributed to Maine lobster gear or the Maine lobster fishery." *Id.* Since 2010, the right whale calving rate has declined, which has been attributed to the oceanic shift. *Id.*

Numerous scientists have linked the post-2010 right whale population decline to a spike in serious injuries and deaths caused by Canadian fishing gear and vessels in Canada's Gulf of St. Lawrence. *Id.* ¶ 57. In 2017, twelve observed right whale mortalities were attributed to events in Canadian waters. *Id.* In 2019, eleven observed right whale mortalities occurred in Canadian waters. *Id.*

Additionally, ocean noise from human activities—including military sonar, shipping, construction, and energy exploration—has increased in the Northwest Atlantic, interrupting the normal behavior of right whales and interfering with their ability to communicate. *Id.* ¶ 58. The increased noise likely hinders the ability of right whales to detect and avoid predators and human hazards, navigate, identify physical surroundings, find food, and find mates. *Id.*

### 2. The Measures Taken by the Maine Lobster Fishery to Protect Right Whales

The Plaintiffs allege that, despite Seafood Watch's claims that the Maine lobster fishery has employed "insufficient measures" that "do not go far enough to mitigate entanglement risks," the measures implemented in the Maine lobster fishery are both effective and a model for sustainable, environmentally responsible

27

Add.27

fisheries.  *Id.* ¶ 60.  According to the Plaintiffs, these measures have reduced risks to right whales in the increasingly rare circumstances when they migrate through the Gulf of Maine.  *Id.* ¶ 61.

Between the implementation of the Take Reduction Act in 1997 and 2011, the right whale population increased from 295 to 481.  *Id.* ¶ 62.  The first population decline after 1997 was detected in 2017 with the publication of a population model that coincided with the 2017 unusual mortality event.  *Id.* ¶ 62.  Since 2009, known entanglements in any U.S. lobster gear have fallen by 90% compared to the prior thirteen years.  *Id.* ¶ 63.  Plaintiffs aver that, as of the date of the complaint's filing on March 14, 2023, no entanglements had been linked to the Maine lobster fishery since 2004.  *Id.*

### 3.    The Data Cited by Seafood Watch

According to the Plaintiffs, the "data relied on by Seafood Watch does not support that Maine lobster fishing practices pose a significant threat or cause harm to the right whale."  *Id.* ¶ 64.  As a result, the Plaintiffs accuse MBAF of "attempting to skew facts to support its conclusion" and, in doing so, disregarding the scientific processes it claims to follow.  *Id.*

Seafood Watch relies heavily on data regarding Canadian entanglements.  *Id.* ¶ 65.  Gear used in the Canadian snow crab fishery differs significantly from gear used in the Maine lobster fishery, with the Canadian gear posing far greater risks due to its rope size, rigging, heavy traps, and absence of weak links.  *Id.*

28

Add.28

Additionally, Plaintiffs say, Seafood Watch misuses broad statistics about the existence of any documented right whale injuries or deaths in U.S. or Canadian waters to support its charge that "each fishery" using vertical lines, including the Maine lobster fishery, "is putting [the right whale] at risk of extinction." *Id.* ¶ 66 (quoting *MBAF FAQ Answers*). But the NMFS attributes the risk of right whale extinction to "[c]urrent conditions that continue to act on the species, like the effect of Canadian fisheries and vessel strikes in the United States and Canada," not to Maine lobster gear. *Id.*

In its September 5, 2022 press release, Seafood Watch stated that "[m]ore than 90% of entanglements cannot be linked to a specific gear type, and only 12% of entanglements can be linked to a specific location." *Id.* ¶ 67 (quoting *Red Listing Press Release*) (emphasis removed). Seafood Watch then concluded that "[u]ntil there is more evidence, all of the fisheries using this gear are considered a risk." *Id.* (quoting *Red Listing Press Release*) (emphasis removed). The gear used in the Maine lobster fishery is distinguishable from other gear, such as the kind used to catch snow crab in Canadian waters. *Id.* Similarly, Seafood Watch notes that "[d]ue to a lack of information, it is often not possible to assign entanglements to a specific fishery," but concludes "[d]ocumented entanglements from 2015 to 2019 involving pot/trap gear or unidentified gear are all attributed to unknown fisheries, of which the lobster fishery may be a part." *Id.* ¶ 68 (emphasis removed).

Further, the Lobster Report acknowledges that entanglement in fishing gear is one of several factors contributing to the decline in the right whale population. *Id.*

29

Add.29

¶ 70. Likewise, the Report states that right whales have shifted northward in recent years. *Id.* ¶ 71. However, Plaintiffs accuse MBAF of ignoring this evidence when attributing potential entanglements to the Maine lobster fishery. *Id.*

Finally, Plaintiffs allege that MBAF cites outdated studies that support its conclusion while failing to acknowledge more recent facts demonstrating a significant reduction in the risk to right whales from lobster fishing. *Id.* ¶ 72. In Plaintiffs' view, when MBAF mentions the measures taken by the lobster fishery to protect right whales, it disregards this data. *Id.* ¶ 74. In sum, Plaintiffs allege that MBAF's "disregard for fact-driven analysis and its arbitrary treatment of data to suit its false narrative demonstrate the falsity of its claims that 'scientific data' shows that Maine lobster fishing practices threaten . . . right whales." *Id.* ¶ 75.

### J.      The Harms Suffered by the Plaintiffs

Seafood Watch influences the commercial decisions of thousands of restaurants, stores, distributors, and other major purchasers of seafood, many of whom have pledged to avoid any items that appear on the Seafood Watch "red" list. *Id.* ¶ 80. For example, following a 2013 red listing by Seafood Watch, around 13,000 restaurants and stores across the United States refused to sell Louisiana shrimp pursuant to sustainability commitments. *Id.* ¶ 81. After Seafood Watch issued its red rating for lobster, several large commercial buyers announced plans to stop selling Maine lobster. *Id.* ¶ 82. Additionally, there are reports that large restaurant chains are in the process of removing Maine lobster from their menus because of the red listing. *Id.*

Add.30

Plaintiffs have suffered economic harm as a result of MBAF's allegedly defamatory statements. *Id.* ¶ 89. Atwood lost significant profits when one of its major purchasers, citing the Seafood Watch red listing, announced it would stop buying lobster caught in the Gulf of Maine. *Id.* Atwood pays premiums to the lobstermen who catch and supply lobsters for this purchaser because the purchaser requires strict quality control measures that increase the lobstermen's costs. *Id.* In 2022, Atwood paid $153,194 in premiums, which was offset by revenues from the purchaser. *Id.* However, even after the purchaser stopped buying lobsters from Atwood, Atwood was required to continue paying these premiums. *Id.* In 2023, Atwood was projected to pay $156,965 in premiums and recoup none of the expenditures from the purchaser. *Id.*

Seafood Watch's statements have also damaged the Maine lobster brand, "caus[ing] a significant decrease in consumer demand for Maine lobster and, as a result, economic harm to Maine lobstermen." *Id.* ¶ 84. According to the Maine Department of Marine Resources, the average per-pound price of Maine lobster between September and December 2022 was $3.89, compared with $6.59 for the same period in 2021. *Id.* Plaintiffs allege that at least part of this 40% price drop is the result of Seafood Watch's statements influencing demand. *Id.*

Because of the red rating, Mr. Cushman, the owner of Bug Catcher, has seen an estimated 20% decline in his business, which made roughly $600,000 in sales in 2021. *Id.* ¶ 85. Bug Catcher also suffered a loss of past and future profits in excess of $75,000. *Id.* BML, MLA, and MCFA have also suffered lost profits or losses

31

Add.31

exceeding $75,000. *Id.* ¶¶ 86-88. Additionally, each Plaintiff is suffering ongoing reputational harm, loss of goodwill, and loss of Maine lobster's brand value. *Id.* ¶ 90.

Plaintiffs further allege that MBAF, through Seafood Watch, intentionally harmed them. *Id.* ¶ 91. At the time that it released its updated recommendations, Seafood Watch had in its possession scientific data contradicting its claims. *Id.* Plaintiffs allege there is no evidence that Maine lobster fishing is harming right whales and points out that Seafood Watch's Lobster Report does not cite a single instance of a right whale being killed, entangled, injured, or otherwise harmed by Maine lobster gear since 2004. *Id.*

### K.     The Challenged Statements

Plaintiffs generally accuse MBAF, through Seafood Watch, of "knowingly and intentionally publish[ing] false and injurious statements disparaging Plaintiffs' products and business, including . . . that commercial lobster fishing practices in the Gulf of Maine cause death and serious injury to North Atlantic right whales." *Id.* ¶ 94. Plaintiffs point to nine allegedly defamatory statements (the "Statements") made by MBAF:

> (1) "At this time, each fishery using this gear is putting this protected species [*i.e.*, the North Atlantic Right Whale] at risk of extinction."

> (2) "No one wants to know their appetite for seafood is driving a species to extinction."

> (3) "The seafood [rated Avoid] is caught or farmed in ways that harm other marine life or the environment. There's a critical conservation concern or many issues need substantial improvement."

> (4) "[M]anagement measures and the Atlantic Large Whale Take Reduction Plan have not been successful at reducing serious injury and mortality to the North Atlantic right whale."

32

Add.32

(5) "Based on the available information and the significant risks to [the North Atlantic right whale], the American lobster fishery cannot be considered sustainable."

(6) "The updated assessments highlight significant risks of entanglement in pot, trap, and gillnet fisheries to the endangered North Atlantic right whale and the lack of timely, effective management necessary to mitigate entanglement risks and promote recovery of the species."

(7) That Seafood Watch reviewed "all available scientific data" and followed a "rigorous, transparent, science-based process to evaluate" the Maine lobster fishery.

(8) "According to Seafood Watch standards, when fisheries pose a high risk of harm to marine life or the environment and appropriate management measures are not in place, they are assigned a red rating."

(9) Consumers should "avoid" and "take a pass" on purchasing lobster and lobster products caught in the Gulf of Maine/Georges Bank region on the basis of these allegedly false statements.

*Id.*

### L.    Post-Filing Factual Updates Relating to Entanglement and Death of NARW #5120[6]

In October 2024, MBAF supplemented the record with additional information regarding a deceased North Atlantic right whale that had been found on a beach in Massachusetts in January 2024; officials with the National Oceanographic and Atmospheric Administration (NOAA) conducted a necropsy and, in October 2024,

---

[6]    As the Court explained in its December 5, 2024 Order, First Circuit precedent establishes that judicially noticed documents may be considered on a motion to dismiss; however, in doing so, district courts are restricted to considering only their existence and not the truth of their contents. *See Order on Mots. to Suppl.* at 13 (citing *Torrens v. Lockheed Martin Servs. Grp., Inc.*, 396 F.3d 468, 473 (1st Cir. 2005); *Pietrantoni v. Corcept Therapeutics Inc.*, 640 F. Supp. 3d 197 (D. Mass. 2022)).

33

Add.33

officially attributed its death to chronic entanglement in Maine lobster gear. *Def.'s Second Mot. to Suppl.* at 1.

The deceased right whale, designated as NARW #5120 in official records, was identified on May 1, 2022, and was not entangled at that time. *Def.'s Suppl. Brief* at 2 (citing *Def.'s Second Mot. to Suppl.*, Attach. 2., *N. Atl. Right Whale Updates* (*Current NOAA Update Webpage*)). Also on May 1, 2022, Maine regulations came into effect requiring lobstermen to implement measures to protect right whales, including the use of "weak-link" rope and regional rope-marking. *Id.* at 2-3 (citing *Def.'s Second Mot. to Suppl.*, Attach. 6., *Whale Rules*). However, NOAA recognized supply chain issues presented an obstacle to the industry's replacement of equipment and issued a statement on April 20, 2022:

> Most participants in the Northeast lobster and Jonah crab fishery are nearly finished with the needed gear modifications. However, ***unanticipated supply chain delays are preventing some of the fleet from fully coming into compliance***. I want to assure fishermen who are making good faith efforts to comply with these new measures but are not able to procure compliant gear that we understand the difficulty of their situation. ***We are working closely with our state and federal enforcement partners to implement a graduated enforcement effort that will focus on compliance assistance rather than civil penalties until we have determined that localized supply chain issues have been sufficiently resolved*** . . . . NOAA Fisheries is closely monitoring the challenges that some Northeast lobster and Jonah crab trap/pot fishermen are facing in their effort to comply with weak rope measures.

*Pls.' Suppl. Brief* at 6 (citing *Decl. of Clifford Ruprecht* (ECF No. 51), Attach. 1, *Compliance Assistance in Place to Support Fishermen Changing Gear to Protect Right Whales* at 2 (*NOAA Compliance Letter*)) (emphasis added by Plaintiffs).

NARW #5120 was next seen on August 20, 2022, at which time she was observed entangled in a then-unidentified rope. *Id.* at 3 (citing *Current NOAA Update Webpage* at 6). MBAF submits this observation was reported by NOAA on its Whale Updates webpage and Unusual Mortality Event webpage by August 31, 2022. *Id.* (citing *Current NOAA Update Webpage* at 66-68; *Def.'s Second Mot. to Suppl.*, Attach. 4, *2017-2024 North Atlantic Right Whale Unusual Mortality Event*(*Current Unusual Mortality Event Webpage*)). NOAA published additional reports of the substantial injury by entanglement of NARW #5120 on March 8, 2023 and March 13, 2023, respectively. *Id.* at 3-4 (citing *Def.'s Second Mot. to Suppl.*, Attach. 3, *North Atlantic Right Whale Updates* (*Historic NOAA Update Webpage*); *Def.'s Second Mot. to Suppl.*, Attach. 5, *2017-2023 North Atlantic Right Whale Unusual Mortality Event* at 24-26 (*Historic Unusual Mortality Event Webpage*)).

NARW #5120 was found dead on a beach in Martha's Vineyard, Massachusetts on January 28, 2024. *Id.* at 4 (citing *Current NOAA Update Webpage* at 7-9). NOAA's investigation revealed the rope removed from NARW #5120 came from Maine lobster gear and, following a necropsy, determined in October 2024 that chronic entanglement caused NARW #5120's death. *Id.* (citing *Current NOAA Update Webpage* at 1-2).

## III.   THE PARTIES' POSITIONS

### A.   Monterey Bay Aquarium Foundation's Motion to Dismiss or Change Venue

#### 1.   Personal Jurisdiction

MBAF argues that "Plaintiffs cannot meet the requirements for establishing specific jurisdiction." *Def.'s Mot.* at 13.  In MBAF's view, the Plaintiffs cannot show purposeful availment or reasonableness, both of which are required to establish specific personal jurisdiction.[7]  *Id.* at 15-19.

Regarding purposeful availment, MBAF asserts that it "did not voluntarily avail itself of any benefits or privileges of conducting activities in Maine," and further claims it "has not reached out to Maine in any way other than having a website and posting the Press Release and the [Lobster] Report on that website." *Id.* at 16.  MBAF adds that "the mere existence of a website that is visible in a forum is not enough to subject a defendant to personal jurisdiction in that forum," and "[n]othing alleged in the Complaint supports a finding that MBAF expressly targeted or directed its internet activity toward Maine." *Id.* at 16-17.  Therefore, MBAF concludes, "there is no purposeful availment." *Id.* at 17.

---

[7]   In its motion, MBAF also contested relatedness, the first element of specific personal jurisdiction.  *Def.'s Mot.* at 14-15.  After reviewing the Plaintiffs' opposition, MBAF withdrew this challenge in its reply.  *See Def.'s Reply* at 5 n.1 ("Because Plaintiffs have now supplied evidence that residents of Maine read the Report on MBAF's website, MBAF agrees the relatedness prong has been met").  Since relatedness is no longer at issue, the Court does not further address MBAF's relatedness arguments.

Add.36

Shifting to reasonableness, MBAF contends that "[b]ecause three of the 'Gestalt' factors[8] weigh strongly against jurisdiction in Maine and those factors outweigh Maine's interest in the dispute, it would be unreasonable for this Court to assert personal jurisdiction over MBAF." *Id.* at 19.  MBAF represents that its "burden and expense of appearing in this Court would be great." *Id.* at 18.  It also argues that "jurisdiction in Maine would not further Plaintiffs' interest in obtaining convenient and effective relief," nor would it "further the judicial system's interest in obtaining the most effective resolution of the controversy." *Id.* at 18-19.  While MBAF concedes "Maine does have an interest in the dispute because Plaintiffs are residents of Maine and claim they have been damaged there," it maintains these considerations "do not outweigh the fact that the most efficient and effective jurisdiction for determining whether MBAF has any liability and for enforcement of any remedy obtained by Plaintiffs is California." *Id.* at 19.

### 2.    Change of Venue

MBAF then goes on to argue that, even if the Court has jurisdiction, the case should still be transferred to the U.S. District Court for the Northern District of California. *Id.* at 19-23.

---

[8]    MBAF cites *United Electrical, Radio & Machine Workers of America v. 163 Pleasant Street Corporation*, 960 F.2d 1080 (1st Cir. 1992), in which the First Circuit listed the criteria "which bear upon the fairness of subjecting nonresidents to the authority of a foreign tribunal" (the "Gestalt" factors) as: (1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all sovereigns in promoting substantive social policies.  *Id.* at 1088 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985) and *Donatelli v. Nat'l Hockey League*, 893 F.2d 459, 465 (1st Cir.1990).

Add.37

In support, MBAF first avers that the "likely transfer" of an action brought against it by Massachusetts lobstermen from the U.S. District Court for the Eastern District of Louisiana to the Northern District of California "weighs heavily in favor of transfer of this action." *Id.* at 20. To avoid the "inefficiency" of having multiple actions "involving the same basic issues" and to avert "the potential for contradictory verdicts," MBAF urges the Court "to transfer this action to the N.D. Cal., where the two cases can be consolidated." *Id.* at 21. MBAF also points out that "[b]ecause the plaintiffs in the Louisiana Action are not residents of Maine, there is no likelihood the Louisiana Action will be transferred to this forum." *Id.*

Next, MBAF contends that "the convenience of witnesses and availability of documents weigh heavily in favor of transfer to the Northern District of California." *Id.* (capitalization altered). MBAF maintains that "the bulk of this case, at least as to liability, will concern the actions and intent of MBAF employees and others who created the Press Release and Report." *Id.* at 22. According to MBAF, these individuals are located within the Northern District of California. *Id.* MBAF also suggests that "the documents relevant to [the] issues are primarily within MBAF's records, which, like MBAF itself, reside in California." *Id.*

Anticipating Plaintiffs' argument that "evidence with respect to the damages suffered by them will be located in Maine," MBAF observes that "the damages Plaintiffs claim to suffer are the result of their customers reducing or eliminating orders of lobster." *Id.* In MBAF's view, to "determine the reasons for those decisions, discovery will be aimed not at Plaintiffs but at their customers" and "Plaintiffs do not

38

Add.38

claim their customers are located in Maine." *Id.* Accordingly, MBAF concludes, "although Plaintiffs' choice of venue is given a 'strong presumption,' here, the other factors weigh heavily in favor of transfer." *Id.* at 20.

### 3. Maine's Anti-SLAPP Statute[9]

Should the Court find that jurisdiction and venue are proper, MBAF continues, the case should nevertheless be dismissed on the merits under Maine's anti-SLAPP statute. *Id.* at 23-27. MBAF contends that its Statements "constitute petitioning activity for the purpose of Maine's anti-SLAPP statute because they are 'reasonably likely to enlist public participation in an effort to effect [consideration of an issue by a governmental body].'" *Id.* at 25 (quoting 14 M.R.S. § 556) (emphasis removed).

According to MBAF, the red rating was issued "to enlist the public and influence the outcome of the controversy regarding regulation of the lobster fisheries" and "to effect regulations to promote safer conditions for right whales and improve government enforcement of those regulations," which MBAF describes as "the essence of petitioning activity." *Id.* at 26. MBAF adds it is irrelevant that the Statements "were made outside of the context of a legislative or judicial proceeding" and that "the lobster industry may suffer financially because of MBAF's call to action." *Id.*

MBAF maintains it has demonstrated that "the Statements constitute petitioning activity for the purpose of [the] Maine anti-SLAPP statute," meaning that "the burden shifts to Plaintiffs to show that the exercise of the right of petition was

---

[9] "Anti-SLAPP," as used by both parties, is a commonly used shorthand to refer to Maine's so-called "Strategic Lawsuit Against Public Participation" statute, 14 M.R.S. § 556. *See, e.g., Schelling v. Lindell*, 2008 ME 59, ¶ 6, 942 A.2d 1226; *Godin v. Schencks*, 629 F.3d 79, 84 (1st Cir. 2010).

Add.39

'devoid of any reasonable factual support or any arguable basis in law.'" *Id.* at 27 (quoting 14 M.R.S. § 556). In MBAF's view, Plaintiffs will not be able to carry this burden because "none of the Statements constitute actionable defamation." *Id.*

### 4. Failure to State a Claim

Even if the Court concludes that Maine's anti-SLAPP statute does not apply, MBAF contends Plaintiffs' complaint should nevertheless be dismissed for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). MBAF advances three separate arguments for dismissal on this basis: 1) the Statements are not "of and concerning" Plaintiffs; 2) the Statements are protected opinions; and 3) Plaintiffs are public figures and limited public figures, and they have not sufficiently pleaded actual malice or negligence. *Id.* at 28-38.

