No. 25-1206, 25-1772

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

BEAN MAINE LOBSTER, INC.; MAINE LOBSTERMEN'S ASSOCIATION, INC.; MAINE COAST FISHERMEN'S ASSOCIATION, INC.; MAINE LOBSTER AND PROCESSING, LLC d/b/a ATWOOD LOBSTER, LLC; BUG CATCHER, INC.,

*Plaintiffs - Appellees,*

v.

MONTEREY BAY AQUARIUM FOUNDATION

*Defendant - Appellant.*

_____

*On Appeal from the United States District Court District of Maine*
*No. 2:23-cv-00129-JAW (Hon. Judge John A. Woodcock, Jr.)*

_____

**BRIEF OF AMICUS CURIAE IN SUPPORT OF**
**DEFENDANT-APPELLANT AND REVERSAL**

Erica A. Fuller
Sarah Shahabi*
Conservation Law Foundation
62 Summer St. Boston, MA 02110
(617) 850-1754
efuller@clf.org
*Counsel for Amicus Curiae*
*Conservation Law Foundation*

February 3rd, 2026

\*Not admitted to practice in the First Circuit

**RULE 26.1 DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Conservation Law Foundation states the proposed *Amicus Curiae* is a non-profit 501(c)(3) corporation with no parent corporation, and no person or corporate entity owns ten percent or more of the respective association.

Respectfully submitted this 3rd day of February, 2026,

/s/ *Erica A. Fuller*
Erica A. Fuller
Conservation Law Foundation
62 Summer St.
Boston, MA 02110
(617) 850-1754
efuller@clf.org

*Counsel for Amicus Curiae*
*Conservation Law Foundation*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... ii

STATEMENT OF IDENTITY, INTEREST, AND
SOURCE OF AUTHORITY TO FILE ...............................................................1

INTRODUCTION ..............................................................................................3

STATEMENT OF THE CASE............................................................................7

ARGUMENT ......................................................................................................8

I.       The Statements are not defamatory.. ...................................................8

         A.  The Statements are not "of and concerning" the Plaintiffs.........9

         B.  Statements made in the context of a scientific debate
             are protected advocacy. ...........................................................13

             1. The allegedly defamatory Statements are protected opinions..............13

             2. The allegedly defamatory Statements were made
                in the context of a scientific debate. ....................................15

         C.  Broadening the Group Libel Doctrine will chill protected speech. ...........18

II.      Maine's anti-SLAPP statute bars plaintiffs defamation allegations. .............19

         A.  The Statements are protected petitioning activities. ................21

         B.  The Statements have substantial factual support
             and a strong basis in law...........................................................22

             1. The Statements had ample factual support............................22

             2. The Statements have a strong basis in law. ...........................24

             3. Plaintiffs did not show the Statements lacked reasonable
                factual support or an arguable basis in law at the district court. ..........26

CONCLUSION ................................................................................................28

CERTIFICATE OF COMPLIANCE................................................................29

CERTIFICATE OF SERVICE .........................................................................29

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arcand v. Evening Call Pub. Co.*, 567 F.2d 1163 (1st Cir. 1977) .......................10, 11

*Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517 (1st Cir. 2023) ..............................10, 11

*Conservation Law Found. v. Cooke Aquaculture USA Inc.*,
No. 1:25-cv-00013-KFW, (D. Me. Jan. 14, 2025) ...................................................22

*Conservation Law Found. v. Exxon Mobil Corp.*,
3 F.4th 61 (1st Cir. 2021)........................................................................................22

*Conservation Law Found. v. Ross*,
422 F. Supp. 3d 12 (D.D.C. 2019).........................................................................13

*Conservation Law Found. v. Shell Oil Co.*,
No. 3:21-cv-00933 (D. Conn. July 7, 2021)............................................................22

*Conservation Law Found. v. Shell Oil Products US*,
No. 1:17-cv-00396-WES-LDA, (D. R.I. Aug. 28, 2017).....................................22

*Cookson v. State*, 2011 ME 53 ...................................................................... 24, 30

*Ctr. for Biological Diversity v. Raimondo*,
610 F. Supp. 3d 252 (D.D.C. 2022)........................................................................29

*Ctr. for Biological Diversity v. Raimondo*,
No. 18–112, 2024 WL 324103 (D.D.C. Jan. 29, 2024).......................................29

*Dist. 4 Lodge of the Int'l Ass'n of Machinists &*
*Aerospace Workers Loc. Lodge 207 v. Raimondo*,
40 F.4th 36 (1st Cir. 2022)......................................................................................30

*Franchini v. Inv.s Bus. Daily, Inc.*, 981 F.3d 1 (1st Cir. 2020).......................... 23, 24

*Garrett v. Tandy Corp.*, 295 F.3d 94 (1st Cir. 2002) ................................................10

*Lemelson v. Bloomberg L.P.*, 903 F.3d 19 (1st Cir. 2018)........................................19

*Lester v. Powers*, 596 A.2d 65 (Me. 1991) ...................................................... 10, 15

*Levesque v. Doocy*, 560 F.3d 82 (1st Cir. 2009) ........................................................19

*McKee v. Cosby*, 874 F.3d 54 (1st Cir. 2017) ................................................... 15, 16

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) ................................................16

*Morgan v. Kooistra*, 2008 ME 26, ¶ 29, 941 A.2d 447.............................................10

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
  720 F.3d 490 (2d Cir. 2013)..................................................... 16, 17

*Pacira Biosciences, Inc., v. Am. Soc'y of
  Anesthesiologists, Inc.* 63 F.4th 240 (3rd Cir. 2023) ..................................... 16, 18

*Pan Am Sys. v. Hardenbergh*, 871 F. Supp. 2d 6 (D. Me. 2012) ...................... 15, 17

*Piccone v. Bartels*, 785 F. 3d 766 (1st Cir. 2015) .....................................................15

*Riley v. Harr*, 292 F.3d 282 (1st Cir. 2002)....................................................... 16, 17

*Robinson v. Guy Gannett Pub. Co.*, 297 F. Supp. 722 (D. Me. 1969)....................11

*Saad v. Am. Diabetes Ass'n*, 123 F. Supp. 3d 175 (D. Mass 2015) ................... 16, 18

*Schelling v. Lindell*, 2008 ME 59..............................................................................24

*Strahan v. Coxe*, 127 F.3d 155 (1st Cir. 1997)........................................................28

