**Nos. 25-1206, 25-1772**

## IN THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

BEAN MAINE LOBSTER, INC.; MAINE LOBSTERMEN'S ASSOCIATION; MAINE COAST FISHERMEN'S ASSOCIATION, INC.; MAINE LOBSTER AND PROCESSING, LLC, d/b/a ATWOOD LOBSTER, LLC; BUG CATCHER, INC.,

*Plaintiffs-Appellees,*

v.

MONTEREY BAY AQUARIUM FOUNDATION,

*Defendant-Appellant.*

On Appeal from the United States District Court for the District of Maine, Case No. 23-cv-00129 (Hon. John A. Woodcock Jr.)

### BRIEF OF BRADY CENTER TO PREVENT GUN VIOLENCE, GUNS DOWN AMERICA, AND GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT-APPELLANT AND REVERSAL

Douglas N. Letter*
Shira Lauren Feldman*
Tess M. Fardon*
BRADY CENTER TO PREVENT
  GUN VIOLENCE
840 First Street NE, Suite 400
Washington, DC 20002
(202) 370-8100

William T. Clark*
Leigh Rome*
GIFFORDS LAW CENTER TO
  PREVENT GUN VIOLENCE
244 Madison Ave., Suite 147
New York, NY 10016
(415) 433-2062

*Of Counsel

Abby C. Wright
Sarah E. Harrington
Kristin M. Oakley
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
awright@cov.com

Nina M. Gayleard
COVINGTON & BURLING LLP
One International Place, Suite 1020
Boston, MA 02110

*Counsel for Amici Curiae*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici curiae* Brady Center to Prevent Gun Violence, Guns Down America, and Giffords Law Center to Prevent Gun Violence by and through the undersigned counsel, each state that they have no parent corporation and that no publicly held corporation has a 10% or greater ownership interest in them.

<u>/s/ Abby C. Wright</u>
Abby C. Wright
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF AUTHORITIES ...............................................................iv

IDENTITY AND INTEREST OF *AMICI CURIAE* ...............................1

INTRODUCTION AND SUMMARY OF ARGUMENT ..........................2

ARGUMENT .................................................................................5

I.  Advocacy speech on important public issues is protected by the First Amendment and critical in a democracy built on free expression and spirited debate. ...............................................5

    A.  Advocacy speech in the form of evaluations and ratings that seek to influence and educate the public and lawmakers is an important component of America's marketplace of ideas. ...........................................................6

        1.  *Amici*'s advocacy speech provides critical information and transparency about gun-violence prevention. ................................................................7

        2.  The importance of advocacy speech spans a wide range of issues and perspectives.................................14

    B.  Advocacy speech is subject to the most robust First Amendment protection.........................................................17

        1.  Advocacy speech on issues of public concern in the form of appraisal, evaluation, and critique educates the public and inspires action. .....................18

        2.  This vital speech must not be chilled. .........................20

II.  The district court's decision threatens to silence the advocacy speech of the Aquarium, *Amici,* and other organizations............21

A.    The district court's expansive application of the group defamation doctrine strips it of any meaning and runs headlong into the First Amendment. ....................................23

B.    The district court's holding forces two improper choices on advocacy organizations: say what they do not believe true or stay silent...................................................27

    1.    The district court erred in holding that plaintiffs plausibly alleged actual malice because the Aquarium did not share contrary sources. ..................27

    2.    An injunction like the one requested here would be an impermissible prior restraint on speech............32

CONCLUSION .................................................................................34

CERTIFICATE OF COMPLIANCE.......................................................35

CERTIFICATE OF SERVICE.............................................................36

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arcand v. Evening Call Publ'g Co.,*
567 F.2d 1163 (1st Cir. 1977) ...........................................................25

*Ashcroft v. Free Speech Coal.,*
535 U.S. 234 (2002)...........................................................................29

*Barr v. Matteo,*
360 U.S. 564 (1959)...........................................................................19

*Bose Corp. v. Consumers Union of U.S., Inc.,*
466 U.S. 485 (1984)...........................................................................28

*Bose Corp. v. Consumers Union of U.S., Inc.,*
692 F.2d 189 (1st Cir. 1982) .............................................................28

*Brandenburg v. Ohio,*
395 U.S. 444 (1969)..................................................................... 18, 30

*Carey v. Brown,*
447 U.S. 455 (1980)....................................................................... 6, 18

*Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley,*
454 U.S. 290 (1981).............................................................................5

*Conformis, Inc. v. Aetna, Inc.,*
58 F.4th 517 (1st Cir. 2023).............................................................23

*Counterman v. Colorado,*
600 U.S. 66 (2023).............................................................................20

*Emerito Estrada Rivera-Isuzu de P.R., Inc. v. Consumers Union of U.S., Inc.,*
233 F.3d 24 (1st Cir. 2000) ......................................................... 25, 26

*Eyal v. Helen Broad. Corp.*,
   583 N.E.2d 228 (Mass. 1991) .............................................................. 24

*Feldman v. United States*,
   322 U.S. 487 (1944) ............................................................................ 21

*Garrison v. Louisiana*,
   379 U.S. 64 (1964) .............................................................................. 18

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323 (1974) ............................................................................ 20

*Hudson v. Guy Gannett Broad. Co.*,
   521 A.2d 714 (Me. 1987) .............................................................. 23, 26

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*,
   515 U.S. 557 (1995) ...................................................................... 29, 30

*Konigsberg v. State Bar*,
   366 U.S. 36 (1961) ................................................................................ 6

*Levesque v. Doocy*,
   560 F.3d 82 (1st Cir. 2009) ................................................................ 28

*Miami Herald Publ'g Co. v. Tornillo*,
   418 U.S. 241 (1974) ............................................................................ 30

