**No. 25-1206, 25-1772**

———————————————

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

———————————————

BEAN MAINE LOBSTER, INC., MAINE LOBSTERMEN'S ASSOCIATION; MAINE COAST FISHERMEN'S ASSOCIATION, INC.; MAINE LOBSTER AND PROCESSING, LLC, d/b/a Atwood Lobster, LLC; BUG CATCHER, INC.,

*Plaintiffs – Appellees*,

v.

MONTEREY BAY AQUARIUM FOUNDATION,

*Defendant – Appellant*.

———————————————

On Appeal from the United States District Court for the District of Maine
No. 2:23-cv-00129 (Hon. John A. Woodcock, Jr.)

———————————————

**BRIEF OF PROPOSED AMICI CURIAE THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND 22 NEWS AND MEDIA ORGANIZATIONS IN SUPPORT OF DEFENDANT-APPELLANT**

———————————————

Lisa Zycherman*
Mara Gassmann*
Ann Seminara*
REPORTERS COMMITTEE FOR
   FREEDOM OF THE PRESS
1156 15th Street NW, Ste. 1020
Washington, D.C. 20005
Phone: 202-795-9300
 lzycherman@rcfp.org
 *Of Counsel

Sigmund D. Schutz, Bar #80591
Alexandra A. Harriman, Bar #1196232
PRETI FLAHERTY
One City Center
Portland, ME 04101
Phone: 207-791-3000
sschutz@preti.com
aharriman@preti.com

*Counsel of Record for Amici Curiae*

25283359.2

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Fed. R. App. P. 26.1, amici curiae certify as follows:

The Reporters Committee for Freedom of the Press is an unincorporated nonprofit association of reporters and editors with no parent corporation and no stock.

The Atlantic Monthly Group LLC is a privately held media company, owned by Emerson Collective and Atlantic Media, Inc.  No publicly held corporation owns 10% or more of its stock.

Bangor Publishing Company is a privately held company that publishes the *Bangor Daily News*.

Boston Globe Media Partners, LLC, is a privately held company.  No publicly held corporation owns 10% or more of its stock.

The Maine Freedom of Information Coalition ("MFOIC") is a tax-exempt Maine non-profit corporation.  MFOIC's mission is to broaden knowledge and awareness of the First Amendment and Maine laws aimed at ensuring transparency in government.

The Maine Center for Public Interest Reporting is a non-profit organization with no parent corporation and no stock.

The Maine Trust for Local News is a Maine low-profit limited liability company owned by the National Trust for Local News.

25283359.2

The Massachusetts Newspaper Publishers Association is a non-profit corporation. It has no parent, and no publicly held corporation owns 10% or more of its stock.

The McClatchy Company, LLC is privately owned by certain funds affiliated with Chatham Asset Management, LLC and does not have publicly traded stocks.

The Media Institute is a 501(c)(3) non-stock corporation with no parent corporation.

The Media Law Resource Center has no parent corporation and issues no stock.

MediaNews Group Inc. is a privately held company. No publicly-held company owns ten percent or more of its equity interests.

New England First Amendment Coalition has no parent corporation and no stock.

New Hampshire Public Radio is an independent, community-owned and operated 501(c)3 organization with no parent company.

The New York Times Company is a publicly traded company and has no affiliates or subsidiaries that are publicly owned. No publicly held company owns 10% or more of its stock.

News/Media Alliance represents the newspaper, magazine, and digital media industries, including nearly 2,200 diverse news and magazine publishers in the

iii

25283359.2

United States and internationally.  It is a nonprofit, non-stock corporation organized under the laws of the commonwealth of Virginia.  It has no parent company.

Online News Association is a not-for-profit organization.  It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

Pro Publica, Inc. ("ProPublica") is a Delaware nonprofit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code.  It has no statutory members and no stock.

The Society of Environmental Journalists is a 501(c)(3) non-profit educational organization.  It has no parent corporation and issues no stock.

Society of Professional Journalists—Maine Pro Chapter is a Maine-based chapter of the non-profit Society of Professional Journalists and has no stock.

Society of Professional Journalists is a non-stock corporation with no parent company.

Student Press Law Center is a 501(c)(3) not-for-profit corporation that has no parent and issues no stock.

USA Today Co., Inc., formerly known as Gannett Co., Inc., is a publicly traded company and has no affiliates or subsidiaries that are publicly owned.

25283359.2

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS ....................................................... ii

TABLE OF AUTHORITIES ...................................................................... vi

SOURCE OF AUTHORITY TO FILE ........................................................ xi

FED. R. APP. P. 29(a)(4)(E) STATEMENT ........................................... xi

IDENTITY AND INTEREST OF AMICI CURIAE ...................................................1

INTRODUCTION ...................................................................................4

ARGUMENT ........................................................................................6

I.   The District Court's misapplication of defamation law weakens two long-standing First Amendment protections essential to the work of the press. ...................................................................................6

   A.  The District Court's misinterpretation of the group libel rule will chill news reporting and analysis. ...........................................................6

   B.  The District Court's failure to apply the constitutional opinion doctrine will stifle commentary and debate on important scientific and public policy matters. ...................................................................15

II.  The Report is "petitioning activity" that triggers Maine's former anti-SLAPP law......................................................................................20

CONCLUSION.....................................................................................28

CERTIFICATE OF COMPLIANCE.............................................................29

CERTIFICATE OF SERVICE ...................................................................30

APPENDIX A: Statements of Identity of Amici Curiae ........................................31

25283359.2

# TABLE OF AUTHORITIES

## Cases

*Aldana v. Worcester Digital Mktg., LLC*,
  No. WOCV20191689C, 2020 WL 5993103
  (Mass. Super. Ct. Aug. 12, 2020) ...................................................................26

*Alvord-Polk, Inc. v. F. Schumacher & Co.*,
  37 F.3d 996 (3d Cir. 1994),
  *cert. denied*, 514 U.S. 1063 (1995) ......................................................................13

*Arcand v. Evening Call Publ'g Co.*,
  567 F.2d 1163 (1st Cir. 1977) ....................................................................6

*Arthur v. Offit*,
  No. 01:09-cv-1398, 2010 WL 883745 (E.D. Va. Mar. 10, 2010) ........................19

*Auvil v. CBS 60 Minutes*,
  836 F. Supp. 740 (E.D. Wash. 1993),
  *aff'd*, 67 F.3d 816 (9th Cir. 1995) ................................................. 17, 18

*Cardno ChemRisk, LLC v. Foytlin*,
  476 Mass. 479, 68 N.E.3d 1180 (2017).................................................................25

*Church of Scientology of Cal. v. Flynn*,
  744 F.2d 694 (9th Cir. 1984) ..............................................................14

*Desjardins v. Reynolds*,
  2017 ME 99, 162 A.3d 228 .................................................................24

*Gaudette v. Mainely Media, LLC*,
  2017 ME 87, 160 A.3d 539 ..................................................................25

*Hudson v. Guy Gannett Broad. Co.*,
  521 A.2d 714 (Me. 1987) ...............................................................6, 8

*Immuno AG. v. Moor-Jankowski*,
  77 N.Y.2d 235, 567 N.E.2d 1270 (1991) .............................................................18

*Kirch v. Liberty Media Corp.*,
  449 F.3d 388 (2d Cir. 2006) ...................................................... 11, 12

vi

25283359.2

*Mabee v. Eckrote*,
No. 1:19-CV-00432-JDL, 2020 WL 1171939 (D. Me. Mar. 11, 2020)...............25

*Mich. United Conservation Clubs v. CBS News*,
485 F. Supp. 893 (W.D. Mich. 1980),
*aff'd*, 665 F.2d 110 (6th Cir. 1981) ........................................................9

