**Nos. 25-1206, 25-1772**

In The
# United States Court of Appeals for the First Circuit

**Bean Maine Lobster, Inc.; Maine Lobstermen's Association; Maine Coast Fishermen's Association, Inc.; Maine Lobster and Processing, LLC d/b/a Atwood Lobster, LLC; Bug Catcher, Inc.,**

*Plaintiffs-Appellees*,

*v.*

**Monterey Bay Aquarium Foundation,**
*Defendant-Appellant*.

On Appeal from the United States District Court for the
District of Maine
No. 2:23-cv-00129 (Woodcock, J.)

## BRIEF OF PLAINTIFFS-APPELLEES

**RUPRECHT & BISCHOFF LLP**

Clifford Ruprecht
75 Market Street, Suite 303
Portland, ME 04101
(207) 618-5400
cruprecht@rb-lawyers.com

**VENABLE LLP**

Megan Barbero
Kevin J. Lipson
Elizabeth M. Wilson
600 Massachusetts Avenue, NW
Washington, DC 20001
(202) 344-4540
mbarbero@venable.com

Edward P. Boyle
Stephanie P. Diu
151 West 42nd Street, 49th Floor
New York, NY 10036
(212) 808-5675
epboyle@venable.com

Kyle H. Keraga
750 East Pratt Street, Suite 900
Baltimore, MD 21202
(410) 244-7650
khkeraga@venable.com

## CORPORATE DISCLOSURE STATEMENT

No Appellee has any parent corporation or any publicly held corporation that owns 10% or more of its stock.

/s/ *Megan Barbero*
Megan Barbero

# TABLE OF CONTENTS

INTRODUCTION ................................................................................ 1

STATEMENT OF JURISDICTION............................................................ 4

STATEMENT OF THE ISSUES................................................................ 4

STATEMENT OF THE CASE .................................................................. 5

    A.   Factual Background .............................................................. 5

    B.   Procedural History ............................................................ 13

SUMMARY OF ARGUMENT ................................................................ 17

STANDARD OF REVIEW.................................................................... 21

ARGUMENT .................................................................................... 21

  I.   The Circumstances-of-Publication Exception to the to the Group-Defamation Rule Applies to Plaintiffs' Claim .................... 21

    A.   The Group-Defamation Rule Does Not Apply Where a Plaintiff Can Show Special Application ................................ 22

    B.   Plaintiffs Plausibly Allege that the Circumstances-of-Publication Exception Applies ................................ 27

  II.  The Aquarium's Statements are Factual Assertions, Not Scientific Opinions .................................................................. 35

    A.   Courts Protect Scientific Theories in Scientific Journals, Not Factual Assertions in Consumer Periodicals ................... 35

    B.   The Aquarium's Statements are Commercial Advocacy, Not Scientific Theory ................................ 41

  III. The District Court Correctly Denied the Aquarium's anti-SLAPP Motion. ............................................................ 48

    A.   The Seafood Watch Report and Media Statements Are Consumer Advocacy, Not Petitioning Activity. ...................... 49

    B.   The Aquarium's Statements Lacked any Reasonable Factual Support and Caused Actual Injury. .......................... 54

  IV. This Court Should Reconsider its Jurisdiction over this Interlocutory Appeal ...................................................... 60

CONCLUSION.................................................................................. 66

ii

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Abbas v. Foreign Pol'y Grp., LLC*,
783 F.3d 1328 (D.C. Cir. 2015) .......................................................... 63

*Advance Dx, Inc. v. YourBio Health, Inc.*,
753 F. Supp. 3d 53 (D. Mass. 2024) ........................................ 36, 37, 41

*Alexis v. District of Columbia*,
77 F. Supp. 2d 35 (D.D.C. 1999) ......................................................... 26

*Alvord-Polk, Inc. v. F. Schumacher & Co.*,
37 F.3d 996 (3d Cir. 1994) .................................................................. 25

*Arcand v. Evening Call Publ'g Co.*,
567 F.2d 1163 (1st Cir. 1977) ............................................................. 22

*Arthur v. Offit*,
2010 WL 883745 (E.D. Va. Mar. 10, 2010) ......................................... 42

*Ball v. Taylor*,
416 F.3d 915 (8th Cir. 2005) .............................................................. 25

*Ballard v. Wagner*,
877 A.2d 1083 (Me. 2005) .................................................................. 35

*Barger v. Playboy Enters., Inc.*,
564 F. Supp. 1151 (N.D. Cal. 1983) .............................................. 32, 33

*Batzel v. Smith*,
333 F.3d 1018 (9th Cir. 2003) ............................................................ 62

*Black v. CNN, Inc.*,
423 So.3d 2 (Fla. Dist. Ct. App. 2025) .......................................... 40, 44

*Blackwell v. Wyeth*,
971 A.2d 235 (Md. 2009) ............................................................. 40, 42

*Blakesley v. Marcus*,
158 F.4th 90 (1st Cir. 2025) ...................................................... 21, 62, 64

*Brady v. Ottaway Newspapers, Inc.*,
84 A.D.2d 226 (N.Y. App. Div. 1981) .............................. 25, 26, 32, 34

iii

*Camden Nat'l Bank v. Weintraub*,
 143 A.3d 788 (Me. 2016) ........................................................................54

*Caraballo-Seda v. Mun. of Hormigueros*,
 395 F.3d 7 (1st Cir. 2005) .......................................................................61

*Carbone v. CNN, Inc.*,
 910 F.3d 1345 (11th Cir. 2018)...............................................................63

*Cassava Scis., Inc. v. Bredt*, 2
 024 WL 1347362 (S.D.N.Y. Mar. 28, 2024) ....................................42, 44

*Castrol Inc. v. Pennzoil Co.*,
 987 F.2d 939 (3d Cir. 1993) ....................................................................43

*Cheng v. Neumann*,
 106 F.4th 19 (1st Cir. 2024).....................................................................65

*Church of Scientology International v. Time Warner, Inc.*,
 806 F. Supp. 1157 (S.D.N.Y. 1992) .........................................................30

*Conformis, Inc. v. Aetna, Inc.*,
 58 F.4th 517 (1st Cir. 2023)............................................................. passim

*Coomer v. Make Your Life Epic LLC*,
 98 F.4th 1320 (10th Cir. 2024) ..........................................................62, 64

*Daubert v. Merrell Dow Pharms., Inc.*,
 509 U.S. 579 (1993) .................................................................................42

*Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aero.*
 *Workers Local Lodge 207 v. Raimondo*,
 18 F.4th 38 (1st Cir. 2021)......................................................................56

*Eastman Chem. Co. v. Plastipure, Inc.*,
 775 F.3d 230 (5th Cir. 2014).......................................................... passim

*Elias v. Rolling Stone LLC*,
 872 F.3d 97 (2d Cir. 2017) .................................................................25, 30

*Emerito Estrada Rivera-Isuzu de P.R., Inc. v.*
 *Consumers Union of U.S., Inc.*,
 233 F.3d 24 (1st Cir. 2000) ................................................................33, 34

*Ernst v. Carrigan*,
 814 F.3d 116 (2d Cir. 2016) ...............................................................62, 64

*Fawcett Publications, Inc. v. Morris,*
377 P.2d 42 (Okla. 1962)......................................................26, 30

*Florio v. Gallaudet Univ.,*
119 F.4th 67 (D.C. Cir. 2024) .............................................23, 25, 27, 31

*Franchini v. Investor's Business Daily, Inc.,*
981 F.3d 1 (1st Cir. 2020) ........................................................62, 63

*Fratello v. Mann,*
339 A.3d 804 (Me. 2025) ......................................................14, 48, 49

*Friends of Falun Gong v. Pac. Cultural Enter., Inc.,*
288 F. Supp. 2d 273 (E.D.N.Y. 2003) .....................................................31

*Garey v. Stanford Mgmt., LLC,*
319 A.3d 1022 (Me. 2024) ................................................................22

*Gaudette v. Davis,*
160 A.3d 1190 (Me. 2017) ................................................................54

*Gaudette v. Mainely Media, LLC,*
160 A.3d 539 (Me. 2017) ................................................................49

*Golden N. Airways, Inc. v. Tanana Publ'g Co.,*
218 F.2d 612 (9th Cir. 1954)........................................................25, 26

*Gopher Media LLC v. Melone,*
154 F.4th 696 (9th Cir. 2025) .....................................................62, 63

*Gray v. St. Martin's Press, Inc.,*
221 F.3d 243 (1st Cir. 2000) ............................................................36

*Hearts with Haiti, Inc. v. Kendrick,*
202 A.3d 1189 (Me. 2019) ..........................................................50, 51

*Hudson v. Guy Gannet Broad. Co.,*
521 A.2d 714 (Me. 1987) ........................................................25, 29, 33

*JB & Assocs., Inc. v. Neb. Cancer Coal.,*
932 N.W.2d 71 (Neb. 2019)........................................................26, 29

*Jenkins v. KYW,*
829 F.2d 403 (3d Cir. 1987) ............................................................33

*Joseph v. Springer Nature,*
2021 WL 1372952 (S.D.N.Y. Apr. 12, 2021) ........................................42

*Klocke v. Watson*,
  936 F.3d 240 (5th Cir. 2019)....................................................... 63

*Ky. Fried Chicken of Bowling Green, Inc. v. Sanders*,
  563 S.W.2d 8 (Ky. 1978)............................................................ 32

*La Liberte v. Reid*,
  966 F.3d 79 (2d Cir. 2020) ................................................ 34, 63

*Levinsky's, Inc. v. Wal-Mart Stores, Inc.*,
  127 F.3d 122 (1st Cir. 1997). .................................................... 48

*LLT Mgmt. LLC v. Emory*,
  766 F. Supp. 3d 576 (E.D. Va. 2025)................................... 41, 42

*Los Lobos Renewable Power, LLC v. AmeriCulture, Inc.*,
  885 F.3d 659 (10th Cir. 2018).................................................... 63

*Maine People's All. v. Mallinckrodt, Inc.*,
  471 F.3d 277 (1st Cir. 2006) ..................................................... 43

*Malone v. WP Co., LLC*,
  2023 WL 6447311 (W.D. Va. Sep. 29, 2023)............................. 44

*Mamani v. Berzain*,
  825 F.3d 1304 (11th Cir. 2016)................................................. 61

*Marr v. Putnam*,
  246 P.2d 509 (Or. 1952) ........................................................... 33

*McCullough v. Cities Serv. Co.*,
  676 P.2d 833 (Okla. 1984).......................................................... 27

*McNeill-P.C.C., Inc. v. Bristol-Meyers Squibb Co.*,
  938 F.2d 1544 (2d Cir. 1991) .................................................... 43

*Metabolife Int'l, Inc. v. Wornick*,
  264 F.3d 832 (9th Cir. 2001)..................................................... 43

*Mimedx Grp., Inc. v. Osiris Therap., Inc.*,
  2017 WL 3129799 (S.D.N.Y. Jul. 21, 2017) .............37, 41, 45, 47

*Mzamane v. Winfrey*,
  693 F. Supp. 2d 442 (E.D. Pa. 2010) ......................................... 29

*NAACP v. Claiborne Hardware Co.*,
  458 U.S. 886 (1982) .................................................................. 53

*Nader v. Me. Democratic Party,*
41 A.3d 551 (Me. 2012) ........................................................52, 55, 58, 60

*Nat'l Nutritional Foods Ass'n v. Whelan,*
492 F. Supp. 374 (S.D.N.Y. 1980) .......................................................29

*New York Times Co. v. Sullivan,*
376 U.S. 254 (1964) .......................................................................34

*ONY, Inc. v. Cornerstone Therapeutics, Inc.,*
720 F.3d 490 (2d Cir. 2013) ..................................................... passim

*Pacira BioSciences, Inc. v. Am. Soc'y of Anesth., Inc.,*
63 F.4th 240 (3d Cir. 2023).......................................................... passim

