Nos. 25-1206, 25-1772

# In the United States Court of Appeals
# for the First Circuit

---

BEAN MAINE LOBSTER, INC; MAINE LOBSTERMEN'S
ASSOCIATION; MAINE COAST FISHERMEN'S ASSOCIATION, INC.;
MAINE LOBSTER AND PROCESSING, LLC, d/b/a Atwood Lobster,
LLC; BUG CATCHER, INC.,
*Plaintiffs-Appellees*

*v.*

MONTEREY BAY AQUARIUM FOUNDATION,
*Defendant-Appellant.*

---

*On Appeal from the United States District Court for the District of Maine
No. 2:23-cv-00129 (Hon. John A. Woodcock, Jr.)*

---

## REPLY BRIEF OF DEFENDANT-APPELLANT

---

RUSSELL B. PIERCE, JR.
NORMAN, HANSON & DETROY, LLC
   220 Middle Street, P.O. Box 4600
   Portland, ME 04112
   (207) 774-7000
   rpierce@nhdlaw.com

LISA S. BLATT
   *Counsel of Record*
JOSEPH M. TERRY
AMY MASON SAHARIA
NICHOLAS G. GAMSE
CLAIRE R. CAHILL
EDWARD L. PICKUP
HAROLD W. HILD
WILLIAMS & CONNOLLY LLP
   680 Maine Avenue SW
   Washington, DC 20024
   (202) 434-5000
   lblatt@wc.com

**TABLE OF CONTENTS**

Page

INTRODUCTION ..................................................................................1

ARGUMENT ........................................................................................3

I.    The Group Defamation Rule Bars Plaintiffs' Claims...............................3

      A.    Plaintiffs Cannot Sue Over Statements About Large
            Groups Absent a Specific Reference to Plaintiffs ..........................4

      B.    The Aquarium's Industrywide Statements Make No
            Specific Reference to Any Individual Plaintiff ..............................8

II.   The Statements Are Protected Opinions Within an Ongoing
      Scientific Debate..................................................................................14

      A.    Scientific Conclusions Are Protected Opinions .............................14

      B.    The Aquarium's Statements Are Scientific Conclusions...............19

III.  Maine's Anti-SLAPP Statute Bars Plaintiffs' Claim ............................24

      A.    The Aquarium's Statements Are Petitioning Activity.................24

      B.    The Aquarium's Statements Had Considerable Factual
            Basis...............................................................................................26

IV.   The Court Should Reach the Merits ......................................................29

CONCLUSION.....................................................................................33

i

# TABLE OF AUTHORITIES

Page

## CASES

*Advance DX, Inc. v. YourBio Health, Inc.*,
753 F. Supp. 3d 53 (D. Mass. 2024)................................................................18

*AIDS Counseling & Testing Ctrs. v. Grp. W Television, Inc.*,
903 F.2d 1000 (4th Cir. 1990)........................................................................11

*Alexis v. District of Columbia*, 77 F. Supp. 2d 35 (D.D.C. 1999).......................6

*Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996 (3d Cir. 1994)............7

*Arcand v. Evening Call Publ'g Co.*, 567 F.2d 1163 (1st Cir. 1977).........passim

*Arthur v. Offitt*, 2010 WL 883745 (E.D. Va. Mar. 10, 2010)............................16

*Ball v. Taylor*, 416 F.3d 915 (8th Cir. 2005).......................................................5

*Ballard v. Wagner*, 877 A.2d 1083 (Me. 2005)................................................15

*Biolase, Inc. v. Fotona Proizvodnja Optoelektronskih Naprav D.D.*,
2014 WL 12579802 (C.D. Cal. June 4, 2014)................................................18

*Brady v. Ottaway Newspapers, Inc.*,
445 N.Y.S.2d 786 (N.Y. App. Div. 1981)...................................................6, 13

*Cassava Scis., Inc. v. Bredt*, 2024 WL 1347362 (S.D.N.Y. Mar. 28, 2024)......16

*Cheng v. Neumann*, 51 F.4th 438 (1st Cir. 2022)..............................................23

*Church of Scientology Int'l v. Time Warner, Inc.*,
806 F. Supp. 1157 (S.D.N.Y. 1992)............................................................5, 12

*Clarke v. Ky. Fried Chicken, Inc.*, 57 F.3d 21 (1st Cir. 1995)......................32, 33

*Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517 (1st Cir. 2023).....................passim

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)...........................22

*Eastman Chemical Co. v. Plastipure, Inc.*,
775 F.3d 230 (5th Cir. 2014).....................................................................17, 18

*Elias v. Rolling Stone LLC*, 872 F.3d 97 (2d Cir. 2017)................................7, 12

*Fawcett Publ'ns, Inc. v. Morris*, 377 P.2d 42 (Okla. 1962)..........................7, 12

*Florio v. Gallaudet Univ.*, 119 F.4th 67 (D.C. Cir. 2024)..................................5

*Franchini v. Investor's Business Daily, Inc.*,
981 F.3d 1 (1st Cir. 2020) .................................................................30, 31, 32

*Friends of Falun Gong v. Pac. Cultural Enter., Inc.*,
288 F. Supp. 2d 273 (E.D.N.Y. 2003),
*aff'd*, 109 F. App'x 442 (2d Cir. 2004).............................................................6

*Godin v. Schencks*, 629 F.3d 79 (1st Cir. 2010)................................................30

*Golden N. Airways, Inc. v. Tanana Publ'g Co.*,
218 F.2d 612 (9th Cir. 1954)...........................................................................7

Page

Cases—continued:

*Gopher Media LLC v. Melone*, 154 F.4th 696 (9th Cir. 2025) (en banc) .........31

*Hearts with Haiti, Inc. v. Kendrick*, 202 A.3d 1189 (Me. 2019).......................26

*HipSaver, Inc. v. Kiel*, 984 N.E.2d 755 (Mass. 2013) ........................................13

*Hudson v. Guy Gannet Broad. Co.*, 521 A.2d 714 (Me. 1987) ..........................10

*JB & Assocs., Inc. v. Neb. Cancer Coal.*, 932 N.W.2d 71 (Neb. 2019) .........6, 11

*Ky. Fried Chicken of Bowling Green, Inc. v. Sanders*,
    563 S.W.2d 8 (Ky. 1978).................................................................................11

*Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122 (1st Cir. 1997) ........22

*LLT Mgmt. LLC v. Emory*, 766 F. Supp. 3d 576 (E.D. Va. 2025) ...................20

*Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180 (2021).....................................16

*Maietta Const., Inc. v. Wainwright*, 847 A.2d 1169 (Me. 2004) .......................25