### a. The "Of and Concerning" Element

MBAF asserts that "Plaintiffs' claim for defamation fails because they cannot prove the alleged defamatory publications refer to them." *Id.* at 30. According to MBAF, "Maine has long held that 'defamation of a class or group does not form the basis of a cause of action on the part of an individual member of the group.'" *Id.* (quoting *Robinson v. Guy Gannett Publ'g Co.*, 297 F. Supp. 722, 726 (D. Me. 1969)). Here, MBAF avers, "Plaintiffs estimate the Maine fishery employs more than 5,600 lobstermen," yet "the Statements neither mention Plaintiffs by name nor imply their identities." *Id.* MBAF therefore maintains that "Plaintiffs do not, and cannot, allege any special application of the Statements to them," meaning "they have failed to allege an actionable claim for defamation." *Id.*

Add.40

### b.    Facts vs. Opinions

MBAF avers the Statements constitute mere opinion based on the scientific data gathered by experts, and as such are protected as constitutional free speech unless the Statements are "provable as false." *Id.* at 31. (citing *Levesque v. Doocy*, 560 F.3d 82 (1st Cir. 2009); *Piccone v. Bartels*, 785 F.3d 766 (1st Cir. 2015); and *Pan Am Sys. v. Hardenbergh*, 871 F. Supp. 2d 6 (D. Me. 2012)).  MBAF directs the Court to apply a similar inquiry as in *Pan Am Systems, Inc. v. Hardenbergh*, 871 F. Supp. 2d 6 (D. Me. 2012), in which the court "look[ed] to the totality of the circumstances and to whether the statement was intended to state an objective fact or personal observation." *Id.* at 19.  MBAF also cites cases from the Second Circuit, Third Circuit, and District of Massachusetts to support their contention that "[t]entative scientific conclusions that are expressly disclosed as such are deemed non-verifiable facts and are therefore nonactionable." *Def.'s Mot.* at 31.  MBAF asserts their "Statements are based on, and restate, tentative scientific conclusions . . . and they were expressly disclosed as such." *Id.* at 32.

MBAF argues the Lobster Report "does not assert there exists conclusive evidence that right whales were killed or injured by entanglements in gear in Maine fisheries," but instead characterizes the contents of the report as "present[ing] facts, findings, and theories . . . to support MBAF's ***thesis*** that lobster fishing gear in Canadian and U.S. fisheries, including Maine, pose a threat to the nearly extinct right whale." *Id.* (emphasis in original).  To support this characterization as mere opinion, MBAF cites numerous examples of "concessions throughout the Press

41

Add.41

Release and [Lobster] Report, expressly acknowledging when it lacks certain evidence to supports its opinion." *Id.* These textual examples include prefatory language such as "[u]ntil there is more specific information available regarding which fisheries are responsible for the unattributed entanglements, Seafood Watch considers that all relevant fisheries that may overlap with NARW pose risks," "[u]ntil there is more evidence, all of the fisheries using this gear are considered a risk" and "due to a lack of information, it is often not possible to assign entanglements to a specific fishery," as well as entire statements disclosing the presence of data gaps, including:

> The Report acknowledges that entanglement in fishing gear is only one of several factors contributing to the decline of the right whale population.

> The Report admits there has been a northward distributional shift in recent years with the right whales' presence in the Gulf of Maine.

*Id.* at 32-33. (internal citations omitted). "Plaintiffs' own characterization of the above statements as 'conjecture' underscores the very reason their defamation claims must be dismissed as non-verifiable opinion." *Id.* at 33.

Lastly, MBAF defends its statement "[n]o one wants to know their appetite for seafood is driving a species to extinction" as "the sort of 'rhetorical hyperbole' and 'imaginative expression' that is protected by the First Amendment." *Id.* (quoting *Riley v. Harr*, 292 F.3d 282, 297 (1st Cir. 2002)).

### c.    Actual Malice and Negligence

MBAF next states that "Plaintiffs' defamation claim must be dismissed because they cannot overcome their burden of proof on the element of 'fault.'" *Id.* "A claimant who is a public official or public figure," MBAF says,

42

Add.42

"must show the defendant acted with 'actual malice,' that is, with knowledge that the statements were false or [made with] reckless disregard to their truth or falsity." *Id.* (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80) (1964) (concerning public officials); *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 154-55 (1967) (concerning public figures)).

MBAF goes on to say that individuals are public figures for purposes of this analysis if they assume "'roles of special prominence in the affairs of society . . . [that] invite attention and comment,' (so-called 'all-purpose public figures') or if they 'thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved' (so-called 'limited purpose public figures')." *Id.* (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349-50 (1974)). MBAF describes the "critical questions for limited-purpose public figure status" as: "whether a matter of 'public controversy' existed prior to alleged defamation, and whether the defamed individual deliberately 'thrust himself into the vortex' of that controversy or otherwise 'engage[d] the public's attention in an attempt to influence its outcome." *Id.* at 33-34 (quoting *McKee v. Cosby*, 874 F.3d 54, 61 (1st Cir. 2017)).

Regarding the present case, MBAF argues that the Maine Lobstermen's Association and Maine Coast Fisherman's Association qualify as "all-purpose public figures" based on these organizations' purpose and longstanding practice of public advocacy on behalf of their respective members, which predated the publications of the allegedly defamatory Statements at issue here. *Id.* at 34. In the alternative, MBAF argues that these two plaintiffs are "limited public figures for the purpose of

43

Add.43

the controversy over regulating lobster fisheries in favor of conservation," supporting its position with decisions from the First Circuit finding purportedly analogous research firms to be public figures and with examples of these two Plaintiffs intervening in similar lawsuits and making public statements on similar issues. *Id.* at 35 (for analogous research firms deemed limited public figures, citing *Norris v. Bangor Publ'g. Co.*, 53 F. Supp. 2d 495 (D. Me. 1999); *Quantum Elecs. Corp. v. Consumers Union*, 881 F. Supp. 753 (1st Cir. 1995); and *Gray v. St. Martin's Press, Inc.*, 221 F.3d 243 (1st Cir. 2000); and, for examples of previous intervention in litigation by the plaintiffs, citing *Ctr. for Biological Diversity v. Raimondo*, 610 F. Supp. 3d 252 (D.D.C. 2022); *Ctr. for Biological Diversity v. Ross*, 310 F. Supp. 3d 119 (D.D.C. 2018); and *Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, No. 21-2509 (JEB), 2022 U.S. Dist. LEXIS 169246 (D.C.C. Sept. 8, 2022)). Quoting *McKee*, 874 F.3d at 62, MBAF posits that the Maine Lobstermen's Association and Maine Coast Fisherman's Association have "engag[ed] the public's attention and invit[ed] public scrutiny" such that the Court should apply an actual malice standard to these Plaintiffs. *Id.* at 36. MBAF concedes the remaining three plaintiffs, Bean Maine Lobster, Atwood Lobster, and Bug Catcher, "are likely not public figures and therefore their claim is subject to the negligence standard." *Id.*

Regarding a finding of actual malice, MBAF asks the Court to apply a "clear and convincing proof" standard. *Id.* at 36 (citing *Gertz*, 418 U.S. at 342). MBAF relies heavily on *St. Amant v. Thompson*, 390 U.S. 727 (1968), which MBAF summarizes:

> [The Supreme Court] discussed the examples of evidence that would support the requisite showing [of actual malice], breaking them down

44

Add.44

into three general categories: evidence that the story was (1) "fabricated"; (2) "so inherently improbable that only a reckless man would have put [it] in circulation"; or (3) "based wholly on an unverified anonymous telephone call" or some other source that the defendant had "obvious reasons to doubt."

*Id.* (quoting *St. Amant*, 390 U.S. at 732). MBAF cites numerous cases in support of its proposition that the burden of proving actual malice "is onerous and rarely overcome, especially when defendants rely on sources for their reporting." *Id.* at 36-37 (citing *St. Amant*, 390 U.S. at 733; *Levesque*, 560 F.3d at 90-93; *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012); and *Tavoulareas v. Piro*, 817 F.2d 762, 790-91 (D.C. Cir. 1987)). It also extends this argument to negligence, arguing the applicable reasonable person standard "is difficult to overcome when a defendant relied on a source." *Id.* at 37 (citing *Penobscot Indian Nation v. Key Bank*, 906 F. Supp. 13, 22-23 (D. Me. 1995)).

Based on the foregoing, MBAF concludes that Plaintiffs failed to demonstrate the Statements were made with actual malice or negligence because they have not proven the Statements were based on invalid or noncredible sources. *Id.* MBAF argues it sourced its information from "experts in ocean conservation and right whales in particular," as well as the credible findings of a federal judge. *Id.* at 37-38.

### 5.    Injunctive Relief

MBAF asserts that Plaintiffs' requested injunction constitutes a "prior restraint" on speech in violation of the First Amendment to the U.S. Constitution. *Id.* at 38. Such a "prior restraint," MBAF says, should be subjected to "the most exacting scrutiny demanded by our First Amendment jurisprudence." *Id.* (citing *Sindi v. El-Moslimany*, 896 F.3d 1, 32 (1st Cir. 2018)). MBAF argues that, even if the Court finds

fully in favor of Plaintiffs' claims, their requested injunction "would be impermissibly broad and punish future conduct that may, because of endless possible contextual variations, be constitutionally protected." *Id.* at 39. Based on these reasons, MBAF takes the position that the Court "must refuse the Plaintiffs' request." *Id.*

### B. Plaintiffs' Opposition to Monterey Bay Aquarium Foundation's Motion to Dismiss or Change Venue

#### 1. Personal Jurisdiction

In arguing that they have established specific personal jurisdiction, Plaintiffs first assert that *Calder v. Jones*, 465 U.S. 783 (1984), a case not cited by MBAF, is controlling and "confirms that the Aquarium is subject to specific personal jurisdiction in Maine." *Pls.' Opp'n* at 8 (capitalization altered). The present case is similar to *Calder*, Plaintiffs argue, because "the Aquarium 'expressly aimed' the Statements in Maine, knew the Statements would have a 'potentially devastating' effect on Plaintiffs, and knew the 'brunt of the injury' would be felt in Maine." *Id.* at 10 (quoting *Calder*, 465 U.S. at 789-90). Because of these similarities, Plaintiffs aver MBAF "could reasonably anticipate it would have to answer for its Statements in a Maine court." *Id.*

Plaintiffs then respond to MBAF's purposeful availment arguments, contending that "[p]ublication of statements in a forum amounts to purposeful availment where the defendant intended that its statements would exploit the market within the forum," and "[t]he facts belie the Aquarium's claims that it did not 'deliberately exploit a market in Maine.'" *Id.* at 12 (quoting *Def.'s Mot.* at 16).

Plaintiffs also take issue with MBAF's reasonableness analysis, arguing that MBAF "would not suffer an unusual burden to appear in federal court in Maine," "Maine has a strong interest in adjudicating this dispute," and "Maine can provide convenient and effective relief." *Id.* at 13. While Plaintiffs concede that "Maine and California may share a sovereign interest in prohibiting defamation," they counter that this "hardly renders personal jurisdiction in Maine unreasonable." *Id.*

Plaintiffs' final personal jurisdiction argument is that MBAF's motion "cites to authorities that either confirm the Aquarium is subject to personal jurisdiction in this action, or are distinguishable from this case." *Id.* In particular, Plaintiffs suggest that many of the cases cited by MBAF "are distinguishable because the defendants lacked any contact at all with the forum state," whereas here, MBAF "promoted its website and the Statements to Maine media, solicited and received feedback from Maine residents, boasted about its use of Maine sources to reach its conclusions, and purposefully disseminated the Statements through Maine media channels." *Id.* at 13-14 (emphasis omitted).

### 2.  Change of Venue

Plaintiffs next argue that, in addition to there being personal jurisdiction over MBAF, "there is no basis to transfer this case to the Northern District of California." *Id.* at 14. Plaintiffs remind the Court that, in the First Circuit, "there is a strong presumption in favor of the plaintiff's choice of forum." *Id.* at 15 (quoting *Coady v. Ashcraft & Gerel*, 223 F.3d 1, 11 (1st Cir. 2000)). They also observe that it "is indisputable that Maine law applies here," meaning that "a Maine court will be more

familiar with the governing law." *Id.* Further, Plaintiffs assert that "Maine has a considerable interest in the outcome of this action because the Aquarium's defamation attacks the business practices of Maine residents and directly impacts a signature Maine industry." *Id.*

Responding to MBAF's argument that transfer is warranted because its documents and witnesses are in California, Plaintiffs point out that "[t]here are five Plaintiffs and only one Aquarium, and the Plaintiffs' witnesses and documents are located in Maine." *Id.* In Plaintiffs' view, transferring this case will merely "shift the inconvenience from one party to the other." *Id.* at 15-16 (quoting *Banjo Buddies, Inc. v. Renosky*, 156 F. Supp. 2d 22, 26 (D. Me. 2001)). Plaintiffs also argue that "in the age of electronic discovery, the location of documents has little impact on the convenience of reviewing and producing them." *Id.* at 16.

With respect to MBAF's argument that the potential for consolidation favors transfer, Plaintiffs observe that they are not parties to the action filed by the Massachusetts lobstermen and "[t]his action asserts common-law defamation under Maine law" whereas that action "claims violation of a Louisiana statute prohibiting disparagement of aquacultural products and interference with proprietary rights." *Id.* According to Plaintiffs, "[n]o precedent exists for consolidation or joint venue transfer of such different actions." *Id.*

### 3.    Maine's Anti-SLAPP Statute

Plaintiffs next turn to Maine's anti-SLAPP statute, which they contend "has a narrow focus." *Id.* at 17. In Plaintiffs' view, the Statements do not constitute

48

Add.48

petitioning activity because MBAF "has not shown that the purpose of the Statements was to bring about governmental action." *Id.* Plaintiffs contend MBAF's argument "that 'petitioning activity' should include statements 'in connection with' an issue pending before a government body, or 'reasonably likely' to affect consideration of such an issue or enlist participation in the consideration of such an issue . . .disregards well-established precedent." *Id.*

Plaintiffs declare that "the express purpose of the Aquarium's Statements was to convince consumers and businesses not to buy Maine lobster," and MBAF's "speculation that these Statements to the public could conceivably impact a governmental body's decision-making hardly transforms the Statements into petitioning activity protected by the anti-SLAPP statute." *Id.* at 19. Plaintiffs further aver that MBAF's "expression of dissatisfaction with existing regulations is not the same as petitioning the U.S. and Canadian governments to change them." *Id.*

Even if the Court does conclude that MBAF was engaged in petitioning activity, Plaintiffs argue the Court should nevertheless deny MBAF's anti-SLAPP motion because they "have made a prima facie case that the Statements were intentionally false and caused actual injury." *Id.* at 21 (capitalization altered). Plaintiffs assert that their "plea for monetary damages in the Complaint suffices to meet the actual injury requirement." *Id.* They further contend that MBAF's Statements were without factual or legal basis because "the Complaint alleges that the Aquarium deliberately misled consumers and businesses to believe that Maine lobstermen are causing harm to right whales, claiming that it reviewed 'all available

49

Add.49

scientific data,' when it ignored the relevant scientific data and other facts that contradicted its Statements." *Id.* at 22. Plaintiffs also point out that MBAF "has admitted there is no proof connecting Maine lobster gear to any right whale entanglements." *Id.* According to Plaintiffs, "[i]f a jury finds that Plaintiffs' allegations are true, Plaintiffs will prevail on their defamation claim," meaning that MBAF's anti-SLAPP motion should be denied. *Id.*

### 4.      Failure to State a Claim

#### a.      The "Of and Concerning" Element

Regarding MBAF's arguments for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), Plaintiffs first contend they have adequately pleaded that the Statements were about them. *Id.* at 23-26. Plaintiffs submit that "Maine courts have observed, 'it is not necessary that the publication on its face mention the plaintiff by name,' and it is enough if the plaintiff is identifiable 'by clear implication.'" *Id.* at 23 (quoting *Osgood v. C.U. York. Ins. Co.*, No. CV-04-568, 2006 WL 1980396, at *5 (Me. Super. June 5, 2006)). Plaintiffs further argue that "the Complaint pleads ample facts showing that the Aquarium's Statements were 'actually understood as referring' to Plaintiffs, and that this was 'the reasonable understanding of the recipient of the communication.'" *Id.* (quoting *Robinson*, 297 F. Supp. at 726). In Plaintiffs' view, "the Complaint alleges that the Aquarium's Statements were understood to refer to Plaintiffs and their business" and MBAF has not offered "any reason to disregard this allegation." *Id.* at 23-24.

Expanding on this point, Plaintiffs offer that the "record shows that recipients of the Aquarium's publications—including the press and general public—recognized that the Aquarium's Statements referred to Maine lobstermen and the Maine lobster industry." *Id.* at 24. According to Plaintiffs, "[i]t is immaterial that the Aquarium did not identify Plaintiffs by name" because the "'clear implication' is that all Maine lobstermen are killing or causing serious harm to right whales, and all businesses that sell Maine lobsters are selling products that kill or cause serious harm to right whales." *Id.* at 24-25 (emphasis omitted). Plaintiffs further contend their "businesses have been damaged by the Statements to the same degree as if the Aquarium had singled them out by name." *Id.* at 25. Plaintiffs therefore conclude that "those who read the Aquarium's Statements understood that they referred to all members of the Maine lobster industry, including Plaintiffs." *Id.* at 26.

### b.  Facts vs. Opinions

Plaintiffs contest MBAF's characterization of the Statements as mere opinion, arguing that MBAF "expressed and implied verifiably false facts." *Id.* at 28-29 (capitalization altered). According to the Plaintiffs, MBAF presented an "unmistakable message to consumers and business: The Maine lobster fishery is responsible for the harm, death, and near extinction of right whales . . . [a message] supported by a 'rigorous, transparent, science-based process.'" *Id.* at 29. The Plaintiffs refer the Court to *St. Martin's Press, Inc.*, 221 F.3d 243, in which the First Circuit considered "whether the statement is properly understood as purely speculation or, alternatively, implies that the speaker or writer has concrete facts

51

Add.51

that confirm or underpin the truth of the speculation." *Id.* at 250 (citing *Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997)). Plaintiffs assert that "[a] statement 'couched as an opinion that presents or implies the existence of facts which are capable of being proven true or false can be actionable.'" *Pls.' Opp'n* at 29 (quoting *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 127 (1st Cir. 1997)).

Plaintiffs describe "surrounding circumstances that confirm [MBAF] intended to state objective facts about Maine lobster-fishing practices, not opinion or hyperbole." *Id.* Plaintiffs begin with the position that MBAF holding itself out as "the leading source of science-based information for sustainable seafood around the world . . . conveyed that [MBAF] is a reliable source of factual scientific conclusions, not a purveyor of opinion or hyperbole." *Id.* (internal quotation marks omitted). Thus, Plaintiffs argue, "[t]he audience naturally understood [the Statements] as factual." *Id.*

Plaintiffs then articulate three distinct reasons for why MBAF's "'opinion, theory and hyperbole' arguments are not saved by the existence of isolated phrases in the [Lobster] Report." *Id.* at 30. First, Plaintiffs ask the Court to consider the effect of the report on its readers, arguing that "the record establishes that *actual* readers of the Report treated it as factual and acted upon it, and refused to market, buy or sell Maine lobster." *Id.* (emphasis in original). Second, Plaintiffs cite cases from the Second Circuit and state of California Appellate Court to support their claim that "the law is clear that self-serving insertions of qualifying language do not insulate the author from liability for defamation." *Id.* at 30-31. Third, Plaintiffs

52

Add.52

argue that the Report's "isolated and sporadic acknowledgements that the data actually were uncertain" failed to overcome MBAF's "Statements condemning Maine lobster fishing based on supposed 'scientific data.'" *Id.* at 31. In fact, Plaintiffs assert, MBAF "repeatedly insisted that it must attribute blame to Maine lobster fisheries," despite the uncertain data. *Id.* (citing the Red Listing Press Release statement: "[u]ntil there is more evidence, all of the fisheries using this gear are considered a risk").

Plaintiffs draw a comparison to *Maine Lobstermen's Association v. National Marine Fisheries Services*, 70 F.4th 582 (D.C. Cir. 2023), in which the D.C. Circuit Court held that NMFS had erred in its assessment of responsibility for right whale deaths by "distort[ing] that scientific judgment by indulging in worst-case scenarios and pessimistic assumptions to benefit a favored side." *Id.* at 32 (quoting *Me. Lobstermen's Ass'n* at 585). Plaintiffs allege MBAF "engaged in a similar misrepresentation of scientific data to the public that the Court should subject to scrutiny under the laws of defamation." *Id.* Further, Plaintiffs dispute the cases cited by MBAF, arguing that "[t]he protected statements in those cases appeared in peer-reviewed scientific journals," were "conclusions reached by experiments," and were "presented in publications directed to the relevant scientific community . . . and are then available to other scientists who may respond." *Id.* (cleaned up) (internal citations and quotations omitted). Plaintiffs distinguish MBAF as "not a scientific authority," "[i]t conducted no experiments," and "[it] directed its Statements to the

53

public with the express goal of harming Plaintiffs economically, not for analysis by the scientific community." *Id.*

Plaintiffs contend that "a statement could be defamatory even where couched as a rating within a self-styled 'policy statement,'" citing a recent case where the First Circuit found a statement conveyed verifiable fact where the statement "suggest[s] an appraisal . . . against objective professional or scientific standards." *Id.* at 33 (quoting *Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517, 532 (1st Cir. 2023)). Finally, Plaintiffs argue that, "even if some of [MBAF's] Statements were opinion," the Court should still hold them liable on the ground that "expressions of 'opinion' may often imply an assertion of objective fact." *Id.* (quoting *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 18 (1990)).