*Strahan v. Sec'y, Mass. Exec. Off. Energy & Env't Aff.*,
  458 F.Supp.3d 76 (D. Mass. 2020).........................................................................14

*Thurlow v. Nelson*, 2021 ME 58 ...............................................................................24

**Constitutional Provisions**

U.S. Const. amend. I. .................................................................................................20

**Statutes**

16 U.S.C. § 1362.........................................................................................................24

16 U.S.C. § 1387.......................................................................................................2, 23

Me. Rev. Stat. Ann. Tit. 14 § 556................................................................... 20, 28

Me. Rev. Stat. Ann. Tit.14 §§ 731–42...................................................................20

**Regulations**

50 C.F.R. § 229 .................................................................................. 12, 23

64 Fed. Reg. 7529 (Feb. 16, 1999) ........................................................17

65 Fed. Reg. 80,368 (Dec. 21, 2000)......................................................17

86 Fed. Reg. 51,970 (Sept. 17, 2021) ......................................... 12, 13, 27

87 Fed. Reg. 11,590 (Mar. 2, 2022) .......................................................24

**Rules**

Fed. R. App. P. 29....................................................................................3

**Other Authorities**

*Cooke Family of Companies Newsletter*, Cooke, 4 (2021)
    https://www.cookescotland.com/wp-content/uploads/2021
    /02/Cooke-Newsletter-Winter-2021.pdf...............................................19

Eric Thunberg, *Demographic and Economic Trends
    in the Northeastern United States Lobster Fishery*,
    NOAA (2007) https://repository.library.noaa.gov/view/noaa/5251 .....................11

ExxonMobil, *ExxonMobil announces 2024 results*, (Jan. 31, 2025)
    https://corporate.exxonmobil.com/news/news-releases
    /2025/0131_exxonmobil-announces-2024-results ...............................................19

Global Seafoods, *Understanding the Economics of the Lobster Industry*,
    (Sep. 6, 2024) https://globalseafoods.com/blogs/news/
    economics-of-the-lobster-industry-market-insights ...............................................11

H. Johnsom, D. Morrison & C. Taggart, *WhaleMap:
    A Tool to Collate and DisplayWhale Survey Results
    in Near Real-Time*, 6 J. Open Source Software, 3094, (June 9, 2021) ................27

Imarc, *U.S. Lobster Market*,
    https://www.imarcgroup.com/
    united-states-lobster-market (last visited Jan. 15, 2026)....................................11

iv

*Attorney work product – confidential and privileged*
*Do not distribute*

Jennifer Goebel, *Status of Atlantic Large Whale Take Reduction Plan Modifications*, NOAA, slide 4 (Sept. 26, 2024) https://d23h0vhsm26o6d.cloudfront.net /NEFMC-September-2024-Meeting.pdf ............................................................24

MBAF, *Celebrating 25 Years of Seafood Watch*, (Jan. 30, 2024) https://www.seafoodwatch.org/stories/25-years-seafood-watch. ..........................6

MBAF, *Seafood Watch New and Updated Ratings*, (Sept. 2022) https://www.seafoodwatch.org/globalassets /sfw/pdf/whats-new/2022/seafood-watch-whats-new-sep-2022.pdf. ..........5, 6, 11

MBAF, *Standards for Fisheries*, https://www.seafoodwatch.org/recommendations /our-standards/standard-for-fisheries (last visited Jan. 15, 2026)....................................................................................6

NOAA Fisheries, *Atlantic Large Whale Take Reduction Team, Team Members*, https://www.fisheries.noaa.gov/new-england- mid-atlantic/marine-mammal-protection/atlantic-large-whale- take-reduction-team#team-members (last updated Dec. 18, 2025). .....................2

NOAA, *2017-2026 North Atlantic Right Whale Unusual Mortality Event*,..............5

NOAA, *Atlantic Large Whale Take Reduction Team,* https://www.fisheries.noaa.gov/new-england-mid- atlantic/marine-mammal-protection/atlantic-large- whale-take-reduction-team (last updated Dec. 18, 2025). ..................................12

NOAA, *MMPA List of Fisheries for 2021*, (Jan. 14, 2021) https://www.fisheries.noaa.gov/action/mmpa-list-fisheries-2021.........................6

Pub. L. No. 117-328, Div. JJ, 126 Stat. 4459, 6089–93, § 101(a) (Dec. 29, 2022)....................................................................................4

Shell, *Shell plc Annual Report and Accounts*, 241(Dec. 31, 2924) https://www.shell.com/investors/results-and-reporting /annual-report/_jcr_content/root/main/section/promo/links/ item0.stream/1752580693041/6c20b8111738b9a590ba145f0 d1c4fa0e530dae0/shell-annual-report-2024.pdf...............................................19

## STATEMENT OF IDENTITY, INTEREST, AND
## SOURCE OF AUTHORITY TO FILE

*Amicus curiae* Conservation Law Foundation (CLF) is an environmental advocacy organization with offices in Maine, Massachusetts, Vermont, New Hampshire, Rhode Island, and Connecticut. Our mission is to protect and restore New England's environment for the benefit of all people for generations to come. CLF has worked for decades to end overfishing, protect ecologically important habitat, restore groundfish and forage species, and recover threatened and endangered species by advocating for sustainable fishing practices.

To protect our longstanding interests in the recovery of critically endangered North Atlantic right whales (right whales), CLF has litigated to ensure that the states and the National Oceanic and Atmospheric Administration (NOAA) lawfully manage U.S. fisheries consistent with the Marine Mammal Protection Act (MMPA), Endangered Species Act (ESA), Magnuson-Stevens Fishery Conservation and Management Act, and other applicable laws.

Separate from litigation, CLF has relied on First Amendment principles of free speech to advocate for improved right whale protection and durable, effective solutions to their threats. For decades, CLF has provided public comment to both NOAA and the Atlantic States Marine Fisheries Commission (ASMFC) on federal and state authorizations and management of the American lobster and Jonah crab fishery (lobster fishery). An attorney and former veterinarian on CLF's staff is a

1

federally appointed member of NOAA's Atlantic Large Whale Take Reduction Team,[1] and participates with the conservation caucus to recommend measures that reduce entanglement risk in commercial fisheries. CLF publicly advocates for a transition away from traditional lobster fishing—using persistent buoy lines between weighted traps on the seafloor and surface marking buoys—to on-demand ("ropeless") fishing when and where right whales are present. As part of this advocacy, CLF has contributed on-demand fishing systems and in-kind services to NOAA's Northeast Fisheries Science Centers' Gear Lending Library. CLF also has an appointment on the New England Fishery Management Council's On-Demand Working Group; a group tasked with reducing gear conflicts between fishermen using on-demand fishing gear and other fishing gear.