*Moody v. NetChoice, LLC*,
   603 U.S. 707 (2024) ............................................................................ 29

*Murphy v. Waterfront Comm'n of N.Y. Harbor*,
   378 U.S. 52 (1964) .............................................................................. 21

*N.Y. Times Co. v. Sullivan*,
   376 U.S. 254 (1964) ............................................................................ 17

*NAACP v. Claiborne Hardware Co.*,
   458 U.S. 886 (1982) ................................................. 6, 17, 19, 20, 26

*Rosenblatt v. Baer*,
   383 U.S. 75 (1966) .............................................................................. 26

v

*Sindi v. El-Moslimany*,
896 F.3d 1 (1st Cir. 2018) ........................................................... 29, 32

*Snyder v. Phelps*,
562 U.S. 443 (2011) .............................................................................. 18

*Terminiello v. City of Chicago*,
337 U.S. 1 (1949) ................................................................................. 21

*Thomas v. Collins*,
323 U.S. 516 (1945) ............................................................................. 19

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) ............................................................................. 30

*Whitney v. California*,
274 U.S. 357 (1927) ............................................................................. 29

## Federal Rules of Appellate Procedure

Fed. R. App. P. 29(a) ............................................................................. 1

## Restatements

*Restatement (Second) of Torts* § 564A (A.L.I. 1977) ........................ 23, 24

## Other Authorities

BBB, *Overview of Ratings* (archived Jan. 29, 2026),
https://perma.cc/BXE5-8KEC ............................................................ 14

Brady, *Annual Report for Fiscal Year 2025: Persistence and
Progress in Preventing Gun Violence* (2025),
https://perma.cc/QDL3-J8PV .................................................... 9, 12, 13

Brady, *Gun Store Transparency Project* (archived Jan. 29,
2026), https://perma.cc/4KAF-FT6G .................................................... 9

Brady, *Press Releases* (last visited Feb. 3, 2026),
http://www.bradyunited.org/press ..................................................... 33

vi

Business Must Act, *Gun Safety Scorecard* (Nov. 2024),
https://perma.cc/5ZZS-SAA2 ........................................................ 10, 11

Consumer Reports, *Our Mission* (archived Jan. 29, 2026),
https://perma.cc/Q32X-NAAP ............................................................ 15

Cradle to Cradle Prods. Innovation Inst., *The Institute*
(archived Feb. 3, 2026), https://perma.cc/6FNT-U4BD ....................... 15

Cradle to Cradle Prods. Innovation Inst., *The Standard*
(archived Jan. 29, 2026), https://perma.cc/5FV2-3PD2 ...................... 16

Edmond Cahn, *The Firstness of the First Amendment*, 65
Yale L.J. 464 (1956) ..................................................................... 18

Ethan Murray, *State Blueprints: Restoring Gun Industry
Accountability,* Giffords (2025), https://perma.cc/4WWS-
B9GW ........................................................................................ 11

1792 Exchange, *About* (archived Jan. 29, 2026),
https://perma.cc/BGN9-Z3GJ ............................................................ 16

1792 Exchange, *Grading Criteria* (archived Jan. 29, 2026),
https://perma.cc/6SJ4-SXAT ............................................................. 16

Geoffrey R. Stone, *Group Defamation*, 15 U. Chi. L.
Occasional Papers 1 (1978) ............................................................. 31

Giffords, *15 Years of Lifesaving Progress* (Jan. 8, 2026),
https://perma.cc/R5DR-2XKP ....................................................... 13, 14

Giffords, *Annual Gun Law Scorecard* (2025),
https://perma.cc/UQQ2-8MH7 .......................................................... 12

Giffords, *The Gun Industry Abused Gun Owner Data to Elect
Trump* (Feb. 5, 2025), https://perma.cc/7DYM-LZ59 ........................ 12

Giffords, *Gun Industry Accountability* (archived Jan. 29,
2026), https://perma.cc/FJ8Q-7V96 .................................................. 11

Giffords, *The Latest* (last visited Feb. 3, 2026),
https://giffords.org/news/press/ ........................................................ 33

Guns Down America, *Our Work* (archived Jan. 29, 2026),
 https://perma.cc/RA4M-ZLAF ............................................................. 13

Guns Down America, *Press* (last visited Feb. 3, 2026),
 http://www.gunsdownamerica.org/press; ........................................... 33

NRA Political Victory Fund, *Grades and Endorsements:
 What the Grades Mean* (archived Feb. 3, 2026),
 https://perma.cc/PS5N-PCKE ............................................................. 17

Red Blue & Brady: *"Your Man Card Reissued": The Truth
 About Masculinity and Gun Violence* (Brady United, Jan.
 27, 2023),
 https://www.bradyunited.org/resources/podcast/man-card-
 masculinity-gun-violence ..................................................................... 8

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are national gun violence prevention organizations that have filed numerous amicus briefs in cases that implicate their gun violence prevention efforts.

Brady Center to Prevent Gun Violence ("Brady") is the nation's most longstanding non-partisan, non-profit organization dedicated to reducing gun violence through education, research, legal advocacy, and political action.

Guns Down America is a national campaign to take back public life from the gun violence epidemic. Guns Down America uses research and communications to identify and execute novel solutions and bring to light gun industry operations in America.

Giffords Law Center to Prevent Gun Violence ("Giffords") is a survivor-led, non-profit, national policy organization dedicated to researching, writing, enacting, and defending laws and programs proven to reduce gun violence and save lives.

*Amici* engage in constitutionally protected advocacy speech

---

[1] No party's counsel authored this brief in whole or part and, apart from *amici,* no person contributed money to fund its preparation or submission. All parties consent to this brief's submission. *See* Fed. R. App. P. 29(a).