*Milkovich v. Lorain J. Co.*,
497 U.S. 1 (1990) ........................................................15

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964) ........................................................ 7, 8, 12

*Neiman-Marcus v. Lait*,
13 F.R.D. 311 (S.D.N.Y. 1952)........................................................13

*O'Brien v. Williamson Daily News*,
735 F. Supp. 218 (E.D. Ky. 1990)........................................................9, 10

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
720 F.3d 490 (2d Cir. 2013) ........................................................19

*Phantom Touring, Inc. v. Affiliated Publ'ns*,
953 F.2d 724 (1st Cir. 1992) ........................................................15

*Piccone v. Bartels*,
785 F.3d 766 (1st Cir. 2015) ........................................................16

*Provisional Gov't of New Afrika v. ABC, Inc.*,
609 F. Supp. 104 (D.D.C. 1985)........................................................9

*Riley v. Harr*,
292 F.3d 282 (1st Cir. 2002) ........................................................ 15, 16

*Riss & Co. v. Ass'n of Am. R.R.s*,
187 F. Supp. 323 (D.D.C. 1960)........................................................10

*Rosenblatt v. Baer*,
383 U.S. 75 (1966) ........................................................8

*Schelling v. Lindell*,
2008 ME 59, 942 A.2d 1226 ........................................................ 22, 23, 24, 27

25283359.2

*Schuster v. U.S. News & World Rep., Inc.*,
    459 F. Supp. 973 (D. Minn. 1978),
    *aff'd*, 602 F.2d 850 (8th Cir. 1979) ................................................................9

*Serv. Parking Corp. v. Wash. Times Co.*,
    92 F.2d 502 (D.C. Cir. 1937)............................................................ 6, 7, 9

*Spelson v. CBS, Inc.*,
    581 F. Supp. 1195 (N.D. Ill. 1984),
    *aff'd*, 757 F.2d 1291 (7th Cir. 1985) ...............................................17

*Sumner v. Buel*,
    12 Johns. 475 (N.Y. Sup. Ct. 1815) ...................................................7

*Thomson v. Town of Andover Bd. of Appeals*,
    No. 931716, 1995 WL 1212920 (Mass. Super. Ct. July 25, 1995)......................25

*Thurlow v. Nelson*,
    2021 ME 58, 263 A.3d 494 ...............................................................24

*Underwager v. Salter*,
    22 F.3d 730 (7th Cir. 1994) ...............................................................19

*Weatherhead v. Globe Int'l, Inc.*,
    832 F.2d 1226 (10th Cir. 1987) ................................................ 13, 15

*Weinstein v. Old Orchard Beach Fam. Dentistry, LLC*,
    2022 ME 16, 271 A.3d 758 ...............................................................22

**Statutes**

14 M.R.S.A. § 556 ............................................................. 20, 22, 23, 27

14 M.R.S.A. §§ 731–742 ............................................................21

14 M.R.S.A. § 733 ............................................................21

28 U.S.C. § 1292 ............................................................2

An Act to Strengthen Freedom of Speech Protections by Enacting the
    Uniform Public Expression Protection Act,
    S.P. 367 - L.D. 870, 131st Me. Leg., 2d Reg. Sess. (Apr. 13, 2024)...................21

25283359.2

**Other Authorities**

1 Robert D. Sack, Sack on Defamation: Libel, Slander, and Related
Problems (5th ed. 2017) ...............................................................................5

1 Rodney A. Smolla, Rights and Liabilities in Media Content (2d ed.)....... 8, 13, 22

8A Alfred W. Gans et al., American Law of Torts (Feb. 2025 update) ..................15

Br. of Proposed Amici Curiae Reps. Comm. for Freedom of the Press, et al.,
in Supp. of Def.'s Mot. to Certify for Interlocutory Appeal,
*Bean Me. Lobster, Inc. v. Monterey Bay Aquarium Found.*,
2025 WL 416436 (D. Me. 2025) (No. 2:23-CV-00129-JAW) .............................2

Br. of Amici Curiae Reps. Comm. for Freedom of the Press & Others News
& Media Orgs. in Supp. of Plaintiffs-Appellees,
*Rodríguez-Cotto v. González-Colón*,
No. 23-1626 (1st Cir. Aug. 26, 2025) ...................................................................2

Br. of Proposed Amici Curiae Reps. Comm. for Freedom of the Press, et al.,
in Supp. of Def.'s Pet. for Permission to Appeal,
*Bean Me. Lobster, Inc. v. Monterey Bay Aquarium Found.*,
No. 25-8012 (1st Cir. May 29, 2025) ....................................................................3

Daniel Kool, *Most Drivers on Maine Turnpike Speed through Work Zones*,
PORTLAND PRESS HERALD (Dec. 15, 2025),
https://www.pressherald.com/2025/12/15/most-drivers-on-maine-turnpike-
speed-through-work-zones-2/..............................................................................11

Ellyn Tracy Marcus, Comment, *Group Defamation and Individual Actions:
A New Look at an Old Rule*,
71 CALIF. L. REV. 1532 (1983)...........................................................................14

Emily Bader, *At the Root of an Epidemic in Maine: a Prescription Pad*,
SUN JOURNAL (Apr. 10 2022),
https://www.sunjournal.com/2022/04/10/legacy-of-pain-part-1-at-the-root-
of-an-epidemic-in-maine-a-prescription-pad/ ....................................................10

John G. Osborn & Jeffrey A. Thaler, *Maine's Anti-SLAPP Law: Special
Protection Against Improper Lawsuits Targeting Free Speech and
Petitioning*,
23 ME. BAR J. 32 (2008)................................................................ 20, 21, 22, 23

25283359.2

Karen M. Markin, *Libel and the Lab: Scientists and Defamation*,
26 COMMC'N L. & POL'Y 1 (2021) ...................................................................16

Kay Neufeld, *Freight Railroads Police Themselves and Inspect Their Own
Tracks. Some Say a Disaster Is Inevitable*,
PORTLAND PRESS HERALD (Oct. 8, 2023),
https://www.pressherald.com/2023/10/08/freight-railroads-police-
themselves-and-inspect-their-own-tracks-some-say-a-disaster-is-
inevitable/ ..........................................................................................................11

*NOAA Fisheries Announces New Lobster and Jonah Crab Fisheries
Regulations to Help Save Endangered North Atlantic Right Whales*,
NOAA FISHERIES (Aug. 31, 2021),
https://www.fisheries.noaa.gov/media-release/noaa-fisheries-announces-
new-lobster-and-jonah-crab-fisheries-regulations-help-save......................... 26, 27

Rebecca Richard, *Cannabis Recalls Spark Questions About Chemical
Testing in Maine*, FRANKLIN JOURNAL (Dec. 18, 2025),
https://www.sunjournal.com/2025/12/18/cannabis-recalls-spark-questions-
about-testing-and-how-chemical-was-missed/.....................................................11

Restatement (Second) of Torts § 564A (Am. L. Inst. 1977) ..............................6, 14

Sigmund D. Schutz & Alexandra A. Harriman, *Maine's New Anti-SLAPP
Law: the Uniform Public Expression Protection Act (UPEPA)*,
40 ME. BAR J. 10 (2025)....................................................................................21

*Updates to the 2025 Anti-SLAPP Report Card*,
INST. FOR FREE SPEECH (Jan. 16, 2026),
https://www.ifs.org/blog/updates-to-the-2025-anti-slapp-report-card/.................22

William B. Odgers, Odgers on Libel and Slander (6th ed. 1929) ............................6

25283359.2

## SOURCE OF AUTHORITY TO FILE

Plaintiffs-Appellees and Defendant-Appellant consent to the filing of this amici curiae brief; this brief is thus filed pursuant to Fed. R. App. P. 29(a)(2).