*Piccone v. Bartels,*
785 F.3d 766 (1st Cir. 2015) ................................................................36

*Plante v. Long,*
170 A.3d 243 (Me. 2017) ....................................................................64

*Pollack v. Fournier,*
237 A.3d 149 (Me. 2020) ........................................................49, 51, 53

*Pratt v. Nelson,*
164 P.3d 366 (Utah 2007) ..............................................................26, 27

*Price v. Viking Press, Inc.,*
625 F. Supp. 641 (D. Minn. 1985) ....................................................24

*Robinson v. Guy Gannett Publ'g Co.,*
297 F. Supp. 722 (D. Me. 1969) ........................................................24

*Sanchez v. United States,*
740 F.3d 47 (1st Cir. 2014) ................................................................62

*Santiago v. Puerto Rico,*
655 F.3d 61 (1st Cir. 2011) ................................................................21

*Schelling v. Lindell,*
942 A.2d 1226 (Me. 2008) ..................................................................53

*Service Parking Corp. v. Wash. Times Co.,*
92 F.2d 502 (D.C. Cir. 1937)..............................................................22

*Shire City Herbals, Inc. v. Blue,*
2016 WL 2757366 (D. Mass. May 12, 2016) ......................................53

*Thomas v. Jacksonville Television, Inc.*,
  699 So.2d 800 (Fla. Dist. Ct. App. 1997) ............................................. 32

*Thurlow v. Nelson*,
  263 A.3d 494 (Me. 2021) ......................................................... 20, 52, 55

*Torrey v. Infectious Disease Soc'y of Am.*,
  86 F.4th 701 (5th Cir. 2023) ............................................. 36, 39, 40, 42

*Town of Madawaska v. Cayer*,
  103 A.3d 547 (Me. 2014) ............................................................... 49, 52

*Tucker v. Fischbein*,
  237 F.3d 275 (3d Cir. 2001) ............................................................ 33, 64

*Underwager v. Salter*,
  22 F.3d 730 (2d Cir. 1994) .................................................................. 44

*United States ex rel. Michaels v. Agape Senior Cmty., Inc.*,
  848 F.3d 330 (4th Cir. 2017) .............................................................. 61

*United States v. Gissantaner*,
  990 F.3d 457 (6th Cir. 2021) .............................................................. 45

*Vasquez v. Whole Foods Mkt., Inc.*,
  302 F. Supp. 3d 36 (D.D.C. 2018) ...................................................... 24

*Weatherhead v. Globe Int'l, Inc.*,
  832 F.2d 1226 (10th Cir. 1987) .......................................................... 31

*Weinstein v. Bullick*,
  827 F. Supp. 1193 (E.D. Pa. 1993) ..................................................... 29

## Statutes

14 M.R.S. § 556 ............................................................................... passim

28 U.S.C. § 1292(b) ......................................................................... 4, 16

28 U.S.C. § 1332(a) ............................................................................... 4

## Rules

Fed. R. Evid. 702 ................................................................................. 43

## Other Authorities

1 Sack on Defamation § 4:3.7 ................................................................. 65

David A. Elder, *Small Town Police Forces, Other Governmental Entities and the Misapplication of the First Amendment to the Small Group Defamation Theory—A Plea for Fundamental Fairness for Mayberry*, 6 U. Pa. J. Const. L. 881 (2004) .......................................................... 25

H.M. Pettis, et al., North Atlantic Right Whale Consortium 2024 Annual Report Card (2025) ........................................................ 59

Record of Decision for the Final Environmental Impact Statement on Amendment to the Atlantic Large Whale Take Reduction Plan, NMFS (2021). .................................................. 59

Restatement (Second) of Torts § 564A .................................. 1, 17, 23, 27

S.M. Sharp et al., *Gross and Histopathologic Diagnoses from North Atlantic Right Whale Eubalaena Glacialis Mortalities Between 2003 and 2018*, 135 Diseases of Aquatic Organisms (2019) ......................................... 59

Stedman's Med. Dictionary 1731 (28th ed. 2006) .................................... 40

## INTRODUCTION

For decades, the Maine lobster-fishing community has diligently protected the North Atlantic right whale. Those efforts have succeeded. Between 2004 and 2022, Maine lobster-fishing gear did not cause even one right whale entanglement or fatality. But in 2022, the Monterey Bay Aquarium lowered its Seafood Watch rating of Maine lobster to "red," urging consumers not to buy Maine lobster and declaring the fishery a threat to the whale's survival. That claim was false, and the Aquarium ignored contrary evidence when making it.

Consumers, wholesalers, and restaurants recognized the Aquarium's statements applied to Plaintiffs, three lobster businesses and two trade associations. Some expressly cited the "red" rating to cut ties with Plaintiffs, harming their reputations and livelihoods. The district court found these "circumstances of publication" led readers to identify Plaintiffs specifically, even though the Aquarium referred to the Maine lobster fishery generally. Restatement (Second) of Torts § 564A. Far from holding that "the Aquarium could be liable for defaming the entire industry," Br. 1, the district court held only that Plaintiffs alleged special application to themselves. That narrow holding is correct.

The district court properly recognized that the group-defamation rule is not absolute. Even a member of a large group can bring suit if the circumstances of publication create a special application to that member. And extrinsic circumstances can support such an inference even if the statements did not mention "any particular company" by name. Br. 2. The circumstances alleged here led readers to recognize Plaintiffs as the subject of the Aquarium's remarks. The complaint offers examples of purchasers who stopped doing business with Plaintiffs because of the Aquarium's "red" rating. And the associations, which lead the industry's efforts to protect the whale, are directly implicated by the Aquarium's assertion that those efforts failed.

Nor can the Aquarium's statements be reasonably characterized as "nonactionable scientific opinions." Br. 3. The Aquarium claimed right whales are becoming entangled in Maine lobster-fishing gear, "putting the species at risk of extinction." JA29. That is a factual assertion, not a scientific theory. It was advanced in a forum demanding consumer action, not an academic journal inviting scholarly debate. And it was framed as conclusive without disclosing the contradictory data.

2

The Aquarium's contention that the district court should have dismissed this case by applying Maine's anti-SLAPP law, Br. 4, is meritless. The anti-SLAPP statute applies only to petitioning activity—and Seafood Watch seeks to effect change in the private sector, not regulatory action. And regardless, the district court correctly found Plaintiffs offered prima facie evidence that at least one statement lacks factual support. Any conflicts in the evidence should be resolved through discovery, not foreclosed at the motion to dismiss stage.

This Court generally refuses to hear interlocutory appeals from denials of motions to dismiss. And this case is particularly ill-suited for the extraordinary appellate vehicles the Aquarium invoked. The merits issues raised under Section 1292(b) are fact-specific, not pure issues of law. The collateral-order appeal of the anti-SLAPP motion denial is entangled with the element of "falsity," not distinct from the merits—which is why other circuits have increasingly refused to allow anti-SLAPP appeals. And the issues turn on state-law principles best resolved by the Supreme Judicial Court of Maine. Ultimately, the Aquarium's appeal rests only on disagreement with the district court's application of the law to the facts alleged in the complaint. That does not justify interlocutory review.

3

## STATEMENT OF JURISDICTION

The district court had diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). JA19. This appeal arises from that court's order denying the Aquarium's motion to dismiss under Rule 12(b)(6) and Maine's anti-SLAPP statute. JA1902. The Aquarium appealed the anti-SLAPP ruling under the collateral order doctrine. JA1916. The district court certified its Rule 12(b)(6) ruling for interlocutory appeal, and this Court granted permission to appeal. JA1928; 28 U.S.C. § 1292(b). Plaintiffs maintain that appeal on these grounds is improper. *See infra* Section IV.

## STATEMENT OF THE ISSUES

1. Are the Aquarium's statements actionable under the circumstances-of-publication exception to the group-defamation rule where consumers and businesses reasonably recognized that those statements refer to the Plaintiffs?

2. Are the Aquarium's statements actionable factual assertions where they refer to ordinary causal issues rather than scientific theories, and are published in a consumer advocacy periodical rather than a peer-reviewed scientific journal?

4

3. Is Maine's anti-SLAPP statute inapplicable where the Aquarium's statements seek change in the private sector, not by the government, and Plaintiffs have made a prima facie showing that those statements lack reasonable factual support?

4. Should this court reconsider its interlocutory jurisdiction given that Section 1292(b) requires pure issues of law and the collateral order doctrine applies only to orders distinct from the merits?

## STATEMENT OF THE CASE

### A.  Factual Background

#### 1.  Maine Lobstermen Have Long Embraced Conservation Efforts to Protect the Right Whale

Maine lobstermen are "stewards of the State's natural resources." JA14. They have long pioneered "efforts to make lobster fishing environmentally sustainable." JA14. For more than 150 years, the lobster-fishing community has voluntarily embraced conservation measures to preserve marine wildlife. JA22. And for many decades, fishermen have worked with governments and industry to protect the endangered North Atlantic right whale. JA23-25. Today, both the State of Maine and the lobster industry carefully manage lobster-fishing practices to prevent harm to the whale and preserve marine resources. JA22; JA25.

5

Maine lobstermen "have been in the forefront of efforts to design" measures to protect the right whale. JA1751. They worked with scientists and regulators to design the Atlantic Large Whale Take Reduction Plan, which the National Marine Fisheries Service (NMFS) enacted in 1997. JA23. They added sinking lines between traps, reduced the total amount of rope in use, and implemented breakable "weak rope." JA23. They also went beyond the Plan by further reducing the number of ropes in use and maintaining whale protections in exempt waters. JA25. NMFS amended the Plan in 2021 by closing another 1,000 square miles of fishing grounds for four months each year, reducing the number of buoy lines, and requiring weaker ropes that can break more easily. JA24-25. In 2022, NOAA "acknowledge[d] the tremendous efforts of fishermen" in designing and implementing these measures. JA1751.

These proactive steps "significantly reduced the frequency and severity of interactions between whales and U.S. fishing gear." JA23-24. They led to the removal of 30,000 miles of rope from New England waters. JA23. The global right whale population tripled from 150 in 1971 to 481 in 2011. JA23. Total entanglements with U.S. fishing gear declined by 90% since 2009 and no entanglements with Maine gear were reported

6

between 2004 and 2022. JA34. Although the whale's mortality rate has increased since 2017, JA34, just one fatality has been connected to Maine lobster-fishing gear, JA24, JA1892-93.

### 2. The Aquarium Urged Consumers to Stop Purchasing Maine Lobster Even as Maine Lobster Fishing Was Getting Safer

The Aquarium operates Seafood Watch, a program that encourages businesses and consumers to source sustainable seafood. JA25. Seafood Watch aims to "spark change throughout the supply chain" by securing commitments from "major seafood buyers, including restaurants, grocery stores, and retailers" to follow its recommendations. JA26. It also rates seafood products based on environmental impact:

- Products with a "green" rating are the "best choice," and considered "caught or farmed responsibly." JA27.

- Products with a "yellow" rating are a "good alternative," reflecting "concerns with how they're caught, farmed, or managed." JA28.

- Products with a "red" rating are marked "avoid," indicating "a critical conservation concern." JA27.

These ratings are based on Seafood Watch's "guiding principles," JA27, which examine each fishery's impact on endangered species and management measures taken to maintain a sustainable stock. JA27-28.

In 2014, the Aquarium gave Maine-caught lobster an intermediate "yellow" rating. JA28. The Aquarium explained that Maine lobster fishing "align[s] with most of" Seafood Watch's "guiding principles," but asserted that there were still outstanding entanglement concerns. JA28. Maine lobstermen had already adopted the Take Reduction Plan requirements, but they "implemented even more changes" following the yellow rating and the 2021 Plan amendments. JA28. From the yellow rating's publication in 2014 until the red rating's release in 2022, no right whale entanglements were reported in the Maine fishery's waters. JA24. And data collected by the U.S. and Canadian governments does not identify a single right whale fatality connected to Maine lobster-fishing gear during that time. JA33-34.