*Malone v. WP Co., LLC*, 2023 WL 6447311 (W.D. Va. Sept. 29, 2023) .....16, 23

*McCullough v. Cities Serv. Co.*, 676 P.2d 833 (Okla. 1984) .................................8

*Mich. United Conservation Clubs v. CBS News*,
    665 F.2d 110 (6th Cir. 1981).........................................................................12

*Mimedx Grp., Inc. v. Osiris Therapeutics, Inc.*,
    2017 WL 3129799 (S.D.N.Y. July 21, 2017) ................................................18

*Mundell v. Acadia Hosp. Corp.*, 92 F.4th 1 (1st Cir. 2024) ..............................32

*Mzamane v. Winfrey*, 693 F. Supp. 2d 442 (E.D. Pa. 2010) ...............................7

*Nader v. Me. Democratic Party*, 41 A.3d 551 (Me. 2012)..................................26

*Nat'l Nutritional Foods Ass'n v. Whelan*,
    492 F. Supp. 374 (S.D.N.Y. 1980)................................................................12

*NCDR, L.L.C. v. Mauze & Bagby, P.L.L.C.*,
    745 F.3d 742 (5th Cir. 2014)........................................................................32

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
    720 F.3d 490 (2d Cir. 2013) ............................................................*passim*

*Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*,
    63 F.4th 240 (3d Cir. 2023)..........................................................16, 20, 22, 23

*Pratt v. Nelson*, 164 P.3d 366 (Utah 2007)..........................................................7

*Pratt v. Nelson*, 2004 WL 5569383 (Utah Dist. Ct. Aug. 17, 2004) ..................7

*Schelling v. Lindell*, 942 A.2d 1226 (Me. 2008)..................................................25

*Serv. Parking Corp. v. Wash. Times Co.*, 92 F.2d 502 (D.C. Cir. 1937)............4

*Snyder v. Phelps*, 562 U.S. 443 (2011) .................................................................8

*Torrey v. Infectious Diseases Soc'y of Am.*,
    86 F.4th 701 (5th Cir. 2023) .......................................................15, 18, 19, 20

iii

Page

Cases—continued:

*United States v. Rodriguez*, 527 F.3d 221 (1st Cir. 2008) ..................................30
*Vasquez v. Whole Foods Mkt., Inc.*, 302 F. Supp. 3d 36 (D.D.C. 2018).............7
*Weinstein v. Bullick*, 827 F. Supp. 1193 (E.D. Pa. 1993)................................10

## CONSTITUTION AND STATUTES

U.S. Const. amend. I..............................................................................*passim*
28 U.S.C. § 1292 ...............................................................................................29
14 M.R.S. § 556 (2023) ......................................................................24, 25, 30

## OTHER AUTHORITIES

John Ordinario & Jonathan Anticamara, *The Status, Trends, and Limitations of Philippine Mollusk Production and Trade Based on Available Databases and Publications*, 8:3 J. of Tropical Biodiversity & Biotech. 1 (2023) ........................................20
Pablo Presa et al., *Genetic Divergence and Connectivity Among Gene Pools of* Polyprion Americanus, 13 Animals 302 (2023) ..............................20
Record of Decision for the Final Environmental Impact Statement on Amendment to the Atlantic Large Whale Take Reduction Plan, NMFS (2021)..................................................................................................27
Report on American Lobster in Canada: Northwest Atlantic Pots, MBAF Seafood Watch (Sept. 6, 2022), https://perma.cc/TV6W-YMLF..............................................................27
Restatement (Second) of Torts (1977)..........................................................3, 5
*Seafood Watch 'Red Lists' U.S. American Lobster*, Oceana (Sept. 6, 2022), https://perma.cc/6F4P-TAEG...............................25

## INTRODUCTION

Plaintiffs agree that neither speech about entire industries nor scientific opinions are defamation. Those undisputed principles resolve this case. The Aquarium's speech about the risks lobster fishing poses to the North Atlantic right whale, as the district court found, "applied to the entire American lobster fishery" and deployed an "objective and scientific methodology." Add.107, 115. The group-defamation rule and the scientific-opinion doctrine thus independently protect the Aquarium's statements. The district court erred by holding otherwise.

Plaintiffs respond by seeking to dramatically expand a narrow exception to the group-defamation rule and by mischaracterizing the Aquarium's science-backed advocacy as a "consumer periodical." Plaintiffs are wrong.

Plaintiffs do not identify (and we do not know of) a single case where such a large group overcame the group-defamation rule. Instead, Plaintiffs observe that speech concerning a large group can be actionable when the speaker specifically calls out an individual plaintiff. But nothing of the sort happened here. That is why Plaintiffs conceded below that the Aquarium's statements "implicate all participants in the Maine lobster industry" and

1

"refer to all who catch and sell Maine lobsters," D. Ct. Dkt. 24 at 24-25—not to Plaintiffs in particular.

Plaintiffs also are wrong to claim the Aquarium's speech is unprotected "consumer advocacy," not protected scientific opinion. Aquarium scientists, consulting with outside peer reviewers, analyzed dozens of scientific articles providing data on right-whale population decline. The Aquarium then posited a theory: Given the difficulty tracing right-whale entanglement deaths to specific fisheries, all pot-and-trap fisheries using vertical lines in the Northwest Atlantic, including American lobster fisheries, present a risk to right whales. This is a classic scientific opinion. Nor did the Aquarium's speech become unscientific because the Aquarium self-published its Report and addressed consumers (among others). As countless courts have recognized, opinions do not transmute into factual assertions because they appear outside academic journals.

The district court alternatively should have dismissed this suit under the applicable version of Maine's Anti-SLAPP statute. Plaintiffs cannot show that a report designed to spur legislative change and backed by ten pages of citations is not "petitioning activity" or lacks "factual support."

Finally, this Court should reject Plaintiffs' (three) last-ditch attempts to avoid a ruling on the merits and should reverse with instructions to dismiss the complaint.

## ARGUMENT

### I.    The Group Defamation Rule Bars Plaintiffs' Claims

Plaintiffs (at 22-23) agree that the group-defamation rule bars a member of a large group from suing over allegedly defamatory speech about the group, unless the plaintiff falls within one of two exceptions.  Plaintiffs (at 23) invoke only the particular-reference exception, under which group-wide statements are actionable if the "circumstances of publication reasonably give rise to the conclusion that there is particular reference to the member."  Restatement (Second) of Torts § 564A (1977); *Arcand v. Evening Call Publ'g Co.*, 567 F.2d 1163, 1164 (1st Cir. 1977).