### c.     Actual Malice and Negligence

Plaintiffs cite the Federal Rules of Civil Procedure in support of their position that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* at 34 (quoting FED. R. CIV. P. 9(b)). "Generally, a plaintiff is unlikely to have sufficient information regarding the defendant's thoughts and motivations prior to discovery." *Id.* (citing *Conformis*, 58 F.4th at 528). Plaintiffs do not contest MBAF's characterization of MLA and MCFA as public figures subject to the higher standard of actual malice but argue actual malice "may be inferred where a defendant is confronted with contradictory facts but ignores them and publishes the statements anyway." *Id.* (citing *Sindi*, 896 F.3d at 16). Plaintiffs assert that "MLA confronted the Aquarium with conclusive evidence contradicting its planned

assessment," but that, despite this, MBAF "unreasonably disregarded this evidence and published the Statements." *Id.* Plaintiffs analogize this case to a Delaware case in which the plaintiff provided documents to the defendants contradicting its story regarding voter fraud, which defendants then ignored; in that case, the court found sufficient evidence of actual malice to survive a summary judgment motion. *Id.* at 34-35. (citing *US Dominion, Inc. v. Fox News Network, LLC*, No. N21C-03-257 EMD, 2023 Del. Super. LEXIS 42 (Del. Super. Ct. Jan. 27, 2023)).

### 5. Injunctive Relief

Plaintiffs contest MBAF's characterization of its requested injunction as "asking the court to enjoin the Aquarium from any future speech," arguing that the Complaint merely seeks an order to "remove and retract any and all defamatory statements from its website and other publications." *Id.* at 35 (citing *Compl.* ¶¶ 13, 110). "The requested injunction," Plaintiffs say, "is consistent with the First Amendment, which does not protect speech that is defamatory." *Id.* (citing *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245-46 (2002)). Plaintiffs direct the Court to dicta in *Sindi*, in which the First Circuit noted that "an injunction against speech sometimes may pass constitutional testing if it follows an adjudication that the expression is unprotected, and the injunction itself is narrowly tailored to avoid censoring protected speech." *Id.* (citing *Sindi*, 896 F. 3d at 32).

### 6. Leave to Amend

In their opposition, Plaintiffs raise the request for the first time that, should the Court find in favor of MBAF's motion to dismiss for failure to plead any element

of defamation, they be granted leave to amend the complaint to cure the deficiency. *Id.* at 35-36 (citing *Amyndas Pharm., S.A. v. Zealand Pharma A/S*, 48 F.4th 18, 37 (1st Cir. 2022) ("Generally, valid reasons [for leave to amend] include a motion to dismiss or a ruling from the court pointing out flaws in the original pleading or the discovery of new information").

### C.   Monterey Bay Aquarium Foundation's Reply in Support of Its Motion to Dismiss or Change Venue

#### 1.   Personal Jurisdiction

MBAF first argues that Plaintiffs cannot show purposeful availment under *Calder* because MBAF did not act with the intent to injure Plaintiffs in Maine. *Id.* at 2-4. In MBAF's view:

> [U]nlike the defamatory statements at issue in *Calder*, which were about a specific resident of California and, therefore, could reasonably be said to have been made with the intention to harm that specific person in California, MBAF's statements regarding lobster fishing practices in the Gulf of Maine/Georges Bank fishery do not specifically refer to or target lobstermen from Maine or any other individual state.

*Id.* at 4. MBAF further suggests that "unlike *Calder*, which involved a newspaper with its largest circulation in California, here, the statements were published on MBAF's website, which is freely accessible to anyone, anywhere." *Id.*

MBAF then reiterates its contention that Plaintiffs have not established purposeful availment because "a generally available website that does not purposely target the residents of a particular state is not sufficient to establish purposeful availment, even if the website has some interactive aspects." *Id.* at 5. MBAF then argues that its "minimal contacts with Maine before and after the publication of the Report are not sufficient to establish purposeful availment." *Id.* at 5-6. In MBAF's

56

Add.56

view, it "cannot reasonably be held to have purposefully availed itself of every forum from which it obtained information or feedback in connection with the Report." *Id.* at 6. Moreover, MBAF maintains that its "minimal interactions with Maine media after the [Lobster] Report was published are also not sufficient to establish purposeful availment." *Id.*

Turning to the reasonableness of requiring MBAF to litigate this case in Maine, MBAF avers that "the issue is not inconvenience to MBAF, but the fact that the individuals who authored the [Lobster] Report all reside in California," and "[a]rranging for their attendance at a trial in Maine, along with the attendance of witnesses from other locations, will be a special and unusual burden." *Id.* at 8. MBAF also reiterates its claims that "[t]he factor of obtaining convenient and effective relief weighs strongly against personal jurisdiction in Maine" and "[t]he most effective and efficient way to obtain resolution of this claim is in California." *Id.*

### 2. Change of Venue

With respect to venue, MBAF again argues that transfer is warranted because its witnesses and documents are located in California, and discovery regarding Plaintiffs' damages will be aimed at its customers, who may not be located in Maine. *Id.* at 8-9. In MBAF's view, "very little of the evidence relevant to any material issue in this case will come from Maine." *Id.* at 9.

MBAF also contends that, although "the causes of action alleged in the Louisiana Action are different, the underlying factual issues in this action and the Louisiana Action are the same: in particular, plaintiffs in both cases allege the

[Lobster] Report is not based on reasonable or reliable scientific inquiry, facts or data." *Id.* at 10. MBAF maintains that the cases should be consolidated because "the liability determinations in both cases will be based on evidence relating to MBAF's process of researching and drafting the [Lobster] Report and its decision to publish the [Lobster] Report." *Id.*

### 3. Maine's Anti-SLAPP Statute

Turning to Maine's anti-SLAPP statute, MBAF reemphasizes that "[u]nder Maine's broad definition of petitioning activity, MBAF's Statements fall within the ambit of [the] statute because they were reasonably likely to enlist public participation to effect tighter regulations of lobster fisheries." *Id.* at 10. MBAF adds that the "cases Plaintiffs cite to support their position that the Statements were not petitioning activity are inapplicable." *Id.*

In MBAF's view, the "Press Release and Report were, on their face, meant to encourage better government management of lobster fisheries." *Id.* at 12. MBAF further argues that the Statements' publication "outside of a privileged setting does not change the fact they were meant to influence policy at the center of the fierce debate over regulatory conflicts between lobstering and protecting right whales." *Id.* As "the Statements constitute petitioning activity," MBAF avers that dismissal is warranted because Plaintiffs have not shown that the Statements had no basis in fact or law. *Id.*

### 4.    Failure to State a Claim

### a.    The "Of and Concerning" Element

With respect to its Federal Rule of Civil Procedure 12(b)(6) arguments, MBAF first reiterates that "Plaintiffs, five members of a group comprising 5,600 individuals, cannot meet the 'of and concerning' element because the Statements do not refer to them individually." *Id.* at 13. Invoking the "group libel" doctrine, MBAF argues "a plaintiff cannot prove the mandatory 'of and concerning' element of a defamation claim if the allegedly defamatory statement referenced the plaintiff solely as a member of a group, unless the plaintiff can show that the circumstances of the publication reasonably give rise to the conclusion that there is a particular reference to the plaintiff." *Id.* MBAF further submits that "[a] review of Maine and First Circuit caselaw on the group libel rule did not yield a single case where a large group was defamed and a member of that group, who was not specifically identified in the statement, successfully brought a defamation claim." *Id.* at 14 (emphasis omitted).

Although MBAF concedes "the Statements likely were understood by many readers to include Maine's lobster industry," it maintains that "[t]here is no conceivable way the Statements were interpreted by a reasonable reader to apply explicitly to five Plaintiffs given the large size of the group, comprising 5,600 individuals." *Id.* Were the Court to allow Plaintiffs' claims to proceed, MBAF continues, it would be doing "what no other American court has done in over 60 years for any group exceeding 30 members." *Id.* at 15. MBAF further argues that "[u]nder Plaintiffs' theory, all 5,600 lobstermen would possess individual claims for

59

Add.59

defamation against MBAF, an absurd result with no legal precedent." *Id.* MBAF goes on to distinguish the cases relied upon by Plaintiffs before concluding that "[b]ecause Plaintiffs are not specifically referenced by or identifiable from the Statements, they cannot meet the 'of and concerning' requirement and their claims against MBAF must be dismissed." *Id.* at 15-16.

### b.    Facts vs. Opinions

MBAF argues that "because the Statements could not have been reasonably understood as anything other than opinion based on third-party scientific sources cited by MBAF in the Press Release and Report," they cannot be defamatory. *Id.* at 16-17. (citing *Piccone,* 785 F.3d at 771). MBAF resists Plaintiffs' attempts to distinguish their Statements from "publications directed to the relevant scientific community" by claiming that "[its] sources were themselves publications directed to relevant scientific communities whose findings are not subject to a defamation claim." *Id.* at 17. MBAF also contests Plaintiffs' allegation that it did not rely on scientific evidence in support of its conclusion, maintaining that "[w]hile MBAF may have discounted findings touted by the lobster industry, it is undisputed that MBAF relied on . . . numerous publications by federal agencies and leading ocean scientists whose findings differed from the sources embraced by the lobster industry." *Id.* at 17-18.

MBAF goes further, arguing that Plaintiffs' failure to acknowledge the sources on which MBAF relied was no mere oversight. *Id.* at 18. "Acknowledgement of MBAF's sources would be a major concession undermining Plaintiff[]s['] false narrative that MBAF lied to the public about the scientific evidence supporting the

60

Add.60

red rating," MBAF says, and "would also undermine Plaintiffs' argument that MBAF holds *itself* out as a 'reliable source of factual scientific conclusions,'" and "would concede that MBAF availed itself of its editorial right to choose which information it found more reliable." *Id.* (emphasis in original). MBAF asserts it "had the right to exclude lobster industry data interpretations in favor of other credible scientific conclusions and sources." *Id.*

MBAF continues by citing numerous federal decisions in defense of its "reasonable and appropriate editorial decision to give greater weight to some sources—including federal agencies . . . and leading ocean research institutes … over others that are highly biased with much to lose—e.g., the lobster industry." *Id.* at 19-20 (collecting cases). MBAF notes that Plaintiffs do not impute the sources cited by MBAF in its Report to be facially unreliable; rather, they allege MBAF purposely misrepresented scientific data to support the red rating. *Id.* at 20. MBAF says that Plaintiffs' characterization of the D.C. Circuit Court's decision in *Maine Lobstermen's Association* is "misleading" because "the appellate court did not make factual findings against the science on which the district court relied (i.e., whether lobster fisheries pose a threat to the right whale), but instead criticized the lower court's method of analysis that discounted economic and other factors." *Id.* (citing *Me. Lobstermen's Ass'n,* 70 F.4th at 599-600).

### c. Actual Malice or Negligence

MBAF describes the Plaintiffs as using "actual-malice buzzwords," including "knowledge," "serious doubts," and "reckless disregard," to state legal conclusions

without pleading the necessary underlying facts. *Id.* at 21. MBAF argues that, despite being allowed to plead states of mind generally under the Federal Rules of Civil Procedure, Plaintiffs' conclusory allegations fail to assert sufficient facts for a reasonable inference of a plausible claim. *Id.* (citing *Schatz*, 669 F.3d at 58).

MBAF again asserts that Plaintiffs ignore its reliance on credible sources, the use of which precludes a finding of actual malice or negligence. *Id.* at 21-22. (collecting First Circuit, Maine, and other court cases). MBAF further states it "was under no obligation to include information provided by Plaintiffs in favor of its credible sources," and concludes that "Plaintiffs cannot show actual malice or negligence merely by making assertions contrary to those of the identified sources from which MBAF obtained its information." *Id.* at 22. At bottom, MBAF posits that Plaintiffs have failed to satisfy the pleading standard for either actual malice or negligence, such that the defamation claim should be dismissed as to all Plaintiffs. *Id.*

### 5.    Injunctive Relief

MBAF quotes the U.S. Supreme Court for the proposition that "[n]o prior decisions support the claim that the interest of an individual in being free from public criticism of his business practices . . . warrants use of the injunctive power of a court." *Id.* at 24. (quoting *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971)). MBAF asserts that Plaintiffs fail to "cite a single case where a federal appellate court approved an injunction against speech following a defamation trial," and argue Plaintiffs mischaracterize the holding of *Sindi*, which they say held that "speech

62

Add.62

found to be defamatory and unprotected in one context may warrant constitutional protection in another, and therefore no injunction could conceivably be tailored narrow enough to pass constitutional muster." *Id.* (citing *Sindi*, 896 F.3d at 33-35). MBAF concludes that this case does not warrant the exceptional remedy of an injunction and that the "remedy for defamation is a damages action after publication." *Id.* at 25 (quoting *Living Vehicle, Inc. v. Megan Kelley, et al,* No. 2:22-cv-06226-RGK-AS, 2023 U.S. Dist. LEXIS 37872, at \*24-25 (C.D. Cal. Jan. 20, 2023)).

### 6. Leave to Amend

MBAF contests any grant of leave to amend the complaint, arguing that Plaintiffs fail to articulate "any information of how they would cure their deficiency." *Id.* at 23. MBAF quotes the First Circuit, which wrote in 2013 that "except perhaps in 'exceptional circumstances,' a bare request in an opposition to a motion to dismiss does not constitute a motion to amend for purposes of Rule 15(a)." *Id.* (quoting *United States ex rel Ge v. Takeda Pharm. Co.*, 737 F.3d 116, 128 (1st Cir. 2013)). To be granted leave to amend, MBAF says, the plaintiff must "set forth the factual and legal predicate for the remedy sought," and "do[] the necessary leg work." *Id.* at 23-24 (quoting *Silverstrand Invs. v. AMAG Pharms., Inc.*, 707 F.3d 95, 107 (1st Cir. 2013)). MBAF reiterates that "the Opposition fails to set forth a single additional fact to be included in an amended complaint," and concludes "the request to amend should be denied." *Id.*

### D. MBAF's Motion to Supplement and Supplemental Brief

MBAF supplemented the record with information "that the cause of death of a North Atlantic right whale found deceased on a beach in Massachusetts in January

63

2024 was entanglement in fishing gear used by Maine lobster fishermen." *Def.'s Second Mot. to Suppl.* at 2. MBAF's supplemental brief argues that the new information should result in a dismissal of the case because its statements implicated as defamatory "have been proven true or substantially true by . . . NOAA's recent finding." *Def.'s Suppl. Brief* at 2.

MBAF contends the evidence that lobster gear caused the death of NARW #5120 compels the dismissal of Plaintiffs' defamation suit. Directing the Court to First Circuit and Supreme Court caselaw, it asserts that "[t]ruth is a complete defense [to defamation]." *Id.* at 5 (quoting *Pan Am Sys. v. Atl. Ne. Rails & Ports, Inc.*, 804 F.3d 59, 64 (1st Cir. 2015); *see also Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 517 (1991)). Further, statements regarding matters of public concern must be proven "materially false." *Id.* at 6 (citing *Salmon v. Lang*, 57 F.4th 296, 321 (1st Cir. 2022)). MBAF contends the longstanding public debate over lobster fishing regulations designed to protect the right whale makes the issue one of public concern and that the new information makes it impossible for Plaintiffs to prove the purportedly defamatory statements were materially false. *Id.* It emphasizes the new information only validates the accuracy of its original conclusion and concludes the Court should dismiss the Plaintiffs' complaint. *Id.* at 7-10.

### E.    Plaintiffs' Motion to Supplement and Supplemental Brief

Plaintiffs insist extrinsic materials may only lead to dismissal when "the extrinsic evidence is so strong that it undercuts the truth of the allegations in the Complaint." *Pls.' Suppl. Brief* at 6 (citing *Bruns v. Mayhew*, No. 1:12-CV-00131-JAW, 2012 U.S. Dist. LEXIS 165380, at *25 (D. Me. Nov. 20, 2012)). They contend the new

64

Add.64

information fails to demonstrate that the rope which entangled and ultimately caused the death of NARW #5120 was one of the "weak link" ropes the industry adopted in 2022 pursuant to the federal Take Reduction Plan because NOAA themselves recognized that supply chain issues had prevented industrywide implementation by the May 1, 2022 date of regulatory effect and publicly stated a focus on compliance assistance rather than enforcement. *Id.* (citing *NOAA Compliance Letter*).

Plaintiffs aver that the NOAA webpages submitted by MBAF "do not identify the kind of rope that entangled Right Whale #5120" and further that the NOAA Compliance Letter acknowledged that the "weak link" rope requirements had not been fully implemented as of May 1, 2022. *Id.* at 8. As such, Plaintiffs say, it is "thus impossible to conclude from the extrinsic evidence what kind of rope entangled Right Whale #5210." *Id.* Plaintiffs remind the Court that all reasonable inferences should be drawn in a plaintiff's favor on a motion to dismiss, *id.* (citing *Bruns,* 2012 U.S. Dist. LEXIS 165380, at *25) and argue that the new information submitted by MBAF fails to prove that current regulations are inadequate to protect the right whale as MBAF had stated in 2022. *Id.* Thus, Plaintiffs say, MBAF's statements "were false when made, and are still false today." *Id.*

Plaintiffs continue by arguing MBAF's new information fails to demonstrate an increase in right whale mortality due to Maine lobster gear between 2017 and 2022 as stated by MBAF, nor any other reported instances of right whale mortality or serious injury from Maine lobster gear prior to the 2024 reports involving Right

65

Add.65

Whale #5120. *Id.* at 9. Plaintiffs conclude that, even accepting the new extrinsic evidence, the Court should deny MBAF's motion to dismiss. *Id.* at 10.

### F. Plaintiffs' Response to MBAF's Motion to Supplement

Plaintiffs respond to MBAF's motion to supplement and supplemental brief by arguing that MBAF mischaracterizes the applicable legal standard for the purposes of the motion to dismiss. While MBAF suggests "Plaintiffs have the burden of proving that the statements in the Press Release and Report were materially false, i.e., Plaintiffs will have to establish that the death of [Right Whale] #5120 was not due to entanglement in Maine gear," *Pls.' Suppl. Resp.* at 2 (citing *Def.'s Suppl. Brief* at 6), Plaintiffs assert a defamation claim survives a motion to dismiss so long as the plaintiff has alleged the "factual underpinning of how the statements are false." *Id.* (quoting *Kaplan v. Blue Hill Mem'l Hosp.*, 2014 U.S. Dist. LEXIS 167384, at *23 n.11 (D. Me., Nov. 28, 2014), *aff'd* 2014 U.S. Dist. LEXIS 174621 (D. Me. Dec. 17, 2014) (citation corrected)).

Plaintiffs reassert their position that MBAF has presented no evidence that NARW #5120, nor any other right whale, has been identified as killed or seriously injured by entanglement in the lobster fishing gear implemented pursuant to regulations in 2022. *Id.* at 3. Thus, Plaintiffs maintain their claim that MBAF's statements were false and constituted defamation. *Id.* at 3-4. Plaintiffs further argue that, for the same reasons, the new information submitted by MBAF is immaterial to its anti-SLAPP defense or any other arguments raised in its motion to dismiss, such that the motion to dismiss should be denied. *Id.* at 4-5.

### G. MBAF's Response to Plaintiffs' Motion to Supplement

MBAF replies to the Plaintiffs' motion to supplement by reasserting the grounds for dismissal from its motion to dismiss and reiterating that "MBAF's statements have been proven true, or substantially true, by NOAA's October 2, 2024 findings that NARW #5120 became entangled in Maine rope, which killed the calf, *before* MBAF published its statements." *Def.'s Suppl. Resp.* at 2. MBAF rejects Plaintiffs' argument that the Court should infer the rope which entangled NARW #5120 was not one a "weak link" rope, but submits the Court should dismiss the complaint based on a finding that Maine-identified rope entangled the whale regardless of whether the rope was of the "weak link" or the former variety because this fact demonstrate the truth of MBAF's statements that lobster fishing practices threaten the North Atlantic right whale. *Id.* at 2-4. MBAF further argues that the distinction between "weak link" and older ropes is irrelevant to the Court's assessment of actual malice, claiming that regulation's May 1, 2022 date of implementation permitted a reasonable belief that any entanglements after this date involved "weak link" rope. *Id.* at 4-5. The statement by the NOAA Regional Administrator, MBAF says, does not demonstrate the MBAF knew or recklessly disregarded information that the entanglement of NARW #5120 was in older ropes, nor that MBAF acted with actual malice in stating the new regulations were insufficient to mitigate risks to right whales by the U.S. and Canadian lobster industries. *Id.* at 5.

Finally, MBAF restates that its statements were supported by circumstantial evidence provided by reliable experts and asks the Court to dismiss the Plaintiffs'

67

Add.67

defamation claim for failure to state a claim and under the Maine anti-SLAPP statute. *Id.* at 6.

## IV.  PERSONAL JURISDICTION

### A.  Legal Standard

MBAF first moves to dismiss Plaintiffs' complaint for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). "To hear a case, the court must have personal jurisdiction over the parties, 'that is the power to require the parties to obey its decrees.'" *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 8 (1st Cir. 2009) (quoting *United States v. Swiss Am. Bank, Ltd.*, 191 F.3d 30, 35 (1st Cir. 1999)). "On a motion to dismiss for want of personal jurisdiction, the plaintiff ultimately bears the burden of persuading the court that jurisdiction exists." *Id.* (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *Mass Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 34 (1st Cir. 1998)). "Faced with a motion to dismiss for lack of personal jurisdiction, a district court 'may choose from among several methods for determining whether the plaintiff has met [its] burden.'" *Id.* (alteration in original) (quoting *Adelson v. Hananel*, 510 F.3d 43, 48 (1st Cir. 2007)). "The different methods involve application by the district court of different legal standards." *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 674 (1st Cir. 1992); *see also Foster-Miller, Inc. v. Babcock & Wilcox Can.*, 46 F.3d 138, 145-47 (1st Cir. 1995) (describing the prima facie, preponderance and likelihood standards).