On March 28, 2022, CLF submitted public comments to the Monterey Bay Aquarium Foundation (Aquarium) during its Seafood Watch public comment process. We did not take a position on its ratings, rather we urged it to adopt a new rating for products caught using on-demand fishing systems that do not leave persistent buoy lines in the water column.

---

[1] *See* NOAA, *Atlantic Large Whale Take Reduction Team, Team Members*, https://www.fisheries.noaa.gov/new-england-mid-atlantic/marine-mammal-protection/atlantic-large-whale-take-reduction-team#team-members (last updated Dec. 18, 2025) This team is convened under the MMPA and advises NOAA on regulations to reduce right whale mortalities and serious injuries in commercial fisheries. *See* 16 U.S.C. § 1387(f).

This brief seeks to assist the Court's understanding of the lengthy regulatory and judicial processes preceding the Seafood Watch American Lobster Report (Report),[2] and the substantial risks to free speech this litigation poses—for the Aquarium, for CLF and other advocacy organizations, and for administrative rulemakings that rely on scientific conclusions.

CLF affirms that no counsel for a party authored this brief in whole or in part, and that no one other than CLF or their counsel made any monetary contributions intended to fund the preparation or submission of it. *Cf.* Fed. R. App. P. 29(a)(4)(E).

Under Local Civil Rule 7.1(a)(2), counsel for *Amicus Curiae* conferred with counsel for Plaintiffs-Appellees and Defendant-Appellant. By emails dated September 18 and 22, 2025, counsel for Defendant-Appellant and Plaintiffs-Appellees (respectively) consented to CLF filing this brief.

## INTRODUCTION

The right to zealously advocate for issues of public concern has never been more important. At issue is whether an organization engaged in public advocacy—such as the Aquarium—can speak freely about commercial fisheries that use gear known to entangle critically endangered right whales, a factor driving the species toward extinction.

---

[2] Joint Appendix ("JA")54.

This issue directly impacts *Amicus Curiae*, CLF. As an environmental advocacy organization, our advocacy cannot prevail without identifying and speaking freely about the causes of the environmental, ecological, and social harms that are occurring, without fear of legal action or censorship. Only by the sharing of ideas can solutions be found.

The protection and recovery of right whales is a serious and complex issue that has already demanded decades of legislative, executive, and judicial consideration. Since 1997, when the first Atlantic Large Whale Take Reduction Plan was enacted, NOAA has implemented eleven major rulemakings under the MMPA to reduce entanglements in fixed gear fisheries (lobster, other trap/pot, and gillnet fisheries). During the same time period, the lobster industry vigorously resisted meaningful gear marking regulations, leaving tremendous uncertainty (even today) about which fishery, or even what country, the ropes taken off an entangled whale originated from. And a federal district court has found, twice, that NOAA's authorization of the lobster fishery is unlawful; prompting Congress to intervene so the fishery can operate today (despite its non-compliance with ESA and MMPA mandates).[3]

---

[3] Consolidated Appropriations Act of 2023. *See* Pub. L. No. 117-328, Div. JJ, 126 Stat. 4459, 6089–93, § 101(a) (Dec. 29, 2022) (deeming 2021 Final Rule amending the Atlantic Large Whale Take Reduction Plan sufficient to ensure state and federal lobster fisheries comply with MMPA and ESA until December 31, 2028).

Entanglements remain the primary cause of the species decline inflicting the most injuries and accounting for the leading cause of death in the U.S. and Canada.[4] Although the population peaked at nearly 500 whales in 2011, it declined to as low as 359 in 2020. Even after a few years of modest increases (2022-2024), it remains nearly 20% below its limited recovery level. Of the fewer than 380 remaining animals, 85% have been entangled at least once, and some many times.[5] This Court has previously found the death of even a single whale increases the chance of extinction. *Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo*, 18 F.4th 38, 41 (1st Cir. 2021). It is an urgent conservation crisis.

In September 2022, the Aquarium issued a series of reports calling public attention to the "high risk to the environment" that 14 different trap/pot and gillnet fisheries pose to entangle threatened, endangered, and protected species because of the gear used in these fisheries.[6] The Aquarium reasonably attributed risk after consulting the best scientific data available, government reports, experts in the

---

[4] *See* NOAA, *2017-2026 North Atlantic Right Whale Unusual Mortality Event*, https://www.fisheries.noaa.gov/national/marine-life-distress/2017-2026-north-atlantic-right-whale-unusual-mortality-event, (last updated Jan. 5, 2026).
[5] NOAA, *North Atlantic Right Whale*, https://www.fisheries.noaa.gov/species/north-atlantic-right-whale (last updated Jan. 5, 2026).
[6] MBAF, *Seafood Watch New and Updated Ratings*, (Sept. 2022) https://www.seafoodwatch.org/globalassets/sfw/pdf/whats-new/2022/seafood-watch-whats-new-sep-2022.pdf.

field, and prior judicial decisions. In the U.S., these fixed gear fisheries are also designated as Category I or II Fisheries by NOAA on its MMPA List of Fisheries because they present risk of "frequently" or "occasionally" seriously injuring or killing right whales.[7]

Plaintiffs allege that nine statements (Statements) made by the Aquarium, about lobster caught with trap/pot gear in the Gulf of Maine and Georges Bank, are defamatory.[8] JA52. Statements about right whale entanglements, and the Aquarium's call to avoid eating certain seafood products they consider unsustainable,[9] were intended to create market pressure and encourage the government to improve their still insufficient regulations. Its audience will have to decide if boycotting lobster will save right whales. Regardless, CLF and other environmental advocates must be able to engage in this public debate (and others) without fear of retaliation or violations of their free speech.

Statements made about an entire industry, and scientific opinions expressly disclosed as such in the context of a political and regulatory firestorm, are not

---

[7] *Id.*; *see also* NOAA, *MMPA List of Fisheries for 2021*, (Jan. 14, 2021) https://www.fisheries.noaa.gov/action/mmpa-list-fisheries-2021.

[8] The Aquarium's recommendations started in 1999 and, as of December 2023, it had issued 681 assessments. MBAF, *Celebrating 25 Years of Seafood Watch*, (Jan. 30, 2024) https://www.seafoodwatch.org/stories/25-years-seafood-watch.