1

designed to educate on matters of public concern and inspire people to action. *Amici* submit this brief because that speech may well be chilled and silenced if this Court affirms the district court's decision and permits this defamation suit—brought on behalf of an entire industry—to proceed.

## INTRODUCTION AND SUMMARY OF ARGUMENT

If allowed to stand, the district court's decision would chill and undermine the ability of organizations like *Amici* to appraise industry-wide practices and advocate for common-sense reforms.

The Monterey Bay Aquarium Foundation ("Aquarium") runs the Seafood Watch program, through which it evaluates the environmental sustainability of wild-caught and farmed seafood to inform consumers and businesses about which seafood options best protect the environmental health of our oceans. JA54.

In a 2022 Seafood Watch report, the Aquarium advised consumers to avoid "American Lobster," a species of lobster found on the continental shelf of northeastern North America. JA59. Representatives of the Maine Lobster industry—a subset of those who fish "American Lobster"—sued the Aquarium for defamation. JA1767–68. In denying the Aquarium's

2

motion to dismiss, the district court held that plaintiffs plausibly alleged that the Aquarium specifically defamed "each and every" one of the more than 5,000 Maine lobstermen. JA1869–78. The district court also held that plaintiffs plausibly alleged that the Aquarium acted with actual malice by not including industry-provided data in its statements. JA1889–95.

The district court's decision threatens to chill and foreclose *Amici*'s First Amendment protected speech. *Amici* engage in valuable advocacy speech on gun violence prevention by, for example, rating and evaluating gun industry practices, businesses' gun violence prevention efforts, and state legislatures' responses to gun violence. *Amici*'s speech is designed to educate the public and stakeholders, to inspire the public (both as voters and as consumers) to act to prevent gun violence, and to press for legislative and cultural changes. And whether educating Americans about sustainable fishing practices, gun violence prevention, or public corporations' adoption of programs targeting climate change, organizations that engage in advocacy speech on important public issues across political lines are a vital part of our system of free expression.

3

When organizations like *Amici* appraise industry practices, provide guidance to the public, and call the public to action, they exercise established First Amendment rights to engage in advocacy speech. Advocacy speech enables the public to make informed decisions about what they buy, whom they support, and what kind of law and policies should govern their country. Adopted in the wake of a revolution from monarchy, the First Amendment seeks to prevent vested interests—whether a king exercising sovereign authority or a king of industry exercising the power of a defamation suit—from oppressing opposing views. Allowing a defamation suit brought by an entire industry to target core advocacy speech encourages industry representatives to sue critics to silence them. This in turn raises the cost of engaging in these core speech activities and threatens to chill or even silence such speech, in clear violation of the First Amendment.

Two facets of the district court's decision are particularly troubling to *Amici*. *First,* although the First Amendment does not categorically prohibit group defamation claims, the common law has long imposed meaningful limits, and when a court ignores those limits, the First Amendment must function as a crucial backstop. If, as the district court

4

held, general statements about industry practices can support a defamation claim for *every single member* of that industry, JA1875, the law intolerably extends liability without limits and seriously menaces constitutionally protected advocacy speech.

*Second*, the district court misapplied the First Amendment's actual malice standard in holding that to avoid defamation liability, those engaged in advocacy speech must cite sources on both sides of a dispute. Compelling an advocate to provide both sides of an argument, including by citing industry material purporting to rebut the advocate's considered and evidence-based view, violates the First Amendment in two ways. First, it threatens protected speech and second, it compels additional speech. And where, as here, plaintiffs request a permanent injunction barring disfavored speech, speakers are effectively left with an intolerable choice: be a mouthpiece for others or stay silent.

The district court's order should be reversed.

## ARGUMENT

**I.    Advocacy speech on important public issues is protected by the First Amendment and critical in a democracy built on free expression and spirited debate.**

The advocacy speech of organizations like *Amici* and the Aquarium forms part of "the clash of different views and conflicting ideas" central

to the functioning of our democracy. *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 295 (1981); *see also Konigsberg v. State Bar*, 366 U.S. 36, 66 (1961) (Black, J., dissenting) (explaining that the First Amendment protects speech "wholly related … to conflicting ideas about governmental affairs and policies"). Advocacy speech may cover a wide range of issues and offer a wide range of perspectives, and it promotes healthy debate and civic action. Reflecting these core values, such "expression on public issues 'has always rested on the highest rung of the hierarchy of First Amendment values.'" *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (quoting *Carey v. Brown*, 447 U.S. 455, 467 (1980)).

**A.  Advocacy speech in the form of evaluations and ratings that seek to influence and educate the public and lawmakers is an important component of America's marketplace of ideas.**

Organizations across the political spectrum engage in protected advocacy speech that is intended to educate Americans about matters of public importance, persuade legislators to adopt reforms, and hold industries accountable for their practices. Such speech does not lose its protected character when it takes the forms of evaluations and ratings intended to inform the public and/or lawmakers about practices

6

employed by particular industries or businesses. But the district court's order imposes serious costs and an impermissible chill on that protected speech.

### 1. *Amici*'s advocacy speech provides critical information and transparency about gun-violence prevention.

*Amici* organizations are dedicated to preventing gun violence and holding irresponsible actors in the gun industry accountable for their misconduct. They do so particularly through public advocacy, including advocacy aimed at changing laws. One such form of advocacy involves formulating and publicizing ratings and evaluations of gun retailers, other gun industry members, and politicians. *Amici* develop such evaluations based on a careful analysis and then use the evaluations as tools to promote transparency, public awareness, and debate about the degree to which various actors are aligned with *Amici*'s values. By providing a shorthand that is easy to digest, ratings and evaluations effectively and efficiently communicate to the public the extent to which complex industries, legislatures, and businesses contribute to or detract from the goal of stopping gun violence.