## FED. R. APP. P. 29(a)(4)(E) STATEMENT

The Reporters Committee for Freedom of the Press declares that:

1. no party's counsel authored the brief in whole or in part;

2. no party or party's counsel contributed money intended to fund preparing or submitting the brief; and

3. no person, other than amici, their members or their counsel, contributed money intended to fund the preparation or submission of this brief.

25283359.2

## IDENTITY AND INTEREST OF AMICI CURIAE

Proposed amici curiae are the Reporters Committee for Freedom of the Press ("Reporters Committee"), The Atlantic Monthly Group, LLC, Bangor Publishing Company, Boston Globe Media Partners, LLC, Maine Freedom of Information Clinic, The Maine Center for Public Interest Reporting, Maine Trust for Local News, Massachusetts Newspaper Publishers Association, The McClatchy Company, LLC, The Media Institute, Media Law Resource Center, MediaNews Group Inc., New England First Amendment Coalition, New Hampshire Public Radio, The New York Times Company, News/Media Alliance, Online News Association, Pro Publica, Inc., Society of Environmental Journalists, Society of Professional Journalists—Maine Pro Chapter, Society of Professional Journalists, Student Press Law Center, and USA Today Co., Inc. (together, "amici").[1]  Collectively, they include news organizations that gather and report the news and publish analysis and media organizations that advocate on behalf of press rights.  Amici do not through this brief take sides on the underlying scientific and policy disagreement between the parties. Rather, they possess a shared interest in the correct application of controlling principles of defamation law, including the First Amendment defenses and anti-SLAPP protections at issue here, that ultimately ensure journalists' ability to publish news and commentary on matters of public concern and debate.

---

[1]    Descriptions of all amici can be found in Appendix A attached to this brief.

25283359.2

Lead amicus, the Reporters Committee, is an unincorporated nonprofit association. The Reporters Committee was founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists. The Reporters Committee regularly files in this and other courts on issues impacting the legal rights of journalists. *See* Br. of Amici Curiae Reps. Comm. for Freedom of the Press & Others News & Media Orgs. in Supp. of Plaintiffs-Appellees, *Rodríguez-Cotto v. González-Colón*, No. 23-1626 (1st Cir. Aug. 26, 2025).

The Reporters Committee, together with the New England First Amendment Coalition, Maine Center for Public Interest Reporting, and Maine Pro Chapter of the Society of Professional Journalists, filed as amicus below in support of certification of the issues for appeal pursuant to 28 U.S.C. § 1292(b), and in this Court in support of the Monterey Bay Aquarium Foundation's ("MBAF") Petition for Permission to Appeal. *See* Br. of Proposed Amici Curiae Reps. Comm. for Freedom of the Press, et al., in Supp. of Def.'s Mot. to Certify for Interlocutory Appeal, *Bean Me. Lobster, Inc. v. Monterey Bay Aquarium Found.*, 2025 WL 416436 (D. Me. 2025) (No. 2:23-CV-00129-JAW); Br. of Proposed Amici Curiae Reps. Comm. for Freedom of the

25283359.2

Press, et al., in Supp. of Def.'s Pet. for Permission to Appeal, *Bean Me. Lobster, Inc.*

*v. Monterey Bay Aquarium Found.*, No. 25-8012 (1st Cir. May 29, 2025).

25283359.2

**INTRODUCTION**

This libel suit raises serious concerns about the press's ability to report news and analysis, including on complex policy topics, without the threat of crippling libel suits.  The undersigned newsrooms and media organizations submit this brief—for some, their third amicus filing in this litigation—because the District Court's analysis on two foundational issues of defamation law threatens to weaken key protections for journalists to do their jobs.  The District Court also erred when it did not apply Maine's former anti-SLAPP law to the challenged publication.

Defendant-Appellant Monterey Bay Aquarium Foundation's ("MBAF") Seafood Watch report concerns the American lobster in the Northwest Atlantic and its views that by fishing in certain waters, the fishing industry has a negative impact on endangered right whales (the "Report").  In writing on this matter of public concern, MBAF did not single out Plaintiffs-Appellees—three commercial seafood companies and two trade associations—for criticism, but rather discussed and opined on data and the industry practices of the over 5,600 lobster fishermen who work in those waters.  While amici take no position here on the conclusions reached by Defendant-Appellant or the underlying environmental debate, amici emphasize that journalism routinely involves raising questions about, criticizing or shedding light on the practices of companies and other large groups and industries that impact public life, health, and safety.

25283359.2

The law of defamation protects such speech. First, the group libel doctrine protects the ability of the press to perform its constitutionally recognized and protected role of keeping the public informed about matters of public concern by placing certain limits on the persons and companies who can sue over speech with which they do not agree. If that long-standing rule of constitutional dimension were abandoned or weakened, courts would see an "unwarranted proliferation of litigation"—including litigation arising out of news reporting about organizations and groups—that would come with a significant "cost to free expression." 1 Robert D. Sack, Sack on Defamation: Libel, Slander, and Related Problems § 2:9.4 (5th ed. 2017). Second, the Report offers to its readers numerous conclusions and recommendations while also disclosing the predicate facts for the views expressed on a matter of scientific debate. The District Court departed from the precedent of this Circuit and weakened First Amendment protections for news and opinion journalism when it failed to apply the constitutional doctrine of opinion. Both holdings, if affirmed, would signal a troubling shift for the law of defamation, a significant departure from the law of this Circuit, and be profoundly detrimental to news reporting and commentary on issues of public importance.

Finally, while Maine, since the publication of the Report, has joined the 15 U.S. states that have enacted the Uniform Public Expression Protection Act ("UPEPA"), there can be little doubt based on the language, intent, and judicial

5

interpretations of its former anti-SLAPP statute that the Report is "petitioning activity" triggering application of the law.  The District Court erred when it denied the special motion to dismiss without engaging in that analysis.  For all these reasons, amici urge this Court to reverse the decision below.

## ARGUMENT

I.    **The District Court's misapplication of defamation law weakens two long-standing First Amendment protections essential to the work of the press.**

  A.    **The District Court's misinterpretation of the group libel rule will chill news reporting and analysis.**

An allegedly defamatory statement, "to be actionable, [] must be 'of or concerning the plaintiff.'"  *E.g.*, *Hudson v. Guy Gannett Broad. Co.*, 521 A.2d 714, 716 (Me. 1987) (citation omitted).  Put another way, "[t]he defamatory words must refer to some ascertained or ascertainable person, and that person must be the plaintiff."  *Serv. Parking Corp. v. Wash. Times Co.*, 92 F.2d 502, 504 (D.C. Cir. 1937) (quoting William B. Odgers, Odgers on Libel and Slander, at 123 (6th ed. 1929)).  From this follows the equally well-settled principle that "[d]efamation of a large group gives rise to no civil action on the part of an individual member of the group unless he can show special application of the defamatory matter to himself." *Arcand v. Evening Call Publ'g Co.*, 567 F.2d 1163, 1164 (1st Cir. 1977) (citation omitted); *see also* Restatement (Second) of Torts § 564A, cmt. a (Am. L. Inst. 1977) ("As a general rule no action lies for the publication of defamatory words concerning

25283359.2

a large group or class of persons . . . and no individual member of the group can recover for such broad and general defamation. The words are not reasonably understood to have any personal application to any individual unless there are circumstances that give them such an application.").