Plaintiffs learned that the Aquarium was prepared to downgrade the rating of Maine lobster in February 2020. JA38-39. For the next two years, they gave the Aquarium evidence detailing the connection between whale fatalities and Canadian fishing gear, and the lack of connection to

Maine lobster fishing. JA39. But the Aquarium "discounted" this information because it came from industry sources. JA38-39; JA1884. The Aquarium did not disclose this data to Seafood Watch readers. Nor did it explain to readers why it had disregarded this information.

Although the data showed that Maine lobster fishing was getting safer, the Aquarium downgraded the Maine lobster fishery from "yellow" to "red" in 2022. JA28; JA31. The Aquarium declared that there were "significant risks of entanglement" in Maine lobster-fishing gear and a "lack of timely, effective management" needed to protect the right whale population. JA28-29. And it urged consumers to "avoid" and "take a pass" on lobster, specifically highlighting the Gulf of Maine/Georges Bank region that encompasses the Maine fishery. JA27-28.

The Aquarium assured the public its findings were the result of a "rigorous, transparent, science-based process" examining "all available scientific data." JA29. But when the Aquarium issued this "red" rating, it possessed concrete data attributing the increase in fatalities to other sources. JA38-39. Leading studies attributed most fatalities to climate change, ship strikes, and Canadian snow crab fishing—not Maine lobster fishing. JA30-34. Shifts in prey populations led the right whale to largely

abandon the Gulf of Maine for the Gulf of St. Lawrence, in Canada. JA31. This migration exposed right whales to "vessel strikes and entanglement by heavy, deep-water snow crab gear." JA31. Canadian fishing gear and other hazards in Canadian waters caused 12 right whale deaths in 2017 and another 11 in 2019. JA32. And Maine lobster-fishing gear caused no right whale fatalities during this time. JA32.

The Aquarium rejected this data and did not disclose it. JA37-38. Instead, it "falsely depicted the Maine lobster fishery as being directly responsible for right whale injuries and mortalities" JA15, stating:

- "[M]anagement measures and the Atlantic Large Whale Take Reduction Plan have not been successful at reducing serious injury and mortality to the North Atlantic right whale."

- "Based on the available information and the significant risks to [the right whale], the American lobster fishery cannot be considered sustainable."

- "The updated assessments highlight significant risks of en-tanglement in pot, trap, and gillnet fisheries to the endan-gered North Atlantic right whale and the lack of timely,

10

effective management necessary to mitigate entanglement risks and promote recovery of the species."

- "At this time, each fishery using this gear is putting this protected species [i.e., the right whale] at risk of extinction."

- "No one wants to know their appetite for seafood is driving a species to extinction."

JA42-43. No evidence supported any of these assertions. JA32.

### 3. Consumers Understood the Aquarium's Statements to Refer to Plaintiffs Specifically

The Aquarium's statements had dramatic effects on the Plaintiffs. JA44. Plaintiffs are a family fishing company, two businesses that sell lobster, and two trade associations that represent lobstermen in the State of Maine. JA18-19. The Seafood Watch declared that "each fishery" operating in the Gulf of Maine/Georges Bank region posed serious risks to the right whale. JA44. But there is just one lobster fishery in that region. *See* JA20. So when the Aquarium downgraded Maine-caught lobster to "red," and declared that lobster fishing was harming the right whale, readers knew exactly whom the Aquarium meant. JA44.

Plaintiffs Bean Maine Lobster, Bug Catcher, and Atwood (the "Businesses") lost revenues, relationships, and goodwill after the release

11

of the Aquarium's report and "red" rating. JA16-17. The price of lobster cratered—and consumers, wholesalers, and restaurants stopped purchasing lobster from Plaintiffs in reliance on the Aquarium's statements. JA40-41. Bug Catcher saw a 20% decline in its business as customers turned away "[b]ecause of the 'red' rating." JA41. And Atwood "lost significant profits" when a major purchaser cut ties expressly "citing the Aquarium's 'red' listing." JA40.

The Maine Lobstermen's Association and Maine Coast Fishermen's Association (the "Associations") are "industry-led non-profit organizations that advocate for a sustainable lobster resource and the lobstermen and communities that depend on it." JA130; *see also* JA18. The Fishermen's Association "works to enhance the sustainability of Maine's fisheries" by promoting "the environmental restoration of the Gulf of Maine." JA18. And the Lobstermen's Association "leads the lobster industry's effort to save Maine's lobster fishery and endangered right whales." JA276. Both suffered economic and reputational harm from the Aquarium's statements, which falsely deride their sustainability efforts. JA18-19.

### B.   Procedural History

#### 1.   Plaintiffs Sued the Aquarium for Defamation

After failing to convince the Aquarium to reconsider the red rating, Plaintiffs sued the Aquarium for defamation on March 14, 2023. JA12, JA17. They seek compensatory damages for their economic and reputational injuries and injunctive relief. JA42-43, JA47.

In January 2024, a right whale (whale #5120) was found dead after becoming entangled in a Maine lobster-fishing line. JA1616; JA1681-82. This was the first fatality attributed to Maine lobster gear in twenty years. JA24. NOAA reported that #5120 was seen entangled on August 20, 2022. JA1681. But NOAA reports indicated that "supply chain issues" had delayed the industry's implementation of the Take Reduction Plan, JA1751, which had been scheduled to take effect on May 1, 2022, JA1744. It was thus unclear whether #5120 had become entangled in the weaker ropes mandated under current regulations. *See* JA1864.

## 2. The District Court Denied the Aquarium's Motion to Dismiss Under Rule 12(b)(6) and the Anti-SLAPP Statute

On May 22, 2023, the Aquarium moved to dismiss the Complaint under Rule 12(b)(6) and Maine's anti-SLAPP statute, 14 M.R.S. § 556,[1] and other grounds. JA1768. On February 6, 2025, the district court denied that motion, recognizing that Plaintiffs had plausibly alleged defamation under settled Maine law. JA1902-1903.

*First*, the district court held that Plaintiffs had pled an exception to the group-defamation rule. JA1878. The court recognized that statements about a group are actionable if "the circumstances of publication reasonably give rise to" a "particular reference to the member." JA1871 (cleaned up). And it held the complaint satisfied this exception. JA1873. It reasoned that the Aquarium's unqualified statements "left no room" for readers to conclude "that any subset of Maine lobstermen" were not harming the right whale. JA1874. The court also observed that readers of the Seafood Watch had actually understood the Aquarium's comments to refer "to Plaintiffs in particular." JA1877.

---

[1] While Maine's anti-SLAPP statute was replaced in 2025, the previous version, 14 M.R.S. § 556 (2024), governs here. *See Fratello v. Mann*, 339 A.3d 804, 805 n.1 (Me. 2025).

14

*Second*, the court rejected the Aquarium's efforts to characterize its claims as scientific opinions. JA1889. The court noted that the fact-opinion divide turns on whether a statement is "purely speculation" or implies "concrete facts." JA1880 (citation omitted). Applying that rule, it found the Aquarium's statements were not "tentative scientific conclusions" but assertions of "objectively verifiable fact." JA1885-1886. It concluded that the Aquarium's claims lacked "any indication of doubt or speculation." JA1882-1883. And while the Aquarium stated its claims were based on "all available scientific data," and acknowledged some "data gaps," it had "discounted" contradictory data. JA1884; JA1886.

*Third*, the district court rejected the anti-SLAPP motion, finding Plaintiffs had shown falsity and injury. JA1861-62; JA1866. It noted that Maine courts apply "a two-step process" in analyzing an anti-SLAPP motion to dismiss. JA1860. The district court declined to decide whether the Aquarium's statements constitute "petitioning activity" at the first step because it had no difficulty finding at the second step that the Plaintiffs had made a prima facie showing that the Aquarium's statements were "devoid of any reasonable factual support." JA1862. The court held that Plaintiffs had shown "that there was no factual basis for [the Aquarium's]

15

statements that the 2021 Take Reduction Plan was inadequate," as there were no right-whale entanglements with Maine gear from 2004 to 2022. JA1863. The court also found #5120's death did not support the Aquarium's claims because the supply chain issues meant #5120 may not have been entangled in rope mandated by the current Plan. JA1864.

### 3. The Aquarium Pursued an Interlocutory Appeal of the Denial of its Motion to Dismiss

Rather than proceed to discovery, the Aquarium pursued an immediate appeal. On February 27, 2025, the Aquarium appealed the denial of its anti-SLAPP motion, invoking the collateral order doctrine. JA1916, That same day, it moved to certify the court's order on the Rule 12(b)(6) motion to dismiss for appeal under 28 U.S.C. § 1292(b). JA1904.

In support of its Section 1292(b) appeal, the Aquarium argued that the district court's rulings on group defamation and scientific statements were pressing issues, and that judicial economy supported interlocutory appeal since the anti-SLAPP motion was before this Court. Petition, No. 25-8012 (1st Cir. Apr. 25, 2025). Plaintiffs argued that the district court's order fell outside the scope of Section 1292(b) because it did not raise pure questions of law—only the application of settled law to the facts at hand. Opposition, No. 25-8012 (1st Cir. May 5, 2025).

16

The district court certified the Section 1292(b) appeal on April 15, 2025, JA1918, and this Court granted the Aquarium's petition for appeal on August 12, 2025, Judgment, No. 25-8012 (1st Cir. Aug. 12, 2025). The two cases have been consolidated for review.

## SUMMARY OF ARGUMENT

**I.** The group-defamation bar does not apply. All agree that statements about large groups cannot typically support defamation claims. But a longstanding exception to that rule permits claims where "the circumstances of publication reasonably give rise to . . . [a] particular reference to the member." Restatement (Second) of Torts § 564A. When that exception is met, the individual plaintiff is defamed as readily as if they were named. And in the narrow situations where the exception applies, the concerns animating the group-defamation bar carry no force.

Such is the case here. The Aquarium's assertions can reasonably be understood as particular references to Plaintiffs, satisfying the exception. Its insistence that lobstermen are responsible for right whale mortalities led multiple consumers and businesses to cut ties with Plaintiffs. And its statement that the Maine lobster-fishing industry's protective measures have failed directly implicates the Associations, which spearhead the

17

industry's efforts to protect the right whale. These allegations clear the low hurdle of a motion to dismiss and entitle Plaintiffs to discovery.

The Aquarium's argument would narrow the circumstances-of-publication exception. First, the Aquarium partially quotes the Restatement to argue that a statement must make an express "particular reference" to the plaintiff to qualify. But courts recognize that extrinsic circumstances can yield such a reference even if the plaintiff is not named. Second, the Aquarium urges this Court to hold that statements about groups of this size are not actionable. But caselaw and the Restatement recognize that group size, while relevant, is not controlling.

**II.** The Aquarium's statements are not scientific theory, much less protected opinion. The classification of a statement as fact or opinion depends on the totality of the circumstances—including its context, its medium, its audience, and its words. The Aquarium claims right whales are becoming entangled in Maine lobster-fishing gear, "putting [the species] at risk of extinction." JA42. That is a factual assertion, not a theory developed through the scientific method. It was published in a report aiming to influence consumers, not a journal inviting debate among experts. And it did not fully disclose methodologies or contrary data, as a scientific

18

article would. Indeed, the Aquarium concedes it "discounted" data offered by Plaintiffs that contradicted its claims. JA1884.

The Aquarium cites three decision from other circuits for the notion that its statements are scientific opinions. But the fact-opinion divide examines the totality of the circumstances, and those cases do not resemble the facts at hand. All three address scientific and medical theories published in expert journals with a full disclosure of the underlying data. They do not apply when statements are directed at consumers, conceal relevant data, and lack the hallmarks of scientific inquiry. And that is precisely the situation here.