Notably, Plaintiffs (at 23) now accept this formulation of what they call the "circumstances-of-publication exception."  Plaintiffs do not mention, let alone defend, the district court's contrary holding—adopted at Plaintiffs' urging—that the particular-reference exception applies where a statement's "industry-wide nature" "necessarily implicate[s] each and every member of the Plaintiff group."  Add.109.  Plaintiffs likewise do not defend the court's conclusion that a group member may sue if a statement about a large group

3

gives rise to a "high degree of suspicion" that he was implicated. Add.109; *see* MBAF Br. 36-41 (explaining why those holdings are incorrect).

Instead, Plaintiffs (at 29-30) argue that the Aquarium's statements about American lobster fishing made particular reference to specific Plaintiffs. But the Aquarium's statements did not identify any Plaintiff. By Plaintiffs' own admission, the challenged statements "implicate[d] all participants" in an industry with 5,600+ members. D. Ct. Dkt. 24 at 24-25.

### A. Plaintiffs Cannot Sue Over Statements About Large Groups Absent a Specific Reference to Plaintiffs

Again, the particular-reference exception applies only when a group-wide statement, though couched in general terms, refers to an identifiable group member—either by name or in context. *See, e.g.*, *Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517, 530 (1st Cir. 2023). A plaintiff must show the group-wide statement had "special application" to him, *Arcand*, 567 F.2d at 1164, or "referred solely or especially to himself," *Serv. Parking Corp. v. Wash. Times Co.*, 92 F.2d 502, 504 (D.C. Cir. 1937). The exception does *not*, as Plaintiffs (at 27) urge, allow suit whenever a plaintiff can show that the allegedly defamatory statements *could* apply to him by virtue of his membership in a group.

4

Consider an example from the Restatement. The statement "All lawyers are shysters" does not authorize every lawyer in the country to sue for defamation because clients could fairly understand the statement to apply to their lawyers. *See* Restatement § 564A cmts. a, d. But that same statement "may be defamatory as to an individual lawyer, when the words are uttered on an occasion when he is the only lawyer present and the context or the previous conversation indicates that the speaker is making personal reference to him." *Id.* cmt. d.

Courts apply the exception where the record leaves no doubt that a group-wide statement referenced a specific member. Thus, in *Conformis*, this Court applied the exception to a statement concerning all total-knee-replacement devices because "background" information published alongside the statement singled out the plaintiff's system. 58 F.4th at 530; *accord Ball v. Taylor*, 416 F.3d 915, 917-18 (8th Cir. 2005) (plaintiffs identified in legal documents); *Florio v. Gallaudet Univ.*, 119 F.4th 67, 76 (D.C. Cir. 2024) (plaintiffs appeared in a photograph); *Church of Scientology Int'l v. Time Warner, Inc.*, 806 F. Supp. 1157, 1159, 1161 (S.D.N.Y. 1992) (same).

Conversely, courts refuse to apply the exception where the record merely indicates that the plaintiff belonged to the allegedly defamed group.

5

For instance, the Nebraska Supreme Court refused to allow tanning salons to sue over statements asserting that *all* such salons cause cancer. *JB & Assocs., Inc. v. Neb. Cancer Coal.*, 932 N.W.2d 71, 79 (Neb. 2019). Evidence that "customers asked questions about [the plaintiffs'] facilities" after reading the statements did not show that the "statements were about [the plaintiffs] specifically." *Id.*; *see Alexis v. District of Columbia*, 77 F. Supp. 2d 35, 43 (D.D.C. 1999); *Friends of Falun Gong v. Pac. Cultural Enter., Inc.*, 288 F. Supp. 2d 273 (E.D.N.Y. 2003), *aff'd*, 109 F. App'x 442 (2d Cir. 2004).

Plaintiffs (at 23) also do not dispute that "group size is relevant." As one of Plaintiffs' key cases puts it, "[t]he possibility of specific reference [to the plaintiff] diminishes as the [group] size increases" because the "larger" the group "the less likely it is that a reader would understand it to refer to a particular individual." *Brady v. Ottaway Newspapers, Inc.*, 445 N.Y.S.2d 786, 788 (N.Y. App. Div. 1981) (cited at Pls.' Br. 25, 26, 32, 34). A statement that "a Yankees pitcher used performance-enhancing drugs" may bring to mind a particular player, while an allegation that "baseball players use steroids" does not. The bigger the group, the more evidence a plaintiff needs to show the statement referred to him specifically.

Tellingly, Plaintiffs fail to identify any case allowing claims for speech about a group as large as the 5,600+ member industry here. The closest Plaintiffs come is a case involving statements concerning approximately 1,400 cult members—and there, legal filings issued alongside the statements mentioned the plaintiffs "by name." *Pratt v. Nelson*, 164 P.3d 366, 383 (Utah 2007); 2004 WL 5569383 (Utah Dist. Ct. Aug. 17, 2004) (stating group number). Conversely, where statements concern entire industries with no such express reference, courts routinely reject claims. *See* MBAF Br. 28-29 (collecting cases).[1]

---

[1] Plaintiffs cite many cases involving the distinct small-group exception, which applies only to small groups (*e.g.*, "9 models" or "25 salesmen") on the theory that group-wide speech defames each group member. *Arcand*, 567 F.2d at 1164. But cases addressing the small-group exception (which Plaintiffs do not invoke) cannot speak to the entirely separate requirements of the particular-reference exception (which Plaintiffs invoke here). *See Elias v. Rolling Stone LLC*, 872 F.3d 97, 108 (2d Cir. 2017) ("53-member fraternity"); *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1015 (3d Cir. 1994) ("between 20 and 25 800-number dealers"); *Golden N. Airways, Inc. v. Tanana Publ'g Co.*, 218 F.2d 612, 616 (9th Cir. 1954) ("5-10" "large irregular air carriers"); *Vasquez v. Whole Foods Mkt., Inc.*, 302 F. Supp. 3d 36, 44 (D.D.C. 2018) ("nine managers of Whole Foods Stores"); *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 490 (E.D. Pa. 2010) ("approximately 30 'adults' on … campus"); *Fawcett Publ'ns, Inc. v. Morris*, 377 P.2d 42, 44 (Okla. 1962) (the "1956 Oklahoma University football team").

The particular-reference exception's demanding standard protects First Amendment speech. Because statements about large groups "almost always relate to matters of public concern," the group-defamation rule safeguards discussion on "topics about which people must be able to express themselves freely and without fear of liability." Institute for Free Speech Amicus Br. 14, 18. Plaintiffs (at 33) deny that "the First Amendment requires" the group-defamation rule, yet they cite (at 27) a case recognizing that the rule promotes "First Amendment guarantees." *McCullough v. Cities Serv. Co.*, 676 P.2d 833, 837 (Okla. 1984). Where state defamation law chills speech on matters of "public concern," it must yield to the Constitution. *See, e.g.*, *Snyder v. Phelps*, 562 U.S. 443, 451 (2011). States thus cannot narrow the group-defamation rule in a way that would chill protected speech. And if the particular-reference exception were as permissive as Plaintiffs (at 27-32) suggest, it would cannibalize the group-defamation rule, burdening critical advocacy and reporting. *See* Reporters Committee Amicus Br. 8-9; Brady Amicus Br. 26-27.