Here, the parties agree that the Court should use the prima facie standard to assess personal jurisdiction. *See Def.'s Mot.* at 11; *Pls.' Opp'n* at 8.  Under this

standard, "the inquiry is whether the plaintiff has proffered evidence which, if credited, is sufficient to support findings of all facts essential to personal jurisdiction." *Bluetarp Fin., Inc. v. Matrix Constr. Co.*, 709 F.3d 72, 79 (1st Cir. 2013) (quoting *Phillips v. Prairie Eye Ctr.*, 530 F.3d 22, 26 (1st Cir. 2008)).  In conducting such an inquiry, the Court draws "the relevant facts from 'the pleadings and whatever supplemental filings (such as affidavits) are contained in the record, giving credence to plaintiff's version of genuinely contested facts.'" *Ward v. AlphaCore Pharma, LLC*, 89 F.4th 203, 209 (1st Cir. 2023) (quoting *Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 34 (1st Cir. 2016)).  The Court may also consider "undisputed facts put forth by the defendant."  *Baskin-Robbins*, 925 F.3d at 34. "Withal, the district court acts not as a factfinder, but as a data collector." *Foster-Miller*, 46 F.3d at 145.

Importantly, under the prima facie method, "the plaintiff cannot rely solely on conclusory averments but must 'adduce evidence of specific facts.'"  *Chen v. U.S. Sports Acad., Inc.*, 956 F.3d 45, 54 (1st Cir. 2020) (quoting *Foster-Miller*, 46 F.3d at 145).  Likewise, the Court does not "credit conclusory allegations or draw farfetched inferences."  *Ward*, 89 F.4th at 209 (quoting *Ticketmaster-N.Y., Inc. v. Alioto*, 26 F.3d 201, 203 (1st Cir. 1994)).  The "inquiry must be governed by 'evidence of specific facts set forth in the record' — not simply predicated upon a plaintiff's 'unsupported allegations in their pleadings.'"  *Id.* (quoting *Boit*, 967 F.2d at 675).  "Ordinarily, such evidence will be contained in affidavits, authenticated documents, and the like, submitted by one or more of the parties."  *Id.*

Since the single count in Plaintiffs' complaint is a state-law defamation claim, the Court's subject matter jurisdiction is premised on diversity jurisdiction. *Compl.* ¶¶ 28, 93-113. When sitting in diversity, a federal court "is the functional equivalent of a state court sitting in the forum state." *Baskin-Robbins*, 825 F.3d at 34 (internal citation omitted). Accordingly, for a district court to have personal jurisdiction over a party, the exercise of jurisdiction must be consistent with the forum state's long-arm statute and the Due Process Clause of the Fourteenth Amendment. *See Chen*, 956 F.3d at 54. Because Maine's long-arm statute allows for the exercise of jurisdiction "to the fullest extent permitted" by the Due Process Clause, 14 M.R.S. § 704-A(1), the Court need only assess whether personal jurisdiction is constitutionally permissible. *See Hunt v. Hunt*, 512 F. Supp. 3d 39, 59 (D. Me. 2020).

Although there are two types of personal jurisdiction—general and specific—Plaintiffs only suggest the Court has specific personal jurisdiction over MBAF. Specific jurisdiction, as its name suggests, is transaction specific. *See Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (noting that courts exercise specific jurisdiction when the suit "aris[es] out of or relate[s] to the defendant's contacts with the forum" (alterations in original) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)). For specific jurisdiction to attach, "[d]ue process requires that the defendant 'have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Plixer Int'l, Inc. v. Scrutinizer GmbH*, 905 F.3d 1, 7 (1st Cir. 2018) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Add.70

In particular, "[a] litigant seeking to establish that a court has specific jurisdiction over a defendant must satisfy three criteria." *Ward*, 89 F.4th at 209. "First, the plaintiff's claim must directly arise from or relate to the defendant's activities in the forum." *Id.* at 209-10 (quoting *Chen*, 956 F.3d at 59). "Second the defendant's forum-state contacts must represent a purposeful availment of the privilege of conducting activities in that state." *Id.* at 210 (quoting *Chen*, 956 F.3d at 59). "Third, 'the exercise of specific jurisdiction in the forum must be reasonable under the circumstances.'" *Id.* (quoting *Chen*, 956 F.3d at 59). Since MBAF concedes Plaintiffs have satisfied the relatedness element, *Def.'s Reply* at 5 n.1, the Court's inquiry centers only on purposeful availment and reasonableness.

## B.    Discussion

### 1.    Purposeful Availment

In general, courts considering purposeful availment must assess "whether a defendant has 'deliberately target[ed] its behavior toward the society or economy of a particular forum [such that] the forum should have the power to subject the defendant to judgment regarding that behavior.'" *Baskin-Robbins*, 825 F.3d at 36 (alterations in original) (quoting *Carreras v. PMG Collins, LLC*, 660 F.3d 549, 555 (1st Cir. 2011)). "The function of the purposeful availment requirement is to assure that personal jurisdiction is not premised solely on a defendant's 'random, isolated, or fortuitous' contacts with the forum state." *Sawtelle v. Farrell*, 70 F.3d 1381, 1391 (1st Cir. 1995) (quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 774 (1984)).

71

In the context of a defamation claim, the First Circuit has recognized that a plaintiff can establish purposeful availment by means of the effects test, announced by the Supreme Court in *Calder*, 465 U.S. 783. *See Swiss Am. Bank*, 274 F.3d at 623; *Noonan v. Winston Co.*, 135 F.3d 85, 90-92 (1st Cir. 1998). In *Calder*, an entertainer who lived and worked in California sued the author and the editor of an allegedly libelous *National Enquirer* article in California court. 465 U.S. at 784-85. The author and the editor, both Florida residents, moved to dismiss the complaint for lack of personal jurisdiction. *Id.* at 784-86. They argued their California contacts, which were limited to making unrelated trips to the state and placing phone calls to individuals in California to research the article at issue, were insufficient to establish personal jurisdiction. *Id.* at 785-86.

The Supreme Court disagreed, holding that jurisdiction over the author and the editor in California was proper "based on the 'effects' of their Florida conduct in California." *Id.* at 789. In support, the *Calder* Court observed that:

> The allegedly libelous story concerned the California activities of a California resident. It impugned the professionalism of an entertainer whose television career was centered in California. The article was drawn from California sources, and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California. In sum, California is the focal point both of the story and of the harm suffered.

*Id.* at 788-89. The Supreme Court also noted that the author and the editor worked on an article that "they knew would have a potentially devastating impact," and "they knew that the brunt of that injury would be felt by respondent in the State in which she lives and works and in which the *National Enquirer* has its largest circulation." *Id.* at 789-90.

In interpreting *Calder*, the First Circuit has held that a plaintiff can establish purposeful availment by showing that 1) the defendant "aimed an act at the forum state," 2) the defendant "knew the act would likely have a devastating effect," and 3) the defendant "knew the injury would be felt in the forum state." *Noonan*, 135 F.3d at 90. Here, the parties primarily dispute the first element. Plaintiffs contend that MBAF aimed its allegedly defamatory statements at Maine because the statements "focused on the forum where Plaintiffs reside and do business," and MBAF "cited Maine-based sources to support the credibility of its Statements," "reached into Maine to contact and solicit comments from sources, including MLA, and" "delivered the defamatory message directly to Maine and New England-based outlets." *Pls.' Opp'n* at 9. MBAF retorts that its statements "do not specifically refer to or target lobstermen from Maine or any other individual state" and "were published on MBAF's website, which is freely accessible to anyone, anywhere." *Def.'s Reply* at 4. Further, MBAF suggests that its "minimal contacts with Maine before and after the publication of the Report are not sufficient to establish purposeful availment." *Id.* at 5.

Underlying the parties' dispute is the larger question of how to apply *Calder*'s effects test to defamatory statements published on the internet. *Calder* involved statements published in the *National Enquirer*, a print magazine, and part of the Supreme Court's reasoning rested on the fact that the *National Enquirer* "has its

73

Add.73

largest circulation in California."[10]  After *Calder*, lower courts have relied in part on circulation to determine whether a defendant aimed allegedly defamatory statements at a particular forum.  *See, e.g., Noonan*, 135 F.3d at 90-91 (noting that the "size of a distribution of offending material helps determine whether a defendant acted intentionally" and concluding that the distribution of 305 magazines in Massachusetts, unbeknownst to the defendant advertiser, was insufficient to show purposeful availment); *Casualty Assurance Risk Ins. Brokerage Co. v. Dillon*, 976 F.2d 596, 599 (9th Cir. 1992) ("[T]he circulation of the defamatory material in the forum state is an important factor in the minimum contacts analysis for a defamation action").  But there is no proxy for circulation in situations where, as here, challenged statements are published on websites freely accessible by anyone, anywhere.  Nor has the First Circuit addressed how *Calder*'s effects test applies to internet-based defamation.

In the absence of clear guidance from the First Circuit on this narrow issue, other district courts in this circuit have adapted *Calder* to the internet era.  What has emerged from these decisions is a general rule that publication of allegedly defamatory statements about a forum resident on the internet, without more, is insufficient to confer personal jurisdiction.  *See Mullane v. Breaking Media, Inc.*, No. 18-12618-PBS, 2019 U.S. Dist. LEXIS 193270, at *28 (D. Mass. Aug. 13, 2019) ("The fact that Above the Law is a website freely accessible to readers in Massachusetts is

---

[10]     Specifically, the Court noted that the *National Enquirer* had "a total circulation of over 5 million.  About 600,000 of those copies, almost twice the level of the next highest State, are sold in California." *Calder*, 465 U.S. at 785.

insufficient to establish purposeful availment" because its content "is not aimed at legal consumers in Massachusetts specifically"); *Farquharson v. Metz*, No. 13-10200-GAO, 2013 U.S. Dist. LEXIS 106374, at *6 (D. Mass. July 30, 2013) (declining to find purposeful availment where the defendant "did not take any additional steps to specifically aim content at any Massachusetts residents" other than making Facebook posts visible to her "'friends,' and perhaps [] 'friends of friends'"); *BroadVoice, Inc. v. TP Innovations LLC*, 733 F. Supp. 2d 219, 225-26 (D. Mass. 2010) (rejecting jurisdiction under *Calder* because "Bednar's defamatory website was aimed at Massachusetts only in the sense that it could be accessed by Massachusetts residents (along with the rest of the world)" and "Bednar did nothing to incite residents of Massachusetts—as opposed to the world at large—to take up arms against BroadVoice"); *Gentle Wind Project v. Garvey*, No. 04-103-P-C, 2005 U.S. Dist. LEXIS 261, at *23 (D. Me. Jan. 20, 2005) (observing that "application of *Calder* in the Internet context requires proof that the out-of-state defendant's Internet activity is expressly targeted at or directed to the forum state" (quoting *Young v. New Haven Advocate*, 315 F.3d 256, 262-63 (4th Cir. 2002))).

The particular facts of this case, however, make the general rule an ill fit here because MBAF did not merely post allegedly defamatory statements on a generally available website. Instead, after uploading the allegedly defamatory material, MBAF actively promoted its statements in Maine.

On September 6, 2022—the day the Lobster Report was released—Ms. Kemmerly, MBAF's Vice President of Global Ocean Initiatives, discussed the

75

Add.75

statements in a broadcast interview with New England Cable News, a regional news outlet.  *See Pls.' Opp'n* at 6 & n.1.[11]  Ms. Kemmerly also gave a lengthy interview published in the December 2022 issue of *Down East*, a Maine-based magazine focused on Maine issues.  *See id.* at 6-7, 7 n.3 (citing *Down East Article*).  In this interview, which appeared in an article devoted to Seafood Watch's red rating, Ms. Kemmerly explained how Seafood Watch develops its ratings, noting, for example, that "Seafood Watch has based its rating system on international best practices, including those established by the United Nations' Food and Agriculture Organization."  *Down East Article.*[12]  Ms. Kemmerly also noted that Seafood Watch was "doing a lot of updating, watching, and incorporating new data for two years before [it] began circulating [the] draft assessment for peer review and public comment."  *Id.*

By authorizing its representatives to make statements to press outlets that broadcast and publish in Maine, including a Maine-based magazine, MBAF raised awareness of the allegedly defamatory statements in Maine and, in so doing, aimed the statements at Maine.  Although the statements at issue here were posted on a generally available website, the broader circumstances are more analogous to *Calder* than the internet-based defamation cases.  Here, MBAF promoted its allegedly defamatory statements in Maine by engaging with media outlets focused on Maine,

---

[11]    For an article discussing the interview, see David Guildford, *Maine Leaders React to 'Absurd' Seafood Watch Red List on Lobster* (Sept. 10, 2022, 11:38 AM EDT), NBC NEWS CTR. ME., https://www.newscentermaine.com/article/money/business/maine-leaders-stew-over-seafoodwatch-red-list-lobster-industry-right-whale-regulations-protections-lobstermen-environment/97-d718ea08-3e2d-4b07-97a1-08ecebe897ca.

[12]    The online *Down East* article cited in Plaintiffs' opposition is not paginated.

and the broader region.  While the statements were accessible to anyone, MBAF took affirmative steps to ensure they would be circulated in Maine.

MBAF resists this conclusion.  It contends that "most of the media interactions" cited by Plaintiffs "were not publications in Maine" and although *Down East* is an "actual Maine publication," "there is no indication that Ms. Kemmerly or anyone else sought out publication of anything in *Down East* magazine as opposed to just responding to the writer's request for comment."  *Def.'s Reply* at 6-7.  But regardless of whether MBAF reached out to *Down East*, or vice versa, Ms. Kemmerly still gave a lengthy and presumably voluntary interview to the magazine.  The record reveals that MBAF knew how to decline interviews, as it declined an interview request from NBC News Center Maine.  *See News Center Maine Article* ("Seafood Watch's media email account responded to a request for an interview Friday evening.  It did not offer an interview, but maintained its stance").  The Court does not know why MBAF decided to make Ms. Kemmerly available for an interview with *Down East*, but the interview had the effect of promoting the Statements in Maine.

Beyond MBAF's promotion of the Statements in Maine, the subject matter of the statements themselves further underscores that MBAF aimed its speech at Maine.  In discussing the first prong of *Calder*'s effects test, the First Circuit noted that the *Calder* Court "found that the defendants' intentional conduct was '*calculated* to cause injury to respondent in California.'"  *Noonan*, 135 F.3d at 90 (emphasis in original) (quoting *Calder*, 465 U.S. at 791).  Likewise, the character of MBAF's statements suggests they were calculated to injure Plaintiffs in Maine.

This is because, quite simply, the statements at issue here advocated for an economic boycott of lobster, see *Lobster Rep.* at 6 (urging readers to "[a]void American lobster"), and Maine is the center of the American lobster industry. *Compl.* ¶ 25.[13] In 2021, the Maine lobster fishery was responsible for landing 100 million pounds of lobster—or 80% of the lobster landings in the United States—worth nearly $725 million all told. *Id.* The lobster industry is a critical part of Maine's economy, contributing about $1 billion annually. *Id.* ¶ 3. The industry supports 18,600 jobs and many ancillary businesses, including Maine's tourism sector. *Id.* ¶¶ 3-4. Indeed, 42% of the roughly 10.1 million people who visited Maine between May and August 2021 said they specifically came to Maine for lobster. *Id.* ¶ 4. Given the significance of the lobster industry to Maine, the Court concludes that, like the statements in *Calder*, MBAF's allegedly defamatory Statements, connected to calls for consumers to stop purchasing lobster, were reasonably calculated to injure Plaintiffs in Maine.

MBAF counters that its Statements "do not specifically refer to or target lobstermen from Maine or any other individual state" and insisting the "[Lobster] Report provides the rating for 'American Lobster,' not 'Maine Lobster,' and concerns fisheries in the Gulf of Maine/Georges Bank and Southern New England fisheries, not just Maine lobster fisheries." *Def.'s Reply* at 3-4. But this argument ignores the realities of the American lobster industry. While commercial lobster fishing occurs in multiple states, the data makes clear that Maine is the focal point of the industry.

---

[13]    While the Court cites the Plaintiffs' complaint for the statistics in this paragraph, the Plaintiffs provided factual support in the complaint for each cited statistic.

Maine lobstermen are responsible for the vast majority of lobster landings in the United States, and the lobster industry is a critical part of Maine's economy. In addition, the record contains news articles that show how lobster is not just an emblematic food but interwoven with Maine culture. These articles suggest that in many ways, "Maine is synonymous with lobster." *Compl.* at 2. The Court therefore rejects MBAF's argument that it did not aim its statements at Maine because the Seafood Watch publications do not specifically discuss "Maine lobster."

Based on its review of the record, the Court determines Plaintiffs have satisfied the first prong of *Calder*'s effects test. The record contains sufficient evidence to find that MBAF aimed its allegedly defamatory statements at Maine. Specifically, MBAF personnel promoted the statements in Maine by giving interviews to a Maine-based magazine and at least one other media outlet focused on New England. Further, the nature of MBAF's statements, which were part of an effort to urge consumers to boycott lobster, suggest they were calculated to cause injury to Plaintiffs in Maine, which is the focal point of the U.S. lobster industry. Although MBAF's allegedly defamatory statements were posted on a freely accessible website available to anyone, anywhere, the totality of the circumstances nevertheless establishes that MBAF aimed the statements at Maine.

Plaintiffs have also satisfied the second and third prongs of the effects test. To satisfy these elements, Plaintiffs must show that MBAF "knew the [statements] would likely have a devastating effect," and "knew the injury would be felt in [Maine]." *Noonan*, 135 F.3d at 90. Prior to publishing the statements, MBAF wrote

Add.79

in an email to MLA that "[t]he possible results of this assessment and the impact that it may have is not lost on us." *McCarron Decl.* ¶ 6. Further, lobster industry stakeholders underscored the impact of the statements in a later email, writing that the publication of a red rating would cause "permanent, irreparable harm to one of the world's most sustainable, conscientious, and proactive fisheries." *Id.* ¶ 16. This evidence, particularly MBAF's acknowledgment of the economic consequences of its statements, is sufficient to show that MBAF "knew the [statements] would likely have a devastating effect." *See Noonan*, 135 F.3d at 90.

Further, MBAF's acknowledgment was made to MLA, which represents 1,200 Maine lobstermen and advocates to protect its members, the lobster industry, and the value of the lobster resource. *Compl.* ¶ 15; *McCarron Decl.* ¶ 6. This fact, combined with MBAF's extensive communications with Maine-based lobster industry stakeholders before publishing the statements, establishes MBAF "knew the injury would be felt in [Maine]." *See McCarron Decl.* ¶¶ 3-8, 10-17; *Noonan*, 135 F.3d at 90. Accordingly, Plaintiffs have satisfied all three elements of *Calder*'s effects test, meaning they have carried their burden of establishing purposeful availment.

### 2.    Reasonableness

Even where a plaintiff has shown that a defendant has purposeful contacts with the forum state and that those contacts are related to the underlying claims, the plaintiff must also show that exercising personal jurisdiction is reasonable. *See Harlow v. Child.'s Hosp.*, 432 F.3d 50, 66-67 (1st Cir. 2005). Unreasonableness can "trump a minimally sufficient showing of relatedness and purposefulness." *Id.* at 67

80

Add.80

(quoting *Ticketmaster-N.Y.*, 26 F.3d at 210). The Court considers the following factors, known as the Gestalt factors, to determine whether exercising personal jurisdiction is reasonable:

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

*Id.* (quoting *United Elec., Radio and Mach. Workers of Am.*, 960 F.2d at 1088). Reasonableness is a sliding scale. *Id.* "[T]he weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction. The reverse is equally true: an especially strong showing of reasonableness may serve to fortify a borderline showing of relatedness and purposefulness." *Id.* (quoting *Ticketmaster-NY*, 25 F.3d at 210).

In MBAF's view, three of the five Gestalt factors support the conclusion that it would be unreasonable for this Court to exercise personal jurisdiction. First, MBAF argues its burden of appearing "would be great" because it "is located in California and the individuals who published the statements . . . are in California." *Def.'s Mot.* at 18. Next, MBAF contends "jurisdiction in Maine would not further Plaintiffs' interest in obtaining convenient and effective relief" because it would be easier for Plaintiffs to enforce a judgment issued by a California court. *Id.* at 18-19. Finally, MBAF suggests the judicial system's interest in obtaining the most effective resolution of the controversy weighs against jurisdiction in Maine because those

81

Add.81

responsible for drafting and publishing the Statements reside in California, and the Statements themselves were published in California. *Id.* at 19.

Plaintiffs disagree with MBAF's weighing of the Gestalt factors. *Pls.' Opp'n* at 13. They argue that MBAF "would not suffer an unusual burden to appear" in Maine because the "mere inconvenience of litigating outside one's home state" is not a sufficient burden. *Id.* Furthermore, they argue that "Maine has a strong interest in adjudicating this dispute" and "can provide convenient and effective relief." *Id.*

The Court concludes that Plaintiffs again have the better argument. Regarding MBAF's burden of appearing, the First Circuit has "recognized that defending in a foreign jurisdiction almost always presents some measure of inconvenience." *Sawtelle*, 70 F.3d at 1395. Thus, "this factor is only meaningful where a party can demonstrate some kind of special or unusual burden." *Henderson v. Laser Spine Inst.*, 815 F. Supp. 2d 353, 378 (D. Me. 2011) (quoting *Pritzker v. Yari*, 42 F.3d 53, 64 (1st Cir. 1994)).

MBAF maintains that if this Court exercises jurisdiction, arranging for the attendance and testimony of its employees who authored and published the Statements "will be a special and unusual burden." *Def.'s Reply* at 8. The Court disagrees. Corporate or organizational defendants litigating outside their home states must often arrange for the attendance of percipient employee witnesses because these entities can only act through their employees. In other words, the burden posited by MBAF fails to distinguish it from many organizational defendants.

82

Add.82

Therefore, from the Court's perspective, litigating this case in Maine would present no "special or unusual" burdens on MBAF.[14]  *See Pritzker*, 42 F.3d at 64.