[9] Seafood Watch considers a fishery "sustainable" if it has "no more than a negligible impact on any threatened, endangered, or protected species." MBAF, *Standards for Fisheries*, https://www.seafoodwatch.org/recommendations/our-standards/standard-for-fisheries (last visited Jan. 15, 2026).

actionable by these five plaintiffs in a monolithic industry. Further, the Statements

are petitioning activities with ample factual and legal basis and thus protected by

Maine's anti-SLAPP statute. This Court should reverse the district court's

judgment with instructions to dismiss the complaint.

## STATEMENT OF THE CASE

Plaintiffs[10] filed suit in the U.S. District Court for the District of Maine on

March 14, 2023, alleging nine Statements[11] were defamatory and claiming the

---

[10] Plaintiffs are five industry members (Bean Maine Lobster, Inc., Maine Lobstermen's Association, Maine Coast Fishermen's Association, Inc., Maine Lobster and Processing, LLC, d/b/a Atwood Lobster, LLC, and Bug Catcher, Inc.) that represent a small part of a $1 billion dollar industry comprised of thousands of businesses and at least 5,600 individual harvesters in Maine alone. JA1873.

[11] Bean et al.'s allegations concern nine allegedly false defamatory statements in the Report or its related Press Release:
  a. "At this time, each fishery using this gear is putting this protected species [i.e., the right whale] at risk of extinction."
  b. "No one wants to know their appetite for seafood is driving a species to extinction."
  c. "The seafood [rated Avoid] is caught or farmed in ways that harm other marine life or the environment. There's a critical conservation concern or many issues need substantial improvement."
  d. "[M]anagement measures and the Atlantic Large Whale Take Reduction Plan have not been successful at reducing serious injury and mortality to the North Atlantic right whale[.]"
  e. "Based on the available information and the significant risks to NARW, the American lobster fishery cannot be considered sustainable."
  f. "The updated assessments highlight significant risks of entanglement in pot, trap, and gillnet fisheries to the endangered North Atlantic right whale and the lack of timely, effective management necessary to mitigate entanglement risks and promote recovery of the species."

7

Aquarium published verifiably false facts targeting them without supporting data and harming their businesses. JA42–46.

The district court denied the Aquarium's motion to dismiss on February 6, 2025, and this appeal follows. Issues on appeal include: (1) whether an exception to the group libel rule applies to defamation claims brought by this small group of plaintiffs; (2) whether the allegedly defamatory Statements made in the context of a public scientific debate are protected scientific opinions; and (3) whether Statements intended to raise awareness about the plight of right whales and improve regulations are "petitioning activity" with "reasonable factual or legal support" under Maine's anti-SLAPP statute (protects against Strategic Litigation Against Public Participation). JA1904–06.

ARGUMENT

## I.   The Statements are not defamatory.

Freedom of speech under the First Amendment and Maine law protects the right to freely and publicly express ideas and opinions. Speech only rises to

---

g.  That Seafood Watch reviewed "all available scientific data" and followed a "rigorous, transparent, science-based process to evaluate" the Maine lobster fishery.

h.  "According to Seafood Watch standards, when fisheries pose a high risk of harm to marine life or the environment and appropriate management measures are not in place, they are assigned a red rating."

i.  That consumers should "avoid" and "take a pass" on purchasing lobster and lobster products caught in the Gulf of Maine/Georges Bank region on the basis of these false statements.

defamation if it is (1) a false and defamatory statement pertaining to the plaintiff; (2) an unprivileged publication to a third party; (3) through fault amounting to at least negligence; and (4) if the statement is either defamatory per se or causes special harm. *Garrett v. Tandy Corp.*, 295 F.3d 94, 103 (1st Cir. 2002); *Morgan v. Kooistra*, 2008 ME 26, ¶ 29, 941 A.2d 447.

To be defamatory, statements must be false and "of and concerning" the plaintiffs. *Lester v. Powers*, 596 A.2d 65, 69 (Me. 1991). As a guiding principle, and as this Court recognizes, "[d]efamation of a large group gives rise to no civil action on the part of an individual member of the group unless he can show special application of the defamatory matter to himself." *Arcand v. Evening Call Pub. Co.*, 567 F.2d 1163, 1164 (1st Cir. 1977); *see also Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517, 530 (1st Cir. 2023).

### A. The Statements are not "of and concerning" the Plaintiffs.

Plaintiffs have not proven the allegedly defamatory Statements about the American lobster fishery "can reasonably be understood to refer to [plaintiffs], or [that]… the circumstances of publication reasonably give rise to the conclusion that there is particular reference to plaintiffs." *Conformis*, 58 F.4th at 530 (citing Restatement (Second) of Torts § 564A cmt. A (1997)). Nor could the Statements be "actually understood as referring to [these five]." *See Robinson v. Guy Gannett Pub. Co.*, 297 F. Supp. 722, 725–26 (D. Me. 1969) (finding when a statement does

9

not name plaintiff, it must show the statement was "actually understood as referring to him").

There are two exceptions to the group libel rule: (1) when the statement applies to all members of a small group; or (2) where there are circumstances making a particular reference to plaintiffs such that the audience would reasonably presume the statements about a large group apply to plaintiffs specifically. *Id.* at 1165 (finding statements aimed at one unidentified member of a group of 21 not defamatory to the entire group); *Conformis*, 58 F.4th at 530 (finding statements without reference to plaintiff does not give rise to a cause of action). Neither applies here.

As an initial matter, the Aquarium did not mention any of the five plaintiffs in its reports or in the media; it explained that inadequate data mostly precludes identifying a specific individual responsible for entanglements. Thus, Statements about the "American lobster fishery" (Statement (e)) or even the "Maine fishery" (Statement (f))—cannot be understood as actually referring to plaintiffs. The U.S. lobster *fishery* is vast, and it stretches from North Carolina to the Canadian border with thousands of participating industry members including harvesters, processors, crew members, restaurants, and dealers. JA60–61; JA21. The Maine lobster fishery alone has 5,600 harvesters. JA 18. In the U.S., the lobster industry is an economic driver for coastal communities from Long Island to the Canadian border, and no

10

one could actually understand the allegedly defamatory Statements refer to these particular plaintiffs.[12]

Plaintiffs do not make up all members of a small group entitling them to the first exception to the group libel rule. As discussed above there are thousands of participants in the U.S. lobster fishery, and the Aquarium did not limit its assessments to this one fishery. *See* Statement (a) ("each fishery using this gear"); Statement (f) ("updated assessments highlight significant risks of entanglement in pot, trap, and gillnet fisheries"). It simultaneously analyzed and red-rated 13 other trap/pot and gillnet fisheries in the U.S. and Canada on grounds their fisheries also pose unacceptable risk of injury and death to right whales.[13]

Finally, no one could reasonably presume based on the circumstances the allegations referred to these five plaintiffs, which would entitle them to the second exception to group libel rule. The Aquarium's reports were issued at the height of an international push by advocacy groups to force the U.S. and Canadian governments to do more to protect right whales throughout the northwest Atlantic.