7

*Amicus* Brady engages on thorny topics with the purpose of educating and changing people's minds—advocacy at its core. Brady has frequently criticized the gun industry directly, including by condemning fraudulent and extremely dangerous marketing practices that mislead consumers into believing guns are safe when they are not, or that otherwise promote gun sales in harmful ways (such as to children and troubled teens). *See, e.g.*, Red Blue & Brady: *"Your Man Card Reissued": The Truth About Masculinity and Gun Violence* (Brady United, Jan. 27, 2023), www.bradyunited.org/resources/podcast/man-card-masculinity-gun-violence (criticizing practice of marketing that targets vulnerable teenage boys by invoking highly biased views of masculinity).

Brady also speaks to the public through the courts—through lawsuits, administrative filings, and amicus briefs—to increase awareness about legal issues impacting gun violence prevention. In addition, Brady advocates to state and federal legislators and other government actors such as law enforcement agencies to encourage them to take action to ensure that firearm sellers, distributors, and manufacturers adopt safe business practices.

Other Brady efforts include a grassroots advocacy campaign in 2025, that placed more than twenty-five Letters to the Editor and Op-eds about various gun-violence prevention topics in local and national publications with a combined monthly viewership of over 200 million; the End Family Fire campaign, which reached 60 million gun owners through public service announcements geared toward increasing safe gun storage; and work with executives in Hollywood to advise on responsibly depicting firearms in film and television. Brady, *Annual Report for Fiscal Year 2025: Persistence and Progress in Preventing Gun Violence* 15, 17, 18 (2025), https://perma.cc/QDL3-J8PV.

By publishing gun dealer inspection reports issued by the Federal Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"), Brady also created and maintains the Gun Store Transparency Project, through which it informs the public of instances in which federal firearms licensees ("FFLs") do not comply with relevant public safety laws. Brady, *Gun Store Transparency Project* (archived Jan. 29, 2026), https://perma.cc/4KAF-FT6G.

As part of this Project, Brady collects federal inspection reports of gun businesses through federal Freedom of Information Act requests and

then collates them into a searchable map that shows the levels of compliance with federal firearms laws of thousands of FFLs nationwide. For each gun business, Brady summarizes key takeaways from the inspection report, any violations the report reflects, the adverse administrative action taken by ATF in response to those violations, and how any cited violations impact public safety. In doing so, Brady provides critical information to the public about gun industry business practices and how ATF is enforcing our public safety laws with respect to the firearms industry.

*Amicus* Guns Down America endeavors to make communities safer by promoting corporate accountability and novel research-backed policy approaches to gun-violence prevention. One line of effort involves educating the public about the role that particular companies play in contributing to gun violence. The "Business Must Act" campaign seeks to promote corporate responsibility by assigning companies a grade from A+ to F to reflect "which businesses are doing their part to reduce gun violence and which ones are failing to act," based on "a mix of in-store policies, corporate action, and political and lobbying donations." Business

Must Act, *Gun Safety Scorecard* (Nov. 2024), https://perma.cc/5ZZS-SAA2.

Guns Down America also recommends that people avoid shopping at businesses with low grades because it believes that "consumers have unique leverage to push the businesses they patronize to live up to their stated corporate values and give back to the communities they serve." *Id.* Through these ratings, Guns Down America calls the public to act through boycotts and petitions.

*Amicus* Giffords advocates for effective oversight of the gun industry and directly addresses the gun lobby's power in legislatures across the country. Championing gun industry accountability is a cornerstone of Giffords's advocacy work. *See, e.g.*, Giffords, *Gun Industry Accountability* (archived Jan. 29, 2026), https://perma.cc/FJ8Q-7V96. As part of this work, Giffords publishes reports advocating for accountability for the gun industry. These reports highlight how the gun industry has pushed for weakening gun violence prevention laws and call upon states to pass laws to bring oversight back to the gun industry. *See* Ethan Murray, *State Blueprints: Restoring Gun Industry Accountability,* Giffords (2025), https://perma.cc/4WWS-B9GW. Critiques of

11

irresponsible gun industry actors are a core part of Giffords's work. *See, e.g.*, Giffords, *The Gun Industry Abused Gun Owner Data to Elect Trump* (Feb. 5, 2025), https://perma.cc/7DYM-LZ59.

Additionally, just as the Aquarium runs the "Seafood Watch" program, Giffords publishes an Annual Gun Law Scorecard that assigns each State a grade from A to F based on how effective they are at reducing gun violence. Giffords, *Annual Gun Law Scorecard* (2025), https://perma.cc/UQQ2-8MH7. Through this effort, Giffords promotes transparency by explaining to the public its view that States with failing grades are "not … working to save lives" and are instead "actively making their residents less safe." *Id.*

Importantly, *Amici*'s advocacy *works*. In 2025 alone, Brady's advocacy inspired its supporters to make 55,000 calls and emails to officials regarding the federal government's actions on guns, showing that the public responds when Brady calls for action. Brady, *Annual Report for FY2025, supra,* at 5. On the state level, Brady's efforts resulted in legislatures passing nearly fifty of its priority bills, twenty-seven of which were signed into law. *Id.* at 7. On an economic level, Brady's work with law enforcement agencies to encourage them to transact only with

12

gun industry actors that employ safe practices when purchasing firearms through procurement could impact up to $5 billion a year in gun sales. *Id.* at 9.