The modern rule against group libel evolved from 18th and 19th century common law, which instructed that "[a] writing which inveighs . . . against a particular order of men[] is no libel." *Sumner v. Buel*, 12 Johns. 475, 477 (N.Y. Sup. Ct. 1815). Instead, the statement "must descend to particulars and individuals, to make it a libel." *Id.* The rule was firmly established by the early 20th century when the D.C. Court of Appeals explained that "courts have chosen not to limit freedom of public discussion except to prevent harm occasioned by defamatory statements reasonably susceptible of special application to a given individual." *Serv. Parking Corp.*, 92 F.2d at 505–06. It affirmed judgment for a newspaper in a case brought by a business that argued the challenged article's discussion of the industry necessarily implied bad practices by his particular business. *Id.* (holding that parking lot owner was not defamed by newspaper's "parking lot racket probe," which concerned D.C.'s "downtown parking lots and their owners as a class" but did not identify a particular one). Nearly 30 years later, the U.S. Supreme Court found in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), that statements about the city police as a group were not "of and concerning" the plaintiff, the city commissioner

25283359.2

tasked with oversight of law enforcement.  This, the Court held, rendered the plaintiff's claim "constitutionally defective."  *Id.* at 288; *accord Rosenblatt v. Baer*, 383 U.S. 75, 83 (1966) (members of a group who were allegedly responsible for conduct of a county ski recreation area were not defamed by article that cast "indiscriminate suspicion" on them).  The prohibition on group libel has become "not merely a venerable common-law doctrine, but a rule of constitutional dimension"—even, as one leading treatise has acknowledged, "a threshold requirement of the First Amendment itself."  1 Rodney A. Smolla, Rights and Liabilities in Media Content § 6:9 (2d ed.); *see also Hudson*, 521 A.2d at 716 n.5 (stating that beyond the requirements of Maine law, "[a]t least in public figure defamation cases[,] the [F]irst [A]mendment . . . requires that a publication . . . must be 'of and concerning' the plaintiff" (citation omitted)).

Importantly, this prevailing rule, relied upon by publishers to report and comment on issues of public concern, is far from "a mere superficial technicality or trivial detail."  Smolla, Rights and Liabilities in Media Content § 6:9.  It is "a basic cornerstone doctrine that reflects the deepest and most fundamental social policies embodied in the law of defamation," *id.*, a balancing between the need to address true injury to the reputation of someone specifically and personally defamed, and the need to protect critical speech (including reporting and analysis) about policies, practices, and groups.  The consequences should the District Court decision be

8

25283359.2

affirmed would stretch beyond this case, chilling newsgathering and reporting in general, which would in turn undermine the public's ability to stay informed and participate in debate. This is because "the limitations the concept of group libel imposes on [libel] actions," *Provisional Gov't of New Afrika v. ABC, Inc.*, 609 F. Supp. 104, 108 (D.D.C. 1985), safeguard "the social interest in free press discussion of matters of general concern," *Serv. Parking Corp.*, 92 F.2d at 505. Claims unconstrained by the group libel rule would "seriously interfere with public discussion of issues, or groups, which are in the public eye" and "result in the public receiving less information." *Mich. United Conservation Clubs v. CBS News*, 485 F. Supp. 893, 900 (W.D. Mich. 1980), *aff'd*, 665 F.2d 110 (6th Cir. 1981); *accord Schuster v. U.S. News & World Rep., Inc.*, 459 F. Supp. 973, 978 (D. Minn. 1978), *aff'd*, 602 F.2d 850 (8th Cir. 1979) (explaining that if statements about a public controversy are too easily held "of and concerning individuals prominent in the controversy," this "would chill heated public debate into lukewarm pap").

By rejecting libel claims on the basis of one's association with an allegedly defamed group, the law preserves "journalistic freedom" to "investigat[e] and report[] on matters of public interest." *Schuster*, 602 F.2d at 853. This has resulted in legal protection for many stories on matters of public concern, including those touching on the activities of companies, organizations, and even entire industries. *See id*. (group libel doctrine protects reporting on cancer drug controversy); *O'Brien*

9

*v. Williamson Daily News*, 735 F. Supp. 218, 222 (E.D. Ky. 1990), *aff'd*, 931 F.2d 893 (6th Cir. 1991) (same, for reporting on teachers allegedly having affairs with students, where 27–35 teachers were "too large a group" to bring libel claim); *Riss & Co. v. Ass'n of Am. R.R.s*, 187 F. Supp. 323, 325 (D.D.C. 1960) (same, for reports on illegal cargo carried by railroads).

There is a wealth of journalism that exposes public ills or challenges prevailing practices, which might not have been possible were unnamed persons or companies able to maintain a libel suit due to mere association with the subject matter of a story and alleged downstream harms from public scrutiny. For example, the Sun Journal in 2022 published reporting about the endemic problem of opioid abuse. It revealed that "Maine had the highest rate of prescriptions per capita for extended-release opioid pain medications, like OxyContin, out of all 50 states and the District of Columbia in 2012." Emily Bader, *At the Root of an Epidemic in Maine: a Prescription Pad*, Sun Journal (Apr. 10 2022), https://www.sunjournal.com/2022/04/10/legacy-of-pain-part-1-at-the-root-of-an-epidemic-in-maine-a-prescription-pad/ (reporting on web of persons, companies, and interests underlying opioid crisis). According to its findings, a web of companies and individuals played a role in Maine's opioid epidemic, including Purdue Pharma and its drug representatives, the U.S. Food and Drug Administration, and primary care physicians. *Id.* The Sun Journal's reporting is just one example of

10

25283359.2

the kind of reporting in Maine that is made possible by the rule against group libel.
*See also, e.g.*, Kay Neufeld, *Freight Railroads Police Themselves and Inspect Their Own Tracks. Some Say a Disaster Is Inevitable*, PORTLAND PRESS HERALD (Oct. 8, 2023), https://www.pressherald.com/2023/10/08/freight-railroads-police-themselves-and-inspect-their-own-tracks-some-say-a-disaster-is-inevitable/ (reporting on those involved in rail system, unreported accidents, and secret transport of hazardous chemicals); Rebecca Richard, *Cannabis Recalls Spark Questions About Chemical Testing in Maine*, FRANKLIN JOURNAL (Dec. 18, 2025), https://www.sunjournal.com/2025/12/18/cannabis-recalls-spark-questions-about-testing-and-how-chemical-was-missed/ (reporting on recall of recreational cannabis product and response from cannabis retailers, producers, and state oversight body); Daniel Kool, *Most Drivers on Maine Turnpike Speed through Work Zones*, PORTLAND PRESS HERALD (Dec. 15, 2025), https://www.pressherald.com/2025/12/15/most-drivers-on-maine-turnpike-speed-through-work-zones-2/ (reporting on data released by Maine Turnpike Authority on prevalence of speeding in highway work zones and bill to install cameras for traffic enforcement).  Reporting on such complex and multi-faceted issues is decidedly in the public interest but requires firm protections for speech to prevent defamation law from becoming a vehicle by which associated or downstream persons or entities can recover for perceived harms.  *See Kirch v. Liberty Media Corp.*, 449 F.3d 388, 398

25283359.2

(2d Cir. 2006) ("A false disparaging statement about IBM, for example, would not, we think, ordinarily be a defamatory statement 'of and concerning' all of IBM's suppliers, employees and dealers, however much they may be injured as a result."). Expanding the universe of individuals allowed to sue over reporting on policies, practices, and trends threatens important public service reporting.

Whether litigation over public interest reporting critical of industry-wide activities or practices would ultimately be successful on the merits is not the measure of whether such reporting is consistent with the First Amendment. Such litigation would deter reporting on account of "fear of the expense" required to defend claims and the inevitable result would be a chilling effect. *Sullivan*, 376 U.S. at 279. A rule that encourages self-censorship "dampens the vigor and limits the variety of public debate," and is generally "inconsistent" with the First Amendment. *Id*.