**III.** This court may affirm the denial of the Aquarium's anti-SLAPP motion under either prong of Maine's two-part analysis. The Aquarium cannot show that all of its challenged conduct is petitioning activity. Petitioning must, at the very least, encourage the government to take action or mobilize popular support to achieve the same. The Seafood Watch report on Maine lobster encouraged consumers to stop purchasing lobster in order to pressure the lobster-fishing industry to change its practices. Neither that report nor the Aquarium's related press statements sought government action.

And even if the Aquarium could show that Seafood Watch is petitioning activity, Plaintiffs made a prima facie showing that at least one challenged statement lacks factual support. Plaintiffs' evidence that no right whale fatalities were linked to Maine lobster-fishing gear between 2004 and 2024 belies the Aquarium's contention that Maine lobstermen pose a dire risk to the whale population. And Plaintiffs' evidence that the Take Reduction Plan is succeeding negates the Aquarium's assertion that those protective measures have failed. Because Plaintiffs have carried their burden, "the special motion to dismiss must be denied." *Thurlow v. Nelson*, 263 A.3d 494, 502 (Me. 2021).

**IV.** Finally, this interlocutory appeal is a uniquely poor fit for the issues the Aquarium asserts. Section 1292(b) applies to controlling questions of law but both merits issues turn on the application of law to fact. The collateral order doctrine is limited to orders distinct from the merits, but the district court decided that motion on falsity—a core component of defamation. And because the underlying questions turn on state law, not federal law, Maine's highest court is better positioned to answer them. The Aquarium's mere disagreement with the district court does not justify this extraordinary appeal.

20

## STANDARD OF REVIEW

This Court reviews de novo the denial of motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Santiago v. Puerto Rico*, 655 F.3d 61, 72 (1st Cir. 2011). This Court also reviews de novo the denial of motions to dismiss under state anti-SLAPP laws. *Blakesley v. Marcus*, 158 F.4th 90, 95 (1st Cir. 2025).

## ARGUMENT

### I. The Circumstances-of-Publication Exception to the Group-Defamation Rule Applies to Plaintiffs' Claim

The Aquarium argues that its false statements are not actionable because they apply to the entire Maine lobster industry. Br. 33. But the bar against large-group defamation does not apply when the circumstances suggest a particular reference to the plaintiff. And Plaintiffs do not bring a claim on behalf of the entire Maine lobster-fishing industry. Rather, they allege only that Seafood Watch readers could reasonably conclude that the Aquarium's statements apply to them—and that many reached that very conclusion. That is enough to state a plausible claim at the motion to dismiss stage.

## A.  The Group-Defamation Rule Does Not Apply Where a Plaintiff Can Show Special Application

Only statements "of and concerning" the plaintiff can support a defamation claim. *Garey v. Stanford Mgmt., LLC*, 319 A.3d 1022, 1027 & n.3 (Me. 2024). Typically, "[d]efamation of a large group gives rise to no civil action on the part of an individual member." *Arcand v. Evening Call Publ'g Co.*, 567 F.2d 1163, 1164 (1st Cir. 1977). But that rule does not apply if the plaintiff shows "special application of the defamatory matter to himself." *Id.* When defamatory statements are "reasonably susceptible of special application to a given individual," the balance between "the social interest in free [expression]" and "the individual interest in reputation" tilts towards personal redress. *Service Parking Corp. v. Wash. Times Co.*, 92 F.2d 502, 505-06 (D.C. Cir. 1937).

The Restatement (Second) of Torts outlines two scenarios in which statements about a group have special application to one of its members. Under Section 564A, group-defamation claims may proceed where:

(a)  the group or class is so small that the matter can reasonably be understood to refer to the member [(the small-group exception)], or

(b)  the circumstances of publication reasonably give rise to the conclusion that there is particular reference to the member [(the circumstances-of-publication exception)].

22

Restatement (Second) of Torts § 564A. Both exceptions recognize that the group-defamation rule turns on whether a statement about a group "can fairly be understood as a statement about" the plaintiff. *Florio v. Gallaudet Univ.*, 119 F.4th 67, 76 (D.C. Cir. 2024); JA1874 ("The recognized exceptions to this rule carve out situations where an individual can demonstrate special application[.]"). If the group is small, that inference may be reasonable as to all its members. If the group is large, its members can bring claims only if the circumstances bridge the gap.

This case concerns only the circumstances-of-publication exception. The Aquarium seeks to narrow that exception, arguing that (1) it requires an express mention of the plaintiff; and (2) statements about large groups are not actionable. But the circumstances-of-publication test has never required the plaintiff to be named—instead, it can be satisfied by context. And while group size is relevant, it is not dispositive.[2] Adopting the Aquarium's view of this exception would disrupt the balance of interests

---

[2] The Restatement demonstrates the point. The comments to Section 564A note that a statement like "all lawyers are shysters" may be defamatory if expressed with only one lawyer present. Restatement (Second) of Torts § 564A cmt. d. If a direct mention were required, or group size were dispositive, such a claim would be a nonstarter.

in defamation actions, offering expansive protection for obvious libel so long as it is cast in broad terms.

1. The Aquarium suggests that the circumstances-of-publication exception applies only where the statement mentions the plaintiff directly. It selectively quotes the Restatement as requiring that a statement make "'particular reference' to a specific individual," Br. 31; *see also id.* ("[A] statement concerning a large group cannot give rise to an action by one of its members unless that member is specifically identified."); Br. 24 ("[N]one of the Aquarium's statements mention any specific lobster-fishing company, let alone Plaintiffs.").

That is not the law. "[I]t is not necessary that the publication on its face mention the plaintiff by name." *Robinson v. Guy Gannett Publ'g Co.*, 297 F. Supp. 722, 726 (D. Me. 1969). Instead, "extrinsic circumstances" can demonstrate a reference to the plaintiff. *Id.*; *Vasquez v. Whole Foods Mkt., Inc.*, 302 F. Supp. 3d 36, 64 (D.D.C. 2018) ("[A] plaintiff can rely upon extrinsic evidence to show that listeners understood the statements to pertain to the plaintiff."); *Price v. Viking Press, Inc.*, 625 F. Supp. 641, 646 (D. Minn. 1985) (statement about large group actionable if "context

24

of publication raises a reasonable presumption of personal allusion.").[3]

Thus, "[e]ven in a large group context," the "circumstances known to readers" may give rise to an "individual reference as effective as if plaintiff alone were specified."[4]

And all manner of circumstances may be considered in evaluating "whether a statement about a group refers to some ascertained or ascertainable person." *Florio*, 119 F.4th at 76 (cleaned up). In addition to size, courts examine the group's "definiteness" and "organization," *Brady v. Ottaway Newspapers, Inc.*, 84 A.D.2d 226, 236 (N.Y. App. Div. 1981); whether the plaintiff "had a prominent role" in the group, *Elias v. Rolling Stone LLC*, 872 F.3d 97, 106 (2d Cir. 2017); whether "an actual recipient" identified the plaintiff, *Hudson v. Guy Gannet Broad. Co.*, 521 A.2d 714, 717 (Me. 1987); the "character of the audience and its relationship to the

---

[3] *See Ball v. Taylor*, 416 F.3d 915, 917 (8th Cir. 2005) ("[T]he plaintiff need not be named if . . . extraneous facts and circumstances . . . show that plaintiff was intended to be the object of the alleged libel, and was so understood by others." (cleaned up)); *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1015 (3d Cir. 1994); *Golden N. Airways, Inc. v. Tanana Publ'g Co.*, 218 F.2d 612, 622 (9th Cir. 1954).

[4] David A. Elder, *Small Town Police Forces, Other Governmental Entities and the Misapplication of the First Amendment to the Small Group Defamation Theory—A Plea for Fundamental Fairness for Mayberry*, 6 U. Pa. J. Const. L. 881, 919 (2004).

subject of the publication," *JB & Assocs., Inc. v. Neb. Cancer Coal.*, 932 N.W.2d 71, 79 (Neb. 2019); and "descriptive matter in the publication," *Golden N. Airways*, 218 F.2d at 622. These factors can lead readers to identify the plaintiff just as if they were mentioned by name.

2. The Aquarium also urges the Court to "hold that statements concerning" a sufficiently large group "are not actionable." Br. 41. To be sure, very few cases have allowed defamation claims to proceed based on statements concerning a large group. But while such claims are rare, courts have recognized that they may be brought in appropriate circumstances. There has never been a "'bright line' above which a defamed group is 'too big,'" *Alexis v. District of Columbia*, 77 F. Supp. 2d 35, 41 (D.D.C. 1999), and there is "no substantial reason why *size* alone should be conclusive," *Fawcett Publications, Inc. v. Morris*, 377 P.2d 42, 51 (Okla. 1962); *Brady*, 84 A.D.2d at 236 ("An absolute limit on size is not justifiable. There is no compelling logic in allowing a greater number of wrongs to afford a lesser degree of liability in group defamation actions." (cleaned up)).

Instead, "the primary consideration" is "whether the plaintiff was in fact defamed, although not specifically designated." *Pratt v. Nelson*, 164 P.3d 366, 383 n.114 (Utah 2007) (cleaned up). Group size is "a

26

contextual consideration," affecting how reasonable it is for a reader to conclude that the statement refers to the plaintiff. *Florio*, 119 F.4th at 76. Certainly, "the larger the collectivity named in the libel, the less likely it is that a reader would understand it to refer to a particular individual." *McCullough v. Cities Serv. Co.*, 676 P.2d 833, 837 (Okla. 1984). But "[i]t is not possible to set definite limits as to the size of the group or class," Restatement (Second) of Torts § 564A cmt. b, so there is no firm threshold above which surrounding circumstances do not matter. *Pratt*, 164 P.3d at 383 n.114; *McCullough*, 676 P.2d at 837 ("The numerical size of the group is a consideration, but is not the only factor[.]").

## B. Plaintiffs Plausibly Allege that the Circumstances-of-Publication Exception Applies

The Aquarium's challenged statements "can fairly be understood as a statement about" Plaintiffs. *Florio*, 119 F.4th at 76. The Aquarium asserted that Maine lobster-fishing gear poses an existential threat to the right whale, JA43, and that the fishery's "management measures" have failed to reduce right whale injury and mortality. JA43. Those statements "falsely depicted the Maine lobster fishery as being directly responsible for right whale injuries and mortalities." JA15. And the surrounding

27

circumstances suggest readers could reasonably understand those statements to refer to Plaintiffs.

1. Seafood Watch influences the supply chain by securing commitments from "major seafood buyers, including restaurants, grocery stores, and retailers," JA26, and the Aquarium leveraged this publication "to pressure those parties into cutting off business with Plaintiffs." JA17. Its strategy worked. When the Aquarium issued its "red" rating, consumers, restaurants, and wholesalers stopped doing business with Plaintiffs. JA39-41. Bug Catcher lost roughly 20% of its business as a result "of the 'red' rating." JA41. A major purchaser cut ties with Atwood "citing the Aquarium's 'red' listing." JA40. Thus, not only could Seafood Watch readers reasonably understand that the Aquarium's statements concerned these Plaintiffs—many reached that very conclusion. *See* JA1877 ("Plaintiffs [have] pleaded facts alleging readers of [Seafood Watch] understood its contents to contain 'special application' of the defamatory matter to [Plaintiffs], as revealed by their responses.").