### B. The Aquarium's Industrywide Statements Make No Specific Reference to Any Individual Plaintiff

Plaintiffs conceded below that the Aquarium's statements "referred to all members of the Maine lobster industry, including Plaintiffs." D. Ct. Dkt.

24 at 26.  The court likewise understood the Aquarium's speech to "appl[y] to the entire American lobster fishery."  Add.107.  The particular-reference exception cannot apply to speech that all agree concerns an entire industry—especially where the Aquarium emphasized the absence of specific information about "which fisheries are responsible" for right-whale entanglements.  JA92.  Plaintiffs' counterarguments do not show otherwise.

1.  Plaintiffs (at 28-30) first contend that the Aquarium's statements referred to them because "consumers, restaurants, and wholesalers" stopped doing business with some Plaintiffs.  That is not nearly enough to show that the Aquarium's statements had "special application" to Plaintiffs.  *Arcand.*, 567 F.2d at 1164.

For starters, only Plaintiff Bug Catcher fishes for lobsters.  The other non-associational Plaintiffs fall elsewhere in the supply chain (for example, Bean Maine Lobster distributes lobster).  JA18-19.  Alleged harm to those entities cannot possibly show that the Aquarium's statements about an activity they do not engage in (lobster fishing) made special reference to them.  Speech about an entire industry may well produce downstream economic harms.  For instance, speech criticizing gun manufacturers may depress firearms sales at outdoor retailers.  But that does not make such speech defamatory.

Nor does the complaint allege that Plaintiffs' losses differentiated them from other industry members. Quite the contrary, the complaint alleges that the Report provoked a decrease in "overall consumer demand for Maine-caught lobsters," allegedly harming *all* Plaintiffs' businesses. JA17, 18-19, 40 & nn.47-48. Although Plaintiffs (at 28-30) highlight Atwood's lost profits, the complaint traces those losses to a major purchaser's decision to stop "buy[ing] lobster caught in the Gulf of Maine." JA40. In short, the complaint lacks allegations that any purchaser understood the Aquarium's statements to refer to Plaintiffs in particular.

Plaintiffs' purported industry-wide harm cannot possibly show "special application." *Arcand*, 567 F.2d at 1164.[2] As other courts have recognized, "[t]he mere fact that a publication might injure" group members "does not give rise to a claim for defamation" unless *other evidence* confirms that the

---

[2] Underscoring the weakness of Plaintiffs' loss-means-reference theory, Plaintiffs rely on two cases addressing the "of and concerning" requirement generally without discussing the group-defamation rule at all. *See Hudson v. Guy Gannet Broad. Co.*, 521 A.2d 714, 717 (Me. 1987) (holding, in a case involving a small group of 12 employees, that a "recipient's understanding" of a statement can illuminate whether the statement is "of and concerning" the plaintiff); *Weinstein v. Bullick*, 827 F. Supp. 1193, 1201 (E.D. Pa. 1993) (holding that a statement about a singular "female Bryn Mawr student" was "of and concerning" the plaintiff).

10

"publication … refer[s] to the[m] individually." *AIDS Counseling & Testing Ctrs. v. Grp. W Television, Inc.*, 903 F.2d 1000, 1005 (4th Cir. 1990) (cited at MBAF Br. 41, unaddressed by Plaintiffs); *JB & Assocs.*, 932 N.W.2d at 79 (consumer "questions" not enough).

If injury to a group member satisfied the particular-reference exception, the exception would swallow the group-defamation rule. Statements about a large group often convince the audience to behave differently toward group members. Consider, for instance, a statement encouraging health-conscious consumers not to visit fast-food restaurants. Nobody would think the statement specifically referred to one such restaurant merely because that restaurant (like many others) lost sales. *See Ky. Fried Chicken of Bowling Green, Inc. v. Sanders*, 563 S.W.2d 8, 9 (Ky. 1978).

2. Plaintiffs (at 30) next contend that the Aquarium's statements specifically referenced the two Association Plaintiffs (one of which has 1,200 members, JA18) because they are "prominent" within the lobster industry and helped draft right-whale management measures. But this theory appears nowhere in the complaint or in the briefing below. *See* D. Ct. Dkt. 24.

Regardless, Plaintiffs' argument lacks merit. Plaintiffs (at 30 n.6) concede that no court has ever treated a plaintiff's prominence within a group

11

as "dispositive" of whether the speech refers to him in particular. Relying on the Associations' "prominence" to find that the Aquarium singled them out would (again) gut the defamation rule, providing a roadmap for any well-known association to sue for speech about the group it represents. Statements that all senior citizens are dangerous drivers? AARP could sue. Statements that all gun owners are dangerous? The NRA could sue. Statements that all abortion clinics murder unborn children? Planned Parenthood could sue. That is not the law, as courts have consistently recognized by refusing to give associations special solicitude under the group-defamation rule. *See Nat'l Nutritional Foods Ass'n v. Whelan*, 492 F. Supp. 374, 380-81 (S.D.N.Y. 1980) (trade association); *Mich. United Conservation Clubs v. CBS News*, 665 F.2d 110, 112 (6th Cir. 1981) (association of hunters).[3]

Plaintiffs (at 30-31) suggest that readers would understand the Report's criticism of right-whale "management measures" to "directly concern" the Associations because they helped develop those measures. But as the

---

[3] Plaintiffs' citations do not provide otherwise. *Elias*, 872 F.3d at 106-08, and *Fawcett*, 377 P.2d at 51, involve the small-group exception. Meanwhile, *Church of Scientology Int'l*, 806 F. Supp. at 1161, held that the "Church of Scientology International" could sue over statements about the "Church of Scientology" because it sat atop the "hierarchical" structure of scientology and appeared in an image accompanying the defamatory statements.

complaint alleges, "a collaboration of *fisheries, agencies, scientists,* lobstermen *and environmental group*s" developed the measures—not just the Associations. JA23 (emphases added). No one would understand the Report to reference (let alone defame) any particular fishery, agency, scientist, lobsterman, or environmental group. In fact, the Associations *opposed* some management measures, making it even less likely that readers would understand criticism to target the Associations. MBAF Br. 8-9; *see HipSaver, Inc. v. Kiel*, 984 N.E.2d 755, 766-67 (Mass. 2013) (not enough that plaintiff was "second largest manufacturer" where "twenty-two other companies … mad[e] similar products").