The Court is similarly unconvinced by MBAF's argument that Plaintiffs' interest in obtaining convenient and effective relief weighs against jurisdiction in Maine.  The First Circuit has "repeatedly observed that a plaintiff's choice of forum must be accorded a degree of deference with respect to the issue of its own convenience." *Sawtelle*, 70 F.3d at 1395.

MBAF's contention that it would be easier for Plaintiffs to enforce a judgment issued by a California court is insufficient to overcome this deference, especially because Plaintiffs have chosen to litigate this case in Maine, their home state.  *See McCarron Decl.* ¶¶ 1-2; *Petersdorf Decl.* ¶ 2; *Martens Decl.* ¶ 2; *Cushman Decl.* ¶ 2; *Thompson Decl.* ¶ 2; *Sawtelle*, 70 F.3d at 1395 (concluding that "unquestionably, it would be more convenient" for the plaintiffs to litigate in "their home state rather than elsewhere").

Finally, the Court rejects MBAF's argument that because the Statements were written and published in California, "jurisdiction in Maine would not further the judicial system's interest in obtaining the most effective resolution of the controversy." *Def.'s Mot.* at 19.  MBAF's assertions with respect to this factor merely

---

[14]    MBAF also claims that litigating this case in Maine would burden it because it would "be difficult to compel the attendance at trial or hearing of witnesses from other jurisdictions." *Def.'s Mot.* at 18; *see also Def.'s Reply* at 8 (arguing that this consideration constitutes a "special or unusual burden").  The Court is unable to fully evaluate this argument because MBAF has not identified the locations of these witnesses.  Without more, the Court concludes that coordinating the attendance of unidentified non-MBAF witnesses does not constitute a special or unusual burden, or considered differently, that the burden on MBAF of litigating in Maine would exceed the burden on the Plaintiffs of litigating in California.

83

Add.83

repackage its burden arguments.  Furthermore, the Court does not see how the fact that the Statements were written and published in California makes a federal court in Maine unable to render effective relief.  "[N]othing about this case suggests that [this Court] will have any difficulty rendering effective relief" if Plaintiffs prevail on their claims.  *Henderson*, 815 F. Supp. 2d at 378 (second alteration in original) (quoting *Jet Wine & Spirits, Inc. v. Bacardi & Co., Ltd.*, 298 F.3d 1, 12 (1st Cir. 2002)).

Ultimately, to prevail on the reasonableness prong, a defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."  *Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215, 220 (1st Cir. 1989) (quoting *Burger King*, 471 U.S. at 477).  Because MBAF has failed to present a compelling case—and because other Gestalt factors clearly support the reasonableness of jurisdiction in Maine[15]—the Court concludes that personal jurisdiction over MBAF is reasonable.

With this determination, all three criteria for specific personal jurisdiction are satisfied in this case.  Therefore, the Court denies MBAF's motion insofar as it relates to personal jurisdiction.  The Court further dismisses as moot Plaintiffs' motion for jurisdictional discovery.  As the facts already in the record establish that personal jurisdiction is proper, no further discovery is necessary.

---

[15]    In particular, Maine has a significant interest in adjudicating this dispute.  As the First Circuit has observed, "a forum state has a demonstrable interest in obtaining jurisdiction over a defendant who causes tortious injury within its borders."  *Sawtelle*, 70 F.3d at 1395; *see Keeton*, 465 U.S. at 777 ("The tort of libel is generally held to occur wherever the offending material is circulated").

84

Add.84

## V.    CHANGE OF VENUE

### A.    Legal Standard

Under 28 U.S.C. § 1404(a), "a district court may transfer a case to any other district or division where the case might have been originally brought, or to which the parties have consented, in the interest of justice or for the convenience of the parties and witnesses." *Bluetarp Fin.,*709 F.3d at 83 n.11. "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness." *Astro-Med*, 591 F.3d at 12 (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)). "Not only does the burden of proof rest with the party seeking to transfer; there is a 'strong presumption in favor of the plaintiff's choice of forum.'" *Id.* at 13 (quoting *Coady*, 223 F.3d at 11).

The United States Supreme Court has advised district courts to consider both "private concerns" and "public interest factors" in exercising discretion under § 1404(a). *Stewart Org.*, 487 U.S. at 30-31. Private factors include "the statutory considerations of convenience of the parties and witnesses, but also often include the plaintiff's forum preference, where the claim arose, and the relative ease of access to sources of proof." *Johnson v. VCG Holding Corp.*, 767 F. Supp. 2d 208, 212 (D. Me. 2011) (quoting 15 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3847 (2007 ed.) (hereafter WRIGHT & MILLER)). Public factors "encompass the statutory consideration of the interest of justice, focus on judicial economy and often include the district court's familiarity with the

85

Add.85

governing law, the local interest in deciding local controversies at home, and the relative congestion of the courts." *Id.* (quoting WRIGHT & MILLER § 3847).  In the First Circuit, "[i]n addition to the convenience of parties and witnesses, the factors to be considered by the court include the availability of documents; the possibility of consolidation; and the order in which the district court obtained jurisdiction." *Coady*, 223 F.3d at 11.

### B.    Discussion

#### 1.    Potential Jurisdiction of the Transferee District

A preliminary question is whether this lawsuit could have been brought in the Northern District of California, the proposed transferee district.  *See Hoffman v. Blaski*, 363 U.S. 335, 341-44 (1960).  Had they elected to do so, Plaintiffs could have brought suit in the U.S. District Court for the Northern District of California, because MBAF's principal place of business is in Monterey, California within the Northern District of California.  *Compl.* ¶ 19*; Kemmerly Decl.* ¶ 1 (describing MBAF as "a California non-profit corporation"); *see* 28 U.S.C. § 1332(c)(1) ("[A] corporation shall be deemed to be a citizen of . . . the State or foreign state where it has its principal place of business"); *id.* § 1391(b)(1) ("A civil action may be brought in . . . a judicial district in which any defendant resides"); *id.* § 1391(d) ("[I]n a State which has more than one judicial district and in which a defendant that is a corporation is subject to personal jurisdiction . . . such corporation shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal

Add.86

jurisdiction if that district were a separate State"). MBAF has met the essential jurisdictional prerequisite for transfer to the Northern District of California.

## 2. The Potential for Consolidation

One of MBAF's principal arguments for transfer is that it would allow this case to be consolidated with *Sawyer v. Monterey Bay Aquarium Foundation*, a case filed by Massachusetts lobsterman that also concerns the Seafood Watch red rating. *Def.'s Mot.* at 20-21; *Def.'s Reply* at 9-10. *Sawyer* was originally filed in the U.S. District Court for the Eastern District of Louisiana, but MBAF moved to transfer the case to the Northern District of California or, in the alternative, to dismiss for lack of personal jurisdiction. *Def.'s Mot.* at 21. At the time this motion became ready for decision, on August 24, 2023, the court in the Eastern District of Louisiana had not ruled on MBAF's motion, although MBAF represented that "transfer of the Louisiana Action to the N.D. Cal. remains the most likely outcome." *Def.'s Reply* at 9-10.

On September 30, 2023, MBAF filed a motion to supplement the record with an order from the *Sawyer* court "finding no personal jurisdiction over MBAF and transferring claims against it to the Northern District of California." *Def.'s Mot. to Suppl.* at 1. Plaintiffs opposed MBAF's motion to supplement on October 24, 2023, seeking to distinguish the plaintiffs and causes of action from the present case. *Pls.' Opp'n to Def.'s Mot. to Suppl.*

The Court holds "considerable leeway in weighing the proof, drawing reasonable inferences, and satisfying itself that subject-matter jurisdiction has attached," which "includes 'broad authority' to 'consider extrinsic evidence.'" *Hearts*

*With Haiti, Inc. v. Kendrick*, No. 2:13-cv-00039-JAW, 2016 U.S. Dist. LEXIS 75220, at *8-9 (D. Me. June 9, 2016) (quoting *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 263-64 (1st Cir. 2001)).   Defendant references the *Sawyer* case extensively in its motion for transfer of venue, *Def.'s Opp'n* at 19-21, and claims these two cases are "based on the exact same set of facts and alleged defamatory publications."  *Def.'s Mot. to Suppl.* at 1.  The First Circuit has instructed "the possibility of consolidation" should inform a decision on transfer of venue.  *Coady*, 223 F.3d at 11.  Therefore, the Court grants Defendant's motion to supplement the record with the decision of the court in the Eastern District of Louisiana to transfer the *Sawyer* case to the Northern District of California for the purposes of determining the proper venue of this case.

Ultimately, however, the potential to consolidate with the purportedly parallel *Sawyer* case has no effect on the current case.  On January 16, 2024, Plaintiffs filed a letter representing that "[a]s of January 8, 2024, the parties to the *Sawyer* Action voluntarily dismissed that case with prejudice, and the Court has ordered such a dismissal." *Pls.' Notice* at 1 (italics added by the Court).  Accordingly, it is the Court's understanding that *Sawyer* is no longer pending before any court, and it is highly unlikely the case may properly be refiled.  9 WRIGHT & MILLER § 2367 ("[A] dismissal with prejudice . . . is final, appealable, and unless the court has made some other provision, is subject to the general rules of preclusion — res judicata and collateral estoppel — and is effective not only on the immediate parties to the action but also to their privies").   Given subsequent developments regarding *Sawyer*, the Court disregards MBAF's consolidation arguments because there is no longer any related

88

Add.88

action pending in a different jurisdiction.  Because there is no longer any realistic possibility of consolidation, the possibility-of-consolidation factor favors Plaintiffs.

### 3.    The Location of Documents and Witnesses

Although MBAF's other arguments for transfer are still relevant, the Court finds them unconvincing.  According to MBAF, "the convenience of witnesses and availability of documents weigh heavily in favor of transfer to the Northern District of California." *Def.'s Mot.* at 21.  In particular, MBAF represents that the individuals "who created the Press Release and [Lobster] Report" mostly reside in California and that all relevant MBAF documents are located in California.  *Id.* at 22.  Further, MBAF suggests that, to determine the reasons for Plaintiffs' damages, "discovery will be aimed not at Plaintiffs but at their customers," who may not be in Maine.  *Id.*

Plaintiffs vigorously dispute these arguments, pointing out that "[t]here are five Plaintiffs and only one Aquarium, and the Plaintiffs' witnesses and documents are located in Maine." *Pls.' Opp'n* at 15.  They also contend that "the presence of witnesses and documents outside the forum state is routine in federal diversity jurisdiction cases and does not tilt in favor of forum transfer." *Id.*  Finally, they note that "in the age of electronic discovery, the location of documents has little impact on the convenience of reviewing and producing them." *Id.* at 16.

By its express terms, 28 U.S.C. § 1404(a) instructs courts considering transfer of venue to account for "the convenience of parties and witnesses."  Here, MBAF's witnesses are largely in California, Plaintiffs' witnesses are in Maine, and witnesses not affiliated with either party are in unknown locations. *Def.'s Mot.* at 22; *Pls.' Opp'n*

at 15. The parties have not estimated the number of witnesses in each forum, making it difficult for the Court to weigh the relative convenience of Maine and California. The parties have also failed to indicate where the nonparty witnesses are located, and as a result, the Court is not sure which forum would be more convenient for them.[16] Accordingly, the Court can only say that Plaintiffs would be inconvenienced if this case is transferred to the Northern District of California, while MBAF would be inconvenienced if it is not.

MBAF nevertheless argues that the convenience of witnesses favors transfer because the witnesses located outside of Maine are more material than the witnesses residing in Maine, representing that "very little of the evidence relevant to any material issue will come from Maine." *Def.'s Reply* at 9. While this may be true as to liability, MBAF concedes that Plaintiffs' witnesses and nonparty witnesses will be required to testify as to damages. *Id.* This undermines MBAF's claim that California will be a more convenient forum for all material witnesses. Without more information—such as the estimated number of witnesses MBAF intends to call or the locations of the nonparty witnesses—the Court cannot conclude that the overall

---

[16] MBAF implies that because the nonparty witnesses are not necessarily in Maine, their locations favor transfer. *Def.'s Reply* at 9. Based on the contents of this record, the Court disagrees. The record does not reveal where these nonparty witnesses are located. Even assuming some of the nonparty witnesses are not in Maine, they may be located closer to Maine than California, making Maine less onerous.

Add.90

convenience of the parties and witnesses favors transfer.  Accordingly, this factor is neutral.[17]

The First Circuit has further instructed courts considering transfer of venue to evaluate the availability of documents.  *Coady*, 223 F.3d at 11.  However, this Court has observed that "[t]his factor seems like a holdover from a time when businesses kept important records, including payroll records, in paper and the difficulty of physically accessing the paper documents and the burden of transporting them across jurisdictions could be onerous."  *Johnson*, 767 F. Supp. 2d at 216; *Canales v. Univ. of Phx., Inc.*, No. 2:11-cv-00181-JAW, 2012 U.S. Dist. LEXIS 88930, at *12 (D. Me. June 27, 2012).

In their opposition, Plaintiffs cited this Court's previous statements and observed that "the location of documents has little impact on the convenience of reviewing and producing them."  *Pls.' Opp'n* at 16.  MBAF did not respond to this argument, other than to reiterate that its records are in California.  *Def.'s Reply* at 9.  Because Plaintiffs raised this issue, and MBAF has not actually described the extent

---

[17]     MBAF also cites two cases for the proposition that transfer to the Northern District of California is proper because "the witnesses and information pertinent to Plaintiffs' defamation claim are located in California." *Def.'s Mot.* at 22; *Def.'s Reply* at 9.  Neither case is analogous to the present suit.

In *Mateo v. University System*, No. 18-11953-FDS, 2019 U.S. Dist. LEXIS 6810 (D. Mass. Jan. 14, 2019), the U.S. District Court for the District of Massachusetts transferred a case to the District of New Hampshire after dismissing the plaintiff's defamation claim, and the court cited the dismissal in its reasoning for transferring venue.  *Id.* at *20-21, *24.  Here, Plaintiffs' defamation claim has not been dismissed, rendering *Mateo* inapposite.

All the parties in *Bassili v. Chu*, 242 F. Supp. 2d 223 (W.D.N.Y. 2002), resided outside of the Western District of New York, where the case was filed.  *Id.* at 231-32.  Further, the plaintiffs did not identify any witnesses in the Western District of New York.  *Id.* at 232-33.  As a result, the court opted to transfer the case to Central District of California.  *Id.* at 233.  Here, Plaintiffs all reside in Maine, and they have identified witnesses who reside in Maine.  *Bassili* is likewise distinguishable.

91

Add.91

to which it maintains paper documents, the Court will not assume either that it does or that it does so to a degree that affects venue. Accordingly, this factor is also neutral.[18]

In *Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981), the U.S. Supreme Court noted that "there is ordinarily a strong presumption in favor of the plaintiff's choice of forum, which may be overcome only when the private and public interest factors clearly point towards trial in the alternative forum." *Id.* at 255. The Court concludes that MBAF has not carried its burden of overcoming this strong presumption, as it has only presented evidence on two factors that remain relevant, neither of which favors transfer. *See Astro-Med*, 591 F.3d at 13 (noting that "the burden of proof rest[s] with the party seeking to transfer"). Therefore, the Court dismisses MBAF's motion to transfer venue.

## VI. MAINE'S ANTI-SLAPP STATUTE

### A. Legal Standard

Maine's anti-SLAPP statute, 14 M.R.S. § 556, "is designed to guard against meritless lawsuits brought with the intention of chilling or deterring the free exercise of the defendant's First Amendment right to petition the government by threatening would-be activists with litigation costs." *Schelling*, 2008 ME 59, ¶ 6, 942 A.2d 1226. As the Maine Supreme Judicial Court has written, "SLAPP plaintiffs do not intend

---

[18]    Plaintiffs also represent that their documents are in Maine. *Pls.' Opp'n* at 15. Because the parties have not attempted to quantify the relevant documents in their possession, the Court cannot ascertain which forum contains more documents. Therefore, to the extent this factor remains relevant, it is neutral because the record only shows that MBAF's documents may be in California and Plaintiffs' documents may be in Maine.

to win their suits; rather they are filed solely for delay and distraction, and to punish activists by imposing litigation costs on them for exercising their constitutional right to speak and petition the government for redress of grievances." *Thurlow v. Nelson*, 2021 ME 58, ¶ 8, 263 A.3d 494 (quoting *Morse Bros., Inc. v. Webster*, 2001 ME 70, ¶ 10, 772 A.2d 842). Accordingly, to protect defendants faced with such suits, the statute allows the filing of a "special motion to dismiss," designed to resolve the suit at an early stage while minimizing litigation costs. *See Morse Bros.*, 2001 ME 70, ¶ 10, 772 A.2d 842.

The statute provides, in relevant part:

> When a moving party asserts that the civil claims, counterclaims or cross claims against the moving party are based on the moving party's exercise of the moving party's right of petition under the Constitution of the United States or the Constitution of Maine, the moving party may bring a special motion to dismiss. . .. The Court shall grant the special motion, unless the party against whom the special motion is made shows that the moving party's exercise of its right of petition was devoid of any reasonable factual support or any arguable basis in law and that the moving party's acts caused actual injury to the responding party. In making its determination, the court shall consider the pleading and supporting and opposing affidavits stating the facts upon which the liability or defense is based.
>
> . . . .
>
> If the court grants a special motion to dismiss, the court may award the moving party costs and reasonable attorney's fees, including those incurred for the special motion and any related discovery matters. This section does not affect or preclude the right of the moving party to any remedy otherwise authorized by law.

14 M.R.S. § 556.

The anti-SLAPP statute also contains a definition of "a party's exercise of its right to petition":

As used in this section, "a party's exercise of its right of petition" means any written or oral statement made before or submitted to a legislative, executive or judicial body, or any other governmental proceeding; any written or oral statement made in connection with an issue under consideration or review by a legislative, executive or judicial body, or any other governmental proceeding; any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive or judicial body, or any other governmental proceeding; any statement reasonably likely to enlist public participation in an effort to effect such consideration; any written or oral statement made in connection with a discrimination complaint pursuant to the Maine Human Rights Act; any written or oral statement made in connection with a complaint pursuant to Title 20-A, chapter 445 or the so-called Title IX provisions of the federal Education Amendments of 1972, Public Law 92-318; or any other statement falling within constitutional protection of the right to petition government.

*Id.* "As is clear from the language of section 556, the Legislature intended to define in very broad terms those statements that are covered by the statute." *Schelling*, 2008 ME 56, ¶ 12, 942 A.2d 1226.

The Maine Supreme Judicial Court has developed a two-step process to determine the validity of an anti-SLAPP motion to dismiss. *Weinstein v. Old Orchard Beach Fam. Dentistry, LLC*, 2022 ME 16, ¶ 5, 271 A.3d 758. First, "the [moving party] must file a special motion to dismiss and establish, based on the pleadings and affidavits, that the claims against him are based on his exercise of the right to petition pursuant to the federal or state constitutions." *Id.* (quoting *Gaudette v. Davis* (*Gaudette I*), 2017 ME 86, ¶ 16, 160 A.3d 1190). "If the moving party fails to meet its burden at this step, the anti-SLAPP statute does not apply, and the special motion is denied." *Nader v. Me. Democratic Party* (*Nader I*), 2012 ME 57, ¶ 15, 41 A.3d 551.

If the moving party demonstrates that the claims against it are based on petitioning activity, "the burden shifts to the nonmoving party to establish, through pleadings and affidavits, that the moving party's exercise of its right to petition (1) was 'devoid of any reasonable factual support or any arguable basis in law,' and (2) 'caused actual injury' to the nonmoving party." *Id.* ¶ 16, 41 A.3d at 557. At this stage, the nonmoving party need only present "prima facie evidence that at least one of the moving party's petitioning activities was 'devoid of any reasonable factual support or any arguable basis in law and . . . caused actual injury." *Thurlow*, 2021 ME 58, ¶19, 263 A.3d 494.[19] "If the nonmoving party fails to meet its burden at this second step of the analysis, the court must grant the special motion to dismiss." *Nader I*, 2012 ME 57, ¶ 15, 41 A.3d 551.

## B.   Discussion

Although the parties vigorously dispute whether MBAF's publishing of the Press Release and Lobster Report constitutes petitioning activity, the Court need not resolve this issue. Even if MBAF was engaged in petitioning activity, Plaintiffs have

---

[19]   The Maine Supreme Judicial Court first adopted the prima facie evidentiary standard in *Nader I. See Thurlow*, 2021 ME 58, ¶ 13, 263 A.3d 494. In *Gaudette I*, 2017 ME 86, 160 A.3d 1190, the Maine Supreme Judicial Court "added a third step" to the analysis, which "imposed a greater burden upon the plaintiff/nonmoving party." *Thurlow*, 2021 ME 58, ¶ 14, 263 A.3d 494. Under the *Gaudette I* framework, "[n]ot only was the plaintiff/nonmoving party required to present prima facie evidence in the second step, but, if the record revealed a dispute regarding material facts, then the plaintiff/nonmoving party was required, in the newly created third-step, to convince the trial court by a preponderance of the evidence that the assertions articulated in the second step were in fact true." *Id.* However, recognizing that "a fact-finding step like the one [] adopted in *Gaudette I* could implicate a citizen's right to a jury trial under article I, section 20 of the Maine Constitution," *id.* ¶ 17, the Maine Supreme Judicial Court abandoned the *Gaudette I* framework and returned to the *Nader I* framework in *Thurlow. Id.* ¶ 19, 263 A.3d 494. Thus, the analytical framework announced in *Nader I* is once again the governing law, meaning Plaintiffs here need only present prima facie evidence to carry their burden at the second step of the anti-SLAPP analysis.