---

[12] Global Seafoods, *Understanding the Economics of the Lobster Industry*, (Sep. 6, 2024) https://globalseafoods.com/blogs/news/economics-of-the-lobster-industry-market-insights; Imarc, *U.S. Lobster Market*, https://www.imarcgroup.com/united-states-lobster-market (last visited Jan. 15, 2026); Eric Thunberg, *Demographic and Economic Trends in the Northeastern United States Lobster Fishery*, NOAA (2007) https://repository.library.noaa.gov/view/noaa/5251.
[13] MBAF, *Seafood Watch New and Updated Ratings*., *supra* note 6.

11

A rash of right whale deaths in 2017 led to new litigation[14] and the initiation of new regulatory actions with implications for several fisheries. In 2021, NOAA issued an expansive rule seeking to reduce entanglement risk by 60% in the lobster fishery to meet its court-ordered deadline to comply with the ESA. 86 Fed. Reg. 51,970 (Sept. 17, 2021) ("2021 Rule"). Follow up actions were planned to further reduce risk—not only in the lobster fishery but also in the "other trap/pot, and gillnet fisheries." *Id.* at 51,982. Immediately after issuing the 2021 Rule, NOAA convened its Atlantic Large Whale Take Reduction Team again (comprised of industry members from fixed gear fisheries, scientists, and conservationists)[15] to develop additional management measures to meet still unsatisfied ESA and MMPA mandates. 50 C.F.R. §229.32; 86 Fed. Reg. at 51,971. And around the same time, the Massachusetts Department of Marine Fisheries was ordered by a federal court to obtain an ESA section 10 permit for its state waters lobster fishery. *Strahan v. Sec'y, Mass. Exec. Off. Energy & Env't Aff.*, 458 F.Supp.3d 76, 95 (D. Mass. 2020) (requiring MA Division of Marine Fisheries to obtain an incidental

---

[14] In 2018, CLF filed two lawsuits seeking to hold NOAA accountable for its legal obligations under the ESA. *See Conservation Law Found. v. Ross*, 422 F. Supp. 3d 12, 30–31 (D.D.C. 2019) (finding NOAA violated ESA when it failed to consult on an action allowing gillnet fishing in right whale foraging habitat); *Conservation Law Found. v. Ross*, No. 18-283, consolidated with *Ctr. for Biological Diversity v. Ross*, 613 F. Supp. 3d 336 (D.D.C. 2020) (finding NOAA violated ESA when it authorized lobster fishery without a valid incidental take statement).
[15] NOAA, *Atlantic Large Whale Take Reduction Team,* https://www.fisheries.noaa.gov/new-england-mid-atlantic/marine-mammal-protection/atlantic-large-whale-take-reduction-team (last updated Dec. 18, 2025).

take permit within 90 days to meet its ESA obligations). As part of the 2021 Rule, Massachusetts also expanded its seasonal state water closures spatially and temporally, to further reduce entanglement risk. *Id.* at 51,971.

Under the circumstances, massive state and federal undertakings were necessary, both to save right whales and for NOAA to comply with the law. Solutions to this problem were not aimed solely at the American lobster fishery— let alone specific individuals or fishing associations within Maine—they were focused on reducing risk where data demonstrated it existed in fixed gear fisheries throughout the U.S. and Canada. Potential exceptions to the group-libel rule do not apply here.

**B. Statements made in the context of a scientific debate are protected advocacy.**

1. The allegedly defamatory Statements are protected opinions.

The Aquarium's scientific findings that interpret the scientific and legal documents that the Statements rely upon are protected opinions. *See Piccone v. Bartels*, 785 F. 3d 766, 771 (1st Cir. 2015) (finding statements cannot be defamatory if "the speaker is expressing a subjective view."); *McKee v. Cosby*, 874 F.3d 54, 61 (1st Cir. 2017); *Pan Am Sys. v. Hardenbergh*, 871 F. Supp. 2d 6, 15 (D. Me. 2012) (dictating defamatory statement must be provable as false); *Lester*, 596 A.2d at 71, 71 n.9 (precluding "recovery for statements of opinion alone") (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, ---- (1990)); *ONY, Inc. v. Cornerstone*

13

*Therapeutics, Inc.*, 720 F.3d 490, 496 (2d Cir. 2013) (determining statements about scientific hypotheses are opinions under the First Amendment); *Pacira Biosciences, Inc., v. Am. Soc'y of Anesthesiologists, Inc.* 63 F.4th 240 (3rd Cir. 2023) (stating opinions based on stated facts or facts that parties know or assume to exist does not provide basis for relief); *Saad v. Am. Diabetes Ass'n*, 123 F. Supp. 3d 175, 179 (D. Mass 2015) (noting if speakers discloses the non-defamatory facts relied upon to form opinions, statements are not actionable).

The First Amendment generally does not protect speech consisting of statements that can be proven false, but it does protect speech that can be proven false if the speaker presents it as an opinion "rather than claiming to be in possession of objectively verifiable facts." *McKee*, 874 F.3d at 61 (citing *Riley v. Harr*, 292 F.3d 282, 289 (1st Cir. 2002)). Speech can easily be identified as protected opinion when the speaker first "outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions…" *Riley*, 292 F.3d at 289 (citation omitted).

At the lower court, plaintiffs failed to prove the allegedly defamatory Statements false. In its 73-page Report on the lobster fishery, the Aquarium cited numerous reliable sources as the factual basis for its conclusions. *Pan Am*, 871 F. Supp. 2d at 15 (finding a court must look at "the totality of the circumstances" in

14

analyzing "whether the statement was intended to state an objective fact or a personal observation"). In the over 100 references cited, the Aquarium relied on the history of regulations from NOAA, peer-reviewed scientific articles, entanglement reports from state and federal government agencies, ASMFC stock assessments and management plans, decisions by federal judges, and international guidelines on protecting endangered species. JA54, JA115–24.