Guns Down America's advocacy has inspired thousands of consumers to demand that companies change which guns they sell, reconsider their open-carry policies, and cease contributions to lawmakers funded by the National Rifle Association ("NRA"). Guns Down America, *Our Work* (archived Jan. 29, 2026), https://perma.cc/RA4M-ZLAF. One specific campaign, for example, urged consumers to petition and email a particular business to encourage it to leave the NRA's Business Alliance, which offers discounts to NRA members. *Id.* Nearly 500,000 consumers participated, and the company pulled out of the alliance. *Id.* Guns Down America's efforts also led a major restaurant chain to ban open-carry of guns in its restaurants. *Id.*

Giffords's advocacy efforts have contributed to the passage of more than 820 new state gun laws in the fifteen years since its founding, as well as the first new federal gun law in almost 30 years—the Bipartisan Safer Communities Act. Giffords, *15 Years of Lifesaving Progress* (Jan. 8, 2026), https://perma.cc/R5DR-2XKP. These state laws include enhanced

13

background check requirements, extreme risk protection orders, industry responsibility laws, and funding for community violence intervention. *Id.* Giffords also tracks its impact through its Annual Gun Law Scorecard. *Id.* In 2012, only three States received A or A- grades; in 2025, thirteen did. *Id.*

### 2. The importance of advocacy speech spans a wide range of issues and perspectives.

There are many types of organizations from across the political spectrum that, like the Aquarium and *Amici*, speak with the purpose of advocating change aligned with their missions and educating the public about the values they espouse—including by publicizing ratings and evaluations of products, businesses, or entire industries with the purpose of influencing and informing voters, consumers, and lawmakers.

For example, the Better Business Bureau ("BBB") and Consumer Reports rate products and businesses in order to educate and influence consumers. The BBB rates companies from A+ to F based on its "opinion of how the business is likely to interact with its customers." BBB, *Overview of Ratings* (archived Jan. 29, 2026), https://perma.cc/BXE5-8KEC.

Consumer Reports "empowers and informs consumers, incentivizes corporations to act responsibly, and helps policymakers prioritize the rights and interests of consumers in order to shape a truly consumer-driven marketplace" by rating consumer products on various factors including safety and performance. Consumer Reports, *Our Mission* (archived Jan. 29, 2026), https://perma.cc/Q32X-NAAP.

Both organizations identify specific products and businesses in their consumer ratings. And, as with the speech of the Aquarium at issue here, consumer-rating speech has an economic impact on rated businesses. In formulating ratings, such organizations analyze and rely on the factors they deem relevant without compulsion to include industry speech with which they disagree.

Other organizations such as Cradle to Cradle and the 1792 Exchange review companies and industries to influence consumer decisions in line with an underlying political perspective—perspectives that may be on either end of the political spectrum.

Cradle to Cradle certifies companies to advocate a "shift to a circular economy, by setting the global standard for materials, products and systems that positively impact people and the planet." Cradle to

Cradle Prods. Innovation Inst., *The Institute* (archived Feb. 3, 2026), https://perma.cc/6FNT-U4BD. These certifications are based on how safe materials are, whether a product is designed for reuse, the environmental impact of the manufacturing process, water and soil stewardship, and the company's commitment to social fairness. Cradle to Cradle Prods. Innovation Inst., *The Standard* (archived Jan. 29, 2026), https://perma.cc/5FV2-3PD2.

The 1792 Exchange seeks to "develop policy and resources to protect and equip non-profits, small businesses and philanthropy from 'woke' corporations, to educate Congress and stakeholder organizations about the dangers of ESG (environmental, social, and governance) policies, and to help steer public companies in the United States back to neutral on ideological issues." 1792 Exchange, *About* (archived Jan. 29, 2026), https://perma.cc/BGN9-Z3GJ. The 1792 Exchange identifies specific companies and rates them as "[l]ower," "[m]edium," or "[h]igh" risk on a scale from "generally respect[s] or allow[s] differing viewpoints" to "pose[s] a high risk of canceling people and businesses who do not share their views." 1792 Exchange, *Grading Criteria* (archived Jan. 29, 2026), https://perma.cc/6SJ4-SXAT.

16

These organizations and others like them engage in advocacy in the form of ratings, sharing their views about what values a business should project and influencing the economic choices of consumers who choose to model their behavior on the organizations' recommendations.

And on the other side from *Amici* on many gun policy debates, the NRA grades candidates, irrespective of party affiliation, based on their views on the Second Amendment. On the NRA's scale, an F means that someone is a "[t]rue enemy of gun owners' rights." NRA Political Victory Fund, *Grades and Endorsements: What the Grades Mean* (archived Feb. 3, 2026), https://perma.cc/PS5N-PCKE. Like the Aquarium's "avoid" rating, such ratings communicate quickly and easily to the public how a candidate for office aligns with the NRA's views on the Second Amendment and may influence the votes and contributions of certain voters.

### B.    Advocacy speech is subject to the most robust First Amendment protection.

Because "debate on public issues should be uninhibited, robust, and wide-open," *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269–70 (1964), "expression on public issues 'has always rested on the highest rung of the hierarchy of First Amendment values,'" *Claiborne Hardware Co.*, 458

17

U.S. at 913 (quoting *Carey*, 447 U.S. at 467). "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964)). Applying these principles, the Supreme Court has struck down laws that "purport[ ] to punish mere advocacy." *Brandenburg v. Ohio*, 395 U.S. 444, 449 (1969).

The speech of the Aquarium, *Amici,* and other organizations educates individuals and inspires the public to action and discussion. That such speech takes the form of evaluations and ratings of industries, government bodies, or businesses does not diminish its First Amendment value nor lessen the constitutional protection it is due.

### 1. Advocacy speech on issues of public concern in the form of appraisal, evaluation, and critique educates the public and inspires action.