Should the District Court order be affirmed, and the Report here deemed to concern these five Appellees, it would represent a signature departure from precedent and a profound weakening of the rule against group libel. Nowhere in the Report is any one of the Appellees named or otherwise described as individual entities. At least 5,600 individuals "in Maine alone" "fish within the Gulf of Maine or Georges Bank." Add.107–08. As the District Court conceded, that is a class "not so small that the Statements [in the Report] can reasonably be understood to refer to the five individual Plaintiffs." *Id*. Yet although the Report did not single out

25283359.2

Appellees, the District Court held that it "implicated all lobstermen who fish within the Gulf of Maine or Georges Bank," and it thus satisfied the "of and concerning" requirement.  Add.108, 112.  This was error.  "Typically such group defamation claims are viable only when the group is relatively small, or there is some individualized focus on the particular members of that group who have brought the action as defamation plaintiffs."  Smolla, Rights and Liabilities in Media Content § 6:9.  "[A]ll lobstermen who fish within the Gulf of Maine or Georges Bank" is precisely the kind of large group whose members would be barred from suing over a critical statement that does not target them directly and personally.  And as the District Court acknowledged, *see* Add.107, the group to which Plaintiffs-Appellees belong is extremely numerous—larger, even, than others that have been found to be too "amorphous and ill-defined" to successfully bring defamation actions, *see*, *e.g.*, *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1016 (3d Cir. 1994), *cert. denied*, 514 U.S. 1063 (1995) (statements that retailers were "pirates" not of and concerning plaintiff-retailers where group of 25 was too "amorphous and ill-defined"); *Weatherhead v. Globe Int'l, Inc.*, 832 F.2d 1226, 1227–28 (10th Cir. 1987) (same, for statements about "America's Dog 'Death Camps'" challenged by 955 dog breeders); *Neiman-Marcus v. Lait*, 13 F.R.D. 311, 316 (S.D.N.Y. 1952) (same, for statement that "all" saleswomen employed by a Neiman-Marcus store were "call girls" where there were 382 saleswomen).

25283359.2

The District Court suggested the Restatement's "circumstances of publication" exception to the group libel doctrine saved Plaintiffs' claims from dismissal. *See* Restatement (Second) of Torts § 564A(b); Add.105–07. Not so. This exception applies when the alleged defamation, "though made in group terms, is really a veiled reference to a specific group member." Ellyn Tracy Marcus, Comment, *Group Defamation and Individual Actions: A New Look at an Old Rule*, 71 CALIF. L. REV. 1532, 1535 (1983). Commentators and courts have described it as "merely a recognition that one who is individually defamed can sue even if the defamation is disguised as a group slur." *Id*. at 1536; *accord Church of Scientology of Cal. v. Flynn*, 744 F.2d 694, 697 n.5 (9th Cir. 1984). As the Restatement explains it:

> Even when the group or class defamed is a large one, there may be circumstances that are known to the readers or hearers and which *give the words such a personal application to the individual* that he may be defamed as effectively as if he alone were named. Thus "All lawyers are shysters" may be defamatory as to an individual lawyer, when the words are uttered on an occasion when *he is the only lawyer present* and the context or the previous conversation *indicates that the speaker is making personal reference to him*.

Restatement (Second) of Torts § 564A, cmt. d (emphasis added). The Restatement is perfectly clear that an alleged defamation must still make "particular reference," or have "personal application," to the individual suing. *See id*. illus. 5.

14

25283359.2

Nothing of the kind occurred here. In its Report, MBAF did not make reference or application to any group in a manner that effectively made a veiled reference to any of the individual Plaintiffs. *See Weatherhead*, 832 F.2d at 1227–28 (no language or circumstances singled out plaintiffs among nearly 1,000 dog breeders). The circumstances-of-publication exception does not apply, and the District Court's decision to the contrary would occasion a shift in controlling law with severe real-world consequences for journalism.

**B.    The District Court's failure to apply the constitutional opinion doctrine will stifle commentary and debate on important scientific and public policy matters.**

A "point of law that is absolutely clear under the modern principles of constitutional privileges against, and limitations on, recovery for defamation . . . is that when a statement . . . is ascertained to be an opinion, it is nonactionable." 8A Alfred W. Gans et al., American Law of Torts § 29:36 (Feb. 2025 update); *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 13–14 (1990). Importantly, the opinion doctrine protects not only pure opinion but also commentary that relies on and discloses predicate facts to form a conclusion. *Riley v. Harr*, 292 F.3d 282, 289 (1st Cir. 2002). This is consistent with the observation that "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 727 (1st Cir. 1992) (citation omitted).

15

Accordingly, "when an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment." *Riley*, 292 F.3d at 289 (citation omitted); *accord Piccone v. Bartels*, 785 F.3d 766, 773 (1st Cir. 2015) (affirming defendant's statements "were not actionable" where he had "fully disclosed the non-defamatory facts" underlying them and audience could form "own impression"). In this manner the opinion doctrine protects not only reports like the one at issue in this litigation but a significant number of publications by the press that are not pure opinion but instead rely on truthful, disclosed facts to reach a conclusion. Expressions of scientific and policy opinion must remain non-actionable to protect critical news commentary and journalism.

Application of the opinion doctrine here and to similar policy publications is supported by the recognition that "scientific findings are subject to revision, and any insistence that scientists guarantee the truth of their statements could lead to self-censorship." Karen M. Markin, *Libel and the Lab: Scientists and Defamation*, 26 COMMC'N L. & POL'Y 1, 12 (2021). Protection of speech from litigation is particularly vital where the public policy under discussion involves a particularly complex or contentious scientific issue, which courts have explained is properly left to scientists and concerned citizens to test, debate, and resolve—not the judicial

16

system in a defamation action. In *Spelson v. CBS, Inc.*, for example, the Northern District of Illinois discussed broadcasts produced and aired by a television station about an investigation into individuals practicing "medical quackery." 581 F. Supp. 1195, 1198 (N.D. Ill. 1984), *aff'd*, 757 F.2d 1291 (7th Cir. 1985). The plaintiff, a chiropractor, alleged that the broadcasts were defamatory because they damaged his reputation "by innuendo, implication, and association." *Id.* at 1200. The court held in the broadcaster's favor, noting that "the underlying subject matter, medical science, is at best an inexact science in which numerous and widely varied approaches and philosophies exist." *Id.* at 1202. The "broadcasts clearly present[ed] the facts from which the opinions are derived and in so doing, allow for the possibility that an individual viewer could reach a different conclusion." *Id.* at 1203. For these reasons, the court held that the broadcasts were "merely statements of opinion protected both by the First Amendment and" the common law. *Id.*

Similarly, in *Auvil v. CBS 60 Minutes*, the Eastern District of Washington entered judgment for a news organization in a defamation lawsuit over a broadcast concerning the apple industry's use of a particular chemical and the potential risks that chemical posed for children's health. 836 F. Supp. 740 (E.D. Wash. 1993), *aff'd*, 67 F.3d 816 (9th Cir. 1995). While acknowledging that the challenged broadcast had a "wide ranging [e]ffect . . . on Washington's apple industry," the court observed that the allegedly defamatory statements "were about an issue that

17

mattered" to the public and, given the scientific data, "cannot be proven as false." *Id.* at 743. The court further cautioned that "[t]o hold as plaintiffs request would have required CBS to take the EPA report and perform a highly technical scientific study before issuing a public broadcast about that report." *Id.* To impose such a requirement on journalists and other speakers, even if it could produce scientific consensus, would "so chill debate that the freedom of speech would be at risk." *Id.*