The Aquarium insists that audience reaction speaks only to harm, not to the of-and-concerning requirement. Br. 40. That misses the point. As the district court noted, JA1873, courts consider factors such as "the

28

character of the audience"; "its relationship to the subject of the publication"; and the "effect" of the statements "upon such audience." *JB & Assocs.*, 932 N.W.2d at 79. And Maine's approach to the "of-and-concerning" element examines whether "an actual recipient" connected the statement to the plaintiff. *Hudson*, 521 A.2d at 716-17 (this "factual issue" turns on "what the recipient reasonably believes"). Thus, the audience reaction—in this case, the reaction of seafood purchasers—is valuable evidence of how defamatory statements can be reasonably understood. *See Weinstein v. Bullick*, 827 F. Supp. 1193, 1201 (E.D. Pa. 1993) (affidavits by students at university where statement was published revealed "personal knowledge that could have led them to conclude reasonably that the broadcast was of and concerning plaintiff").[5]

2. That connection is particularly pronounced for the Associations, which lead the industry's efforts to protect the right whale. The exception looks to whether the plaintiff "would likely be identified" as the subject of the statement, *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 490 (E.D. Pa.

---

[5] *Cf. Nat'l Nutritional Foods Ass'n v. Whelan*, 492 F. Supp. 374, 385 (S.D.N.Y. 1980) (granting summary judgment on group-defamation claim after finding plaintiffs had no proof "that any decline in their sales or profits is due to defendants' publications").

29

2010), and a plaintiff's prominence within a defamed group can support such a finding. In *Elias v. Rolling Stone LLC*, fraternity members who played "a prominent role" in fraternity initiation could sue based on false allegations of sexual assault during initiation. 872 F.3d 97, 106 (2d Cir. 2017). In *Church of Scientology International v. Time Warner, Inc.*, the plaintiff's role "as 'Mother Church'" made it likely readers would perceive it as the subject of statements that could refer to myriad churches. 806 F. Supp. 1157, 1159, 1161 (S.D.N.Y. 1992). And in *Fawcett Publications, Inc. v. Morris*, a football player "well known and identified in connection with" his team could sue based on allegations that the team was taking performance-enhancing drugs. 377 P.2d 42, 51 (Okla. 1962).[6]

Here, too, the prominence of the two Associations makes their role in the Aquarium's defamatory statements direct and apparent. The Lobstermen's Association and Fishermen's Association are the public representatives and spokesmen of the Maine lobster industry. JA18; JA130. They are well-known players that advocate for the Maine lobster brand, JA18; JA130, and "lead[] the lobster industry's effort" to protect the right

---

[6] Of course, the plaintiff's "prominence" was not the only relevant factor in these cases. And Plaintiffs do not contend that prominence is dispositive—only that it is an important factor in the analysis.

whale. JA276; *accord* JA18 (Fishermen's Association "works to enhance the sustainability of Maine's fisheries" and restore "the Gulf of Maine"). And the Aquarium's statements deride those protective efforts. Readers could reasonably conclude that falsehoods criticizing the Maine fishery's "management measures" for right-whale protection directly concern the Associations that led their development. *Cf. Friends of Falun Gong v. Pac. Cultural Enter., Inc.*, 288 F. Supp. 2d 273, 283 n.3, 284 (E.D.N.Y. 2003) (claim based on statement about "over one thousand" religious followers dismissed where "plaintiffs are not 'leaders' of the Falun Gong practice such that their identity is more readily discernible than the identity of a general group member" (cleaned up)).

3. The Aquarium emphasizes that it can find no case dealing with a group this large. Br. 31-32. But the circumstances-of-publication test considers all facts drawing attention to the plaintiff, not group size alone. "[R]egardless of the group's size, the key question is whether a statement about a group refers to some ascertained or ascertainable person." *Florio*, 119 F.4th at 76 (cleaned up). The Aquarium's cases illustrate this point. Some rejected large-group defamation claims only after deciding whether the plaintiffs satisfied the exception. *See Weatherhead v. Globe Int'l, Inc.*,

832 F.2d 1226, 1227 (10th Cir. 1987) (statement about "group of 955" dog breeders nonactionable absent "content or circumstances reasonably specifying the plaintiff"); *Thomas v. Jacksonville Television, Inc.*, 699 So.2d 800, 802, 805 (Fla. Dist. Ct. App. 1997) (statement about "436 commercial net fishermen" nonactionable where plaintiffs did not allege "personal application"); *Ky. Fried Chicken of Bowling Green, Inc. v. Sanders*, 563 S.W.2d 8, 9 (Ky. 1978) (statement about restaurants nonactionable where "there was nothing in the present article which identified [Plaintiff] as the object of the remarks"). In others, the exception was simply not raised or addressed. *E.g.*, *Barger v. Playboy Enters., Inc.*, 564 F. Supp. 1151, 1153-54 (N.D. Cal. 1983).

Moreover, the reasons for the group-defamation bar carry no weight when the circumstances of publication show that the statement was reasonably understood to refer to the plaintiff. As the district court noted, the rule "is premised on the concept that individual members may not have been particularly affected by a defamatory statement against the group." JA1874; *accord Brady*, 84 A.D.2d at 229 (explaining that "as the target group increases in size" the impact of the statement is "diluted"). It balances the "conflicting interests involved in every defamation case":

the "freedom of public discussion" and "individual interest in reputation." *Barger*, 564 F. Supp. at 1153 (cleaned up). But when plaintiffs can show special application of the statements to themselves, their harms are not hypothetical. And because the "circumstances-of-publication" test is narrow and fact-specific, the balance of interests supports redress when it is satisfied. *See Marr v. Putnam*, 246 P.2d 509, 517 (Or. 1952).

4. The Aquarium also asserts that "the First Amendment requires" the group-defamation rule. Br. 29. That is wrong. While defamation has "First Amendment implications," *Jenkins v. KYW*, 829 F.2d 403, 405 (3d Cir. 1987) (cleaned up), it is "fundamentally a state cause of action." *Tucker v. Fischbein*, 237 F.3d 275, 281 (3d Cir. 2001). While the "of-and-concerning" element is constitutionally required in defamation suits featuring "libel of government by impersonal criticism," that not at issue here. *Emerito Estrada Rivera-Isuzu de P.R., Inc. v. Consumers Union of U.S., Inc.*, 233 F.3d 24, 27 (1st Cir. 2000) (cleaned up); *Hudson*, 521 A.2d at 716 n.5 (holding that the "of-and-concerning" element assumes constitutional character in "public figure defamation cases"). Thus, the group-defamation rule remains an element of the common law that the states have the prerogative to develop.

33

Further, the Supreme Court and state law already provide "numerous substantive and procedural limitations" protecting freedom of expression in defamation actions. *Emerito Estrada*, 233 F.3d at 26. Statements concerning public figures or matters of public concern are nonactionable unless made with "actual malice," which must be shown by clear and convincing evidence. *New York Times Co. v. Sullivan*, 376 U.S. 254, 285 (1964). And anti-SLAPP statutes "provide breathing space for free speech on contentious public issues" by allowing dismissal of meritless claims, unlike those at issue here. *La Liberte v. Reid*, 966 F.3d 79, 85 (2d Cir. 2020) (cleaned up). These protections are more than sufficient to safeguard free speech in defamation cases, while allowing those with genuine claims to pursue their right to redress.

Lastly, permitting this suit will not open the floodgates or risk chilling industry criticism. Br. 2. The circumstances-of-publication test is fact-specific, recognizing that "the different characteristics of groups and the varied circumstances of publication" can "permit relief for individual injury" in specific situations. *Brady*, 84 A.D.2d at 235. Plaintiffs do not base their defamation claim merely on their membership in an industry.

34

Instead, they assert a claim particular to them under the unique circumstances at hand.

## II. The Aquarium's Statements are Factual Assertions, Not Scientific Opinions

The Aquarium's attempt to characterize its statements as scientific opinions falls short. Br. 41-56. The Aquarium asserts that entanglements with Maine lobster-fishing gear are placing the right whale at risk of extinction and protective measures used by Maine lobstermen are failing. These are factual assertions, not scientific opinions. They were made in a consumer periodical and a related press conference, not in an academic journal intended to foster scientific debate. The district court correctly found such statements are actionable.

### A. Courts Protect Scientific Theories in Scientific Journals, Not Factual Assertions in Consumer Periodicals

Courts examine "the totality of the circumstances" to distinguish assertions of fact from opinions. *Ballard v. Wagner*, 877 A.2d 1083, 1087-88 (Me. 2005). That analysis looks to "the statement's context," including the "medium" of publication; the intended "audience"; the "words used"; and any "cautionary terms" employed. *Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517, 531, 534 (1st Cir. 2023) (cleaned up). Expressions of "personal

35

judgment" that are "vague and subjective" may be opinions, *Gray v. St. Martin's Press, Inc.*, 221 F.3d 243, 248 (1st Cir. 2000), but statements indicating "the existence of underlying defamatory facts" are actionable. *Piccone v. Bartels*, 785 F.3d 766, 771 (1st Cir. 2015).

The Aquarium relies on three out-of-circuit decisions to argue that its statements are opinions, Br. 42-43, but those cases addressed materially different facts. *See ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 497 (2d Cir. 2013); *Pacira BioSciences, Inc. v. Am. Soc'y of Anesth., Inc.*, 63 F.4th 240, 246 (3d Cir. 2023); *Torrey v. Infectious Disease Soc'y of Am.*, 86 F.4th 701, 705 (5th Cir. 2023). All three concerned scientific theories published in "journal[s] intended for experts alongside an accurate description of the data." *Conformis*, 58 F.4th at 534 (cleaned up). They do not apply to statements that are directed at a lay audience in a consumer periodical.

1. The First Amendment "does not immunize false or misleading commercial claims" anytime they purport to be scientific. *Eastman Chem. Co. v. Plastipure, Inc.*, 775 F.3d 230, 237 (5th Cir. 2014); *accord Conformis*, 58 F.4th at 532; *Advance Dx, Inc. v. YourBio Health, Inc.*, 753 F. Supp. 3d 53, 64 (D. Mass. 2024); *Mimedx Grp., Inc. v. Osiris Therap., Inc.*,

36

2017 WL 3129799, at *7 (S.D.N.Y. Jul. 21, 2017). Consumer publications are "not meant to communicate insights into matters of scientific debate." *Advance Dx*, 753 F. Supp. 3d at 64. They are "directed principally to consumers" to shape economic behavior, not "to scientists" for further inquiry. *Mimedx*, 2017 WL 3129799, at *7. And because "many, if not most, products" can be tied to "scientific or public debate," shielding consumer-oriented statements would gut defamation law. *Eastman*, 775 F.3d at 236 (cleaned up). Everyday product advertisements or disparagements could be immunized by citing scientific sources or asserting that they relied on "all available scientific data." *Cf.* JA29.

In *Conformis*, this Court held that the First Amendment did not protect Aetna's policy asserting that the effectiveness of Conformis's knee replacement implant "has not been established." 58 F.4th 517, 522 (1st Cir. 2023). That policy cited scientific studies to assert there was a lack of clinical evidence for the efficacy of total knee replacements. *Id.* at 526. After Aetna published the policy, Conformis saw a significant reduction in business with orthopedic surgeons. *Id.* When Conformis sued, the district court dismissed its claims, but this Court reversed in relevant part. *Id.* at 525. Distinguishing the Second Circuit's ruling in *ONY*, this Court

37

held that the policy's context did not warrant protection. *Id.* at 534-36. Because the statement "suggested an appraisal . . . against objective professional or scientific standards," not a scientific theory, it was a verifiable factual assertion. *Id.* at 532. And because the statement was made in an insurance document, not a journal, it was not intended "to communicate insights into matters of scientific debate." *Id.* at 534.

Similarly, in *Eastman Chemical Co.*, the Fifth Circuit held that the First Amendment does not shield commercial statements merely because they are "open to scientific or public debate." 775 F.3d at 236. The defendants published a scientific study examining "more than 500 commercially available plastic products." *Id.* at 233. Leveraging that study, defendants disseminated brochures stating that Eastman's plastics contained harmful levels of "estrogenic activity," a precursor to multiple adverse health conditions. *Id.* at 233-34. Eastman secured an injunction, and the Fifth Circuit affirmed, *id.* at 233, distinguishing *ONY* based on the context and purpose of the statements:

> This lawsuit . . . is about statements made in commercial advertisements or promotions, not statements made in a peer-reviewed journal. It is about statements made to consumers, not scientists. It is about statements . . . without the necessary context presented by a full scientific study, such as a

38

description of the data, the experimental methodology, the potential conflicts of interest[.]