Many of the other factors Plaintiffs (at 25-26) agree are relevant cut *against* finding a specific reference, including the lack of any express mention of the Associations in the Report, the Aquarium's disclaimer that the evidence did not show which fisheries were responsible, the extremely large (5,600+) size of the group, and the fact that the group comprises varied individuals and organizations. *See Brady*, 84 A.D.2d at 236 (citing factors). Against that backdrop, that the Associations are "prominent" industry members who purportedly helped draft "management measures" is not enough.

13

## II. The Statements Are Protected Opinions Within an Ongoing Scientific Debate

### A. Scientific Conclusions Are Protected Opinions

Plaintiffs (at 35-41) do not dispute that the First Amendment shields some scientific opinions from defamation liability.  Nor do Plaintiffs (at 36) ask this Court to break from the three other circuits that treat scientific conclusions drawn from "non-fraudulent" data "on subjects about which there is legitimate ongoing scientific disagreement" as protected opinions.  *See ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 (2d Cir. 2013); MBAF Br. 42-43 (collecting cases).  Those concessions should resolve this case:  The Aquarium's data-backed conclusions on a hotly debated scientific issue are protected opinions under the test those circuits deploy.  MBAF Br. 47-56; *infra* pp. 19-24.

Plaintiffs respond (at 36-37, 39-40) by advancing a rule limiting protection for scientific opinions to theories published in scientific media like peer-reviewed journals and directed to the "scientific community."  Although Plaintiffs (at 44 n.9) reluctantly concede in a footnote that protection extends beyond statements in journals, they never say what other kinds of scientific speech might satisfy their test.  Plaintiffs instead (at 41) posit that the

14

Aquarium's statements do not count because the Aquarium self-published its Report and addressed the public.

This cramped view conflicts with the caselaw. To be sure, as Plaintiffs (at 35) observe, the "medium in which the statement was published" and its "audience" may be relevant to whether a statement is a scientific opinion. *Conformis*, 58 F.4th at 534. But courts also consider a host of other factors, including the "content of the publication, the verifiability of the assertions, and the context in which they were written." *Torrey v. Infectious Diseases Soc'y of Am.*, 86 F.4th 701, 706 (5th Cir. 2023). Courts consider, too, whether the speaker employed the "scientific method," accurately described his work, and addressed a subject of "legitimate ongoing scientific disagreement." *ONY*, 720 F.3d at 496-97. In short, as ever when distinguishing opinions from factual assertions, courts evaluate the "totality of the circumstances." *Ballard v. Wagner*, 877 A.2d 1083, 1087-88 (Me. 2005).

That flexible test recognizes that speakers present scientific opinions in varied settings and to varied audiences—including publications beyond journals and readers without PhDs. MBAF Br. 55-56. As Plaintiffs (at 44 n.9) admit, courts have identified scientific opinions in:

15

- A continuing medical education program and podcast, *Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 63 F.4th 240, 244 (3d Cir. 2023);

- A press release, *ONY*, 720 F.3d at 495;

- Magazine and newspaper articles, *Malone v. WP Co., LLC*, 2023 WL 6447311, at *4 (W.D. Va. Sept. 29, 2023); *Arthur v. Offitt*, 2010 WL 883745, at *6 (E.D. Va. Mar. 10, 2010);

- Letters to the FDA and slide decks on websites, *Cassava Scis., Inc. v. Bredt*, 2024 WL 1347362, at *8, *15 (S.D.N.Y. Mar. 28, 2024).

Making liability turn on distinctions between "scientific" publications and others, as Plaintiffs (at 36, 39) propose, would present obvious First Amendment problems. Courts may not offer special protection to ideas that are well-received or to theories directed at educated audiences. *See* MBAF Br. 55-56 (citing *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 190 (2021)). Even if publication in a peer-reviewed journal "shows some degree of basic scientific competence," as Plaintiffs (at 45) suggest, it cannot be the price of admission for First Amendment protection. Any contrary rule would all but confine scientific debates to the ivory tower, forcing the public to participate at their own risk.

16

Plaintiffs (at 36-37) also are wrong to contend that scientific opinions expressed in "[c]onsumer publications" do not receive First Amendment protection. Plaintiffs (at 37) cite *Conformis* as their lead example, but *Conformis* merely conducted a contextual inquiry to determine that an insurance policy statement was not a scientific opinion. *See* 58 F.4th at 534-35. Along the way, the Court observed that the document was directed to "prospective patients" and "physicians," not scientists. *Id.* But the court also noted that the "purpose of the statement" was to set a "reimbursement" rule, not to pursue a "superior understanding of the world around us," and that a "consensus of scientific … experts" agreed on the efficacy of knee-replacement devices, eliminating the possibility of a scientific debate over an unverifiable proposition. *Id.* Indeed, the Court caveated that a scientific opinion might get protection on different facts. *See id.* (noting that *ONY* has "some force").

Nor does the Fifth Circuit's decision in *Eastman Chemical Co. v. Plastipure, Inc.*, 775 F.3d 230 (5th Cir. 2014) (cited at Pls.' Br. 38), establish that speech to consumers cannot be protected. True, in holding that a sales brochure advertising a plastic resin was not a scientific opinion, the court emphasized that the brochure was directed to "consumers." *Id.* at 233, 236.

17

But the court also noted that the brochure misrepresented the scientific sources on which it purported to rely by "transform[ing] snippets" of an article that "never mention[ed]" the plaintiff's product into claims that the product was "harmful." *Id.* at 237. Notably, *Eastman* "discussed … favorably" the Second Circuit's decision in *ONY*—paving the way for the Fifth Circuit later to hold that scientific opinions are protected. *Torrey*, 86 F.4th at 704-05.

Plaintiffs' other citations (at 36-37) to cases involving pure advertising likewise do not help their cause. *See Advance DX, Inc. v. YourBio Health, Inc.*, 753 F. Supp. 3d 53, 64 (D. Mass. 2024); *Mimedx Grp., Inc. v. Osiris Therapeutics, Inc.*, 2017 WL 3129799, at *6-7 (S.D.N.Y. July 21, 2017). Statements made "in connection with" commercial advertisements are less likely to be scientific opinions where a "fair and natural reading" forecloses any suggestion that the author deployed "the scientific method" or sought to contribute to a scientific debate. *See Torrey*, 86 F.4th at 706-07 (citations omitted). But some advertisements do qualify as protected opinions, as where the "advertising statements [are] based on research published in scientific journals." *Biolase, Inc. v. Fotona Proizvodnja Optoelektronskih Naprav D.D.*, 2014 WL 12579802, at *4 (C.D. Cal. June 4, 2014); *accord ONY*, 720 F.3d

18

at 498-99.  *A fortiori*, then, this protection applies to science-backed advocacy like the Aquarium's Report.