95

Add.95

carried their burden of showing that at least one of MBAF's petitioning activities was

"devoid of any reasonable factual support or any arguable basis in law and . . . caused

actual injury." *See* 14 M.R.S. § 556. Accordingly, the Court takes no position on

whether MBAF was engaged in petitioning activity for purposes of 14 M.R.S. § 556

and instead concludes that Plaintiffs have made a sufficient showing to survive a

motion to dismiss under the statute.

As noted above, to survive MBAF's motion insofar as it is based on Maine's

anti-SLAPP statute, Plaintiffs need only present prima facie evidence as to one of

MBAF's petitioning activities. *See Thurlow*, 2921 ME 58, ¶ 26, 263 A.3d 494 ("[T]he

plaintiff need[s] only to meet this burden as to any *one* of the petitioning activities at

issue, and [is] not obligated to establish prima facie evidence that all of the

defendant's petitioning activities were devoid of a factual or reasonable basis and

caused actual injury" (second and third alterations in original) (emphasis in original)

(quoting *Gaudette I*, 2017 ME 86, ¶ 12, 160 A.3d 1190)). "[P]rima facie proof is a low

standard that does not depend on the reliability or credibility of the evidence." *Nader*

*I*, 2012 ME 57, ¶ 34, 41 A.3d 551 (quoting *Cookson v. State*, 2011 ME 53,

¶ 8, 17 A.3d 1208). In the case at hand, Plaintiffs can carry their burden if, through

their pleadings and affidavits, they present "some evidence," even if MBAF has

presented contrary evidence. *Id.* ¶ 35, 41 A.3d 551. Above all, the Court must

consider "whether the facts as presented by [Plaintiffs], if believed, would prove that

[MBAF's] allegations are devoid of any reasonable factual support or have no

arguable basis in the law." *Thurlow*, 2021 ME 58, ¶ 26, 263 A.3d 494.

96

Add.96

Here, the complaint alleges that MBAF, through the Press Release and Lobster Report, "knowingly and intentionally published false and injurious statements disparaging Plaintiffs' products and business, including, among other things, that commercial lobster fishing practices in the Gulf of Maine cause death and serious injury to North Atlantic right whales." *Compl.* ¶ 94. These statements include: "At this time, each fishery using this gear is putting [the North Atlantic right whale] at risk of extinction"; "The seafood [rated Avoid] is caught or farmed in ways that harm other marine life or the environment"; and "Based on the available information and the significant risks to [the North Atlantic right whale], the American lobster industry cannot be considered sustainable." *Id.*

Plaintiffs' pleadings and other materials present evidence that there was no factual basis for MBAF's statements that the 2021 Take Reduction Plan was inadequate to mitigate the risk of harm posed by the lobster industry to North Atlantic right whales. The complaint avers that there has not been a single documented entanglement of a right whale in Maine lobster gear since 2004 and that the NMFS database chronicling right whale injuries and fatalities contains no record of a right whale entanglement with Maine lobster-fishing gear that caused serious injury or death; by contrast, this same database documents many incidents of right whale entanglements with gear from other fisheries that have led to serious injury or death. *Id.* ¶ 31.

MBAF argues this factual assertion is undermined by the death of NARW #5120, which NOAA officials attributed to chronic entanglement in rope identified as

97

Add.97

belonging to the Maine lobster industry. *Def.'s Mot. to Suppl.* at 1. However, Plaintiffs responded to MBAF's supplementing the record with evidence that NOAA officials had delayed the date of enforcing the Take Reduction Plan's "weak link" requirements to account for supply chain issues beyond the control of the lobster industry, such that the new regulations had not taken effect at the time of NARW #5120's entanglement. *Pls.' Mot. to Suppl.* Accordingly, Plaintiffs say, MBAF presents no evidence that the rope entangling NARW #5120 was one of the "weak link" variety implemented under the 2021 revisions to the Take Reduction Plan, and as such it cannot support its statement that measures adopted pursuant to the Take Reduction Plan were unsuccessful at protecting the right whale. Based on the low standard for prima facie proof articulated by the Law Court in *Cookson v. State*, the Court concludes that, for the purposes of the motion to dismiss pursuant to the Maine anti-SLAPP statute, the Plaintiffs have presented "some evidence" of the inaccuracy of MBAF's statement regarding the inadequacy of the Take Reduction Plan. *Cookson*, 2011 ME 53, ¶ 8, 17 A.3d 1208.

The complaint also suggests that right whales are rarely found in the Maine lobster fishery. *Id.* ¶ 54. Instead, beginning in 2010, right whales started favoring Canada's Gulf of St. Lawrence, where they face an increased risk of vessel strikes and entanglement with Canadian snow crab fishing gear. *Id.* ¶¶ 54-55. According to the complaint, numerous scientists have linked the post-2010 decline in the right whale population to a rise in serious injuries and mortalities caused by Canadian fishing gear in Canada's Gulf of St. Lawrence. *Id.* ¶ 57.

98

Add.98

Further, the declaration of Ms. McCarron, submitted by Plaintiffs, suggests MBAF was aware of at least some of this evidence, and yet proceeded to make its allegedly defamatory statements anyway. *See McCarron Decl.* ¶¶ 6-8, 11-12, 16, 18. For example, the McCarron Declaration states that Mr. Brown, a marine biologist, referred MBAF to relevant scientific data and explained that "the evidence is simply not there" to blame the U.S. lobster fishery for right whale entanglements. *Id.* ¶ 11.

The Court turns to the issue of injury. The complaint contains evidence that Plaintiffs suffered "actual injury" as a result of MBAF's statements. In the context of the anti-SLAPP statute, the Maine Supreme Judicial Court has stated that "'actual injury' requires a 'reasonably certain monetary valuation of the injury' suffered by the plaintiff." *Desjardins v. Reynolds*, 2017 ME 99, ¶ 14, 162 A.3d 228. However, the "statute does not require 'an actuarial analysis of [] damages,' only an amount that is not 'mere guess or conjecture.'" *Camden Nat'l Bank v. Weintraub*, 2016 ME 101, ¶ 14, 143 A.3d 788 (quoting *Schelling*, 2008 ME 59, ¶¶ 17-18, 942 A.2d 1226).

Each of the five Plaintiffs alleges to have suffered damages as a result of MBAF's statements. According to the complaint, the average per-pound price of lobster declined roughly 40% after the publication of the Press Release and Lobster Report. *Compl.* ¶ 84. Both Atwood and Bug Catcher claim to have suffered losses of past and future profits.[20] *Id.* ¶¶ 83, 85. BML likewise alleges that it suffered lost

---

[20] Specifically, Atwood alleges it paid $156,965 in unrecouped premiums to lobstermen for catching lobster for one of Atwood's purchasers, which had strict quality-control requirements but stopped purchasing after the publication of the Press Release and Report. *Compl.* ¶ 83. Bug Catcher estimates its business has declined 20% since MBAF published the Statements. *Id.* ¶ 85.

Add.99

profits in excess of $75,000. *Id.* ¶ 86. MLA and MCFA similarly allege economic losses as a result of MBAF's Statements. *Id.* ¶¶ 87-88. In other words, all Plaintiffs have alleged damages that can be calculated with reasonable certainty, which is sufficient to carry their burden under the anti-SLAPP statute. *See Camden Nat'l Bank*, 2016 ME 101, ¶ 14, 143 A.3d 788 (finding that a party met its prima facie burden of proving actual injury because "speculation about damages is not necessary" as "it would be a simple matter to calculate the monetary loss").

In the Court's view, the evidence marshalled by Plaintiffs is sufficient to meet the "low standard" of prima facie proof that at least one of MBAF's petitioning activities was "devoid of any reasonable factual support" and "caused actual injury." *See Nader I*, 2012 ME 57, ¶ 35, 41 A.3d 551; 14 M.R.S. § 556. Plaintiffs have presented specific allegations, backed by factual support, suggesting the Maine lobster fishery has not presented a significant risk to right whales over the past two decades and is unlikely to do so in the future. To be sure, there may be other sources that support MBAF's allegedly defamatory statements. *See Def.'s Mot.* at 32 ("MBAF's Statements are based on, and restate, tentative scientific conclusions"). But at this stage, "the focus is not on what [MBAF] considered to be [] reasonable factual support for [its statements or its] interpretation of the facts." *Thurlow*, 2021 ME 58, ¶ 26, 263 A.3d 494. Because Plaintiffs have presented facts that "if believed, would prove that [MBAF's statements] are devoid of any reasonable factual support," they have carried their burden of defeating MBAF's motion insofar as it arises under Maine's anti-SLAPP statute.

## VII.   FAILURE TO STATE A CLAIM

### A.   Legal Standard

Rule 12(b)(6) requires dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To state a claim, a complaint must contain, among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). In other words, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Plausible means "'something more than merely possible' or 'merely consistent with a defendant's liability.'" *Germanowski v. Harris*, 854 F.3d 68, 71-72 (1st Cir. 2017) (internal citation omitted) (quoting *Schatz*, 669 F.3d at 55); *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 11 (1st Cir. 2011)). This is a "'context-specific' job that compels [judges] 'to draw on' [their] 'judicial experience and common sense.'" *Schatz*, 669 F.3d at 55 (quoting *Iqbal*, 556 U.S. at 679).

This is a "two-step analysis." *Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015). "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" *García-Catalán v. United States*, 734 F.3d 100, 103

(1st Cir. 2013) (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)); *see also Schatz*, 669 F.3d at 55 (stating that a court may "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements"). "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" *García-Catalán*, 734 F.3d at 103 (quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011)).

## B.   Discussion

Under Maine law, the elements of defamation are "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting to at least negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Morgan v. Kooistra*, 2008 ME 26, ¶ 26, 941 A.2d 447 (quoting *Rice v. Alley*, 2002 ME 43, ¶ 19, 791 A.2d 932).

MBAF contends Plaintiffs have failed to state a valid defamation claim because: 1) the Statements are not "of and concerning" Plaintiffs, *Def.'s Mot.* at 30; *Def.'s Reply* at 13-16; 2) the Statements are protected opinions, *Def.'s Mot.* at 31-33, *Def.'s Reply* at 16-20; and 3) Plaintiffs can demonstrate neither actual malice nor negligence, *Def.'s Mot.* at 33-38; *Def.'s Reply* at 21-23. The Court addresses each of the Defendant's arguments in turn.

102

Add.102

### 1. The "Of and Concerning" Element

MBAF first argues Plaintiffs cannot prove the Statements were "of and concerning" them because they have not demonstrated the applicability of either exception to the general rule that individual group members cannot bring a defamation suit based on allegedly defamatory statements about the group. *Def.'s Mot.* at 30; *Def.'s Reply* at 13-16. MBAF specifically relies upon the fact that "the Statements do not refer to [Plaintiffs] individually." *Def.'s Reply* at 13. Further, although MBAF concedes "the Statements likely were understood by many readers to include Maine's lobster industry," it counters that "[t]here is no conceivable way the Statements were interpreted by a reasonable reader to apply explicitly to the five Plaintiffs given the large size of the group, comprising 5,600 individuals." *Id.* at 16.

Plaintiffs disagree. In their view, "the Complaint pleads ample facts showing that the Aquarium's Statements were 'actually understood as referring' to Plaintiffs, and that this was 'the reasonable understanding of the recipient of the communication.'" *Pls.' Opp'n* at 23 (quoting *Robinson*, 297 F. Supp. at 726). Plaintiffs further submit that it "is immaterial that the Aquarium did not identify Plaintiffs by name" because the "'clear implication' is that all Maine lobstermen are killing or causing serious harm to right whales, and all businesses that sell Maine lobsters are selling products that kill or cause serious harm to right whales." *Id.* at 24-25 (emphasis omitted). According to Plaintiffs, "those who read the Aquarium's Statements understood that they referred to all members of the Maine lobster industry, including Plaintiffs." *Id.* at 26.

The Court concludes that Plaintiffs' allegations are sufficient to avoid dismissal. "Under Maine law, a defamatory statement must be 'of and concerning' the plaintiff." *Lynch v. Christie*, No. 2:11CV70-DBH, 2012 U.S. Dist. LEXIS 165628, at *11 (D. Me. Nov. 20, 2012) (quoting *Hudson v. Guy Gannett Broad. Co.*, 521 A.2d 714, 716 (Me. 1987)). The Maine Supreme Judicial Court (Law Court) has explained that "[a] defamatory communication is made concerning the person to whom its recipient correctly, or mistakenly but reasonably, understands that it was intended to refer." *Hudson*, 521 A.2d at 717 (quoting RESTATEMENT (SECOND) OF TORTS § 564 (AM. L. INST. 1977)). In Maine, a plaintiff can meet the "of and concerning" requirement simply by putting forth evidence that at least one person understood the allegedly defamatory statement as referring to the plaintiff. *Id.*; *Lynch*, 2012 U.S. Dist. LEXIS 165628, at *11-12. The Law Court has further remarked that "the 'of and concerning' requirement is an essentially factual issue that will almost always be material in a libel case." *Hudson*, 521 A.2d at 716.

The Court acknowledges that this analysis becomes more complicated where, as here, allegedly defamatory statements refer only to a group.[21] *See Compl.* ¶ 94. "Defamation of a large group gives rise to no civil action on the part of an individual member of the group unless he [or she] can show special application of the defamatory matter to him[self or her]self." *Sullivan v. Chester Water Auth.*, No. 2:22-cv-00147-JDL, 2022 U.S. Dist. LEXIS 130080, at *32 (D. Me. July 22, 2022) (alterations in

---

[21]    Here, for example, the Statements only refer to the American lobster fishery and other fisheries using similar equipment. *See Compl.* ¶ 94. No individual lobstermen or lobster-industry entities are mentioned. *See id.*

original) (quoting *Arcand v. Evening Call Publ'g Co.*, 567 F.2d 1163, 1164 (1st Cir. 1977) (citing RESTATEMENT (SECOND) OF TORTS § 564A (AM. L. INST. 1977)).

The exceptions to the group defamation rule are derived from Restatement (Second) of Torts § 564A. *See Chester Water Auth.*, 2022 U.S. Dist. LEXIS 130080, at *32-33; *accord Robinson*, 297 F. Supp. at 726. The Restatement provides:

> One who publishes defamatory matter concerning a group or class of persons is subject to liability to an individual member of it if, but only if,
>
> > (a) the group or class is so small that the matter can reasonably be understood to refer to the member, or
> >
> > (b) the circumstances of publication reasonably give rise to the conclusion that there is particular reference to the member.

RESTATEMENT (SECOND) OF TORTS § 564A (AM. L. INST. 1977)); *see also Robinson*, 297 F. Supp. at 726 (citing RESTATEMENT (SECOND) OF TORTS § 564A (Tentative Draft No. 11, 1965)). Thus, Restatement (Second) of Torts § 564A outlines two exceptions to the general bar on group defamation actions by individuals not specifically named in the allegedly defamatory statements. The Court refers to these exceptions as the small-group exception and the circumstances-of-publication exception.

Maine courts have not expanded upon these carve-outs to the so-called group libel rule, but as other jurisdictions have adopted these exceptions, the Court looks to those jurisdictions, as well as the commentary to the Restatement (Second), for guidance.

In discussing the small-group exception, the comments to Restatement (Second) of Torts § 564A note that "[i]t is not possible to set definite limits as to the size of the group or class, but the cases in which recovery has been allowed usually

105

Add.105

have involved numbers of 25 or fewer." RESTATEMENT (SECOND) OF TORTS § 564A cmt. b (AM. L. INST. 1977). This general paradigm has not changed in the years since the Restatement (Second) was published, although some jurisdictions have set slightly higher thresholds. *See Florio v. Gallaudet Univ.*, 619 F. Supp. 3d 36, 43 (D.D.C. 2022) ("Across various jurisdictions . . . courts have 'narrowly construed' a 'small-group exception' to generally require 'no more than 20 or 30 members [] before they will hold that defamation of the group should be deemed to have particular application to a group member who is not named in the defamatory remarks'" (alteration in original) (quoting *Alexis v. District of Columbia*, 77 F. Supp. 2d 35, 40 (D.D.C. 1999))); *Anyanwu v. Columbia Broad. Sys., Inc.*, 887 F. Supp. 690, 693 (S.D.N.Y. 1995) ("The Courts have allowed individuals to pursue libel claims where they were identified as a member of a group of less than sixty").

Regarding the circumstances-of-publication exception, the First Circuit has recently said, in interpreting Massachusetts law, that "[w]hether the circumstances of publication reasonably give rise to the conclusion that there is particular reference to the plaintiff is determined by what a reasonable reader would understand."[22]

---

[22]   MBAF advances a restrictive reading of *Conformis*, arguing "the First Circuit found that plaintiff met the 'of and concerning' requirement only because [the] alleged libelous statements disparaging knee replacement devices in general included a specific reference to plaintiff's product" and "every manufacturer of knee replacement devices, except for plaintiff whose product was specifically called out, would have been unable to meet the 'of and concerning' requirement had they filed suit." *Def.'s Reply* at 15. In finding the "of and concerning" requirement satisfied, the *Conformis* Court did rely on the fact that "[t]he Conformis system is the only customized TKR singled out with its own subsection." *Conformis*, 58 F.4th at 530. However, the Court finds no support for Plaintiffs' contention that every other manufacturer would have been deprived of a cause of action. The *Conformis* Court did not comment on other manufacturers, and this Court does not agree that the First Circuit's reliance on particular facts necessarily means those facts were the *only* means of satisfying the "of and concerning" requirement. Instead, the Court views the First Circuit's reasoning

106

*Conformis*, 58 F.4th at 530.  Other jurisdictions describe specific factors to be considered, such as "the circumstances under which the publication of the communication was made, the character of the audience and its relationship to the subject of the publication, and the effect the publication may reasonably have had upon such audience." *JB & Assocs., Inc. v. Neb. Cancer Coal.*, 932 N.W.2d 71, 79 (Neb. 2019).  Still other jurisdictions focus on the allegedly defamed group.  *See Anyanwu*, 887 F. Supp. at 693 (describing New York's "intensity of suspicion test," which involves consideration of "the degree to which the defamatory comments focus on individual members including the definitiveness of the group, its degree of organization, the size and prominence of the group").

Based on the record before the Court, MBAF is correct that the class of Maine lobstermen is not so small that the Statements can reasonably be understood to refer to the five individual Plaintiffs. *See Def.'s Reply* at 13-15.  The individuals comprising the American lobster fishery—numbering 5,600 in Maine alone—form too large a group to qualify for the small-group exception regardless of the threshold. *See Compl.* ¶ 5 (referring to "each of Maine's 5,600 commercial lobstermen").

Notwithstanding that Plaintiffs are members of a relatively large group, the Court finds that the circumstances of publication nevertheless suggest the Statements were "of and concerning" them.  Facially, the Statements applied to the entire American lobster fishery, including and especially Maine's. *See id.* ¶ 94

---

as demonstrating one way of satisfying the "of and concerning" requirement for a group defamation claim.

("Based on the available information and the significant risks to [the North Atlantic right whale], the American lobster fishery cannot be considered sustainable"); *id.* ("At this time, each fishery using this gear is putting [the North Atlantic right whale] at risk of extinction"). As Plaintiffs emphasize, "[t]he Gulf of Maine is the center of the U.S. lobster industry. . . and in 2021, hauled in more than 80% of the country's lobster landings." *Id.* ¶ 25. Furthermore, the Statements' breadth left no room for the possibility that any subset of Maine lobstermen, through particular practices, gear, or location within Maine, did not contribute to the industry's threat to the right whale but rather, MBAF's Statements implicated all lobstermen who fish within the Gulf of Maine or Georges Bank. In doing so, MBAF imputed the Statements' applicability to each individual Maine lobsterman. *Id.* ¶ 94 ("That consumers should 'avoid' and 'take a pass' on purchasing lobster and lobster products caught in the Gulf of Maine/Georges Bank region"). The general prohibition on individual defamation claims for statements made against a group is premised on the concept that individual members may not have been particularly affected by a defamatory statement against the group writ large. The recognized exceptions to this rule carve out situations where an individual can demonstrate "special application of the defamatory matter to him[self or her]self." *Chester Water Auth.*, 2022 U.S. Dist. LEXIS 130080, at *32 (quoting *Arcand*, 567 F.2d at 1164).

In *Arcand*, the First Circuit addressed a newspaper column's assertion that a member of a twenty-one member police department may have locked himself and a female in the back of a cruiser at a town sandpit and had to radio for help. *Arcand*,

108

Add.108

567 F.2d at 1163-64. All twenty-one members of the police department sued the newspaper and others for defamation. *Id.* In affirming the dismissal of the lawsuit, the First Circuit discussed group defamation and, quoting the Restatement, the *Arcand* Court observed:

> In general, there can be recovery only if a high degree of suspicion is indicated by the particular statement. Thus the assertion that one man out of a group of 25 has stolen an automobile may not sufficiently defame any member of the group, while the statement that all but one of a group of 25 are thieves may cast a refection upon each of them.

*Id.* at 1164 (quoting RESTATEMENT (SECOND) OF TORTS § 564A cmt. c (AM. L. INST. 1981)).

Here, each individual Plaintiff, including each member of the Maine Lobstermen's Association, is a Maine lobsterman, and thus by definition sets traps the MBAF decried as endangering the right whale, and each Plaintiff owes his or her livelihood to the industry impacted by the Statements. Thus, the "circumstances of the publication reasonably give rise to the conclusion that there is particular reference to the plaintiff" based on "what a reasonable reader would understand." *Conformis*, 58 F.4th at 530. For that reason, the letter and spirit of the group defamation rule are inapposite here, where the industry-wide nature of the Statements necessarily implicated each and every member of the Plaintiff group.