2. <u>The allegedly defamatory Statements were made in the context of a scientific debate.</u>

The Statements reflect tentative scientific conclusions that the Aquarium discusses more comprehensively in its Report. JA52; *see ONY, Inc.*, 720 F.3d at 496 (finding scientific methods result in tentative conclusions subject to revision and discussion amongst the scientific community and "courts are ill-equipped to undertake to referee such controversies."); *see also Pacira*, 63 F.4th at 240 (stating "a scientific conclusion based on non-fraudulent data in an academic publication is not a 'fact' that can be proven false through litigation."); *Saad,* 123 F. Supp. 3d at 179 (determining statements that are part of scientific discourse are akin to opinions and not actionable for defamation). The debate centers the uncertainty around entanglements. The Aquarium acknowledges that uncertainty in its Report, including its analysis of the impact of the lobster fishery on right whales. JA52. It found NOAA's risk reduction in the 2021 Rule uncertain which contributed to its conclusions. *Id*. at JA100–101. The Aquarium acknowledged that most of the

15

entanglements cannot be attributed to a specific fishery (due to limited instances when gear is still attached to a dead whale for identification as well as insufficient gear markings), which led to its decision to list several U.S. and Canadian fixed gear fisheries because they all posed unacceptable risk. *Id.* at JA92. Thus, while the Aquarium may not have relied on plaintiffs' preferred sources, their advocacy is based on their reasonable interpretations of the decades of peer-reviewed science and any debate about the accuracy of this science is best resolved by scientists not courts.

Further, just because an advocate encounters differing or conflicting information does not make a statement defamatory merely because it does not rely on *all* the existing information, especially where the Aquarium had no reason to doubt the legitimacy of the resources it relied on. *But see Levesque v. Doocy*, 560 F.3d 82, 90 (1st Cir. 2009) (finding statements defamatory where speaker relied on obviously false sources). Nor did the Aquarium selectively omit information that could have proven their Statements false. *Lemelson v. Bloomberg L.P.*, 903 F.3d 19, 25 (1st Cir. 2018) (finding omissions of facts that could prove "probable falsity" defamatory, whereas omissions of facts that created a "balanced" or "fair account" were not defamatory) (citation omitted).

Here, the Aquarium urged consumers to avoid eating seafood caught by 14 different fixed gear fisheries, thus the limited data provided by plaintiffs asserting

16

the Maine fishery is not responsible because it is impossible to determine which fishery causes any given entanglement, JA24 FN15, goes to a different issue. And a self-serving issue—longstanding industry resistance to new gear marking regulations reduced the likelihood of achieving the very certainty plaintiffs now claim is lacking. *See e.g.,* 64 Fed. Reg. 7529, 7533 (Feb. 16, 1999) (eliminating proposed gear marking requirements because of industry resistance); 65 Fed. Reg. 80,368, 80,373–74 (Dec. 21, 2000) (same). Based on the totality of these circumstances, the Aquarium reasonably concluded that asking the public to avoid eating certain products would force the government to do more and that is exactly what their Statements convey.

Similarly, advocacy organizations, such as CLF, need to offer their opinions on complicated environmental problems so that collectively solutions can be found. CLF has spent years advocating for an alternative to traditional trap/pot and gillnet gear (when and where necessary) because it also determined that entanglements are an existential threat to right whales. Publicly sharing such opinions on matters of public concern is what the First Amendment protects and basing opinions on sound science, governmental policies, and prior court decisions makes them no less protected.

If this Court were to hold that scientific conclusions are not protected opinions, the results will not only chill public advocacy, but it will also threaten the

integrity of administrative rulemaking processes. Stakeholders will be discouraged from offering opinions on science related to controversial policies out of fear of being subject to a similar retaliatory action. Managers will rely on only the scientific opinions of those with the power or wealth to survive the burdens of litigation. The use of litigation to interfere with policy processes could go even further when a scientific opinion results in a cause of action that allows plaintiffs to seek discovery on administrative rulemaking decisions that would otherwise be unavailable by design. Administrative rulemakings rely on public comment to ensure that regulations reflect not just public opinion but all available information, including the best available science. This Court should not open the door to these collateral attacks.

**C. Broadening the Group Libel Doctrine will chill protected speech.**

As a regional, nonprofit organization, CLF speaks regularly on environmental issues that matter to our members. The organization has received threats of defamation suits and experienced chilling effects on members that might otherwise have served as standing witnesses but for fear of retaliation from industry groups or corporations.

CLF's advocacy is far reaching and often calls out environmental harm caused by industries and large corporations. Our Strategic Litigation program is often opposite powerful oil majors worth billions of dollars, including Shell and

ExxonMobil.[16] *See Conservation Law Found. v. Exxon Mobil Corp.*, 3 F.4th 61 (1st Cir. 2021); *see also Conservation Law Found. v. Shell Oil Products US*, No. 1:17-cv-00396-WES-LDA, (D. R.I. Aug. 28, 2017); *Conservation Law Found. v. Shell Oil Co.*, No. 3:21-cv-00933 (D. Conn. July 7, 2021). Our Clean Air and Water Program also faces powerful opponents, including Cooke Aquaculture, "a multibillion-dollar business with a dozen brands across" three continents.[17] *See Conservation Law Found. v. Cooke Aquaculture USA Inc.*, No. 1:25-cv-00013-KFW, (D. Me. Jan. 14, 2025). The impact of this SLAPP action for environmental advocacy groups cannot be overstated especially when an adverse rule could restrict the ability of all Americans to freely exercise their First Amendment rights when an industry with resources does not like what they have to say.

## II.    Maine's anti-SLAPP statute bars plaintiffs' defamation allegations.

The First Amendment protects the right to petition the government. U.S. Const. amend. I.; *Franchini v. Inv.s Bus. Daily, Inc.*, 981 F.3d 1, 7, 8 (1st Cir.