"Relying as it does on the consent of the governed, representative government cannot succeed unless the community receives enough information to grasp public issues and make sensible decisions." Edmond Cahn, *The Firstness of the First Amendment*, 65 Yale L.J. 464, 480 (1956). And "'[f]ree trade in ideas' means free trade in the opportunity to

persuade to action, not merely to describe facts." *Thomas v. Collins*, 323 U.S. 516, 537 (1945).

Advocacy organizations like *Amici* play a critical role in providing the public with enough information to grasp public issues and make informed decisions, an important role in our democratic system, because "[t]he effective functioning of a free government like ours depends largely on the force of an informed public opinion." *Barr v. Matteo*, 360 U.S. 564, 577 (1959) (Black, J., concurring). Ratings from trusted advocacy organizations like *Amici* are designed to educate and persuade voters and consumers by providing in an accessible format the results of the organizations' careful analysis of data relating to matters of public importance.

Organizations like *Amici* also spur the public to action when consumers or voters choose to consider *Amici*'s ratings and evaluations of products, policies, industries, or businesses. *Amici*'s calls to action "involve speech in its most direct form," which "does not lose its protected character … simply because it may embarrass others or coerce them into action." *Claiborne Hardware Co.*, 458 U.S. at 909–10. No matter the form

19

or content of *Amici*'s appeals to action, as long as they "do not incite lawless action, they must be regarded as protected speech." *Id.* at 928.

### 2. This vital speech must not be chilled.

"Prohibitions on speech have the potential to chill, or deter, speech outside their boundaries" where a speaker may "be concerned about the expense of becoming entangled in the legal system." *Counterman v. Colorado*, 600 U.S. 66, 75 (2023). When advocacy groups face monetary penalties from successful defamation suits or even litigation costs from defending unsuccessful suits, "[t]he result is 'self-censorship' of speech that could not be proscribed—a 'cautious and restrictive exercise' of First Amendment freedoms." *Id.* (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974)).

Advocacy speech of organizations like *Amici* and the Aquarium is a key component of the exchange of ideas and meaningfully advances society's understanding of important issues like gun-violence prevention and environmental concerns. This Court should act to protect the speech of advocacy organizations by making clear that defamation suits like the one here should be dismissed at the earliest available opportunity.

20

The need to protect advocacy speech from chilling is no less important when the speech invokes debate on controversial topics or may offend the hearer or subject of the speech. The First Amendment "reflects the faith that a good society is not static but advancing, and that the fullest possible interchange of ideas and beliefs is essential to attainment of this goal." *Feldman v. United States*, 322 U.S. 487, 501 (1944) (Black, J., dissenting), *majority decision overruled by Murphy v. Waterfront Comm'n of N.Y. Harbor*, 378 U.S. 52 (1964). One consequence of that fullest possible interchange is "to invite dispute." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949). But speech that invites dispute is vital in our system of democratic government and should be protected because "[t]he proponents of the First Amendment … were determined that every American should possess an unrestrained freedom to express his views, however odious they might be to vested interests whose power they might challenge." *Feldman*, 322 U.S. at 501 (Black, J., dissenting).

II. **The district court's decision threatens to silence the advocacy speech of the Aquarium, *Amici*, and other organizations.**

Two errors in the district court's decision are of particular concern to *Amici*.

21

*First*, the district court undermined the ordinary speech-protective rule that no action for defamation is available for statements about a large group by construing an exception so expansively that every member of an entire industry may now have a defamation claim based on public advocacy. JA1875. But the elements of defamation under Maine tort law, the established common law exceptions to the bar on group defamation, and the First Amendment all caution against allowing thousands of people in a group to sue for defamation based on a generalized critique of industry practices.

*Second*, the district court erred in determining both that plaintiffs plausibly alleged that the Aquarium acted with actual malice by not including contradictory industry sources in its speech, JA1891, and that the requested injunction would not be an impermissible prior restraint, JA1899. In doing so, the district court put the Aquarium in a position of choosing between engaging in speech it disagrees with or engaging in no speech at all.

**A.** **The district court's expansive application of the group defamation doctrine strips it of any meaning and runs headlong into the First Amendment.**

Although the district court pointed to no case where 5,000 individuals were defamed by one statement, and acknowledged that group defamation claims "usually have involved numbers of 25 or fewer," JA1871–72 (quoting *Restatement (Second) of Torts* § 564A cmt. b (A.L.I. 1977)), it proceeded to hold that plaintiffs could state a defamation claim based on a generalized evaluation of industry-wide practices. But that holding vitiates the "general rule" that "no action lies for the publication of defamatory words concerning a large group or class of persons." *Restatement (Second) of Torts* § 564A cmt. a (A.L.I. 1977). Defamation suits may proceed only with respect to statements that are "of and concerning" an individual plaintiff. *See Hudson v. Guy Gannett Broad. Co.*, 521 A.2d 714, 718 (Me. 1987).

Further, although a suit might proceed where an individual is not singled out, that is true only where "'the group or class is so small that the matter can reasonably be understood to refer to the member, or … the circumstances of publication reasonably give rise to the conclusion that there is particular reference to the member.'" *Conformis, Inc. v.*

23

*Aetna, Inc.*, 58 F.4th 517, 530 (1st Cir. 2023) (quoting *Eyal v. Helen Broad. Corp.*, 583 N.E.2d 228, 230 n.6 (Mass. 1991)). Such circumstances include those "that are known to the readers or hearers and which give the words such a personal application to the individual that he may be defamed as effectively as if he alone were named." *Restatement (Second) of Torts* § 564A cmt. d (describing circumstances-of-publication exception).