To be clear, the sober and reasoned language of science is equally subject to the doctrine—not all opinion must contain fiery rhetoric to receive protection. In *Immuno AG. v. Moor-Jankowski*, for example, a letter published in the Journal of Medical Primatology was highly critical of a research company's plan to establish a facility to conduct medical research on chimpanzees. 77 N.Y.2d 235, 240, 567 N.E.2d 1270, 1272 (1991). The company filed suit, alleging it had been defamed. New York's highest court analyzed the challenged letter in the context of its "broader social setting," determining that its "purpose was to voice the conservationist concerns" and "draw this situation to the attention of interested parties." *Id.* at 1280. The letter, in other words, arose in the context of an ongoing public and scientific debate over animal experimentation, which the court reasoned "would induce the average reader of this Journal to look upon the communication as an expression of opinion rather than a statement of fact, even though the language was serious and restrained." *Id.* at 1281. And many other courts have likewise applied the opinion

18

25283359.2

doctrine to conclude that publications on topics of scientific debate were not defamatory. *See, e.g.*, *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 496–97 (2d Cir. 2013) (affirming dismissal of libel case "involving 'matters of argument,'" observing courts "have been reluctant to recognize causes of action grounded on statements of fact that are best evaluated by an informed reader"); *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994) (same, because "[s]cientific controversies must be settled by the methods of science rather than by the methods of litigation. . . . More papers, more discussion, better data, and more satisfactory models—not larger awards of damages—mark the path toward superior understanding of the world around us." (internal citation omitted)); *Arthur v. Offit*, No. 01:09-cv-1398, 2010 WL 883745, at *6 (E.D. Va. Mar. 10, 2010) (dismissing claim by vaccine skeptic against critic because "[c]ourts have a justifiable reticence about venturing into the thicket of scientific debate, especially in the defamation context").

The Seafood Watch program "evaluates the environmental sustainability of wild-caught and farmed seafood" and publishes "assessments" on the environmental impacts of seafood consumption and sustainability "recommendations" for consumers and businesses. JA54–55. The Report contains MBAF's commentary and recommendations based on its scientific analysis, and it sets forth the facts underlying its opinions as to the sustainability of lobster catch. JA64–113. While

19

25283359.2

MBAF is not a news organization, for purposes of the opinion doctrine, the Report contains many of the features of a typical work of journalism. Journalism depends on this Circuit's consistent application of the law of opinion, and the District Court's refusal to afford First Amendment protection here should be reversed.

## II.    The Report is "petitioning activity" that triggers Maine's former anti-SLAPP law.

Maine has long recognized the danger of strategic lawsuits against public participation, or "SLAPPs," which are "aimed at punishing or silencing a party's exercise of free speech or right to petition the government." John G. Osborn & Jeffrey A. Thaler, *Maine's Anti-SLAPP Law: Special Protection Against Improper Lawsuits Targeting Free Speech and Petitioning*, 23 ME. BAR J. 32, 32 (2008). From its enactment in 1995 of one of the country's earliest anti-SLAPP laws, through its adoption of the Uniform Public Expression Protection Act ("UPEPA") in 2024, Maine has protected speech in the public interest, including public debate and commentary. Plaintiffs-Appellees offer a cramped and atextual view of what speech qualifies for protection. But although there is little question that Maine's new UPEPA statute provides broader protection for speech, such as news reporting, the former anti-SLAPP statute easily applies to opinion advocacy such as the Report at issue here.[2]

---

[2]    The Report was published in 2022 and thus qualifies for protection under 14 Me. Rev. Stat. Ann. ("M.R.S.A.") § 556. That law has since been superseded by

25283359.2

SLAPPs threaten the flow of information and knowledge essential to public participation in legislation, government decision-making, and other civic life. What was true in the late 1980s when "SLAPP[s] were growing in frequency, efficacy, and scope," Osborn & Thaler, *supra*, at 33, remains true to this day:

> [T]he mere threat of a SLAPP has served as an effective deterrent to the exercise of the rights of free speech and to petition government. The fact that these SLAPPs are almost always fatally flawed under established constitutional jurisprudence provides scant comfort to the defendant faced with potentially years of conflict and tens (or hundreds) of thousands of dollars in legal fees, in addition to the embarrassment and angst that attends such lawsuits.

*Id.* Though the proliferation of public debate and dialogue may distress those who have personal and financial interests in limiting criticism, protections for speech, including anti-SLAPP laws, represent the country's commitment to "maintain a

---

"An Act to Strengthen Freedom of Speech Protections by Enacting the Uniform Public Expression Protection Act," which took effect on January 1, 2025. S.P. 367 - L.D. 870, 131st Me. Leg., 2d Reg. Sess. (Apr. 13, 2024) (codified at 14 M.R.S.A. §§ 731–742). Maine's new UPEPA statute explicitly "expands anti-SLAPP protections beyond the right to petition the government to protect expressive activity more generally." Sigmund D. Schutz & Alexandra A. Harriman, *Maine's New Anti-SLAPP Law: the Uniform Public Expression Protection Act (UPEPA)*, 40 ME. BAR J. 10, 10 (2025). Under UPEPA, a party may move to dismiss a SLAPP based on its "[e]xercise of the right of freedom of speech or of the press, the right to assemble or petition or the right of association, guaranteed by the United States Constitution or by the Constitution of Maine, on a matter of public concern." 14 M.R.S.A. § 733(2)(C). This "align[ing of] Maine law with a best-practice statute" reflects the state's desire to provide speakers with a clear "tool to deter and defeat meritless defamation, privacy, and other claims that threaten to chill the exercise of First Amendment rights in Maine." Schutz & Harriman, *supra*, at 12.

25283359.2

flourishing marketplace of ideas and to protect the exercise of our constitutional rights to free speech and to petition government for redress of our grievances—true bulwarks of our democratic society." *Id.* at 32.

Starting in 1989, states began adopting "anti-SLAPP" laws to prevent such suits and their "chilling effect on the grass-roots exercise of First Amendment rights, such as petitioning the government for a redress of grievances." Smolla, Rights and Liabilities in Media Content § 6:103. As of January 2026, 39 states, including Maine, have enacted anti-SLAPP legislation. *Updates to the 2025 Anti-SLAPP Report Card*, INST. FOR FREE SPEECH (Jan. 16, 2026), https://www.ifs.org/blog/updates-to-the-2025-anti-slapp-report-card/.

Maine adopted its first anti-SLAPP statute, 14 M.R.S.A. § 556 ("Section 556"), in 1995 with unanimous support in the legislature. Osborn & Thaler, *supra*, at 34. Section 556 is "intended to provide for the swift and early dismissal of frivolous lawsuits that are meant to discourage the defendant's exercise of [its] First Amendment right to petition." *Weinstein v. Old Orchard Beach Fam. Dentistry, LLC*, 2022 ME 16, ¶ 4, 271 A.3d 758, 763. A party seeking to prevail on a special motion to dismiss a lawsuit under Section 556 must "show that the suit was based on some activity that would qualify as an exercise of the defendant's First Amendment right to petition the government." *Schelling v. Lindell*, 2008 ME 59, ¶ 7, 942 A.2d 1226, 1229. For it to apply the court must as a predicate find that the

22

25283359.2

claim at issue is "based on the moving party's exercise of [its] right of petition under the Constitution of the United States or the Constitution of Maine." 14 M.R.S.A. § 556. "A party's exercise of its right of petition" is defined under the statute as:

> [A]ny written or oral statement made before or submitted to a legislative, executive or judicial body, or any other governmental proceeding; any written or oral statement made in connection with an issue under consideration or review by a legislative, executive or judicial body, or any other governmental proceeding; any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive or judicial body, or any other governmental proceeding; *any statement reasonably likely to enlist public participation in an effort to effect such consideration*; . . . or any other statement falling within constitutional protection of the right to petition government.