*Id.* at 236 (cleaned up). Because the defendant's claims were not "made within the academic literature and directed at the scientific community," the specter of defamation liability would not "stifle academic debate and trench upon First Amendment values." *Id.*

2. The Aquarium relies on factually distinct cases addressing scientific theories published in academic journals directed at scientific experts. In *ONY*, the Second Circuit shielded an article examining the effects of surfactants on infant mortality that was published in "the leading journal in the field of neonatology." 720 F.3d at 492. In *Pacira*, the Third Circuit rejected challenges to the "methodology and data" used in a study into the efficacy of liposomal bupivacaine, a pain medication. 63 F.4th at 247. And in *Torrey*, the Fifth Circuit protected a medical society's guidelines counseling against the use of antibiotic therapies for chronic Lyme disease. 86 F.4th at 702.[7]

---

[7] The Fifth Circuit's decisions make clear that context drives the fact-opinion distinction. *Torrey* embraced *Eastman*'s reasoning and distinguished it on the facts. 86 F.4th at 707 (*Eastman* was based on "statements made in commercial advertisements and directed at customers," not "an article in a scientific journal").

These cases addressed scientific theories that were "presented in publications directed to the relevant scientific community," inviting "rigorous debate by qualified experts." *ONY*, 720 F.3d at 494 ("*Journal of Perinatology*"); *Pacira*, 63 F.4th at 243 ("*Anesthesiology*"); *Torrey*, 86 F.4th at 703 ("*Clinical Infectious Diseases*"). Those theories were accompanied by "accurate descriptions of the data," facilitating experimentation and inquiry. *ONY*, 720 F.3d at 496; *see Pacira*, 63 F.4th at 249; *Torrey*, 86 F.4th at 705. And they were the true essence of science: "theoretic explanations of natural phenomena based on experiments and observations." *Blackwell v. Wyeth*, 971 A.2d 235, 239 n.10 (Md. 2009) (quoting Stedman's Med. Dictionary 1731 (28th ed. 2006)); *accord ONY*, 720 F.3d at 490 ("[I]nferences about the nature of reality based on the results of experimentation and observation.").

None of those cases adopted the blanket protections that the Aquarium now invokes. Br. 41-46. They do not reach defamation claims based on consumer publications dressed as science. *Conformis*, 58 F.4th at 536; *Eastman*, 775 F.3d at 236. And courts have declined to extend *ONY* to statements made to a lay audience, *Black v. CNN, Inc.*, 423 So.3d 2, 8 (Fla. Dist. Ct. App. 2025); statements not published for "purely scientific"

purposes, *Advance Dx, Inc.*, 753 F. Supp. 3d at 64; statements that "distort[]" the findings of a scientific study, *Mimedx*, 2017 WL 3129799, at *2, 10; and assertions of fact that "exist independent of the scientific process," *LLT Mgmt. LLC v. Emory*, 766 F. Supp. 3d 576, 601 (E.D. Va. 2025). No court has held that all statements about scientific matters constitute protected opinions as a matter of law. *See* JA1883 ("Claiming a recitation of sources functions as an impenetrable defense overstates the current state of the law.").

## B. The Aquarium's Statements are Commercial Advocacy, Not Scientific Theory

The Aquarium's challenged statements are not scientific opinions. They are factual assertions about events unfolding in the world, not theories about the nature of reality developed through the scientific method. They were made in a publication aiming to influence consumer behavior, not a peer-reviewed scientific journal that aims to cultivate debate among experts. And unlike a scientific publication, the Aquarium's statements misrepresented the data and concealed contradictory facts. These assertions should not be characterized as opinions.

1. To start, the Aquarium's statements are not scientific theories. The Seafood Watch report and press statements claim that right whales

41

are becoming entangled in Maine lobster-fishing gear, "putting the species at risk of extinction." JA29. That is not the type of "theoretic explanation[] of natural phenomena," *Blackwell*, 971 A.2d at 239 n.10, or "inference[] about the nature of reality," *ONY*, 720 F.3d at 497, that defines scientific inquiry. *E.g., id.* at 492 (biological effects of surfactants); *Pacira*, 63 F.4th at 243 (efficacy of liposomal bupivacaine); *Torrey*, 86 F.4th at 702 (efficacy of antibiotics).[8] Rather, it is a factual claim susceptible to ordinary methods of proof. And the mere fact that the public has long "debated" how to protect the whale, Br. 48-49, does not shield false factual assertions made during that debate from liability.

Nor were the Aquarium's assertions "adduced through a scientific method" as a hypothesis would be. *LLT Mgmt.*, 766 F. Supp. 3d at 601. Scientific opinions are "the conclusions of empirical research" based on "the results of experimentation and observation." *ONY*, 720 F.3d at 497; *accord Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993)

---

[8] The same is true of the unpublished decisions the Aquarium cites. *Arthur v. Offit*, 2010 WL 883745, at \*6 (E.D. Va. Mar. 10, 2010) (safety of vaccines); *Joseph v. Springer Nature*, 2021 WL 1372952, at \*1, \*7 (S.D.N.Y. Apr. 12, 2021) (existence of extraterrestrial life); *Cassava Scis., Inc. v. Bredt*, 2024 WL 1347362, at \*8-9 (S.D.N.Y. Mar. 28, 2024) (effectiveness of Alzheimer's medication).

("[I]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method."). The Aquarium grounded its risk assessment not in rigorous empirical analysis, but in a self-professed *lack* of data about the cause of unattributed right whale entanglements. Nothing about that process is scientific.

Adjudicating the Aquarium's statements will not "turn judges into junior-varsity peer reviewers" as the Aquarium contends. Br. 49. Courts are well-equipped to evaluate "scientific" and "technical" issues through expert testimony. Fed. R. Evid. 702. Indeed, courts in defamation cases have heard from experts on issues including the viscosity breakdown of motor oils, *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 944 (3d Cir. 1993); the effects of competing painkillers, *McNeill-P.C.C., Inc. v. Bristol-Meyers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir. 1991); and biological differences between synthetic and naturally-occurring ephedrine, *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 849 (9th Cir. 2001). While courts are "ill-equipped" to second-guess scientific theories, *ONY*, 720 F.3d at 497, applying scientific principles to the facts is "very much within [their] core competency," *Maine People's All. v. Mallinckrodt, Inc.*, 471 F.3d 277, 293 (1st Cir. 2006).

43

2. Seafood Watch is an advocacy publication that aims to "influence consumer decisions," Br. 14, not to propose scientific theories or prompt scientific discourse. It is directed to the general public, not a community of experts. And the Aquarium made some of the challenged statements in communications to the press, which served no scientific purpose. *E.g.*, JA29-30 n.39, JA42 ("[N]o one wants to know their appetite for seafood is driving a species to extinction."). These facts distinguish *ONY*, where the Second Circuit found it "important[]" that the statements were "presented in publications directed to the relevant scientific community." 720 F.3d at 496-97. *Cf. Black*, 423 So. 3d at 8 ("Reporting published on CNN.com and *Anderson Cooper 360°* is not directed to the scientific community of pediatric and congenital heart surgeons.").[9]

---

[9] The Aquarium points to *Malone*, *Cassava*, and *Underwager* to argue that scientific opinions need not be published in academic journals. Br. 56. But *Underwager* rested on the First Amendment's "actual malice" rule, discussing scientific opinion only in dicta. *Underwager v. Salter*, 22 F.3d 730, 736 (2d Cir. 1994). *Malone* and *Cassava*, both unpublished, addressed "contested and contestable scientific hypotheses." *Cassava*, 2024 WL 1347362, at *2, 9 (opinions offered to agency on drug efficacy); *see also Malone v. WP Co., LLC*, 2023 WL 6447311, at *5 (W.D. Va. Sep. 29, 2023) (vaccine efficacy). Besides, Plaintiffs do not claim publication in a peer-reviewed journal is dispositive—only that it is an "important" factor. *ONY*, 720 F.3d at 496-97.

The Aquarium's argument that it does not matter whether a statement is made in a peer-reviewed scientific journal, Br. 55-56, is incorrect. The fact-opinion divide has always looked to the "medium" of publication, *Conformis*, 58 F.4th at 534, so placement in a peer-reviewed scientific journal is particularly "important[]," *ONY*, 720 F.3d at 496-97. Peer review is a rigorous academic safeguard that "conditions publication on a bona fide process of review by other scientists and experts in the field." *United States v. Gissantaner*, 990 F.3d 457, 464 (6th Cir. 2021) (cleaned up). Placement in a peer-reviewed journal shows "some degree of basic scientific competence." *ONY*, 720 F.3d at 497. And such journals are directed to "specialists in their fields," who can validate scientific theories through further experimentation. *Pacira*, 63 F.4th at 248. Seafood Watch offers none of those assurances.

3. The Aquarium did not accurately describe the underlying data, either. *ONY* limited its reach to statements "presented alongside an accurate description of the data taken into account and the methods used." *ONY*, 720 F.3d at 498; *Pacira*, 63 F.4th at 249 (statement not actionable where defendant disclosed "data and methodology"); *Mimedx Grp.*, 2017 WL 3129799, at *7 (statement actionable where plaintiff alleged

45

defendant "distorted" scientific article's findings). An author's candid disclosure of the facts invites "other members of the relevant discipline" to validate them. *ONY*, 720 F.3d at 498. But a publication that distorts data risks misleading the public and damaging scientific inquiry.

As the district court observed, Plaintiffs alleged that the Aquarium distorted the data underlying its findings. The Aquarium stated that its claims were the result of a "rigorous, transparent, science-based process" based on "all available scientific data." JA29. But it "was in possession of scientific data contradicting its claims." JA42. Reports attributed most right whale deaths to Canadian fishing, ship strikes, and climate change. JA30. By 2022, there had been no reported entanglements caused by Maine lobster gear in almost two decades. JA34. Rather than disclose this evidence, the Aquarium "readily concedes it 'discounted'" the data because it came from industry, JA1884, preventing readers from accurately assessing the basis of its claims.[10]

---

[10] The Aquarium claims that it "disclosed gaps in the existing data," such as the lack of data connecting entanglement to specific fisheries. Br. 48-49. But that asserted "lack of data" is also false because data pointed to causes *other than* Maine lobster. *Cf. Conformis*, 58 F.4th at 535 (statements that effectiveness of knee replacement "has not been established" false where "a consensus exists").

46

The Aquarium insists that its misrepresentation of the underlying data must be settled through scientific debate, not litigation. Br. 55-56. Not so. Even in *ONY*, the Second Circuit held that scientific conclusions can only be protected if they are "based on accurate descriptions of the data and methodology." 720 F.3d at 498. And it recognized that the outcome might vary if the author "misstated" or "distorted" the underlying data. *Id.* at 499; *see, e.g.*, *Mimedx*, 2017 WL 3129799, at *2 (finding statements in commercial publication actionable where defendant allegedly "misrepresent[ed] the conclusions" of a scientific paper).

The Aquarium tries to narrow this principle, arguing that scientific statements are actionable only if they are "drawn from falsified or fraudulent data." Br. 55 (quoting *Pacira*, 63 F.4th at 247 n.14). But *ONY* held that the scientific opinions at issue were protected after noting they were "drawn from non-fraudulent data" *and* "based on accurate descriptions of the data and methodology." 720 F.3d at 498. Statements that *conceal* contrary data are actionable—so the Aquarium's distortion of the underlying data disqualifies it from protection.