### B.    The Aquarium's Statements Are Scientific Conclusions

In denying the Aquarium's motion to dismiss, the district court approached the scientific-opinion rule in reverse by highlighting the "objective and scientific" nature of the Aquarium's statements as a reason why they *should* be actionable.  MBAF Br. 51 (quoting Add.115).  Plaintiffs flee from the court's observation that the Report is "scientific," instead seeking (at 41-42) to characterize the Report as "[c]onsumer [a]dvocacy" lacking any indicia of a scientific publication.  The Report's content, context, and scientific method belie Plaintiffs' assertion. *See Torrey*, 86 F.4th at 706-07.

1.  The four challenged statements in the Report manifestly express scientific opinions.  MBAF Br. 48 (discussing statements (c), (d), (e), and (i)).  Plaintiffs do not dispute that Aquarium "scientists" drafted the Report "in collaboration with scientific, government, industry, and conservation experts."  JA54.   And despite Plaintiffs' emphasis (at 44-45) on peer-review as an "important factor," Plaintiffs ignore that the Aquarium's work *was* subject to "[p]eer-revie[w]" by "nine scientists from federal management agencies"

(among others), as the district court noted.    Add.23; JA114 (thanking "reviewers").[4]

Contrary to Plaintiffs' suggestion (at 41-43), the Report also deployed the "scientific method" by offering a "theoretic explanation of natural phenomena." *See LLT Mgmt. LLC v. Emory*, 766 F. Supp. 3d 576, 601 (E.D. Va. 2025).  As Plaintiffs (at 59) admit, the Report relied on scientific studies providing observational data about right-whale entanglements.  The Report then theorized:  Given the lack of "specific information available regarding which fisheries are responsible for unattributed entanglements," "all relevant fisheries … pose risks."  JA92.  And the Aquarium specifically acknowledged that it would revisit its conclusion if new evidence came to light.  JA54, 92.  That is an obvious scientific contribution.  *See Torrey*, 86 F.4th at 705 ("guidelines" based on meta-analysis of others' research); *Pacira*, 63 F.4th at 243 ("editorial based on … meta-analysis and narrative review").

---

[4] Notably, scientists cite and respond to Seafood Watch reports.  *See, e.g.*, Pablo Presa et al., *Genetic Divergence and Connectivity Among Gene Pools of* Polyprion Americanus, 13 Animals 302, at 2 (2023); John Ordinario & Jonathan Anticamara, *The Status, Trends, and Limitations of Philippine Mollusk Production and Trade Based on Available Databases and Publications*, 8:3 J. of Tropical Biodiversity & Biotech. 1, 2, 11-13 (2023).

Plaintiffs (at 41, 45-46) miss the mark when they accuse the Aquarium of "misrepresent[ing] the data and conceal[ing] contradictory facts." The Aquarium provided an "accurate description of the data taken into account," *ONY*, 720 F.3d at 498, by disclosing a ten-page list of studies on which the Aquarium relied and explaining gaps in the available data. MBAF Br. 48; JA92, 115-24. Plaintiffs do not suggest that any of the underlying studies were fraudulent or even that the Aquarium misstated those studies' findings.

Plaintiffs (at 45-46) instead accuse the Aquarium of failing to cite *other* "[r]eports [that] attributed most right whale deaths to Canadian fishing, ship strikes, and climate change." But the Report accounted for those other causes. JA90-92, 107-08. Regardless, even if *most* right whale deaths trace to causes other than American lobster fishing, that does not prove *all* do. Neither Plaintiffs nor their favored reports can say that lobster ropes in the Northwest Atlantic have not killed right whales. At most, Plaintiffs' reports offer contrary scientific *conclusions* about how to attribute responsibility for right-whale deaths, not hard data disproving the Aquarium's view. *See* JA30. Requiring the Aquarium to cite every study to benefit from First Amendment protection would undermine its ability to craft its message and choose what not to say. MBAF Br. 52-53; Brady Amicus Br. 30.

21

That the Report's conclusions would be impossible to verify in the judicial process provides further evidence that the Aquarium's statements are protected opinions. MBAF Br. 49 (citing *Pacira*, 63 F.4th at 248). Plaintiffs do not dispute that if this case proceeds, a judge or jury would have to pick winners and losers in a decades-long, unresolved debate over the risk lobster fishing poses the right whale. *Cf. Conformis*, 58 F.4th at 535.

Plaintiffs (at 43) counter that courts resolve "'scientific' and 'technical' issues" when deciding *Daubert* motions. But under *Daubert*, courts evaluate only the *reliability* of experts' "principles and methodology," not the merits of their "conclusions." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594-95 (1993). Conversely, when a court is called upon to *verify* a statement in a defamation suit, the court must decide whether the statement is true or false. *See Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 127 (1st Cir. 1997). To avoid judgments on the truth of opinions, courts in defamation suits have long asked, as a threshold question, whether a statement is verifiable before probing its alleged falsity. *Id.* That same threshold question applies in cases where scientific opinions are at issue. *ONY*, 720 F.3d at 497. Of course, once a court decides that a statement is an actionable assertion of fact, expert testimony can help the factfinder resolve the truth of technical issues like the

22

"effects of competing painkillers" or the "viscosity breakdown of motor oils." Pls.' Br. 43. But courts may undertake that inquiry only *after* determining that the challenged "statements can be proven true or false." *Pacira*, 63 F.4th at 248 n.17.

2. The Aquarium's media statements restating the Report's findings and describing its methodology are also protected scientific opinions. MBAF Br. 50 (discussing statements (a), (f), (g), (h)). Plaintiffs (at 44 n.9) accept that courts have found that statements to the media addressing "contested and contestable scientific hypotheses" count as opinions. *See Malone*, 2023 WL 6447311, at *4. Plaintiffs (at 44) offer no reason to treat these media statements any differently.

The final at-issue media statement is nonactionable hyperbole because no reasonable person would understand it as an assertion of fact. *See* MBAF Br. 50-51 (discussing statement (b): "no one wants to know their appetite for seafood is driving a species to extinction"); *Cheng v. Neumann*, 51 F.4th 438, 444 (1st Cir. 2022)). Plaintiffs (at 48) retort that this statement is not hyperbole because, in context, a reader might understand it to mean that "the Maine lobster-fishing industry is killing right whales." Even assuming that reading is remotely tenable (it is not), the Aquarium's statement would be a

23

protected scientific opinion on the disputed cause of harm to an endangered species—just like its other statements.