Additionally, the Statements not only encompassed the entire American lobster fishery, including Maine's, but also purported to be based upon scientific data. *See Compl.* ¶¶ 38, 94 (stating that Seafood Watch reviewed "all available scientific data" and followed a "rigorous, transparent, science-based process to evaluate" the

Maine lobster fishery). In support of the statements, both the Lobster Report and press release cite a variety of scientific sources. *See Red Listing Press Release*; *Lobster Rep.* MBAF's reliance on scientific data thus distinguishes the statements at issue here from the type of hyperbolic statements that undergird the group defamation rule, creating the implication that each and every Maine lobsterman endangers the right whale.

Furthermore, the Statements were not merely informational but included a call to action. According to the complaint, Seafood Watch aims to "push suppliers to source more environmentally responsible products." *Id.* ¶ 34 (quoting MONTEREY BAY AQUARIUM SEAFOOD WATCH, https://www.seafoodwatch.org/ (last visited May 1, 2024)). Seafood Watch seeks to influence consumer decisions and secures pledges from major seafood buyers to "serve environmentally responsible seafood following the Seafood Watch recommendations." *Id.* ¶¶ 35-36 (quoting *Businesses*, MONTEREY BAY AQUARIUM SEAFOOD WATCH, https://www.seafoodwatch.org/collaborations/businesses (last visited May 1, 2024)). The complaint alleges the Statements at issue here were made in conjunction with a Seafood Watch recommendation, the red rating for American lobster. *See id.* ¶¶ 47-52. Indeed, one of the Statements apparently advises consumers to "avoid" or "take a pass" on purchasing lobster caught in the Gulf of Maine/Georges Bank region. *Id.* ¶ 94.

Taking the allegations in the complaint as true, which the Court must at this stage, consumers apparently heeded Seafood Watch's recommendation with regard to the plaintiffs specifically, which suggests "its recipient[s] correctly, or mistakenly

but reasonably, underst[ood] that it was intended to refer" to the Plaintiffs. *Hudson*, 521 A.2d at 717. Following the issuance of the red rating, several large commercial buyers announced plans to stop selling Maine lobster, and some large restaurant chains are reportedly in the process of removing Maine lobster from their menus because of the red listing. *Id.* ¶¶ 81-82. Additionally, according to the Maine Department of Marine Resources, the average per-pound price of Maine lobster between September and December 2022 was $3.89, compared with $6.59 for the same period in 2021, and Plaintiffs allege this 40% price drop was, at least in part, due to Seafood Watch's Statements. *Id.* ¶ 84.

Beyond these broader impacts, however, the particular Plaintiffs here pleaded facts alleging readers of the Lobster Report understood its contents to contain "special application of the defamatory matter to him[self or her]self," as revealed by their responses. *Chester Water Auth.*, 2022 U.S. Dist. LEXIS 130080, at *32-33. Atwood alleges it lost significant profits when one of its major purchasers, citing the Seafood Watch red listing, announced it would stop buying lobster caught in the Gulf of Maine and "decided to stop buying Atwood's lobster." *Id.* ¶ 83. Bug Catcher similarly alleges that its sales dropped 20% after the publication of the red rating, while BML claims to have suffered lost profits as a result of decreased demand after the publication of the red rating. *Id.* ¶¶ 85-86. MLA and MCFA likewise claim to have suffered economic harm as a result of the Statements. *Id.* ¶¶ 87-88. Therefore, the Complaint alleges that Seafood Watch's call for a boycott was effective both as to the lobster industry generally and to Plaintiffs in particular.

111

Add.111

Viewing the Complaint's allegations in their totality, the Court concludes that Plaintiffs have "plead[ed] factual content that allows the court to draw the reasonable inference" that the Statements were "of and concerning" the Plaintiffs. *See Iqbal*, 556 U.S. at 678. The Statements allegedly encompassed the entire American lobster industry, of which each Plaintiff, or its members, are a part. They called on consumers to stop purchasing lobster, which many consumers apparently did. In addition, consumers allegedly understood the Statements as applying to Plaintiffs and stopped purchasing lobster from them specifically because of the Lobster Report. Accordingly, Plaintiffs have shown both that the Statements were reasonably understood as "of and concerning" them and that the circumstances-of-publication exception applies.

### 2.    Facts vs. Opinions

MBAF defends its Statements as "***opinions*** based on data gathered by, and conclusions from, scientists who are experts in the fields of ocean conservation and the right whale." *Def.'s Mot.* at 31 (emphasis in original). It characterizes the Lobster Report as "MBAF's thesis" and argues its statements "do[] not assert there exists conclusive evidence that right whales were killed or injured by entanglements with gear in Maine fisheries." *Id.* at 32. MBAF further takes the position that its Statements were "immunized" by virtue of "fully disclosing the non-defamatory facts on which [its] opinion is based." *Def.'s Reply* at 17 (quoting *Piccone*, 785 F.3d at 771). "[B]ecause the Statements could not have been reasonably understood as anything

112

Add.112

other than opinion based on third-party scientific sources," MBAF asserts "they cannot support a claim for defamation." *Id.* at 16-20.

Plaintiffs disagree. Plaintiffs aver that MBAF "intended to state objective facts about Maine lobster-fishing practices, not opinion or hyperbole," which "[t]he audience naturally understood as factual." *Pls.' Opp'n* at 29-30. Plaintiffs reject MBAF's position that the Lobster Report's "isolated and sporadic acknowledgements that the data were actually uncertain" should provide a defense to the defamation claim, arguing that "no similar disclaimer exists in the Aquarium's publications" and "despite the uncertainties and lack of supporting data, the Aquarium repeatedly insisted that it must attribute blame to the Maine lobster fishery." *Id.* at 31. After quoting *Milkovich* to support their contention that "expressions of 'opinion' may often imply an assertion of objective fact," *Milkovich*, 497 U.S. at 18, Plaintiffs ultimately posit that "the Aquarium's Statements at the very least implied that there were objective facts supporting its conclusion that Maine-caught lobsters pose risks of death and serious harm to right whales." *Id.* at 33-34.

Before considering the nature of the Statements, the Court begins by addressing a few preliminary issues.

First, the appropriate scope of review. In its analysis of whether an allegedly defamatory statement constitutes a fact or opinion, according to the law of the state of Maine, "[t]he Court must 'look to the totality of the circumstances and to whether the statement was intended to state an objective fact or a personal observation.'" *Pan Am Sys.*, 871 F. Supp. 2d at 15 (quoting *Ballard v. Wagner*, 2005 ME 86, ¶ 11, 877

113

Add.113

A.2d 1083); *see also Levesque*, 560 F.3d at 88 ("To appropriately construe[] [the statement] in the light of what might reasonably have been understood therefrom by the persons who [heard] it, a court should consider the context in which the challenged statement is made, viewing it within the communication as a whole") (cleaned up) (internal citations omitted).

Second, Maine law has drawn a clear distinction between statements of fact and opinion, explaining that "[t]he crucial difference between statement of fact and opinion depends upon whether ordinary persons hearing or reading the matter complained of would be likely to understand it as an expression of the speaker's or writer's opinion, or as a statement of existing fact." *Caron v. Bangor Publ'g Co.*, 470 A.2d 782, 785 (Me. 1984) (quoting *Mashburn v. Collin*, 355 So. 2d 879, 885 (La. 1977)). The First Circuit applied a similar test in *St. Martin's Press, Inc.*, 221 F.3d 243, writing "[t]he test, admittedly a very crude one, is whether the statement is properly understood as purely speculation or, alternatively, implies that the speaker or writer has concrete facts that confirm or underpin the truth of the speculation." *Id.* at 250 (citing *Levin*, 119 F.3d at 197); *see also Conformis,* 58 F.4th at 531 ("Whether a statement is fact or opinion is determined by whether the statement would be understood by a reasonable reader as containing objectively verifiable facts") (internal citations omitted). The First Circuit elaborated on the effect of articulating a statement's factual underpinnings in *Piccone*, 785 F.3d 766, writing:

> Merely couching a statement as an opinion, however, will not automatically shield the speaker from liability where the statement implies the existence of underlying defamatory facts. Nonetheless, defamation cannot arise where the speaker communicates the non-

114

Add.114

> defamatory facts that undergird his opinion. Thus, the speaker can immunize his statement from defamation liability by fully disclosing the non-defamatory facts on which his opinion is based.

*Id.* at 771 (internal quotations and citations omitted).

With this preface, the Court turns to consider whether MBAF presents the allegedly defamatory Statements as fact or opinion.

Viewing the Statements as a whole, as instructed in *Levesque,* the Court concludes that a reasonable reader could have understood MBAF as presenting "objectively verifiable facts." *Conformis,* 58 F.4th at 531. The Court reaches this conclusion based on two major characteristics of the Statements: first, the unqualified and declarative nature of MBAF's overall assertion, and second, MBAF's emphasis of its methodology as objective and scientific. The Court expands upon its analysis of each of these reasons in turn.

First, the Court considers the substantive thrust of MBAF's Statements, which asserted the threatened extinction of the right whale should be attributed to the Maine lobster industry.[23] As highlighted by the Plaintiffs, MBAF made numerous declarative statements to this effect, such as:

> (a) "At this time, each fishery using this gear is putting this protected species [*i.e.,* the North Atlantic right whale] at risk of extinction."

---

[23] In their opposition, Plaintiffs analogize to *Maine Lobstermen's Association v. National Marine Fisheries Service,* 70 F.4th 582 (D.C. Cir. 2023) to support their argument that MBAF misrepresented the science. *Pls.' Opp'n* at 32. As MBAF correctly notes, despite factual similarities, that case reviewed the NMFS biological opinion under the statutory language of the Endangered Species Act and the Administrative Procedure Act's "arbitrary and capricious" standard. *Me. Lobstermen's Ass'n,* 70 F.4th at 595-601; *Def.'s Reply* at 20. For this reason, the D.C. Circuit Court's analysis in *Maine Lobstermen's Association* is inapposite to the current analysis of this Court and has not been relied upon.

(b) "No one wants to know their appetite for seafood is driving a species to extinction."

(d) "[M]anagement measures and the Atlantic Large Whale Take Reduction Plan have not been successful at reducing serious injury and mortality to the North Atlantic right whale[.]"

*Compl.* ¶ 94. MBAF defends these Statements by citing *Piccone*, in which the First Circuit held that "the speaker can immunize his statement from defamation liability by fully disclosing the non-defamatory facts on which his opinion is based." *Piccone*, 785 F.3d at 771. However, this holding necessarily requires the implicated statement to qualify as an opinion. Per *Caron*, under the law of the state of Maine, "[t]he crucial difference between statement of fact and opinion depends upon whether ordinary persons hearing or reading the matter complained of would be likely to understand it as an expression of the speaker's or writer's opinion, or as a statement of existing fact." *Caron*, 470 A.2d at 785. The Court thus evaluates the substance of these statements to consider whether they give an impression of existing fact or expression of opinion.

First, from a textual perspective, the Statements are not qualified by any indication of doubt or speculation; for example, MBAF presents its conclusion that "each fishery using this gear *is* putting this protected species . . . at risk of extinction" and the public's "appetite for seafood *is* driving a species to extinction," *Compl.* ¶ 94 (emphasis added), in both cases using the affirmative verb "is," the present tense of the verb "to be." The text of the Red Listing Press Release headline carries weight in this analysis as well by unequivocally stating that fisheries, such as the Maine lobster fishery, "pose dire risk to the endangered North Atlantic right whale." *Red Listing*

116

Add.116

*Press Release*.  MBAF does not use conditional verbs or qualify its Statements with any additional language indicating they should be considered inconclusive by readers. Thus, an ordinary person would likely take the Statements on their face to present "existing fact." *Caron*, 470 A.2d at 785.

Second, MBAF makes the legal argument that, by basing its assertions on "credible scientific sources," the Statements cannot give rise to a defamation claim. *Def.'s Reply* at 18.  Claiming a recitation of sources functions as an impenetrable defense overstates the current state of the law.  It is true that "when an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment."  *Riley*, 292 F.3d at 289 (1st Cir. 2002) (quoting *Partington v. Bugliosi*, 56 F.3d 1147, 1156-57 (9th Cir. 1995)).  However, as the First Circuit explained in its application of this standard in *Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724 (1st Cir. 1992):

> Of greatest importance . . . is the breadth of [the] articles, which not only discussed all the facts underlying [the author's] views *but also gave information from which readers might draw contrary conclusions* . . .. Because all sides of the issue, as well as the rationale for [the author's] view, were exposed, the assertion of deceit reasonably could be understood only as [the author's] personal conclusion about the information presented.

*Id.* at 730 (emphasis added).  MBAF claims it "was careful to disclose when certain supporting evidence was unavailable," with concessions such as "[u]ntil there is more specific information available regarding which fisheries are responsible for the unattributed entanglements, Seafood Watch considers that all relevant fisheries that

117

Add.117

may overlap with NARW pose risks;" "[u]ntil there is more evidence, all of the fisheries using this gear are considered a risk;" and "due to a lack of information, it is often not possible to assign entanglements to a specific fishery." *Def.'s Mot.* at 8, 32.

However, MBAF also readily concedes it "discounted" the evidence shared by Plaintiffs, later explaining that "MBAF had the right to exclude lobster industry data interpretations in favor of other credible scientific conclusions and sources." *Def.'s Reply* at 17-18, *see also id.* at 20 ("[MBAF] made the reasonable and appropriate editorial decision to give greater weight to some sources—including federal agencies . . . and leading ocean research institutes ... over others that are highly biased with much to lose—e.g., the lobster industry").

MBAF cannot have it both ways. It claims that the concessions made in the Lobster Report regarding data gaps served to "outline[] the facts available to it . . . and [left] the reader free to draw his own conclusions," while simultaneously asserting the right to "discount" any contradictory evidence shared by industry sources as "highly biased." *Riley*, 292 F.3d at 289; *Def.'s Reply* at 20. In doing the latter, MBAF cannot be said to have "[given] information from which readers might draw contrary conclusions." *Phantom Touring, Inc.*, 953 F.2d at 730. Thus, MBAF's Statement does not qualify for the constitutional protection articulated in *Riley*, 292 F.3d at 289 (1st Cir. 2002).

Furthermore, MBAF failed to facially acknowledge when it has synthesized academic reports to form its own conclusion, nor to couch its citations as its own

118

Add.118

interpretation of the facts.  For example, MBAF cites an NMFS report generally in support of its assertion that the Maine lobster industry poses a risk to right whales, but the underlying report concludes only that right whales face extinction risk based on "[c]urrent conditions that continue to act on the species, like the effect of Canadian fisheries and vessel strikes in the United States and Canada," without specifically implicating Maine lobster gear.  *Compl.* ¶ 66 (quoting *MBAF FAQ Answers*).  MBAF reaches its own conclusion by connecting the Maine lobster industry to the finding of this report, a jump in logic that it does not disclose as its own interpretation.  The citations thus do not serve to "outline all facts available to [it]" and "leave the reader free to draw his own conclusions," *Riley*, 292 F.3d at 289; instead, in the context of the Statements, the citations serve to bolster the apparent veracity of MBAF's assertion regarding the impact of the Maine lobster industry and to "impl[y] the existence of underlying defamatory facts," *Piccone*, 785 F.3d at 766.  As such, a reader could reasonably take the Statements as presenting objectively verifiable facts.  *See Conformis,* 58 F.4th at 531.

MBAF also argues that textual concessions included elsewhere in the Lobster Report should be considered in the Court's evaluation of the Statements as fact or protected opinion; for example, its recognition that some entanglements cannot be linked to a specific gear type or fishery and that other factors may contribute to the decline in the right whale population.  *Def.'s Mot.* at 32.  As such, MBAF characterizes its Statements as "based on, and restat[ing], tentative scientific conclusions . . . and they were expressly disclosed as such."  *Id.*  Notably, however, the Red Listing Press

119

Add.119

Release does not contain such "express" disclaimers, instead describing the assessments in the very first paragraph as "final." *Red Listing Press Release* at 2. While MBAF correctly identifies certain instances where it acknowledged data gaps in the Lobster Report, the Court agrees with Plaintiffs that the MBAF did not use these data gaps to qualify its conclusion, but rather "despite the uncertainties and the lack of supporting data, the Aquarium repeatedly insisted that it must attribute blame to the Maine lobster fishery." *Pls.' Opp'n* at 31 (citing the Red Listing Press Release statement: "[u]ntil there is more evidence, all of the fisheries using this gear are considered a risk"). Based on the foregoing, the Court finds that a reader could reasonably understand MBAF's Statements as assertions of objectively verifiable fact.

The Court turns to the second fundamental aspect of MBAF's Statements that results in an overall impression that it is asserting fact, rather than expressing mere opinion. To support the substantive thrust of its Statements, Plaintiff repeatedly highlights the objective and scientific nature of its methodology. For example, in the Red Listing Press Release, MBAF notes "that Seafood Watch reviewed 'all available scientific data' and followed a 'rigorous, transparent, science-based process to evaluate' the Maine lobster fishery." *Compl.* ¶ 94. In 2023, the First Circuit articulated the appropriate inquiry for reviewing the defamatory impact of a rating system, finding the District Court erred in granting a motion to dismiss when "[a] reasonable reader plausibly could understand those statements, taken together, as conveying verifiable facts" when the assessment "suggest[s] an appraisal . . . against

120

Add.120

objective professional or scientific standards." *Conformis*, 58 F.4th at 532. While applied in the context of an insurer's policy assessment of a medical product in *Conformis*, the Court applies this standard of review to Seafood Watch's published evaluation of the Maine lobster fishery especially since MBAF's reply does not contest the Plaintiffs' recitation of the case for the purposes of evaluating fact versus opinion. *Pls.' Opp'n* at 33.

Here, the Seafood Watch rating system, as articulated by MBAF in the Lobster Report, suggests the application of objective standards to reach an overall recommendation; to wit, the Guiding Principles.[24] *Lobster Rep.* at 4. Further, considering a "totality of the circumstances," *Pan Am Sys.*, 871 F. Supp. 2d at 19, MBAF bolsters the objectivity of its assessment by touting its "science-based ratings" and that "[e]ach assessment follows an eight-step process, which prioritizes rigor, impartiality, transparency and accessibility." *Lobster Rep.* at 3. In applying this robust methodology, MBAF reaches the conclusion that American lobster fits within the Avoid category as being "caught or farmed in ways that harm other marine life or

---

[24]   As listed in the Lobster Report, the "qualities that fisheries must possess to be considered sustainable by the Seafood Watch program" include: "[f]ollow the principles of ecosystem-based fisheries management; [e]nsure all affected stocks are healthy and abundant; [f]ish all affected stocks at sustainable levels; [m]inimize bycatch; [h]ave no more than a negligible impact on any threatened, endangered, or protected species; [m]anaged to sustain the long-term productivity of all affected species; [a]void negative impacts on the structure, function, or associated biota of aquatic habitats where fishing occurs; [m]aintain the trophic role of all aquatic life; [d]o not result in harmful ecological changes such as reduction of dependent predator populations, trophic cascades, or phase shifts; [e]nsure that any enhancement activities and fishing activities on enhanced stocks do not negatively affect the diversity, abundance, productivity, or genetic integrity of wild stocks." *Lobster Rep.* at 4. These principles are "operationalized in the four criteria in this standard," listed in the Lobster Report as "Criterion 1: Impacts on the species under assessment," "Criterion 2: Impacts on other species," "Criterion 3: Management Effectiveness," and "Criterion 4: Impacts on the Habitat and Ecosystem." *Id.* at 2, 4.

121

Add.121

the environment" or presenting "a critical conservation concern or many issues [that] need substantial improvement." *Id.*; *Compl.* ¶ 94.

MBAF argues its rating constitutes a "tentative scientific conclusion," but the Court concludes a reasonable reader could plausibly understand its methodology and conclusion "taken together, as conveying verifiable facts" based on MBAF's "appraisal . . . against objective professional or scientific standards." *Def.'s Mot.* at 31; *see also Conformis*, 58 F.4th at 532. First, the Court again notes the Red Listing Press Release plainly described its assessment, in the opening paragraph, as "final." *Red Listing Press Release* at 2. Second, taking the allegations in the Complaint as true for the purposes of this motion, the effect of the Lobster Report on its readers suggests they understood its assessment as fact and relied upon it as the basis to stop purchasing Maine lobster. *Compl.* ¶ 82 ("Based on the publication of the Aquarium's false statements, several large commercial buyers have announced plans to stop selling Maine lobster, and there are reports that large restaurant chains are in the process of removing Maine lobster from their menus because of the 'red' listing"). The alleged effect on readers goes beyond a single consumer; the market reveals an approximately 40% decline in the average price-per-pound of lobster in the year following the red listing. *Compl.* ¶ 84. These facts, taken as true, lead the Court to the reasonable inference that readers understood MBAF's Statements, as a whole, to present statements of fact, not merely MBAF's opinion, for the purposes surviving a motion to dismiss.

122

Add.122

At bottom, "[i]f the average reader could reasonably understand the statement as either fact or opinion, the question of which it is will be submitted to the jury." *Caron*, 470 A.2d at 784. Here, based on MBAF's unqualified assertions and emphasis on its purportedly objective methodology, and further proven by the market's response, Plaintiffs have plausibly alleged that readers of the Lobster Report and accompanying press release understood MBAF's Statements as presenting objectively verifiable facts.

### 3.    Actual Malice and Negligence

The parties agree that "different state of mind standards exist for different Plaintiffs" based on their status as public figures. *Pls.' Opp'n* at 34; *see also Def.'s Mot.* at 33-36. Specifically, Plaintiffs Maine Lobstermen's Association and Maine Coast Fisherman's Association "must prove the higher standard of actual malice" by virtue of their "public positions on issues relating to the lobster fisheries." *Pls.' Opp'n* at 34. "The remaining three Plaintiffs Bean Maine Lobster, Atwood Lobster, and Bug Catcher are likely not public figures and therefore their claim is subject to the negligence standard." *Def.'s Mot.* at 36.