---

[16] ExxonMobil's 2024 revenue reached over $33 billion, and Shell's 2024 revenue reached nearly $300 billion. *ExxonMobil announces 2024 results*, (Jan. 31, 2025) https://corporate.exxonmobil.com/news/news-releases/2025/0131_exxonmobil-announces-2024-results; *Shell plc Annual Report and Accounts*, 241(Dec. 31, 2924) https://www.shell.com/investors/results-and-reporting/annual-report/_jcr_content/root/main/section/promo/links/item0.stream/1752580693041/6c20b8111738b9a590ba145f0d1c4fa0e530dae0/shell-annual-report-2024.pdf.
[17] *Cooke Family of Companies Newsletter*, Cooke, 4 (2021) https://www.cookescotland.com/wp-content/uploads/2021/02/Cooke-Newsletter-Winter-2021.pdf.

2020). Maine law offers additional protection under Me. Rev. Stat. Ann. Tit. 14 § 556 (the Statute).[18] The Statute seeks to protect advocates from the chilling effects of burdensome litigation. For a defamation claim related to public petitioning activities, defendants are entitled to an anti-SLAPP motion to dismiss, with "petitioning activities" defined to include statements "reasonably likely" to encourage the public to call for government consideration of an issue. 14 M.R.S. § 556. This definition is construed broadly and is not limited to matters already being considered. *Schelling v. Lindell*, 2008 ME 59, ¶ 13–14; *see also Franchini*, 981 F.3d at 9.

It is the moving party's burden to demonstrate its statements are protected petitioning activities. 14 M.R.S. § 556. If so, a court must dismiss the case unless: (1) the nonmoving party presents "some evidence" the moving party "acted without any reasonable factual support or arguable basis in law;" and (2) the nonmoving party can show "actual injury." *Id.*; *Cookson v. State*, 2011 ME 53, ¶ 8; *Thurlow v. Nelson*, 2021 ME 58 ¶ 27. The court analyzes that evidence in a light most favorable to the nonmoving party. *Thurlow*, 2021 ME 58 at ¶ 13.

---

[18] 14 M.R.S. § 556, in effect when plaintiffs sued in 2023, is prevailing law in this matter despite its repeal and replacement by Me. Rev. Stat. Ann. Tit.14 §§ 731–42 (applying to actions filed or asserted after January 1, 2025).

20

### A. The Statements are protected petitioning activities.

The plight of right whales and their entanglement in fishing gear is a "matter of public concern." *See Franchini*, 981 F.3d at 8 (citation omitted). As this Court previously recognized, right whales have been endangered under the ESA since 1970; humans "continue to threaten the survival of the species;" and it remains "one of the world's most endangered large whale species." *Dist. 4 Lodge*, 18 F.4th at 41. As the lower court recognized, there is an ongoing scientific and political debate that had only intensified after lawsuits in 2020 and 2022. *See* JA1778–79 (stating "impact of lobster fishing on the North Atlantic right whale has been the subject of considerable scientific, political, and legal activity in recent years"); *see also infra* pp. 12 FN14, 24–25 (discussion of lawsuits).

In asking consumers to use their buying power and avoid eating lobster products, JA57, JA107–108, the Aquarium was trying "to raise awareness of important ocean conservation issues and empower seafood consumers and businesses to make choices for healthy oceans." JA54. As a respected scientific institution that educates the public about sustainable seafood, its members and Seafood Watch website users are likely to heed their calls. The Aquarium intended to, and successfully managed to, attract government attention to endangered right whales by encouraging a boycott, and thus the Statements are protected petitioning activities.

21

**B. The Statements have substantial factual support and a strong basis in law.**

The Aquarium reviewed over one hundred credible scientific journal articles, regulations, and judicial decisions providing factual and legal support for its Statements.[19] JA115–24. By contrast, plaintiffs' evidence focused only on the uncertainty around entanglements and failed to prove the impossibility of a Maine gear entanglement (nor could it). *See* JA24 FN15. This Court has previously found the uncertainty argument unconvincing and should find the same here. *Dist. 4 Lodge*, 18 F.4th at 46–47 (stating "the lack of a specific case of entanglement attributable to a given area does not mean none have happened in that area or that there is no risk one will happen there in the future").

1. The Statements had ample factual support.

To support its opinion with facts, the Aquarium needed to show that entanglements in fixed fishing gear are impeding right whale recovery, and that right whales are likely to encounter such gear. It reviewed reliable sources including peer-reviewed scientific journal articles and government reports describing the impacts of lethal and sublethal entanglements on right whales (e.g., drowning, weakened and smaller animals, fewer calves, chronic disease) as well as

---

[19] Sources include court opinions finding the lobster fishery operated in violation of the ESA and MMPA, NOAA documents highlighting entanglement threats to right whales, decades of regulations, and stock assessments showing decline in individuals, reproductively viable females, and calves. JA115–24.

data demonstrating when and where right whales were most likely to encounter fixed gear fisheries. JA115–24. It did both.  JA90, JA100.

The factual basis for their red ratings is also supported by an extensive regulatory history. When the MMPA was enacted in 1972, it required "commercial fisheries to reduce the incidental mortality and serious injury of marine mammals to insignificant levels approaching a zero mortality and serious injury rate by April 30, 2001." 16 U.S.C. § 1387(b)(1). Because right whale (and other large whale) deaths in fixed gear fisheries were exceeding legally allowable levels, NOAA formed a Take Reduction Team and implemented its first Atlantic Large Whale Take Reduction Plan in 1997. 50 C.F.R. § 229. Since then, NOAA has implemented at least eleven major regulatory actions in the lobster and gillnet fisheries including the creation of several large Restricted Areas (seasonally closed to persistent buoy lines), a prohibition on the use of floating line between buoys at the surface (known to entangle whales feeding on the surface), a requirement to use sinking groundline on the seafloor (to prevent loops of rope rising up and entangling whales feeding on the bottom), and requirements to regularly attend gear and place more traps on a trawl to reduce the number of vertical lines in the water column.[20] The Aquarium published its Report just after NOAA's 2021 Rule

---

[20]Jennifer Goebel, *Status of Atlantic Large Whale Take Reduction Plan Modifications*, NOAA, slide 4 (Sept. 26, 2024) https://d23h0vhsm26o6d.cloudfront.net/NEFMC-September-2024-Meeting.pdf.

was issued. At that time the Potential Biological Removal (PBR)[21] for right whales was 0.7. 87 Fed. Reg. 11,590 (Mar. 2, 2022). In other words, an average of fewer than one whale a year or seven whales in a 10-year period could die for the species to recover. Even looking just at observed and definitively identified U.S. gear entanglements and those first seen in U.S. waters, the PBR has been exceeded every year since 2010, except for 2013. *Id.*

2.  The Statements have a strong basis in law.

The Aquarium's opinions are also bolstered by judicial decisions related to state and federal management of fixed gear fisheries. Nearly 30 years ago, CLF intervened in a judicial decision that found the Commonwealth of Massachusetts' permitting of gillnet and trap/pot fishing violated the ESA because it was likely to result in the unlawful take of right whales. *See Strahan v. Coxe*, 127 F.3d 155, 158 (1st Cir. 1997). In 2020, CLF and partners won a case challenging NOAA's ongoing authorization of the lobster fishery. *Ctr. for Biological Diversity v. Ross*, 613 F. Supp. 3d 336, 345–46 (D.D.C. 2020) (ruling NOAA's 2014 biological opinion violated the ESA because it failed to include an incidental take statement despite acknowledging lobster fishery would take three times the sustainable level of right whales). In 2022, the same court found NOAA's 2021 biological opinion

---

[21] PBR is "the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." 16 U.S.C. § 1362(20).