The district court concluded that the Aquarium's generalized rating of the sustainability of industry-wide practices gave rise to a cause of action for defamation by every one of the thousands of lobstermen in Maine because each of them uses the harvesting techniques the Aquarium criticized. JA1875. The district court purported to rely on the circumstances-of-publication exception, which allows a member of a group to state a claim for defamation based on a statement about the group when circumstances reasonably suggest that the statement is about the individual member in particular. That exception has no application here and, as understood by the district court, would eviscerate the general rule disallowing claims based on group defamation.

24

The fact that each member of a group shares a characteristic or engages in a behavior that is criticized in a statement about the group does not mean that the group-based statement was in fact about each individual member. But that is exactly what the district court held. JA1875.

The proper query is not whether "each and every member" of a group fits the asserted characteristics of the group, as the district court stated. JA1875–78. The correct question is whether a plaintiff can show "special application of the defamatory matter to himself." *Arcand v. Evening Call Publ'g Co.*, 567 F.2d 1163, 1164 (1st Cir. 1977). Here, none of the plaintiffs, organizational or individual, can show special application of the allegedly defamatory matter to themselves. And the district court's holding to the contrary suggests that "an almost unlimited number of plaintiffs could potentially be injured by defamation" of their employer or industry. *Emerito Estrada Rivera-Isuzu de P.R., Inc. v. Consumers Union of U.S., Inc.*, 233 F.3d 24, 29 (1st Cir. 2000).

The district court compounded its error by holding that every lobsterman that alleges economic harm resulting from the Aquarium's speech can establish that the group-based statements were really about

25

him. JA1877. But just because a person might feel the economic impact of a statement does not mean the statement is about her specifically. Adopting the district court's approach of using economic harm as a proxy for targeted defamation would penalize and chill attempts to "bring about political, social, and economic change" by speaking—a core First Amendment right. *Claiborne Hardware Co.*, 458 U.S. at 911. Indeed, the district court based its holding on the fact that the Aquarium's "call for a boycott was effective." JA1877. But boycotts are protected speech, regardless of whether they are effective.

Reflecting these First Amendment concerns, the Maine Supreme Court has explained that defamation law's requirement that a statement be "of and concerning" the plaintiff has a constitutional dimension "[a]t least in public figure defamation cases the first amendment to the United States Constitution also requires that a publication, to be actionable, must be 'of and concerning' the plaintiff." *Hudson*, 521 A.2d at 717 n.5. And this Court has observed that the "of and concerning" requirement is a constitutionally required element of a defamation cause of action in cases involving "generalized criticism," like this one. *Emerito Estrada Rivera-Isuzu de P.R.*, 233 F.3d at 28 (citing *Rosenblatt v. Baer*, 383 U.S. 75,

26

82 (1966)). The district court's expansive application of the "of and con-cerning" requirement in this case therefore runs afoul of both the common law *and* the First Amendment.

The far-reaching implications of the district court's holding on group defamation should not be ignored. To accept it is to threaten an entire class of critically important advocacy speech. As explained, *Amici*'s speech often takes the form of ratings and evaluations that lodge "gener-alized criticism" at industries. By taking aim at that speech, the district court's decision, if allowed to stand, could effectively silence a substantial amount of speech by advocacy organizations. If *Amici* may be held liable for defamation to *each and every* member of the gun industry for its rat-ings and evaluations, then their free expression on gun violence prevention would be intolerably impaired.

**B.    The district court's holding forces two improper choices on advocacy organizations: say what they do not believe true or stay silent.**

**1.    The district court erred in holding that plaintiffs plausibly alleged actual malice because the Aquarium did not share contrary sources.**

The district court erred in concluding that plaintiffs plausibly alleged that the Aquarium acted with actual malice, that is, "with actual knowledge of the falsity or with reckless disregard for the truth,"

27

*Levesque v. Doocy*, 560 F.3d 82, 90 (1st Cir. 2009), by choosing to rely on scientific data while disregarding contradictory industry-provided information. JA1891–95. The court held that the Aquarium could have avoided potential liability by "incorporat[ing] the contradictory evidence into its statement or, at minimum, address[ing] its existence, rather than simply 'discounting' it as inherently 'highly biased.'" JA1895.[2]

Accordingly, under the district court's view, to avoid a viable claim of actual malice in a circumstance where an advocacy organization wishes to convey its evaluation of available information—which could include scientific studies and other complex analyses—it must disclose even information it has deemed unpersuasive, unreliable, or just simply inaccurate. That holding is wrong under the law of actual malice, which concerns a speaker's state of mind and does not require a speaker to fully air every side of a debate when offering a view. *See, e.g.*, *Bose Corp. v. Consumers Union of U.S., Inc.*, 692 F.2d 189, 196–97 (1st Cir. 1982), *aff'd*,

---

[2] The district court launched similar criticisms in rejecting the Aquarium's argument that its statements were opinions, not facts. *See* JA1884. That conclusion poses the same practical problems and constitutional concerns discussed here.

466 U.S. 485 (1984) ("[A]n attempt to produce a readable article for its mass audience … does not support an inference of actual malice.").

Not only does the district court's decision misconstrue the actual-malice standard, but it also raises additional First Amendment concerns by seemingly compelling the Aquarium to engage in additional speech—and speech with which it disagrees—in order to avoid potential liability. But "the First Amendment forbids the government, including the Judicial Branch, 'from dictating what we see or read or speak or hear.'" *Sindi v. El-Moslimany*, 896 F.3d 1, 30 (1st Cir. 2018) (quoting *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002)). And "presenting a curated and 'edited compilation of [third party] speech' is itself protected speech." *Moody v. NetChoice, LLC*, 603 U.S. 707, 744 (2024) (quoting *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 570 (1995)).