*Id.* (emphasis added).

This definition "cast[] its net widely in its efforts to protect the right to petition." Osborn & Thaler, *supra*, at 35. The "statute manifest[ed] a breadth of scope beyond that of many other states' anti-SLAPP laws" at the time, particularly in its definition of "a party's exercise of its right of petition." *Id.* It did not limit qualifying speech, as some states did, to "statements to government bodies or representatives . . . nor to issues currently under consideration." *Id.* Instead, "Section 556 is, by its explicit terms, quite broad, providing its qualified immunity to even the most indirect of exercises of one's right to petition government." *Id.*; *see also Schelling*, 2008 ME 59, ¶¶ 11–12, 942 A.2d at 1230 ("Maine's anti-SLAPP

23

25283359.2

statute very broadly defines the exercise of the 'right to petition.' . . . As is clear from the language of section 556, the Legislature intended to define in very broad terms those statements that are covered by the statute."); *Thurlow v. Nelson*, 2021 ME 58, ¶ 24, 263 A.3d 494, 503 (referring to Section 556's "broad reach"); *Desjardins v. Reynolds*, 2017 ME 99, ¶ 18, 162 A.3d 228, 236 ("The Legislature has chosen to protect petitioning activity by broadly defining a 'party's exercise of its right of petition.'" (citation omitted)).

Crucially for any organization defending its publication of information on a matter of public concern, "[t]he definition of the right to petition the government . . . *is unquestionably broad enough to encompass activities related to matters not currently pending before a legislative body.*" *Schelling*, 2008 ME 59, ¶ 14, 942 A.2d at 1231 (emphasis added). In *Schelling v. Lindell*, the Maine Supreme Court rejected the argument that a letter to an editor on an "ongoing" controversy could not be considered petitioning activity. The court reasoned that "the statute's definition of the right to petition the government cannot be limited to speech concerning issues currently awaiting specific action before a public body" because the "language is plainly meant to extend to statements that may have the effect of bringing an issue not currently under consideration into consideration or review by any governmental body." *Id.* This broad interpretation of a party's right to petition

24

is consistent with the language of the statute and the intent of the Maine legislature to discourage SLAPPs.

Judicial decisions from Massachusetts' courts, interpreting identical language from the Commonwealth's statute, provide further guidance.[3]  In *Cardno ChemRisk, LLC v. Foytlin*, the Supreme Judicial Court of Massachusetts found that an article by environmental activists, published online in the Huffington Post, that criticized a chemical company fit "squarely within the" law's provision for "any statement reasonably likely to enlist public participation."  476 Mass. 479, 486, 68 N.E.3d 1180, 1188 (2017) (citation omitted).  The court reasoned that the article "formed part of the defendants' ongoing efforts to influence governmental bodies by increasing the amount and tenor of coverage around the environmental consequences of [an oil] spill, and it closes with an implicit call for its readers to take action." *Id.* In *Thomson v. Town of Andover Board of Appeals*, the Superior Court of Massachusetts held that letters published in the *Boston Globe* alleging that a party was "engaging in environmentally unsound or dangerous activities" were "reasonably likely to enlist public participation" because they were "written to bolster the cause" that environmentalists had been advocating.  No. 931716, 1995

---

[3]    *See Mabee v. Eckrote*, No. 1:19-CV-00432-JDL, 2020 WL 1171939, at *2 (D. Me. Mar. 11, 2020) ([T]he Massachusetts Supreme Judicial Court's interpretation of the Massachusetts anti-SLAPP statute 'provides useful guidance for interpreting Maine's [substantively identical anti-SLAPP] statute.'" (quoting *Gaudette v. Mainely Media, LLC*, 2017 ME 87, ¶ 15, 160 A.3d 539, 543 & n.2)).

25283359.2

WL 1212920, at *1 (Mass. Super. Ct. July 25, 1995).  And, in *Aldana v. Worcester Digital Marketing, LLC*, the Superior Court of Massachusetts found that an article lamenting the fact that plaintiff had been released on bail triggered the anti-SLAPP statute.  The article was "indicative of" the author's view of a "failed justice system" and was aimed "to encourage governmental review of bail and sentencing policies and to enlist public participation in an effort to effect governmental review of those issues."  No. WOCV20191689C, 2020 WL 5993103, at *1, *3 (Mass. Super. Ct. Aug. 12, 2020).

Applying the foregoing authorities, MBAF's Report also satisfies the requirement that it be "likely to enlist public participation" and therefore constitutes petitioning activity.  The Report is intended to engage the public on an issue of public importance—one that has both commercial *and* political components—to effect awareness and promote change.  MBAF is far from speaking into the void.  MBAF's Report speaks to an issue that government entities have addressed and will continue to address through regulation.  Indeed, the National Marine Fisheries Service, part of the National Oceanic and Atmospheric Administration ("NOAA Fisheries"), has introduced regulations in recent years designed to address threats to North Atlantic right whales posed by lobster fishing gear.  *See, e.g.*, *NOAA Fisheries Announces New Lobster and Jonah Crab Fisheries Regulations to Help Save Endangered North Atlantic Right Whales*, NOAA FISHERIES (Aug. 31, 2021),

25283359.2

https://www.fisheries.noaa.gov/media-release/noaa-fisheries-announces-new-lobster-and-jonah-crab-fisheries-regulations-help-save.  Assigning a red rating and recommending that readers "avoid" lobster caught in particular waters "due to risks to the critically endangered North Atlantic right whale and insufficient measures for reducing these risks," JA57, increases the "amount and tenor of coverage" around an environmental issue and includes an "implicit call for [] readers to take action." MBAF need not have included an explicit call for action before a judicial, legislative, or governmental body for its statements to qualify as petitioning activity. *Schelling*, 2008 ME 59, ¶ 14, 942 A.2d at 1231.  Were it otherwise, whole swaths of speech, including opinion journalism on public affairs, would fall outside the protections of the anti-SLAPP statute.

The Report constitutes petitioning activity as defined by Section 556 and understood by courts in Maine and elsewhere, and Maine's anti-SLAPP law in effect at the time of publication should be applied.

27

25283359.2

## CONCLUSION

For the foregoing reasons, amici respectfully urge the Court to reverse the District Court's denial of Defendant-Appellant's motion to dismiss for failure to state a claim and its denial of the special motion to dismiss under 14 M.R.S.A. § 556.

DATED: February 4, 2026                    Respectfully submitted,

_/s/ Sigmund D. Schutz_
Sigmund D. Schutz, Bar #80591
Alexandra A. Harriman, Bar #1196232
PRETI FLAHERTY
One City Center
Portland, ME 04101
Phone: 207-791-3000
sschutz@preti.com
aharriman@preti.com

_Counsel of Record for Amici Curiae_

Lisa Zycherman*
Mara Gassmann*
Annie Seminara*
REPORTERS COMMITTEE FOR
    FREEDOM OF THE PRESS
1156 15th Street NW, Ste. 1020
Washington, D.C. 20005
Phone: 202-795-9300
lzycherman@rcfp.org

*Of Counsel

25283359.2

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7) because the brief contains 6,389 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

DATED: February 4, 2026                     */s/ Sigmund D. Schutz*
                                            Sigmund D. Schutz, Bar #80591

                                            *Counsel of Record for Amici Curiae*

25283359.2

## CERTIFICATE OF SERVICE

I, Sigmund D. Schutz, hereby certify that I have filed the foregoing Brief of Amici Curiae electronically with the Clerk of the Court for the United States Court of Appeals for the First Circuit using the appellate CM/ECF system. I certify that all participants in this case are registered CM/ECF Filers and will be served by the CM/ECF system.