4. Finally, the Aquarium's effort to characterize some of its remarks as hyperbole, Br. 50-51, misses the mark. Statements are not hyperbolic

47

if "a reasonable person could interpret the statement to provide actual facts about the individual or institution it describes." *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 131 (1st Cir. 1997). The Aquarium's vice president declared "[n]o one wants to know their appetite for seafood is driving a species to extinction," JA42, in press statements explaining the "red" rating for Maine lobster. JA29-30 & n.29. Given this context, readers can readily understand that statement to assert that the Maine lobster-fishing industry is killing right whales. That factual claim is actionable in defamation.

## III. The District Court Correctly Denied the Aquarium's Anti-SLAPP Motion.

Plaintiffs' defamation claim is well-founded and does not resemble the sort of frivolous suit contemplated by anti-SLAPP laws. Maine's anti-SLAPP statute permits courts to dismiss meritless claims that are meant to chill the defendant's effort to petition the government. 14 M.R.S. § 556. Courts reviewing an anti-SLAPP motion apply a two-step analysis. *Fratello v. Mann*, 339 A.3d 804, 806-08 (Me. 2025). First, the movant "must establish that the nonmoving party's claim is based on petitioning activity." *Id.* at 806. Second, if the movant succeeds, the nonmovant "must present prima facie evidence" that the petitioning activity "was devoid of

48

any reasonable factual support or any arguable basis in law" and "caused actual injury." *Id.* at 807.

The Aquarium's anti-SLAPP motion fails at both steps. First, its statements aim to influence consumer behavior and pressure industry, not to effect government action. Second, Plaintiffs offered prima facie evidence that those statements lack any factual basis, and there is no dispute that they caused harm.

### A.    The Seafood Watch Report and Media Statements Are Consumer Advocacy, Not Petitioning Activity.

The Seafood Watch aims to shape consumer behavior, not to petition the government. Petitioning includes statements that are "reasonably likely to encourage consideration or review of an issue" by the government or "enlist public participation" in the same. *Town of Madawaska v. Cayer*, 103 A.3d 547, 550 (Me. 2014) (quoting 14 M.R.S. § 556). However, "the purpose of the right of petition is to protect expression that seeks redress from government," *Gaudette v. Mainely Media, LLC*, 160 A.3d 539, 543 (Me. 2017), so speech must "*encourage* consideration or review of an issue" by the government to constitute petitioning. *Pollack v. Fournier*, 237 A.3d 149, 154 (Me. 2020) (observing that a typical petition

"conveys the special concerns of its author to the government" or "requests action by the government").

None of the Aquarium's statements do that. In the Seafood Watch report and the accompanying press statements, the Aquarium states that it intends to shape consumer behavior in order to pressure the industry to change its practices. JA26. These consumer-oriented statements seek action in the private sector, not the legislature.

1. The Maine Supreme Judicial Court has held that such statements are not protected by the anti-SLAPP statute. In *Hearts with Haiti, Inc. v. Kendrick*, the plaintiff charity sued the defendant for contacting the charity's donors with false allegations of abuse. 202 A.3d 1189, 1192 (Me. 2019). The defendant had "urge[d] benefactors not to donate to [the charity] and pressure[d] third parties not to do business with" it. *Id.* at 1194. The defendant did so with the explicit "purpose" of "raising public awareness to pressure law enforcement agencies into an investigation." *Id.* at 1192. The court nevertheless held that the anti-SLAPP statute did not apply because the statements sought action by "benefactors and various other third parties," not "governmental entities." *Id.* at 1194. Though

50

"a small portion" of the defendant's speech could constitute petitioning, that did not entitle it to protection. *Id.*

The Aquarium's statements, like the donor messages in *Hearts with Haiti*, are not petitioning activities. The Seafood Watch aims to "pressure third parties not to do business with" Plaintiffs. *Id.* at 1192. It leverages that pressure to encourage the fishing industry to change its practices. *See, e.g.*, JA26 ("spark change throughout the supply chain"); JA54 ("empower seafood consumers and businesses to make choices for healthier oceans"); JA26 ("secure[] commitments from major seafood buyers"). But the report neither conveys concerns to the government nor "requests action by the government to address those concerns." *Pollack*, 237 A.3d at 154 (cleaned up). Nor does it leverage "public participation" by imploring consumers to demand government action. 14 M.R.S. § 556. Because these statements aim only to effect private action, they are not the type of government-oriented advocacy that constitutes petitioning.

The Aquarium's press statements are even further afield. Take the Aquarium's declaration that consumers' "appetite for seafood is driving a species to extinction." JA42. The articles in which that statement was published make plain that the Aquarium "is asking consumers and

businesses to avoid lobster" and that it wants the industry "to change its fishing practices." JA30 n.1. They say nothing about government action. So even if the Seafood Watch report was an exercise of the right to petition (it is not), these press statements place this case beyond the statute's reach. *See Town of Madawaska*, 103 A.3d at 550 (limiting anti-SLAPP statute to defamation claims that "have no substantial basis other than or in addition to the petitioning activities" (cleaned up)).

There are compelling reasons to distinguish this type of private advocacy from petitioning activity. Maine's anti-SLAPP statute is strong medicine, and the Supreme Judicial Court has expressed "concern over its reach." *Thurlow*, 263 A.3d at 498. Even as that statute protects "the moving party's right to petition," it curtails "the nonmoving party's right of access to the courts." *Town of Madawaska*, 103 A.3d at 551. Construing it too broadly risks a "constitutional infirmity" by closing the court to meritorious claims. *Nader v. Me. Democratic Party*, 41 A.3d 551, 559 n.9 (Me. 2012). And because "many, if not most, products" can be tied to some "public debate," *Eastman*, 775 F.3d at 236, applying the anti-SLAPP statute to consumer advocacy would amplify those concerns.

52

2. The Aquarium's post-hoc efforts to recast its statements as petitioning fail. First, the Aquarium quotes *Schelling* to argue that any activity which "may have the effect of bringing an issue" to government attention constitutes petitioning. Br. 58 (quoting *Schelling v. Lindell*, 942 A.2d 1226, 1231 (Me. 2008)). But *Schelling*'s point was simply that the right to petition may relate to matters where no legislation is currently pending. 942 A.2d at 1231. It did not announce a new, capacious standard for petitioning activity. Nor is enough that a statement "could eventually lead to consideration" by the government. *Pollack*, 237 A.3d at 155. Instead, the statement must "*encourage* consideration or review of an issue" by a governmental entity. *Id.*

Second, the Aquarium cites two cases for the idea that urging consumers not to purchase lobster is petitioning. Br. 61. But in those cases, the consumer boycotts unambiguously aimed to pressure the government into action. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 889 (1982) (protesters boycotted to support "a list of particularized demands for racial equality"); *Shire City Herbals, Inc. v. Blue*, No. 15-30069-MGM, 2016 WL 2757366, *2 (D. Mass. May 12, 2016) (defendants attempted "to unite the herbalist community behind a movement to have [plaintiff's

53

trademark] cancelled"). Seafood Watch is completely different. It seeks to "spark change throughout the supply chain" and influence the industry's fishing practices, JA26, not to effect government action.

Third, the Aquarium argues that it has lobbied the government in the past and that legislative action is part of its mission. Br. 59-60. But the Aquarium has the burden to show "that the activity that is the subject of the litigation constitutes petitioning activity." *Gaudette v. Davis*, 160 A.3d 1190, 1196 (Me. 2017). The mere fact that the Aquarium has lobbied to protect the right whale at other times does not turn everything it does into petitioning activities. And the fact that Maine's government officials denounced the Aquarium's findings and tried to strip it of federal funds, Br. 60, is irrelevant. Elected officials routinely react to corporate actions, such as mergers, product launches, advertising, and social media statements. That does not make them petitioning activities.

## B. The Aquarium's Statements Lacked any Reasonable Factual Support and Caused Actual Injury.

This Court should affirm the district court's finding that Plaintiffs made a prima facie showing that the Aquarium's statements are false and caused actual injury. "Prima facie proof is a low standard that does not depend on the reliability or the credibility of evidence." *Camden Nat'l*

54

*Bank v. Weintraub*, 143 A.3d 788, 793 (Me. 2016) (cleaned up). It requires only "some evidence," *Nader*, 41 A.3d at 562, that even "*one* of the petitioning activities at issue" lacks support. *Thurlow*, 263 A.3d at 504 & n.8. Upon this showing, "the special motion to dismiss must be denied," *id.* at 502, even if the movant offers "conflicting evidence," *Nader*, 41 A.3d at 562; *Thurlow*, 263 A.3d at 502 (re-adopting *Nader*).

The district court correctly found Plaintiffs have made a prima facie showing that the Aquarium's statements are "devoid of any reasonable factual support." 14 M.R.S. § 556. The Aquarium's claim that the Maine fishery is a grave threat to the right whale population cannot be squared with Plaintiffs' evidence that Maine lobster-fishing gear was responsible for a single right whale fatality in 22 years. And the Aquarium's claim that the industry's management measures are failing is baseless, as Plaintiffs' evidence indicates that Maine waters have been getting safer since the Take Reduction Plan was implemented.

1. The Aquarium's own metrics belie its assertions. JA42-43. The Seafood Watch measures risk in terms of potential biological removal (PBR)—the number of animals "that may be removed from a marine mammal stock" by human causes "while allowing that stock to reach or

55

maintain its optimum sustainable population." JA101. The PBR for right whales is 0.7, so the whale will maintain a sustainable population as long as human-caused whale deaths do not exceed an average of 0.7 whales per year. JA90; *see Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aero. Workers Local Lodge 207 v. Raimondo*, 18 F.4th 38, 41 (1st Cir. 2021) (explaining that "eight right whales, on average, can be 'taken' every ten years" to maintain a "sustainable population"). The Maine fishery has been linked to just one fatality in the last 22 years—a rate of only 0.05 per year and just one fourteenth of the PBR. That does not approach the risk threshold set in the Seafood Watch.

The Aquarium justified its "red" rating by ascribing responsibility for unattributed entanglements to *all* lobster fisheries. That assessment is not just speculative—it is knowingly false. The Aquarium admitted that "there have been no known entanglements with Maine lobster gear since 2004," and that its "red" rating was "based on the ongoing entanglements in unidentified fishing gear." JA1556. Moreover, experts offered evidence that "21 out of the 30 right whale deaths since 2017 were attributed to Canada," and that the ropes removed from dead whales were not characteristic of the type used by the New England fishery. JA1462-

63. These reports make at least a prima facie showing that the Aquarium had no evidence linking mortalities to Maine lobster-fishing practices—and that the evidence it actually possessed said otherwise.

2. The Aquarium's claim that Maine lobstermen "have not been successful at reducing serious injury and mortality," JA43, is also baseless. The Associations worked closely with Maine lobstermen to protect the right whale, JA23-24; JA18, often going beyond the Take Reduction Plan, JA25. By 2022, these measures "significantly reduced the frequency and severity of interactions between whales and U.S. fishing gear." JA23-24. Reports revealed that regional entanglements have dropped by 90% since 2010, JA1461, and that 79% of ropes removed during that span were "not characteristic of ropes used in the New England lobster fishery," JA1462, JA1560. And not a single right whale fatality was linked to Maine gear between 2004 and 2022. JA24. These data show that lobster fishing is getting safer and the industry's protective measures are working.

The Aquarium highlights the death of right whale #5120 in 2022 as evidence its statements are true. Br. 64-65. But a single entanglement in more than two decades says little about the overall risk posed by Maine lobster-fishing gear. And as the district court found, this whale may have

57

been entangled before the Take Reduction Plan was fully implemented. JA1621; JA1682; JA1751, JA1800. While the fishery had planned to introduce weak rope in May 2022, "supply chain issues" delayed its implementation. JA1863-64. Depending on #5120's exact date of entanglement, the weak rope may not have been in place. JA1864. And because there is no evidence that #5120 was entangled by "weak rope," that fatality cannot speak to the Plan's effectiveness. JA1751.