## III.    Maine's Anti-SLAPP Statute Bars Plaintiffs' Claim

The applicable version of Maine's Anti-SLAPP law, 14 M.R.S. § 556 (2023), commands dismissal because the Aquarium's statements are "petitioning activity" with ample "factual support."  MBAF Br. 56-67.

### A.    The Aquarium's Statements Are Petitioning Activity

Petitioning activity includes statements "reasonably likely to enlist public participation in an effort to effect such consideration." § 556.  That text, Plaintiffs (at 53) admit, encompasses "consumer boycotts" that "ai[m] to pressure the government into action."  *See* MBAF Br. 61 (collecting cases). The Aquarium's statements fit that description.  By encouraging consumers to "avoid" American lobster, the Aquarium aimed to prompt further government consideration of right-whale conservation.  MBAF Br. 61-62.

Plaintiffs (at 54) attempt to minimize the evidence illustrating the Aquarium's objective, arguing that the Aquarium "lobbied the government in the past" and that Maine government officials merely "denounced" the Aquarium.  That is wrong.  The Aquarium repeatedly conferred with Maine government officials *in connection with the Report*.  MBAF Br. 59.  Likewise, spurring legislative action is not tangential to the Aquarium's "mission"; it is

24

a core goal of the Seafood Watch ratings—including the "red" rating for American lobster. MBAF Br. 59-60; *see also Seafood Watch 'Red Lists' U.S. American Lobster*, Oceana (Sept. 6, 2022), https://perma.cc/6F4P-TAEG (citing the Report and calling for "federal government" intervention).

That Maine government officials reacted to the Report (albeit negatively), JA297, confirms that the Aquarium successfully "expand[ed] the public consideration of a controversial issue," MBAF Br. 60 (citing *Schelling v. Lindell*, 942 A.2d 1226, 1231 (Me. 2008)). Even if a government response to private action does not always suffice to show "petitioning," as Plaintiffs (at 54) observe, it is *some* evidence that a Report targeted at attracting government attention in fact had that result.

Plaintiffs (at 51-52) counter that the Aquarium's press statements cannot be petitioning because they "say nothing about government action." But section 556 reaches speech addressing the "public," as well as "statements … [to] the press." *See Maietta Const., Inc. v. Wainwright*, 847 A.2d 1169, 1172 (Me. 2004). The Aquarium's press statements, which encouraged the public to "pay attention" to "an important issue," thus fall within the statute's terms. JA30 n.29.

25

Plaintiffs' citation (at 50-51) to *Hearts with Haiti, Inc. v. Kendrick*, 202 A.3d 1189, 1194 (Me. 2019), proves the Aquarium's point. There, the court held that statements to a charity's "benefactors" were not petitioning, which typically involves a concrete "call to action" and "speaking out publicly." *Id.* (citation omitted). The Aquarium, by contrast, published just such a public call to action.

## B.    The Aquarium's Statements Had Considerable Factual Basis

Plaintiffs (at 54-60) contend that the Aquarium lacked "any reasonable factual support" for its conclusion that lobster fishing in the Northwest Atlantic puts right whales at risk. But Plaintiffs have no proof to back up that assertion, instead offering a different interpretation of the available data. That critique is insufficient to show, as Plaintiffs must, that *no* evidence supports the Aquarium's conclusions. *Nader v. Me. Democratic Party*, 41 A.3d 551, 562 (Me. 2012).

1. Plaintiffs (at 55-56) first contend that the Aquarium's assessment of the risk is "belie[d]" by the fact that Maine's fishery has "been linked" to only "one fatality in the last 22 years" and by evidence that "21 out of the 30 right whale deaths since 2017 were attributed to Canada."

But Plaintiffs (at 56) begrudgingly admit that Maine lobster ropes indisputably cause at least some right whale deaths. MBAF Br. 64 (discussing right whale #5120). And even if Maine's contribution to the risk is less than Canada's, as Plaintiffs (at 56) assert, that would not disprove the Aquarium's view that each fishery's contribution is unacceptable because "the mortality of even one North Atlantic right whale will likely impede the survival and recovery of the species." *See* JA101. Plaintiffs do not (and could not) dispute that right-whale deaths have exceeded the sustainable rate "every year since 2010, except 2013." JA100. The evidence thus demonstrates that even marginal risk to whales poses an existential threat. Nor did the Aquarium ignore Canada's role; the Aquarium also assigned a red rating to Canada's lobster fishery. *See* Report on American Lobster in Canada: Northwest Atlantic Pots, MBAF Seafood Watch (Sept. 6, 2022), https://perma.cc/TV6W-YMLF; CLF Amicus Br. 16.

Plaintiffs fail to mention that the federal government takes a similar view of the risks. NMFS recently rejected Plaintiff Maine Lobstermen Association's argument that an absence of "observed evidence of entanglements in Maine gear" warranted excluding Maine fisheries from "new restrictions." MBAF Br. 9 (quoting Record of Decision for the Final

Environmental Impact Statement on Amendment to the Atlantic Large Whale Take Reduction Plan, NMFS 17-18 (2021)).

At bottom, Plaintiffs concede that the Aquarium's citations provide at least some factual basis for its risk assessment. Plaintiffs (at 58-59) accept that one study establishes that right whales have died from entanglement in "waters between Massachusetts and Maine" and that another study documents "serious injuries and mortalities" "first seen" in U.S. waters. Even if right-whale movements between jurisdictions mean that it is impossible to know whether those fatal entanglements happened in Maine or elsewhere, observed deaths in the relevant region still provide *some* factual basis for the Aquarium's conclusion.

2. Pointing to evidence that "regional entanglements" in Maine have dropped since 2010, Plaintiffs (at 57) also contend that the Aquarium lacked any basis to claim that management measures have "not been successful at reducing serious injury and mortality." But Plaintiffs do not quote the entire passage of the Report. The Report stated that the Aquarium deemed management measures unsuccessful *because* they had not reduced right-whale mortality to a sustainable level (below "the potential biological removal [rate]"). JA56. In other words, whether or not entanglements had decreased,

28

right whale mortality was still unacceptably high—a point that Plaintiffs do not dispute. *See supra* pp. 27.

A right-whale death from entanglement in a Maine lobster rope after the most recent Take Reduction Plan went into effect proves the Aquarium's point. Add.97-98; *see* JA1616-24. To be sure, as Plaintiffs (at 58) observe, because "supply chain issues" delayed implementation of the Plan amendments, that entanglement may have involved an old-style rope. But management measures are plainly ineffective if supply-chain problems prevent them from taking effect.