Regarding the actual malice standard applied to the public figure plaintiffs, the First Circuit has defined "actual malice" to mean "knowledge of falsity or reckless disregard for the truth." *Schatz*, 669 F.3d at 52 (citing *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 509-11 (1991)). "Cases define 'reckless disregard' variously as a defamer's having 'serious doubts' about a statement's falsity, or 'actually' having a 'high degree of awareness of . . . probable falsity,' or suspecting falsity and

123

Add.123

purposefully — not just negligently — avoiding the truth." *Id.* (cleaned up) (citing *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688, 692 (1989) (internal quotations omitted).

Defamation of private parties, on the other hand, only requires proof of "fault amounting to at least negligence." *Waugh v. Genesis Healthcare LLC*, 2019 ME 179, ¶ 10, 222 A.3d 1063. Maine has adopted the standard for negligence from the Restatement (Second) of Torts: "[t]he standard of conduct to which a party must conform to avoid being negligent is that of a reasonable man under like circumstances." *Penobscot Indian Nation*, 906 F. Supp. at 23 (citing RESTATEMENT (SECOND) OF TORTS § 283 (AM. L. INST. 1977)).

MBAF extensively cites caselaw in support of its position that Plaintiffs cannot prove actual malice "when defendants rely on sources for their reporting." *Pls.' Mot.* at 36-37 (citing *St. Amant*, 390 U.S. at 733; *Levesque*, 560 F.3d at 90-93; and *Schatz*, 669 F.3d at 58). It is true that actual malice imposes a high bar on plaintiffs when a defamation defendant "verified other aspects" of cited information, *St. Amant*, 390 U.S. at 733, or "corroborated many of the article's facts with other sources." *Levesque*, 560 F.3d at 92. A close reading of these cases, however, shows these courts did not purport to offer the wholesale protection described by MBAF.

In *St. Amant*, the Supreme Court wrote: "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant*, 390 U.S. at 732. Similarly, the First Circuit in *Levesque* found a publisher could act recklessly where it "deliberately ignores evidence that calls into

124

Add.124

question his published statements." *Levesque*, 560 F.3d at 90; *see id.* at 92 (collecting cases where recklessness was found based on defendants' ignoring available information that contradicted their respective statements). Finally, the First Circuit in *Schatz* reiterated this carveout to the general rule of actual malice, citing *Levesque* for the proposition that recklessness may be found where a defendant "deliberately ignores evidence that calls into question his published statements," before finding the plaintiff in that case had failed to plead sufficient facts to "'nudge[]' his actual-malice claim 'across the line from conceivable to plausible.'" *Schatz*, 669 F.3d at 58 (first citing *Levesque*, 560 F.3d at 90; then citing *Twombly*, 550 U.S. at 570).

Here, Plaintiffs pleaded facts alleging the exact carveout to the general rule as articulated in *Levesque* and *Schatz*: "deliberately ignor[ing] evidence that calls into question [its] published statements." *Schatz*, 669 F.3d at 58. Taking the allegations of the Complaint as true for the purposes of this motion to dismiss, Plaintiffs provided MBAF with data indicating that known entanglements in any U.S. lobster gear had fallen by 90% since 2009 compared to the prior thirteen years. *Compl.* ¶ 63. Plaintiffs also provided MBAF with evidence of the efficacy of the Take Reduction Plan, including the use of sinking lines between traps, which effectively removed 27,000 miles of rope from New England waters; requirements that more lobster traps be attached to each buoy line, removing an additional 3,000 miles of rope; and the incorporation of "weak-links" in the buoy line to allow entangled right whales to break free. *Id.* ¶ 30.

MBAF insists that the new information regarding the entanglement and death of NARW #5120 justifies dismissal of the complaint on the issue of actual malice by proving the material truth of its statements. *Def.'s Suppl. Brief* at 5. Based on several considerations at the motion to dismiss stage, the Court disagrees with the Defendant's assertion that the new information should be deemed dispositive.

First, Plaintiffs' point out that, pursuant to a NOAA statement publicly issued prior to the publication of the Lobster Report, supply chain issues had delayed industrywide implementation of the 2021 revisions to the Take Reduction Plan requiring "weak link" ropes. *Pls.' Suppl. Brief* at 6. Without any evidence that a "weak link" rope caused the death of NARW #5120 and making all reasonable inferences in favor of the Plaintiffs at this stage of the proceeding, the Court infers that this entanglement took place in one of the historic ropes that was phased out by the revised Take Reduction Plan.

Second, MBAF asserts the new information conclusively proves the truth of its statements because "[j]ust one death or serious injury caused by human activity in the ocean endangers the species," citing NOAA's assessment that "for the NARW population to recover, the average number of whales injured or killed by human-related activity must be less than one whale per year." *Def.'s Suppl. Resp.* at 2. MBAF's argument, however, ignores the distinction between a single event and an average. Even accepting the Lobster Report's potential biological removal (PBR) limit of .7 whales per year as the threshold beyond which serious injury or mortality affects the sustainability of the population, the death of NARW #5120 does not prove

126

Add.126

lobster fishing gear has an impact above this limit; as an average, this data point must be considered in light of the rest of the evidence that, since 2004, no entanglements of right whales in lobster fishing gear have been recorded. Thus, taking the Plaintiffs' well-pleaded facts as true, the mortality rate of right whales based on entanglement in Maine lobster fishing gear over the past twenty years would be just .05 whales per year, far below MBAF's own cited PBR threshold of .7 whales per year.

Third and finally, Plaintiffs correctly emphasize that extrinsic materials may only lead to dismissal when "the extrinsic evidence is so strong that it undercuts the truth of the allegations in the Complaint." *Pls.' Suppl. Brief* at 6 (citing *Bruns*, 2012 U.S. Dist. LEXIS 165380, at *25). Based on the reasons articulated and this high legal standard, the Court declines to dismiss the complaint based on the new information regarding the entanglement and death of NARW #5120.

Taken as true, the facts and data regarding the efficacy of the Take Reduction Plan provide MBAF with "obvious reasons to doubt . . . the accuracy of [its] reports" that "each fishery using this gear is putting this protected species [*i.e.*, the right whale] at risk of extinction" and that "[m]anagement measures and the Atlantic Large Whale Take Reduction Plan have not been successful at reducing serious injury and mortality to the North Atlantic right whale." *Compl.* ¶ 94. While MBAF argues it "had the right to exclude lobster industry data interpretations in favor of other credible scientific conclusions and sources," *Pls.' Reply* at 18, the First Circuit has been clear that a defendant who "deliberately ignores evidence that calls into

question his published statements," may have acted recklessly. *Schatz*, 669 F.3d at 58. In 2018, the First Circuit confirmed its adherence to this principle when it upheld a jury finding of actual malice where "[t]he jury heard evidence that [the Defendant] deliberately ignored facts that called her public statements into question." *Sindi*, 896 F.3d at 16.

MBAF correctly asserts that Federal Rule of Civil Procedure 9(b) allowing general allegations of mental states does not permit vague, conclusory claims. *Def.'s Reply* at 21; *see also, e.g.*, *Schatz*, 669 F.3d at 58 ("'Rule 9 merely excuses a party from pleading [states of mind] under an elevated pleading standard' — it does not give him carte blanche 'to plead the bare elements of his cause of action, affix the label "general allegation," and expect his complaint to survive a motion to dismiss'") (quoting *Iqbal*, 556 U.S. at 687). However, "[b]ecause direct evidence of actual malice is rare, it may be proved through inference and circumstantial evidence." *Id.* (citing *Bose Corp. v. Consumers Union.*, 692 F.2d 189, 196 (1st Cir. 1982) and *Connaughton*, 491 U.S. at 668). Taking all plausibly alleged facts as true for the purposes of evaluating this motion to dismiss, Plaintiffs have alleged sufficient specific facts, including statistics of right whale entanglement and the success of protection measures, *Compl.* ¶¶ 30, 63, to allow the Court to make a reasonable inference that MBAF ignored this information as in conflict to their desired conclusion and, in doing so, acted with reckless disregard for the truth of its statements.

As actual malice requires a higher threshold than negligence, having found actual malice, the Court need not now undertake a separate inquiry into negligence.

Add.128

Thus, the Court's actual malice analysis applies to the lower standard of negligence for the private party plaintiffs.  Assuming its truth for the purposes of this motion, the Court makes a reasonable inference that "a reasonable man under like circumstances" would have incorporated the contradictory evidence into its statement or, at minimum, addressed its existence, rather than simply "discounting" it as inherently "highly biased." *Penobscot Indian Nation*, 906 F. Supp. at 23; *Def.'s Reply* at 18, 20. Plaintiffs alleged sufficiently plausible facts for the Court to make a reasonable inference that MBAF acted negligently in its publication of the Statements to survive a motion to dismiss for failure to state a claim.

## VIII.  INJUNCTIVE RELIEF

### A.    Legal Standard

The U.S. Supreme Court has articulated clear principles governing a court's exercise of its equitable power to grant permanent injunctive relief:

> A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  In addition, the injunction must be designed to be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

Add.129

Courts apply special care with regard to a particular type of injunctive relief: prior restraints on speech. *See New York Times Co. v. United States*, 403 U.S. 713, 723 (1971) ("Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity") (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)); *see also Sindi*, 896 F.3d at 32 ("[A] prior restraint on speech must survive the most exacting scrutiny demanded by our First Amendment jurisprudence") (citing *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976)). A prior restraint on speech "may only be imposed when it furthers 'the essential needs of the public order' . . . [and] cannot be imposed when those needs can be achieved through less restrictive means." *Sindi*, 896 F.3d at 32 (quoting *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 183 (1968)). Even when permissible, the restraint "must be precisely tailored both to meet the exigencies of the particular case and to avoid censoring protected speech." *Sindi*, 896 F.3d at 32 (citing *Carroll*, 393 U.S. at 183-84).

**B.     Discussion**[25]

MBAF characterizes Plaintiffs' requested relief as a "prior restraint on speech," *Def.'s Mot.* at 38, and takes the primary position that the Court must refuse their

---

[25]     It strikes the Court as unusual that MBAF is using a motion to dismiss to jettison not a theory of action, such as defamation, but a requested remedy, namely an injunction. A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is available when a complainant has failed "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). It does not provide that a respondent may move to dismiss a remedy if the claim is valid. If the claim survives dismissal, it will be up to Plaintiffs to demonstrate they are entitled to the forms of relief they have requested. In this sense, MBAF's motion puts the remedy cart before the claim horse. Nevertheless, as this curiosity was not raised by Plaintiffs, the Court has addressed the merits of the motion on the assumption that the remedy issue is properly before it on a motion to dismiss.

130

request as "impermissibly broad" and an imposition on their constitutionally protected rights. *Id.* at 38-39. The Supreme Court has defined a prior restraint on speech as a "judicial order[] forbidding certain communications . . . issued in advance of the time that such communications are to occur." *Sindi*, 896 F.3d at 31 (quoting *Alexander v. United States*, 509 U.S. 544, 550 (1993)) (emphasis in original).

Plaintiffs disagree with the characterization of their requested remedy as a prior restraint on speech, arguing they "are not asking the Court to enjoin the Aquarium from any future speech" and citing the language of the complaint in which they "seek an injunction ordering the Aquarium to remove and retract any and all defamatory statements from its website and other locations where those statements were published." *Pls.' Opp'n* at 35 (citing *Compl.* ¶ 110).

Both parties base their positions, in large part, on the First Circuit's analysis of injunctive relief as a remedy to defamation in *Sindi*, 896 F.3d 1; however, the parties diverge in their readings of what *Sindi* stands for in this context.

The Court concludes that Plaintiffs read the First Circuit's opinion more accurately. MBAF is correct that the *Sindi* Court wrote "there may be rare situations justifying an injunction against speech . . ., but an 'injunction that prevents in perpetuity the utterance of particular words and phrases after a defamation trial is quite a different matter.'" *Def.'s Reply* at 24 (citing *Sindi*, 896 F.3d at 33). However, MBAF's comprehension and application of this quotation misses the mark for two reasons.

First, the "different matter" being compared to in the quotation refers to the "significant distinction[] between obscenity and defamation," an issue not implicated here. *See Sindi*, 896 F.3d at 33. Second, and more important, the injunction under review by the First Circuit in *Sindi* "enjoined the appellants from 'repeating – orally, in writing, through direct electronic communications, or by directing others to websites or blogs reprinting –' any of the six particular statements [adjudicated to have been defamatory]." *Sindi*, 896 F.3d at 27. The operative verb of the injunction, "repeating," implies additional defamatory speech; it does not address statements previously made that have already been adjudicated to be defamatory in the context they were made. Here, Plaintiffs do not seek to limit additional, future speech, but rather for MBAF to "remove or retract" its existing statements. *Compl.* ¶ 110.

In fact, as Plaintiffs' correctly note in their opposition, the First Circuit explicitly disclaimed the applicability of *Sindi* to injunctions ordering the removal of language already published and deemed defamatory in that particular context. *Pls.' Opp'n* at 35; *see Sindi*, 896 F.3d at 35 ("[W]e take no view of the legality of an injunction ordering the removal or deletion of speech that has been adjudicated defamatory, such as a decree requiring the erasure of a statement from a website after an adjudication that the statement was unprotected in the context in which it was made") (internal quotation marks omitted). For these reasons, the Court concludes that MBAF's citations to *Sindi* are inapposite and its characterization of the requested injunction as a "prior restraint on speech" also inaccurate. *Def.'s Mot.*

132

at 38. As such, the especially high bar for a prior restraint on speech does not apply to the present case.

The Court thus proceeds with analysis of the Plaintiffs' requested injunctive relief under the four standard elements, as articulated by the Supreme Court in *eBay Inc.*, 547 U.S. at 391. MBAF posits that, because "Plaintiffs do not and cannot demonstrate their case is exceptional," the "remedy for defamation is a damages action after publication." *Def.'s Reply* at 25 (for the latter, quoting *Living Vehicle, Inc.*, 2023 U.S. Dist. LEXIS 37872, at *24-25). The Court understands this argument to be disputing the existence of an irreparable injury and the inadequacy of remedies available at law, which constitute the first and second elements listed in *eBay Inc.*, 547 U.S. at 391: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury." Plaintiffs assert they are "incurring ongoing business losses directly traceable to the cancellation of contracts by companies who followed the Aquarium's malicious libel by ceasing purchases of Maine lobster," and that "these losses are continuing to accumulate." *Compl.* ¶ 108. Further, "[e]ach Plaintiff has also suffered ongoing reputational harm, loss of good will, and loss to the brand value of Maine lobster as a result of the Aquarium's defamatory statements." *Id.* ¶ 90. In part, Plaintiffs argue this effect on the industry's reputation can be seen in the forty percent decline in average per-pound price of lobster in Maine between September and December 2022 compared to the same period in 2021. *Id.* ¶ 84.

Add.133

Taking the allegations of the complaint as true for the purposes of this motion to dismiss, the Court concludes that Plaintiffs' pleaded facts permit a reasonable inference that the remedy of damages would be inadequate. Seafood Watch's rating system "influences the commercial decisions of thousands of restaurants, stores, distributors, and other major purchasers of seafood, many of which have pledged to avoid any items that appear on the Seafood Watch's 'red' list." *Id.* ¶ 80. While some injury remains visible in the forms of cancelled contracts and a decline in market price, *Compl.* ¶¶ 83-84, the ripple effects of the "red listing" go beyond direct financial impacts to significantly affecting "the Maine lobster brand, the industry's reputation for sustainable practices and goodwill." *Id.* ¶ 90. Reputation and goodwill cannot be adequately replaced through awarding damages and this injury lingers as long as the "red listing" does; thus, Plaintiffs have pleaded plausible facts for the Court to make a reasonable inference regarding the suffering of irreparable injury and the inadequacy of available legal remedies. *See Iqbal*, 556 U.S. at 678.

MBAF makes no arguments regarding the balance of hardships element. *See eBay Inc.*, 547 U.S. at 391 (describing the third element for granting an injunction as "that considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted"). The Court agrees with the Plaintiffs that, particularly in the digital age, "[MBAF] is capable of removing any and all false and defamatory statements from its websites and published material without undue burden." *Id.* ¶ 112. Thus, in the absence of an argument against and for the purposes of this motion to dismiss, the Court concludes that Plaintiffs pleaded adequate facts

134

Add.134

to satisfy for the Court to infer the balance of hardships element weighs in favor of granting injunctive relief.

The final element listed by the Supreme Court considers effects of an injunction on the public interest. *eBay Inc.*, 547 U.S. at 391 (describing the fourth element for granting an injunction as "that the public interest would not be disserved by a permanent injunction"). MBAF makes no arguments expressly regarding an injunction's effect on the public interest, though their discussion of constitutional free speech rights in the context of prior restraints may address this element. However, as discussed by the Court above, the injunctive relief requested does not seek to impose forward-looking restraints on public speech; rather, Plaintiffs merely seek the removal of statements determined to be defamatory. "The freedom of speech has its limits; it does not embrace certain categories of speech, including defamation." *Free Speech Coal.*, 535 U.S. at 245-46. Further, Plaintiffs pleaded plausible facts demonstrating the significant ties between the public interest in the state of Maine and the lobster industry. *Compl.* ¶ 3 ("The Maine lobster industry contributes about $1 billion annually to state's economy. The industry directly supports roughly 12,000 jobs on the water and an additional 6,600 shoreside jobs through its supply chain"); *id.* ¶ 4 ("a whopping 42% [of the approximately 10.1 million people who visited Maine between May and August 2021] said they specifically came to Maine for the lobster"). Taking these facts as true, the Court finds Plaintiffs pleaded plausible facts demonstrating an injunction would not disservice the public interest.

135

Add.135

Ultimately, the Court finds that MBAF has failed to prove that the Court must deny the requested injunction as a matter of law, such that granting dismissal of this remedy at this stage of the litigation would be premature.

## IX.    REQUEST FOR LEAVE TO AMEND THE COMPLAINT

Plaintiffs request, as an alternative to dismissal, that the Court grant them leave to amend should it identify a deficiency in its defamation claim. *Pls.' Opp'n* at 35-36. MBAF contests this request, arguing that Plaintiffs failed to "set forth the factual and legal predicate for the remedy sought." *Def.'s Reply* at 23 (citing *Silverstrand*, 707 F.3d at 107.

Based on the disposition of the motion to dismiss, the Court does not reach this argument, as Plaintiffs only requested this remedy be considered as an alternative to a grant of dismissal. As the Court denied the Defendant's motion to dismiss on both its jurisdictional and substantive grounds, the Court dismisses Plaintiffs' alternative request for leave to amend.

## X.    CONCLUSION

The Court DENIES Defendant Monterey Bay Aquarium Foundation's Motion to Dismiss for Lack of Jurisdiction (FED. R. CIV. P. 12(b)), Or, in the Alternative, Transfer of Venue due to Forum Non Conveniens (28 U.S.C. 1404(a)), or Dismiss under Maine's anti-SLAPP Statute (14 M.R.S. § 556), or Dismiss for Failure to State a Claim upon which Relief can be Granted (FED. R. CIV. P. 12(b)(6)) (ECF No. 19).

The Court further DISMISSES as moot Plaintiffs Bean Maine Lobster, Inc.; Maine Lobstermen's Association, Inc.; Maine Coast Fishermen's Association, Inc.;

Maine Lobster and Processing, LLC d/b/a Atwood Lobster, LLC; and Bug Catcher, Inc.'s Motion for Limited Jurisdictional Discovery (ECF No. 30).

The Court GRANTS Defendant Monterey Bay Aquarium Foundation's Motion to Supplement the Record on Motion to Dismiss with Louisiana Order Transferring Parallel Action Against Defendant to the United States District Court for the Northern District of California (ECF No. 41).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 6th day of February, 2025

Add.137

# 14 M.R.S. § 556. Special Motion to Dismiss

When a moving party asserts that the civil claims, counterclaims or cross claims against the moving party are based on the moving party's exercise of the moving party's right of petition under the Constitution of the United States or the Constitution of Maine, the moving party may bring a special motion to dismiss. The special motion may be advanced on the docket and receive priority over other cases when the court determines that the interests of justice so require. The court shall grant the special motion, unless the party against whom the special motion is made shows that the moving party's exercise of its right of petition was devoid of any reasonable factual support or any arguable basis in law and that the moving party's acts caused actual injury to the responding party. In making its determination, the court shall consider the pleading and supporting and opposing affidavits stating the facts upon which the liability or defense is based.

The Attorney General on the Attorney General's behalf or on behalf of any government agency or subdivision to which the moving party's acts were directed may intervene to defend or otherwise support the moving party on the special motion.

All discovery proceedings are stayed upon the filing of the special motion under this section, except that the court, on motion and after a hearing and for good cause shown, may order that specified discovery be conducted. The stay of discovery remains in effect until notice of entry of the order ruling on the special motion.

The special motion to dismiss may be filed within 60 days of the service of the complaint or, in the court's discretion, at any later time upon terms the court determines proper.

If the court grants a special motion to dismiss, the court may award the moving party costs and reasonable attorney's fees, including those incurred for the special motion and any related discovery matters. This section does not affect or preclude the right of the moving party to any remedy otherwise authorized by law.

As used in this section, "a party's exercise of its right of petition" means any written or oral statement made before or submitted to a legislative, executive or judicial body, or any other governmental proceeding; any written or oral statement made in connection with an issue under consideration or review by a legislative, executive or judicial body, or any other governmental proceeding; any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive or judicial body, or any other governmental proceeding; any statement reasonably likely to enlist public participation in an effort to effect such consideration; any written or oral statement made in connection with a discrimination complaint pursuant to the Maine Human Rights Act; any written or oral statement made in connection with a complaint pursuant to Title 20-A, chapter 445 or the so-called Title IX provisions of the federal Education Amendments of 1972, Public Law 92-318; or any other statement falling within constitutional protection of the right to petition government.