(court-ordered to cure its prior legal violations) violated both the ESA and MMPA. *Ctr. for Biological Diversity v. Raimondo*, 610 F. Supp. 3d 252, 273–76 (D.D.C. 2022), vacated No. 12-112, 2024 WL 324103 (D.D.C. Jan. 29, 2024) (NOAA failed to determine the lobster fishery would have a "negligible impact" on right whales as required by the MMPA before issuing a biological opinion as required by the ESA).[22] Only because Congress intervened—at the behest of the Maine delegation when passing the Consolidated Appropriations Act of 2023—is the fishery authorized today. JA240.

Just two months before the Report was published, this Court found in favor of NOAA and Conservation Group intervenors (including CLF) and against a lobster association challenge to the new Restricted Area implemented in the 2021 Rule off the Maine coast. *See Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo*, 40 F.4th 36, 42 (1st Cir. 2022) (stating it did "not doubt . . . that the loss of even one right whale caught in a thicket of trap lines in the LMA 1 Restricted Area would be irreversible").

Given these facts and the existing legal and regulatory framework under which the lobster fishery operates, the Aquarium was wholly justified in its opinion

---

[22] This case was vacated as moot over two years after the Report. *Ctr. for Biological Diversity v. Raimondo*, No. 18–112 (JEB), 2024 WL 324103 (D.D.C. Jan. 29, 2024).

that entanglements had not been sufficiently reduced, and the lobster fishery was not "sustainable" under its definition. [23]

3. <u>Plaintiffs did not show the Statements lacked reasonable factual support or an arguable basis in law at the district court.</u>

The district court erred in finding plaintiffs met the necessary standard of evidence to dismiss the Aquarium's anti-SLAPP defense, JA1864 (relying on *Cookson*, 2011 ME 53 at ¶ 8), because plaintiffs entire argument relies on a lack of evidence argument (if no one has evidence of Maine trap/pot gear entangling a right whale then the Statements lack factual support and a basis in law) that does not address the allegedly defamatory Statements. ECF No. 24 at 22 (Opp. MTD). Uncertainty about the origin of entanglements fails to address the Aquarium's position—that several fixed gear fisheries throughout the U.S. and Canada pose entanglement risk to right whales because they leave persistent buoy lines known to entangles whales in the water column, and those entanglements push the species toward extinction.

Northeast waters from Rhode Island to Maine have more than a million vertical lines in the water column. 86 Fed. Reg. at 51,976. Data also shows right

---

[23] *See supra* note 12, Gear used in the lobster fishery causes serious injuries and deaths to North Atlantic right whales, humpback whales and minke whales. *See* NOAA, MMPA List of Fisheries for 2021, *supra* note 8.

26

whale presence in waters where the lobster fishery operates[24] even during seasonal closures. Thus, there is still risk where fixed fishing gear and right whales co-occur, and in the Aquarium's opinion there is enough risk to warrant its red rating.

The data plaintiffs brought forward at the district court—showing recorded entanglements between 2000 and 2019 (of 114 entanglements only 25 could be identified as to country of origin)[25]—merely demonstrates the undisputed uncertainty associated with entanglements, not that Maine trap/pot gear does not cause entanglements. In 2024 (thanks to new gear marking requirements), NOAA determined that a 3-year-old female right whale found dead off the coast of Martha's Vineyard had spent half of her short life entangled in Maine lobster gear. JA1616–1618. It is incredibly difficult to determine culpability[26] given that entanglements are almost never witnessed, gear is not usually retrieved off dead or stranded whales, and effective gear marking requirements did not go fully into effect until late 2021. *Dist. 4 Lodge*, 18 F.4th at 46–47. According to plaintiffs' own sources at the time, nearly 80% of entanglements could not be attributed to a country, but at least one known entanglement was caused by U.S. lobster gear.

---

[24] H. Johnsom, D. Morrison & C. Taggart, *WhaleMap: A Tool to Collate and Display Whale Survey Results in Near Real-Time*, 6 J. Open Source Software, 3094, (June 9, 2021).

[25] Identifying a fishery of origin is even harder as only 1-2% of entanglements are tied to a fishery of origin. 86 Fed. Reg. at 51,976.

[26] Only 7.5% of right whale entanglements from 1980-2016 had attached gear and less than 1% had an identified entanglement site. *Dist. 4 Lodge*, 18 F.4th at 46.

JA24 FN15. Risk of entanglement exists—the crux of the Statements—and thus they are not "devoid of any factual support or any arguable basis in law." 14 M.R.S. § 556.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be reversed.

Respectfully submitted this 3rd day of February, 2026,

/s/ Erica A. Fuller
Erica A. Fuller
Conservation Law Foundation
62 Summer St.
Boston, MA 02110
(617) 850-1754
efuller@clf.org

Counsel for Amicus Curiae
Conservation Law Foundation

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(f), I hereby certify this brief complies with:

1. the type-volume limitations of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f), this brief contains 6,482 (of 6,500) words; and

2. the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century 14-point font.

Dated: February 3, 2026

*/s/ Erica A. Fuller*
Erica A. Fuller
*Counsel for Amicus Curiae*
*Conservation Law Foundation*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 3, 2026, I filed the foregoing document with the First Circuit Court of Appeals via the CM/ECF system, thereby causing the parties or their counsel of record registered as ECF filers to be served by the CM/ECF system.

Dated: February 3, 2026

*/s/ Erica A. Fuller*
Erica A. Fuller
*Counsel for Amicus Curiae*
*Conservation Law Foundation*

29