If plaintiffs believed the Aquarium's speech to be biased and misguided, then "the fitting remedy for evil counsels is good ones." *Whitney v. California*, 274 U.S. 357, 375 (1927) (Brandeis, J., concurring). The Maine lobster industry, represented by plaintiffs, has access to communication channels like those of the Aquarium. Plaintiffs were and are free to respond to the Aquarium's protected speech with their own

29

speech. But rather than trying to persuade the public of their position, they filed a defamation suit and persuaded the district court that presenting plaintiffs' preferred message was the Aquarium's job.

Here, the Aquarium "clearly decided to exclude a message it did not like"—indeed, that it considered unreliable—"from the communication it chose to make, and that is enough to invoke its right as a private speaker to shape its expression by speaking on one subject while remaining silent on another." *Hurley*, 515 U.S. at 574. Advocacy inherently involves gathering and disseminating information that supports one's viewpoint: "[t]he quality of advocacy turns on the depth of the conviction." *Brandenburg*, 395 U.S. at 457 (Douglas, J., concurring). And a parallel tenet of our free speech system is that "society must take the risk that occasionally debate on vital matters will not be comprehensive and that all viewpoints may not be expressed." *See Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 260 (1974) (White, J., concurring). To require advocates to include contrary information would be to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion"—a result that is not tolerated in our Constitutional structure. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)

The district court's approach, if extended to other industries, would threaten *Amici*'s ability to pursue its mission. Under the district court's reasoning, *Amici* might have to discuss and publicize gun-industry positions with which *Amici* disagree and consider biased or otherwise unreliable as the price of publicizing their own considered and research-based criticism of that industry. The burden of having to speak in a way that does not offend the firearms industry would have a significant and detrimental effect on *Amici*'s advocacy. The reverse is also true: the NRA's speech, for example, would be burdened if it had to speak in a way that does not offend *Amici*.

The First Amendment forbids such attempts to force organizations like *Amici* to muddy their messages to appease the objects of their critique. Indeed, "[t]o elevate the heckler's veto to a principle of First Amendment interpretation," as the district court's decision threatens to do, "would, in practical effect, grant censorial power to any group with the desire and wherewithal to snuff out any other group's or individual's right to speak." Geoffrey R. Stone, *Group Defamation*, 15 U. Chi. L. Occasional Papers 1, 7 (1978).

31

### 2. An injunction like the one requested here would be an impermissible prior restraint on speech.

Not only did the district court rule that plaintiffs plausibly alleged that the Aquarium was reckless and malicious when it opted not to parrot industry positions it viewed as unreliable, but it also opened the door to barring the Aquarium from speaking *at all* by deciding at this early stage in litigation that "the especially high bar for a prior restraint on speech does not apply to the present case." JA1899.

This Court has not decided whether an injunction in a defamation suit could ever be permissible. *See Sindi,* 896 F.3d at 33–35 (holding that the requested injunction did not satisfy strict scrutiny because it did not leave open alternate communication channels). The district court relied heavily on this Court's disclaimer in *Sindi,* contending that the requested injunction was different because "Plaintiffs do not seek to limit additional, future speech, but rather for [the Aquarium] to 'remove or retract' its existing statements." JA1898. But that type of injunction would necessarily prohibit the Aquarium from continuing to engage in the advocacy plaintiffs are challenging.

*Amici* likewise make generalized statements about the gun industry, write press releases, and engage in media interviews where

they discuss their work in an abbreviated manner. *See, e.g.*, Brady, *Press Releases* (last visited Feb. 3, 2026), http://www.bradyunited.org/press; Guns Down America, *Press* (last visited Feb. 3, 2026), http://www.gunsdownamerica.org/press; Giffords, *The Latest* (last visited Feb. 3, 2026), https://giffords.org/news/press/. *Amici* call the public to action to reduce gun violence, and *Amici*'s efforts likely have economic impacts. Allowing a permanent injunction based on an advocate's evaluation of industry practices would chill or silence the speech of organizations like *Amici* and negatively impact robust public discourse about a matter of national importance. That would amount to a prior restraint, and fear of restrained speech presents a serious and unconstitutional chill on organizations like *Amici* in exercising their First Amendment rights.

33

## CONCLUSION

This Court should reverse the district court's order.

February 4, 2026

Respectfully submitted,

/s/ Abby C. Wright

Douglas N. Letter*
Shira Lauren Feldman*
Tess M. Fardon*
BRADY CENTER TO PREVENT
  GUN VIOLENCE
840 First Street NE, Suite 400
Washington, DC 20002
(202) 370-8100

Abby C. Wright
Sarah E. Harrington
Kristin M. Oakley
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
awright@cov.com

William T. Clark*
Leigh Rome*
GIFFORDS LAW CENTER TO
  PREVENT GUN VIOLENCE
244 Madison Ave., Suite 147
New York, NY 10016
(415) 433-2062

Nina M. Gayleard
COVINGTON & BURLING LLP
One International Place, Suite 1020
Boston, MA 02110

*Of Counsel

*Counsel for Amici Curiae*

34

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Brief complies with the type-volume limitations of Rule 29(a)(5) of the Federal Rules of Appellate Procedure because it contains 6,146 words, excluding the parts of the brief exempted by Rule 32(f). I further certify that this Brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO in 14-point Century Schoolbook font.

/s/ Abby C. Wright
Abby C. Wright
*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on February 4, 2026, I caused the foregoing

Brief to be filed with the Clerk of the U.S. Court of Appeals for the First

Circuit using the appellate CM/ECF system and to be served upon

counsel for all parties via the CM/ECF system.

<u>/s/ Abby C. Wright</u>
Abby C. Wright
*Counsel for Amici Curiae*

36