DATED: February 4, 2026

*/s/ Sigmund D. Schutz*
Sigmund D. Schutz, Bar #80591

*Counsel of Record for Amici Curiae*

30

25283359.2

## APPENDIX A: Statements of Identity of Amici Curiae

**The Reporters Committee for Freedom of the Press** (the "Reporters Committee") is an unincorporated non-profit association. The Reporters Committee was founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.

**The Atlantic Monthly Group LLC** is the publisher of *The Atlantic* and TheAtlantic.com. Founded in 1857 by Oliver Wendell Holmes, Ralph Waldo Emerson, Henry Wadsworth Longfellow and others, *The Atlantic* continues its 160-year tradition of publishing award-winning journalism that challenges assumptions and pursues truth, covering national and international affairs, politics and public policy, business, culture, technology and related areas.

**Bangor Publishing Company** is a family-owned business now in its fourth generation of ownership. The company was founded in 1889 by the great-grandfather of our current publisher, Richard J. Warren. Bangor Publishing has produced Maine's newspaper of record, the *Bangor Daily News*, for more than 135 years.

31

25283359.2

**Boston Globe Media Partners, LLC** publishes *The Boston Globe*, the largest daily newspaper in New England.

**The Maine Freedom of Information Coalition** is a nonprofit that unites the Maine Press Association, the Maine Association of Broadcasters, the New England First Amendment Coalition, the Maine Library Association, public employees, and private individuals in the goal of educating all Mainers, from individual citizens to educators, students, the media, legal professionals, public and business officials, about their rights and responsibilities as citizens of our democracy. The Coalition aims to broaden knowledge and awareness of the First Amendment and state laws aimed at assuring public access to government proceedings and government records.

**The Maine Center for Public Interest Reporting** is a non-profit organization founded in 2009 to address Maine's need for investigative reporting on issues impacting local communities. It publishes *The Maine Monitor*, dedicated to delivering high-quality, nonpartisan investigative and explanatory journalism to inform Mainers about issues impacting our state and empower them to be engaged citizens, and to keeping that reporting free to read and republish.

**The Maine Trust for Local News** is a Maine low-profit limited liability company owned by the National Trust for Local News. It is Maine's largest news organization and maintains digital news websites including pressherald.com, sunjournal.com, and centralmaine.com. It publishes newspapers, including the

32

*Portland Press Herald*, the *Sun Journal*, and the *Kennebec Journal*. It is a subsidiary of the National Trust for Local News, a non-profit committed to conserving and operating vibrant and sustainable local news enterprises across the country.

**The Massachusetts Newspaper Publishers Association** is the legal and legislative organization representing newspapers in Massachusetts.

**The McClatchy Company, LLC** is a publisher of iconic brands such as the *Miami Herald*, *The Kansas City Star*, *The Sacramento Bee*, *The Charlotte Observer*, *The* (Raleigh) *News & Observer*, and the *Fort Worth Star-Telegram*. McClatchy operates media companies in 30 U.S. markets in 16 states, providing each of its communities with high-quality news and advertising services in a wide array of digital and print formats. McClatchy is headquartered in Sacramento, California.

**The Media Institute** is a nonprofit foundation specializing in communications policy issues founded in 1979. The Media Institute exists to foster three goals: freedom of speech, a competitive media and communications industry, and excellence in journalism. Its program agenda encompasses all sectors of the media, from print and broadcast outlets to cable, satellite, and online services.

**The Media Law Resource Center, Inc.** ("MLRC") is a non-profit professional association for content providers in all media, and for their defense lawyers, providing a wide range of resources on media and content law, as well as

25283359.2

policy issues.  These include news and analysis of legal, legislative and regulatory developments;  litigation  resources  and  practice  guides;  and  national  and international media law conferences and meetings.  The MLRC also works with its membership to respond to legislative and policy proposals and speaks to the press and public on media law and First Amendment issues.  It counts as members over 125 media companies, including newspaper, magazine and book publishers, TV and radio broadcasters, and digital platforms, and over 200 law firms working in the media law field.  The MLRC was founded in 1980 by leading American publishers and broadcasters to assist in defending and protecting free press rights under the First Amendment.

**MediaNews Group** is a leader in local, multi-platform news and information, distinguished by its award-winning original content and high-quality local media.  It is one of the largest news organizations in the United States, with print and online publications across the country.

**New England First Amendment Coalition** is a non-profit organization working in the six New England states to defend, promote and expand public access to government and the work it does.  The coalition is a broad-based organization of people who believe in the power of transparency in a democratic society.  Its members include lawyers, journalists, historians and academicians, as well as private citizens and organizations whose core beliefs include the principles of the First

34

25283359.2

Amendment. The coalition aspires to advance and protect the five freedoms of the First Amendment, and the principle of the public's right to know in our region. In collaboration with other like-minded advocacy organizations, NEFAC also seeks to advance understanding of the First Amendment across the nation and freedom of speech and press issues around the world.

**New Hampshire Public Radio** is an independent, community-owned and operated 501(c)(3) organization serving the state of New Hampshire and adjacent portions of Vermont, Maine, and Massachusetts.

**The New York Times Company** is the publisher of *The New York Times* and operates the news website nytimes.com.

**The News/Media Alliance** represents over 2,200 diverse publishers in the U.S. and internationally, ranging from the largest news and magazine publishers to hyperlocal newspapers, and from digital-only outlets to papers who have printed news since before the Constitutional Convention. Its membership creates quality journalistic content that accounts for nearly 90 percent of daily newspaper circulation in the U.S., over 500 individual magazine brands, and dozens of digital-only properties. The Alliance diligently advocates for newspapers, magazine, and digital publishers, on issues that affect them today.

**The Online News Association** is the world's largest association of digital journalists. ONA's mission is to inspire innovation and excellence among

35

25283359.2

journalists to better serve the public. Membership includes journalists, technologists, executives, academics and students who produce news for and support digital delivery systems. ONA also hosts the annual Online News Association conference and administers the Online Journalism Awards.

**Pro Publica, Inc.** ("ProPublica") is an independent, nonprofit newsroom that produces investigative journalism in the public interest. It has won six Pulitzer Prizes, most recently a 2020 prize for national reporting, the 2019 prize for feature writing, and the 2017 gold medal for public service. ProPublica is supported almost entirely by philanthropy and offers its articles for republication, both through its website, propublica.org, and directly to leading news organizations selected for maximum impact. ProPublica has extensive regional and local operations, including ProPublica Illinois, which began publishing in late 2017 and was honored (along with the Chicago Tribune) as a finalist for the 2018 Pulitzer Prize for Local Reporting, an initiative with the Texas Tribune, which launched in March 2020, and a series of Local Reporting Network partnerships.

**The Society of Environmental Journalists** is the only North-American membership association of professional journalists dedicated to more and better coverage of environment-related issues.

**Society of Professional Journalists—Maine Pro Chapter** is a chapter for Maine-based reporters of the Society of Professional Journalists ("SPJ"), the

25283359.2

nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior. Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press.

**Society of Professional Journalists** ("SPJ") is dedicated to improving and protecting journalism. It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior. Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press.

**Student Press Law Center** ("SPLC") is a nonprofit, nonpartisan organization which, since 1974, has been the nation's only legal assistance agency devoted exclusively to educating high school and college journalists about the rights and responsibilities embodied in the First Amendment to the Constitution of the United States. SPLC provides free legal assistance, information and educational materials for student journalists on a variety of legal topics.

25283359.2

**USA Today Co., Inc.,** formerly known as Gannett, is the largest local newspaper company in the United States. Its more than 200 local daily brands in 43 states—together with the iconic USA TODAY—reach an estimated digital audience of 180 million each month.

25283359.2