3. The Aquarium's reliance on "*ten pages* of citations" in the Seafood Watch is misplaced twice over. Br. 63. To start, when the parties present "conflicting" evidence at the second step of the anti-SLAPP inquiry, "a nonmoving party's action or claim should be allowed to proceed." *Nader*, 41 A.3d at 562-63. Any factual conflicts should be addressed through discovery, not truncated at the motion to dismiss stage.

Regardless, the Aquarium's sources say nothing about Maine lobster-fishing gear. Some describe the danger posed by entanglements broadly, but offer no connection to the Maine fishery at all. Br. 63.n.3. Others mention that entangled whales were *spotted* in Maine waters, not that they were *entangled* there:

58

- The Aquarium cites a study for the idea that "entanglement" was a leading cause of death "in waters between Massachusetts and Maine." Br. 63. But that study expressly cautions that "[e]ntanglement deaths do not necessarily occur where the whale was initially entangled."[11]

- The Aquarium quotes a 2021 study stating "'entanglement-related serious injuries and mortalities . . . in U.S. waters' had 'persisted' under existing measures." Br. 66 (ellipsis in original). But the source actually describes "serious injuries and mortalities *first seen* in U.S. waters."[12]

- The Aquarium suggests that "data show new entanglements, including in Southern New England." Br. 63.n.3. But the cited study only states that those whales were spotted in Southern New England, not that they were entangled there.[13]

---

[11] S.M. Sharp et al., *Gross and Histopathologic Diagnoses from North Atlantic Right Whale Eubalaena Glacialis Mortalities Between 2003 and 2018*, 135 Diseases of Aquatic Organisms 1, 6 (2019).

[12] Record of Decision for the Final Environmental Impact Statement on Amendment to the Atlantic Large Whale Take Reduction Plan, NMFS 17-18 (2021).

[13] H.M. Pettis, et al., North Atlantic Right Whale Consortium 2024 Annual Report Card, 10-11 (2025).

This is a meaningful distinction. Whales can travel for months after entanglement. *E.g.*, JA.1621 (after becoming entangled, #5120 traveled for at least 10 months from Canada to Massachusetts and back to Canada). The fact that entangled whales have been spotted in Maine waters does not speak to where those entanglements occurred.

4. There is no dispute that the Aquarium's statements caused actual injury. The Businesses alleged commercial harms stemming from the Aquarium's defamatory statements—such as a 40% drop in the price of Maine lobster, a sharp decrease in revenue, and the loss of customer and wholesaler relationships. JA41-43. The Associations also alleged reputational harm, JA18—the Seafood Watch defamed the brand they represent and their sustainability efforts. Because Plaintiffs have presented "some evidence" that at least one statement was "devoid of any reasonable factual support" and "caused actual injury," *Nader*, 41 A.3d at 562, this Court should affirm the denial of the anti-SLAPP motion.

## IV. This Court Should Reconsider its Jurisdiction over this Interlocutory Appeal

This Court should affirm on the merits, but it need not reach them. Interlocutory appeal is meant for extraordinary situations, and this is not one. The district court's order on the Rule 12(b)(6) motion made fact-

60

specific rulings on the "circumstances of-publication" exception and the "fact-or-opinion" question. Its anti-SLAPP order relied on falsity, the very core of a defamation claim. And the defamation issues turn on state-law questions that should be settled by Maine's highest court, not a federal court of appeals. The Aquarium's mere disagreement with the court's decision does not justify derailing the ordinary course of litigation.

1. The issues here are not suitable for interlocutory appeal. Section 1292(b) is applicable only to decide "a controlling question of law." *Caraballo-Seda v. Mun. of Hormigueros*, 395 F.3d 7, 9 (1st Cir. 2005). That requires "an abstract legal issue that the court of appeals can decide quickly and cleanly," *Mamani v. Berzain*, 825 F.3d 1304, 1312 (11th Cir. 2016) (cleaned up), without regard to "whether the district court properly applied settled law to the facts," *United States ex rel. Michaels v. Agape Senior Cmty., Inc.*, 848 F.3d 330, 341 (4th Cir. 2017) (cleaned up). But as discussed, the "circumstances-of-publication" exception and "fact-or-opinion" question are fact-specific. *See supra* Parts I-II. With the benefit of full briefing on the merits, this Court should reconsider and vacate its grant of the Aquarium's petition for appeal.

2. The Aquarium noticed an appeal of the anti-SLAPP denial under the collateral-order doctrine. *See Franchini v. Investor's Business Daily, Inc.*, 981 F.3d 1 (1st Cir. 2020). But as this Court noted just last year, a growing number of circuits "have declined to exercise interlocutory jurisdiction over orders denying anti-SLAPP motions to dismiss." *Blakesley v. Marcus*, 158 F.4th 90, 97 (1st Cir. 2025); *see, e.g.*, *Ernst v. Carrigan*, 814 F.3d 116, 119 (2d Cir. 2016); *Gopher Media LLC v. Melone*, 154 F.4th 696, 699 (9th Cir. 2025) (en banc); *Coomer v. Make Your Life Epic LLC*, 98 F.4th 1320, 1328 (10th Cir. 2024). Plaintiffs maintain that *Franchini* was wrongly decided and should be overruled en banc.

Recent developments suggest the *Franchini* panel would "change its collective mind" if the case was revisited today. *Sanchez v. United States*, 740 F.3d 47, 56 (1st Cir. 2014). At the time *Franchini* was decided, the Ninth Circuit permitted interlocutory appeals from the denial of anti-SLAPP motions. *Batzel v. Smith*, 333 F.3d 1018, 1024-26 (9th Cir. 2003). But just last year, a Ninth Circuit panel referred the issue to the en banc court—which overruled *Batzel* and held that an anti-SLAPP denial does not satisfy the collateral order doctrine. *Gopher Media*, 154 F.4th at 702-04. This Court should do the same. Anti-SLAPP motions address issues

62

that are not "completely separate from the merits," *id.* at 702-03, and are ill-suited for interlocutory review.

Indeed, it is not clear that federal courts can apply anti-SLAPP motions in diversity cases at all. Five circuits have held that such statutes do not apply in federal court because they conflict with Rules 12 and 56. *La Liberte v. Reid*, 966 F.3d 79, 88 (2d Cir. 2020); *Klocke v. Watson*, 936 F.3d 240, 247 (5th Cir. 2019); *Los Lobos Renewable Power, LLC v. AmeriCulture, Inc.*, 885 F.3d 659, 673 (10th Cir. 2018); *Carbone v. CNN, Inc.*, 910 F.3d 1345, 1357 (11th Cir. 2018); *Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1333 (D.C. Cir. 2015). This Court and the Ninth Circuit are alone in allowing such motions. *See Gopher Media*, 154 F.4th at 709-15 (Bress, J., concurring) (criticizing en banc majority's decision to "duck[] that issue"). An en banc hearing would permit this Court to reach alignment with the growing consensus of its sister circuits.

3. This Court could alternatively clarify that *Franchini* applies only to rulings on whether the challenged statements are petitioning activities. *Franchini* involved such a ruling, which it found "distinct from the issues the court would address in a final decision" on the merits because it does not concern the "essential elements of defamation." 981 F.3d at 7.

63

But here, the district court denied the anti-SLAPP motion solely on the ground that the Aquarium's statements may be "devoid of reasonable factual support." JA1866. That issue overlaps with "the element of objective falsity" at the heart of every defamation case. *Plante v. Long*, 170 A.3d 243, 246 (Me. 2017); *Blakesley*, 158 F.4th at 97; *e.g.*, *Coomer*, 98 F.4th at 1328; *Ernst*, 814 F.3d at 119 (observing overlap and declining collateral order jurisdiction on this basis).

The Aquarium's brief illustrates that relationship. In appealing the anti-SLAPP denial, the Aquarium argues that its statements are true and supported by evidence. Br. 62; Br. 63 &.n.3; Br. 65-66. The Aquarium would make the same arguments at trial to defend against Plaintiffs' defamation claim. Such arguments are not collateral to the merits.

4. Plaintiffs renew their motion to certify the state-law merits questions to the Supreme Judicial Court of Maine. Order (Nov. 19, 2025) (denying motion "without prejudice" and noting that "the parties may further address in their briefs the matter of potential certification"). Despite its First Amendment implications, defamation is "fundamentally a state cause of action." *Tucker*, 237 F.3d at 281. And both merits issues turn on state-law questions. The of-and-concerning test is a common-law

rule that becomes a constitutional requirement only in cases featuring criticism of the government. *See supra* Part I.B.4. Moreover, the states have developed different approaches to determining whether a statement is best characterized as fact or opinion. *See* 1 Sack on Defamation § 4:3.7 n.293. Thus, to the extent either issue presents novel legal questions, the Maine Law Court is best positioned to answer them.[14]

The Aquarium's framing of the issues underscores that certification is warranted. In its Petition for Appeal, the Aquarium called these issues "novel," "pivotal," "important," "dispositive." Petition 10, 12, 25, No. 25-8012 (1st Cir. Apr. 25, 2025). In its Opening Brief, the Aquarium labels the district court's holding "novel," "eccentric," and "a sea change." Br. 2, 32, 37, 38. Plaintiffs maintain that the district court applied settled law, and that this litigation should have been permitted to proceed below. But if these issues are indeed so pivotal as to justify an interlocutory appeal, they should be decided by Maine's highest court. *See Cheng v. Neumann*,

---

[14] The Aquarium claims Plaintiffs' certification motion is improper because Plaintiffs "selected a federal forum." Br. 21. But Plaintiffs' position is that this case turns on settled law and should proceed in district court. It is the Aquarium that reframed this case as containing two disputed issues of defamation law by seeking Section 1292(b) appeal. Now that this Court agreed with that framing in granting review, these state-law issues should be decided by the Maine Law Court.

106 F.4th 19, 28 (1st Cir. 2024) (noting that this Court may certify "potentially outcome-determinative questions of Maine law for which there is no clear controlling precedent" (cleaned up)).

## CONCLUSION

This Court should affirm the district court's ruling.

Date: April 6, 2026                              Respectfully submitted,

                                                 /s/ *Megan Barbero*

RUPRECHT & BISCHOFF LLP            VENABLE LLP

Clifford Ruprecht (Bar No. 74826)    Megan Barbero (Bar No. 1136991)
75 Market Street, Suite 303          Kevin J. Lipson (Bar No. 1215936)
Portland, ME 04101                   Elizabeth M. Wilson
(207) 618-5400                            (Bar No. 1221871)
cruprecht@rb-lawyers.com             600 Massachusetts Avenue, NW
                                     Washington, DC 20001
                                     (202) 344-4540
                                     mbarbero@venable.com

                                     Edward P. Boyle (Bar No. 51191)
                                     Stephanie P. Diu (Bar No. 1217562)
                                     151 West 42nd Street, 49th Floor
                                     New York, NY 10036
                                     (212) 808-5675
                                     epboyle@venable.com

                                     Kyle H. Keraga (Bar No. 1214412)
                                     750 East Pratt Street, Suite 900
                                     Baltimore, MD 21202
                                     (410) 244-7650
                                     khkeraga@venable.com

                                     *Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) because it contains exactly 12,987 words. It also complies with the typeface requirements of Fed. R. App. P. 32(a)(5), 32(a)(6) because it was prepared in Microsoft Word in 14-point Century Schoolbook font, a proportionally spaced typeface.

Dated: April 6, 2026                    By:   /s/ *Megan Barbero*

## CERTIFICATE OF SERVICE

I certify that on April 6, 2026, I electronically filed this brief with the Clerk of Court for the United States Court of Appeals for the First Circuit via CM/ECF. I further certify that all participants in this case are registered CM/ECF users, and that service will be accomplished through the CM/ECF system.

Dated: April 6, 2026                By:   /s/ *Megan Barbero*