## IV.    The Court Should Reach the Merits

Finally, Plaintiffs' three last-ditch arguments for why the Court should avoid the merits of this appeal fail to persuade.

1. Plaintiffs (at 61) ask this Court to take the extraordinary step of overturning the motions panel's decision to permit an interlocutory appeal under 28 U.S.C. § 1292(b). But as the Aquarium explained in its petition for interlocutory appeal, this case satisfies section 1292(b) because it presents two controlling questions of law: whether the group-defamation rule applies and whether the Aquarium's statements are protected scientific opinions.

The merits briefing highlights the propriety of an interlocutory appeal. All sides agree that the district court applied the wrong test in analyzing the group-defamation rule. *See supra* pp. 3-4. Repudiating that erroneous approach and holding that Plaintiffs' allegations are insufficient would end this case; dismissing the appeal would waste tremendous resources.

2. Plaintiffs (at 62-64) next ask this Court to revisit Circuit precedent holding that (1) this Court has jurisdiction over interlocutory appeals of Anti-SLAPP orders under section 556, *Franchini v. Investor's Business Daily, Inc.*, 981 F.3d 1 (1st Cir. 2020), and (2) state Anti-SLAPP statutes apply in diversity cases in federal court, *Godin v. Schencks*, 629 F.3d 79 (1st Cir. 2010). Plaintiffs' primary argument (at 62-63) is that these decisions "should be overruled en banc," but they also offer two unconvincing theories for why this panel need not follow *Franchini*.[5]

*First*, Plaintiffs (at 62) claim that this case falls within an exception to the rule that "newly constituted panels are … bound by prior panel decisions." *United States v. Rodriguez*, 527 F.3d 221, 224 (1st Cir. 2008). In Plaintiffs' view, the *Franchini* panel would "change its collective mind" if it revisited the

---

[5] Plaintiffs offer no argument for why this panel need not follow *Godin*.

issue today given a recent Ninth Circuit en banc decision repudiating prior circuit precedent that had deemed Anti-SLAPP orders immediately appealable. *See Gopher Media LLC v. Melone*, 154 F.4th 696 (9th Cir. 2025) (en banc). But *Franchini* itself explains why the Ninth Circuit's about-face would have made no difference: The opinion noted a circuit split and found "more persuasive" the "authority from other circuits," including the Second, Fifth, and Tenth Circuits, permitting "interlocutory appeals." 981 F.3d at 8 n.6.

*Second*, Plaintiffs suggest (at 63) that *Franchini* permits interlocutory appeals only where an Anti-SLAPP order rests on the "petitioning" element, not, as here, on an alleged lack of factual basis. *Franchini* made no such distinction. Instead, the Court observed that Anti-SLAPP orders satisfy the collateral-order doctrine because they are "conclusive," do not "consider [the] essential elements of defamation," "implicat[e] important … First Amendment protections," and are "effectively unreviewable on appeal." 981 F.3d at 7. Those factors apply equally no matter which Anti-SLAPP prong the order rests upon.

Plaintiffs (at 64) retort that an Anti-SLAPP order's consideration of factual basis may "overla[p]" with defamation's "falsity" element. But that is

31

beside the point. As the Fifth Circuit explained in a case cited favorably by *Franchini*, 981 F.3d at 8 n.6, even where an Anti-SLAPP order considers the "prima facie case for each element of [a defamation] claim," interlocutory appeal is still appropriate because the order "resolves a question separate from the merits." *NCDR, L.L.C. v. Mauze & Bagby, P.L.L.C.*, 745 F.3d 742, 749 (5th Cir. 2014) (quotations omitted). The same is true here.

3. Finally, Plaintiffs (at 64-66) renew their argument for certifying group-defamation and scientific-opinion questions to the Maine Supreme Judicial Court. Plaintiffs' contentions (at 64-65) amount to the general notion that state courts should decide "important" questions regarding "state cause[s] of action." That is not enough. *See Mundell v. Acadia Hosp. Corp.*, 92 F.4th 1, 6 (1st Cir. 2024).

Here, every possible indicator points against certification. For one, the state-law issues in this case are inextricably intertwined with federal First Amendment questions. *See supra* pp. 8, 14, 16. For another, at least as to group defamation, because all sides *agree* that Maine would apply the Restatement approach there is no "unsettled" question of state law that this Court cannot resolve by making a "clear prediction" about what Maine's courts might do. *See Clarke v. Ky. Fried Chicken, Inc.*, 57 F.3d 21, 24 n.5 (1st Cir.

1995) (quotation omitted). And Plaintiffs themselves selected a federal forum and then raised certification for the first time on appeal, weighing against certification. *See id.*

## CONCLUSION

The Court should reverse with instructions to dismiss the complaint.

Respectfully submitted,

RUSSELL B. PIERCE, JR.
NORMAN, HANSON & DETROY, LLC
   *220 Middle Street, P.O. Box 4600*
   *Portland, ME 04112*
   *(207) 774-7000*
   *rpierce@nhdlaw.com*

/s/ Lisa Blatt
LISA S. BLATT
   *Counsel of Record*
JOSEPH M. TERRY
AMY MASON SAHARIA
NICHOLAS G. GAMSE
CLAIRE R. CAHILL
EDWARD L. PICKUP
HAROLD W. HILD
WILLIAMS & CONNOLLY LLP
   *680 Maine Avenue SW*
   *Washington, DC 20024*
   *(202) 434-5000*
   *lblatt@wc.com*

*Counsel for Defendant-Appellant Monterey Bay Aquarium Foundation*

MAY 11, 2026

33

# COMBINED CERTIFICATIONS

1. **Bar Membership**:  I certify that I am a member of this Court's Bar.

2. **Word Count, Typeface, and Type Style:**  I certify that this brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 32(a)(7)(B) and 32(f) because the brief was produced using Microsoft Word and it contains 6,489 words, excluding those portions excluded by Rule 32(f).  I further certify that this brief complies with the typeface requirements of Rule 32(a)(5) and type style requirements of Rule 32(a)(6) because it has been prepared in the proportionally spaced typeface, Century Expanded BT, size 14.

3. **Service.**  I certify that on this date I am causing this brief to be filed electronically via the Court's CM/ECF system.  All participants in both consolidated cases are registered CM/ECF users and service will be accomplished using the CM/ECF system.

4. **Paper copies.**  I certify that the text of the electronic brief filed via ECF is identical to the text of the paper copies that will be delivered to the Court.

5. **Virus check.**  I certify that I have caused a virus check to be performed using the latest version of Symantec Endpoint Protection, Version 14.

 /s/ *Lisa Blatt*
*Counsel for Defendant-Appellant*

MAY 11, 2026